UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 18-80153-CR-WPD


UNITED STATES OF AMERICA,       .
                             .

          Plaintiff,     . Fort Lauderdale, Florida
                     . January 7, 2019
          v.           . 8:59 a.m.
                             .

BALMY LINCOLN JOSEPH,        .
                             .

          Defendant.     .
. . . . . . . . . . . . . . .


- - - - -

Transcript of Trial Proceedings had

before the Honorable William P. Dimitrouleas,

United States District Judge, and a Jury.


- - - - -

VOLUME 1

- - - - -


Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

**APPEARANCES:**

```
For the Government:    Rinku T. Tribuiani
                       John J. Parnofiello
                       Assistant U.S. Attorneys
                       500 S. Australian Avenue
                       Suite 400
                       West Palm Beach, Florida  33401


For the Defendant:     Michael B. Cohen, Esq.
                       Law Offices of Michael B. Cohen
                       6400 N. Andrews Avenue
                       Suite 505
                       Fort Lauderdale, FL  33309


Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       299 E. Broward Blvd., Room 205F
                       Fort Lauderdale, Florida  33301
                       (954)769-5657

                            -  -  -  -  -
```

```
1              MONDAY, JANUARY 7, 2019, 8:59 A.M.

2              (The Judge entered the courtroom)

3              THE COURT:  Please be seated.

4              We'll need to move the three people on this side of

5   the courtroom over to the other side, because the jurors will

6   be sitting there.

7              MS. TRIBUIANI:  Yes, your Honor.

8              THE COURT:  I left my chart in the office.  I'll be

9   right back.

10             COURTROOM SECURITY OFFICER:  All rise.

11             (The Judge exited the courtroom)

12             (The Judge entered the courtroom)

13             (Mr. Cohen entered the courtroom at 9:03 a.m.)

14             MR. COHEN:  Good morning, your Honor.

15             THE COURT:  Good morning.

16             MR. COHEN:  Good morning.

17             MS. TRIBUIANI:  Good morning.

18             MR. COHEN:  Good morning.

19             Judge, can I just use the restroom for a moment?

20  Traffic was a little heavy.

21             THE COURT:  Okay.

22             MR. COHEN:  Thank you very much, your Honor.

23             Hey, Balmy.  How are you?

24             Thank you, Judge.  Be right back.

25             (Mr. Cohen exited the courtroom)
```

```
 1              (Pause)

 2              (Mr. Cohen entered the courtroom)

 3              MR. COHEN:  Thank you, your Honor.

 4              THE COURT:  All right.  United States vs. Balmy

 5    Lincoln Joseph.

 6              If counsel would announce their appearances for the

 7    record.

 8              MS. TRIBUIANI:  Rinku Tribuiani and John Parnofiello

 9    on behalf of the United States.  Good morning, your Honor.

10              MR. PARNOFIELLO:  Good morning, your Honor.

11              MR. COHEN:  Your Honor, good morning.  Present for

12    trial, Michael B. Cohen on behalf of Balmy Joseph.

13              THE COURT:  And Mr. Joseph's present?

14              MR. COHEN:  He is.

15              THE COURT:  Both sides ready for trial?

16              MS. TRIBUIANI:  Yes, your Honor.

17              MR. COHEN:  Yes, your Honor.

18              THE COURT:  And I think we agreed that we were going

19    to do the challenges outside the presence of the jury so that

20    Mr. Joseph could hear, correct?

21              MR. COHEN:  Correct.

22              THE COURT:  And who's going to do the voir dire for

23    the government?

24              MS. TRIBUIANI:  I am, your Honor.

25              THE COURT:  Anything further before we bring the jury
```

1   in?

2          MS. TRIBUIANI:  No, your Honor.

3          MR. COHEN:  I don't think so, Judge.

4          THE COURT:  Okay.  Karen, if we have all the jurors,

5   let's go bring them in.

6          Is Mr. Joseph in leg irons?

7          MR. COHEN:  He is, Judge.

8          THE COURT:  So, maybe -- in an abundance of caution,

9   why don't you all sit on this side over here so the jury can't

10  possibly see the leg irons.

11         MR. COHEN:  Yes, sir.

12         THE COURT:  And then after we pick a jury, you can

13  move over to the other side, because there won't be any jurors

14  that would be behind him that could see the leg irons at that

15  point.

16         MR. COHEN:  Will do, Judge.

17         THE COURT:  And for the record, Mr. Joseph is dressed

18  in a suit and tie.  He's not in prisoner garb.

19         *(Pause)*

20         MR. COHEN:  So, you're gonna have eight jurors across

21  the front, Judge?

22         THE COURT:  Eight, seven, seven, eight, eight, eight,

23  and three.

24         MR. COHEN:  Thank you.

25         *(Discussion had off the record between counsel and*

1  *client)*

2          *(Pause)*

3          MR. COHEN:  And I assume, Judge, it matches the names

4  from one through et cetera on the list, correct?

5          THE COURT:  Right.  One will be closest to me in the

6  front row.

7          MR. COHEN:  So, Joanie Barnes will be Number 1, is

8  that correct?

9          THE COURT:  Correct.

10          MR. COHEN:  Thank you, Judge.

11          *(Discussion had off the record between counsel and*

12  *client)*

13          *(Pause)*

14          THE COURT:  I've got a 1:15 sentencing today, so we'll

15  be coming back after lunch at 1:30.

16          MR. COHEN:  Um-hum.

17          THE COURT:  Tomorrow I have a nine o'clock calendar

18  call that they filed a motion for a continuance on, so my guess

19  is that will only take like five minutes.  So, we'll start

20  tomorrow at about 9:05.

21          MR. COHEN:  Very good, Judge.

22          MS. TRIBUIANI:  And, Judge, how late in the day will

23  we be going?

24          THE COURT:  Five o'clock.

25          MS. TRIBUIANI:  Okay.

```
 1              (Pause)

 2              THE COURT:  And we're operating under a second

 3   superseding indictment, is that correct?

 4              MS. TRIBUIANI:  That's correct.

 5              MR. COHEN:  That's right, Judge.

 6              (Pause)

 7              THE COURT:  Is there a forfeiture count in the

 8   indictment?

 9              MS. TRIBUIANI:  No, your Honor.

10              THE COURT:  So, there was one in the superseding

11   indictment, but you dropped it out of the second superseding

12   one?

13              MS. TRIBUIANI:  The forfeiture related to Delson Marc.

14              THE COURT:  Okay.

15              (Discussion had off the record between counsel and

16   client)

17              (Pause)

18              (Discussion had off the record between the Court and

19   counsel)

20              (Pause)

21              THE COURT:  While we're waiting for the jury, I noted

22   that Mr. Cohen filed some proposed jury instructions that

23   contemplate the possibility of lesser included offenses.  When

24   we get near the end of the case, I am gonna be asking each side

25   what their position is regarding lesser included offenses.  And
```

1  then I'll ask Mr. Joseph whether he agrees with the strategy of

2  going all or nothing, or whether he agrees with the strategy of

3  asking for some or all the lesser included offenses.  And

4  typically what I do when I have that colloquy with the

5  defendant, I'll mention to him what the maximum and minimum

6  possible punishments are on the four charges and all the

7  possible lesser included offenses.

8            So, I noted last Friday at the calendar call

9  Ms. Tribuiani alluded to the difference that the new criminal

10  law might have on Mr. Joseph's case.  And I just need to make

11  sure that I'm able to tell Mr. Joseph what the correct maximum

12  and minimum possible punishments are for the four charges and

13  for any lesser included offenses so that he can make an

14  intelligent decision --

15            MR. COHEN:  Sure.

16            THE COURT:  -- as to whether he wants to ask for

17  lesser included offenses or not.

18            MR. COHEN:  Sure.

19            MS. TRIBUIANI:  Yes, sir.

20            MR. COHEN:  Well, they'd be significant, Judge, you

21  know, depending on whether there was a possession finding or

22  not, that being a misdemeanor under 844.  So, I think each of

23  those would have a maximum of one year in jail.  And, of

24  course, depending on the Counts 1, 2, 3, and 4, they would be

25  between ten -- Rinku, what would the maximum be for each of

```
1   those?
2           MS. TRIBUIANI:  Well, as charged --
3           MR. COHEN:  I think the two -- the conspiracy and the
4   more than one kilo count for 1 and 2 would be a minimum
5   mandatory of ten.
6           MS. TRIBUIANI:  Ten years up to life in prison.
7           MR. COHEN:  Up to life in prison.
8           MS. TRIBUIANI:  Yes.
9           MR. COHEN:  And the other two counts, Judge, would
10  be....
11          MS. TRIBUIANI:  A maximum of 20 years.
12          MR. COHEN:  Twenty years, without any minimum
13  mandatory.  So, I think those would be the minimum mandatory on
14  each of those, Judge.
15          THE COURT:  Right.  And I think what Ms. Tribuiani
16  said last Friday was the 851 now doesn't apply to Mr. Joseph.
17  So, what may have been said before about enhanced --
18          MR. COHEN:  Correct.
19          THE COURT:  -- penalties doesn't apply since we
20  postponed the trial.
21          MR. COHEN:  That's correct, Judge.  That would be
22  Count 1 and 2.  Normally, there would have been a 20-year min.
23  man. as to 1 and 2.  Now, 1 and 2 become ten-year min. man.
24  So, I think that -- and I owe this all to Rinku, because she's
25  on top of it.  I'm taking our discussions at face value.
```

```
 1              THE COURT:  So, as to Counts 3 and 4, the lesser would
 2   just be mere possession without the intent to --
 3              MR. COHEN:  Distribute.
 4              THE COURT:  -- distribute.  And that would carry a
 5   maximum of one year, is that right?
 6              MS. TRIBUIANI:  I believe it is a misdemeanor, yes,
 7   your Honor.
 8              THE COURT:  All right.
 9              MR. COHEN:  The 844 is a misdemeanor.
10              THE COURT:  And then if you're gonna ask for lessers
11   as to Count 1, then the lessers would be....
12              MR. COHEN:  The same one year, I think, for each of
13   them.
14              THE COURT:  Well, that would be if it goes all the way
15   down to --
16              MR. COHEN:  Possession.
17              THE COURT:  -- possession, but there could be an
18   intermediate lesser.  What's the mandatory minimums on heroin?
19              MS. TRIBUIANI:  They could find him guilty of less
20   than a kilogram but more than a hundred grams, which would
21   carry a five-year minimum mandatory.
22              THE COURT:  And the maximum would be 40 years?
23              MS. TRIBUIANI:  Correct.
24              MR. COHEN:  Right.  So that might have to be added,
25   Judge.  I didn't put that in my jury instructions, because I
```

```
 1  can't anticipate what the jury might want to find.  But that
 2  would be another possibility the Court might want to add.
 3          THE COURT:  All right.  So, when we get near the end
 4  of the case, we'll talk about that with Mr. Joseph and see what
 5  his position is after he's had a chance to discuss this
 6  strategy with Mr. Cohen.
 7          MR. COHEN:  Yeah.  Thank you, Judge, for bringing that
 8  up, your Honor.  I appreciate it.
 9          MS. TRIBUIANI:  Judge, while we're waiting, would you
10  mind if I turn the podium towards the panel?
11          THE COURT:  That's fine.
12          COURTROOM SECURITY OFFICER:  All rise.
13          (The prospective jurors entered the courtroom)
14          THE COURT:  All right.  We have the jury coming in.
15  And we're going to have the first eight jurors in the front
16  row, with Ms. Barnes seated closest to me in the first seat.
17          And if everybody could take the next consecutive seat
18  as you come in.
19          The last person in the front row is Ms. Prats.
20          Just go ahead and have a seat when you come in.
21          In the second row, closest to me is Mr. Bryan.
22          And be careful when you go into the second row.
23  Sometimes people trip going into that second row.
24          The last person in the second row is -- is it
25  Mr. Smith?  I think.
```

```
 1              And in the third row, closest to me is Mr. Peiretti?
 2              And it was Ms. Smith, I'm sorry.
 3              The last person in the back row is Ms. Crush.
 4              And, again, be careful when you go into that back row.
 5              Against the wall is Mr. Ertug Ozan.  Ertug Ozan.  Oh,
 6    I'm sorry, it's Ms. Ertug Ozan.
 7              Okay.  We need to back everybody up, and
 8    Ms. Ertug Ozan is against the wall in the front row out there.
 9              Ms. Davila will be next to her.
10              Ms. Dixon will be next to her.
11              Mr. Guistiani will be next.
12              Then Ms. Gordon.
13              Mr. Alvarez.
14              Mr. Garbharran.
15              And the last person in that front row is Ms. Shanley.
16              In the second row, against the wall we've got
17    Mr. Caulfield.
18              And if everyone could go in and take the next
19    consecutive seat in the second row.
20              The last person in the second row is Ms. Johnson.
21              In the third row, against the wall, we've got -- I
22    think it's Mr. Alubi?  Or it might be Ms. Alubi.
23              And the last person in the third row is Ms. Bronson.
24              If everyone could just take the next consecutive seat.
25              The last person in the third row is Ms. Bronson.
```

1          So, in that third row, we've got Alubi, Hinton,

2     Linares-Prat, Lessner, Peavey, Carmenate, Flynn *(sic)*, and

3     Bronson is the last one.

4          And in the next row, against the wall we've got Ms. --

5     is it Prabu?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  You're against the wall over there.

8          And then we should have two more jurors, and that's

9     about the last of the jurors.

10         All right.  That wasn't too bad.

11         Karen, can we swear in the panel.

12         ROOM CLERK:  Yes, sir.

13         Please stand.  Please raise your right hand.

14         Do you and each of you solemnly swear or affirm that

15    you will truthfully answer all questions put to you touching

16    upon your qualifications to serve as jurors, so help you God?

17         THE JURY PANEL:  I do.

18         ROOM CLERK:  Thank you.  You may be seated.

19         THE COURT:  Well, good morning, everybody.

20         I'll Bill Dimitrouleas.  Welcome to the United States

21    District Court for the Southern District of Florida.  We're

22    here today to try a criminal case.  And based on the little

23    that I know about the case, I think we should be able to finish

24    it this week.  If not this week, then certainly like Monday of

25    next week.

```
 1              I think this is everybody's first day of the two-week
 2    jury service, is that correct?
 3              THE JURY PANEL:  Yes.
 4              THE COURT:  All right.
 5              And let me see if everybody here is qualified to be a
 6    juror.
 7              Is everybody here a United States citizen?  If you're
 8    not a United States citizen, please raise your hand.
 9              Don't see any hands.
10              Is everyone here a registered voter?  If you're not a
11    registered voter, please raise your hand.
12              Don't see any hands.
13              Is there anybody here that's been convicted of a
14    felony and not restored to your civil rights?  If so, please
15    raise your hand.
16              Don't see any hands.
17              Is there anybody here that has any pending criminal
18    charges against them?  If so, please raise your hand.
19              Don't see any hands.
20              So, it looks to me like everybody here is qualified to
21    sit as a juror in this case.
22              Let's talk a little bit about scheduling.
23              We're going to select a jury this morning, and
24    hopefully we should be able to get a jury by lunchtime, and
25    then we'll go ahead and recess for lunch.  Those of you that
```

1   are selected -- we'll select 12 jurors and two alternates --

2   will go out to lunch and then come back, and we'll start the

3   trial up about 1:30 this afternoon.  The rest of you can go

4   home, go back to work, and continue to call in the rest of this

5   week and next week in the event that you're needed on another

6   case.

7           And we'll work until around five o'clock.  The only

8   time we ever work past five is if, one, there's a witness on

9   the stand, and they've flown in from out of state, and by going

10  a little bit past five, they're going to be able to finish

11  their testimony and fly back home; or, two, if the jury's

12  deliberating, and all 12 jurors want to continue their

13  deliberations.  Other than that, we pretty much break at

14  five o'clock.

15          And we'll start again tomorrow about nine o'clock.

16  And usually we'll take a break halfway through the morning,

17  halfway through the afternoon, go till around noon, take a

18  break around noontime for lunch, and usually come back about

19  1:15.  Sometimes I may have a hearing at 1:15 or 1:30, so the

20  lunch break may be a little longer or it may be shifted a

21  little bit farther back.  And we'll continue that schedule

22  until we finish the case.

23          So that kind of gives you an idea of what to expect

24  scheduling-wise should you be selected as a juror in this case.

25          Let me take a few moments to introduce to you some of

1   the court personnel that you're going to be working with during

2   the trial.

3          You've met Karen Carlton-DeAngelus, and Ms. Carlton

4   deAngelis is the court clerk.  She's in charge of all the

5   paperwork in the case, kind of operates as the judge's

6   secretary in the courtroom.  If there's any evidence that's

7   introduced into the trial, it's into her care, custody, and

8   control that it goes.

9          Fran Salopek's our court reporter.  Fran is taking

10  down everything that I'm saying right now and will take down

11  everything that is said during the course of this trial in this

12  courtroom, including your answers to the questions during jury

13  selection.  So, if you would, please speak up nice and loudly

14  and clearly so that Fran can hear your answers.

15         And you can see she has those little earmuffs on,

16  those earphones, and she's hearing everything through the

17  microphone.  So, when you do have an opportunity to give some

18  answers, we're going to give you a handheld microphone, and if

19  you would speak into the microphone, and if you would stand up.

20  For some reason, when you're standing, it's easier to pick up

21  your voice through the handheld microphone.

22         We have a court security officer with us here today.

23  Terry Grant's in charge of courtroom security and decorum.  If

24  you have any problems of a personal nature, please address it

25  to his attention, and he'll bring it to my attention, if it's

```
1    appropriate.
2           Representing the United States are assistant United
3    States attorneys Rinku Tribuiani --
4           MS. TRIBUIANI:  Good morning.
5           THE COURT:  -- and John Parnofiello.
6           MR. PARNOFIELLO:  Good morning.
7           THE COURT:  And, Ms. Tribuiani, if you could introduce
8    your case agent.
9           MS. TRIBUIANI:  Yes.
10          Ladies and gentlemen, with me is Palm Beach County
11   Sheriff's Detective Chad Booth.
12          THE AGENT:  Hello.
13          THE COURT:  Defense counsel's Michael Cohen.
14          MR. COHEN:  Good morning, folks.
15          THE COURT:  And, Mr. Cohen, if you could introduce
16   your client.
17          MR. COHEN:  Ladies and gentlemen of the jury, good
18   morning.  This is my client, Balmy Joseph, who it's my pleasure
19   to represent.
20          Thank you, Judge.
21          THE DEFENDANT:  Good morning.
22          THE COURT:  In a moment, I'm going to ask the
23   government to read a list of possible witnesses who might
24   testify in the case.  If you happen to know any of the
25   witnesses, please let us know, because that's something that
```

```
1   the attorneys may want to check into to see if it would affect
2   your ability to be a fair and impartial juror.  But does
3   anybody know the sheriff's deputy, Mr. Joseph, any of the
4   lawyers, or any of the court personnel?  If so, please raise
5   your hand.
6            Don't see any hands.
7            Does anybody know anybody else on the panel?  Does
8   anybody know any of the other prospective jurors?
9            Okay.  I've got a hand there from Ms. Crush.
10           THE PROSPECTIVE JUROR:  Yes, your Honor.
11           COURTROOM SECURITY OFFICER:  Hold on, ma'am.
12           THE COURT:  Hold on.  We'll get you the handhold
13  microphone.  And if you can stand.
14           COURTROOM SECURITY OFFICER:  Stand.
15           THE COURT:  Who do you think you might know?
16           THE PROSPECTIVE JUROR:  Yes, your Honor.  I know
17  Kelly -- I don't know where you are.  There she is, right
18  there.  Sorry.  We recognized each other this morning.  Not
19  well.
20           THE COURT:  Okay.
21           And all the way in the back, I think Ms. Alubi also is
22  raising her hand.
23           THE PROSPECTIVE JUROR:  I'm --
24           COURTROOM SECURITY OFFICER:  Hold on, ma'am.  Hold on.
25           THE COURT:  Just hold on until we get the microphone
```

1    to you, because, remember, Fran is taking down everything

2    that's being said.

3            THE PROSPECTIVE JUROR:  Yeah, I'm familiar with

4    Ms. Giboyeaux, Ms. Lourdes.

5            THE COURT:  One more time?  I didn't understand you.

6            THE PROSPECTIVE JUROR:  Ms. Lourdes.

7            THE COURT:  And where's Ms. Lourdes at?

8            Okay.  Ms. Lourdes has a puzzled look on her face,

9    but....

10           *(Laughter)*

11           THE PROSPECTIVE JUROR:  She used to be my daughter's

12   teacher.

13           THE COURT:  She used to be a teacher?

14           THE PROSPECTIVE JUROR:  My daughter's teacher.

15           THE COURT:  Daughter's teacher.  Okay.  Thank you,

16   Ms. Alubi.

17           All right.  So, a couple people are familiar with

18   other jurors.  But usually what the case is, when we pick a

19   jury out of as many people that are registered voters in

20   Broward County, usually we get people that don't know anybody

21   else involved in the case.

22           Ms. Tribuiani, do you have a list of possible

23   witnesses who might testify?

24           MS. TRIBUIANI:  Yes, your Honor.

25           Jose Conde with the DEA laboratory; Wilbert Desir;

```
 1   Doraida Diaz, also with the DEA laboratory; Detective James
 2   Evans with the Palm Beach County Sheriff's Office; latent
 3   fingerprint examiner Emily Fuentes, also with the Palm Beach
 4   County Sheriff's Office; Deputy Sheriff Kristopher Knight with
 5   the Palm Beach County Sheriff's Office; CSI Wendy Martel with
 6   the Palm Beach County Sheriff's Office; CSI Amy Oetinger with
 7   the Palm Beach County Sheriff's Office; task force Officer Rey
 8   Paniagua with the Drug Enforcement Administration; forensic
 9   scientist Brandy Plean with the Palm Beach County Sheriff's
10   Office; Kristopher Polito; Walter Rodriguez with the DEA
11   laboratory; Stephanie Simmons; Deepa Vanmali with the DEA
12   laboratory; and Steven Williams with the Palm Beach County
13   Sheriff's Office laboratory.
14            THE COURT:  Mr. Cohen, any additional names that may
15   be mentioned?
16            MR. COHEN:  No, sir, not at this time.
17            THE COURT:  Do any of those names ring a bell with
18   anybody?  If so, please raise your hand.
19            Don't see any hands.
20            I mean, if it turns out during the trial that a
21   witness comes in, and you say, "Oh, gee, I do know that
22   person," just raise your hand and let us know, and we'll check
23   it out and see if that would affect your ability to continue to
24   be a fair and impartial juror in the case.  The mere fact that
25   you might know a witness wouldn't disqualify you from serving
```

```
 1   as a juror.  If it did, we couldn't pick juries in small
 2   communities all over the United States.
 3        But, again, when we do pick a jury from as many people
 4   as registered voters in Broward County, it's usual that we're
 5   able to find jurors that don't know anybody else involved in
 6   the case.  And as you may glean from the listing of the
 7   witnesses, this case is a Palm Beach County case.  So, most of
 8   the people are from Palm Beach County.
 9        Now, you may be saying Palm Beach County?  Why are we
10   here?  Well, the Southern District of Florida goes all the way
11   from Key West all the way up to Vero Beach.  So, I've got cases
12   all throughout the Southern District of Florida.  And right now
13   we're down five judges.  We're waiting for the president to
14   nominate and the Senate to confirm five vacancies that we have.
15   So, we're kind of spread a little bit thin right now.
16        So, because we're down five judges, I may have a
17   little more hearings going on during the week than I normally
18   would, and it may be that we have little longer recesses than
19   we normally would.  But I'm optimistic that we should be able
20   to finish this case this week.  If not this week, then
21   certainly by Monday of next week.
22        All right.  What I'm going to do at this point is I'm
23   going to give you some background information about jury trials
24   in general and specifically about picking a jury in a criminal
25   case.  Then I'm gonna ask you to give us some background
```

1   information about yourselves in the form of your answers to a

2   series of questions that I'm going to ask every juror.  And

3   we'll start with Ms. Barnes in a moment.  And I'm gonna, again,

4   ask you to stand and use the handheld microphone when it's your

5   turn to answer the questions.  And we'll just go around the

6   courtroom until everybody's had a chance to give us the

7   background information.

8         After we've gotten that background information, I'm

9   gonna turn it over to the attorneys, give them a brief

10  opportunity to ask some questions.  And when all the

11  questioning is done, the lawyers and I and Mr. Joseph will get

12  together, and we'll select the 12 jurors and the two alternates

13  that will serve on this particular case.

14        Now, this part of the case is known as voir dire

15  examination.  And voir dire examination is for the purpose of

16  determining if your decision in this case would in any way be

17  influenced by opinions which you now hold or by some personal

18  experience or special knowledge which you may have concerning

19  the subject matter to be tried.

20        The object of voir dire examination is to obtain 14

21  persons who will impartially try the issues of this case, based

22  upon the evidence presented in the courtroom, without being

23  influenced by any other factor.

24        Now, please understand that this questioning is not

25  for the purpose of prying into your affairs for personal

1   reasons, but is only for the purpose of obtaining a fair and

2   impartial jury.

3          Now, as I mentioned, when all the questioning is done,

4   the lawyers and I and Mr. Joseph are gonna get together and

5   select the jury.  And the way that works is kind of a process

6   of elimination, because the attorneys have an opportunity to

7   challenge or excuse prospective jurors.  And during that

8   challenging process, each side has a certain number of

9   peremptory challenges.  And by that, I mean that each side can

10  challenge you and ask that you be excused, and they don't even

11  have to give a reason.  But, again, they only have a limited

12  number of those peremptory challenges.

13         Additionally, each side has an unlimited number of

14  challenges for cause.  And by that I mean that each side can

15  challenge you and ask that you be excused, but in that

16  situation, they have to give a reason, and I have to agree with

17  that reason.

18         Now, if you're excused by either side for either

19  reason, please do not feel that your honesty or integrity is

20  being questioned, because it is not.

21         Now, this case is the United States vs. Balmy Lincoln

22  Joseph.  And I'm now going to read to you the pertinent portion

23  of the second superseding indictment which sets forth the

24  charges against the defendant.

25         The indictment is not to be considered as evidence,

1    but is a mere formal charge against the defendant.  You must

2    not consider it as any evidence of the defendant's guilt, and

3    you must not be influenced by the fact that this indictment has

4    been returned against the defendant.

5         The indictment charges that Balmy Lincoln Joseph, as

6    early as June 29th of 2018, continuing to July 18th of 2018, in

7    Palm Beach County, in the Southern District of Florida, did

8    knowingly and willfully combine, conspire, confederate, and

9    agree with persons known and unknown to the grand jury,

10   including Delson Marc, to possess with the intent to distribute

11   a controlled substance.  And it's further alleged that the

12   controlled substance involved in the conspiracy attributable to

13   Balmy Lincoln Joseph as a result of his own conduct and the

14   conduct of other conspirators reasonably foreseeable to him is

15   one kilogram or more of a mixture and substance containing a

16   detectable amount of heroin.

17        So, Count 1 charges conspiracy to possess with the

18   intent to distribute a kilogram or more of heroin.

19        Count 2 charges from as early as June 29th, 2018,

20   continuing to July 18th, 2018, in Palm Beach County, in the

21   Southern District of Florida, that Balmy Lincoln Joseph did

22   knowingly and intentionally possess with the intent to

23   distribute a controlled substance, that is, a kilogram or more

24   of a mixture and substance containing a detectable amount of

25   heroin.

1          So, Count 2 charges possession with the intent to

2     distribute a kilogram or more of heroin.

3          Count 3 charges on or about July 18th of last year, in

4     Palm Beach County, in the Southern District of Florida, that

5     Balmy Lincoln Joseph did knowingly and intentionally possess

6     with the intent to distribute a controlled substance, that is,

7     a detectable amount of fentanyl.

8          So, Count 3 charges possession with the intent to

9     distribute fentanyl.

10         Count 4 charges on the same date, July 18th of last

11    year, in Palm Beach County, in the Southern District of

12    Florida, that Balmy Lincoln Joseph did knowingly and

13    intentionally possess with the intent to distribute a

14    controlled substance, that is, a detectable amount of heroin.

15         So, Count 4 charges possession with the intent to

16    distribute heroin.

17         Now, you've heard the charges made in the second

18    superseding indictment against Mr. Joseph.  Does anybody know

19    anything about the case?  If so, please raise your hand.

20         Don't see any hands.

21         Has anybody read or heard anything about the case in

22    any of the news media?  If so, please raise your hand.

23         Don't see any hands.

24         Does anybody have a state of mind with reference to

25    the charges against Mr. Joseph which would in any way prevent

```
 1   you from acting with impartiality?  If so, please raise your
 2   hand.
 3            Don't see any hands.
 4            Does anybody have any personal problems that would
 5   prevent them from being able to pay attention to this case and
 6   be a fair juror?  By that, I mean, does anybody have any
 7   physical defects -- hearing, sight, or otherwise -- which would
 8   render you incapable of performing your duty as a juror in this
 9   case?  If so, please raise your hand.
10            Don't see any hands.
11            Does anybody have any bias or prejudice either for or
12   against the government or for or against Mr. Joseph?  If so,
13   please raise your hand.
14            Don't see any hands.
15            Now, if you're selected as a juror in this case, will
16   you render a fair and impartial verdict based upon the evidence
17   presented in the courtroom and the laws that pertain to this
18   particular case as instructed by the Court?  If you can't do
19   that, please raise your hand.
20            Don't see any hands.
21            And does anybody have any other reason why you
22   couldn't give this case your undivided attention and render a
23   fair and impartial verdict?  If so, please raise your hand.
24            Don't see any hands.
25            And by that, I mean a sick child at home, prepaid
```

```
 1   tickets when you're going out of town next week, a real estate
 2   closing that's coming up this week.
 3           A PROSPECTIVE JUROR:  I'm going out of town on
 4   Wednesday.
 5           THE COURT:  And that's Mr. Guzman Castillo?  And
 6   you're leaving town this Wednesday?  And when will you be back?
 7           THE PROSPECTIVE JUROR:  I believe Sunday night.
 8           THE COURT:  Thank you, sir.
 9           A PROSPECTIVE JUROR:  I'm a professional musician and
10   usually work at nights, and I'm afraid my attention might --
11   attention span....
12           THE COURT:  All right.  You're Mr. St. Rose?
13           THE PROSPECTIVE JUROR:  Yes.
14           THE COURT:  So, you work at nights.  And did you work
15   last night?
16           THE PROSPECTIVE JUROR:  Yes.
17           THE COURT:  So, how tired are you?
18           THE PROSPECTIVE JUROR:  Sleepy.
19           COURTROOM SECURITY OFFICER:  Use the mic.
20           THE PROSPECTIVE JUROR:  Sleepy.
21           THE COURT:  You're a little sleepy?  Well, hopefully
22   if the lawyers pick you, they'll make it interesting and keep
23   you awake.
24           (Laughter)
25           THE COURT:  Ms. Gutierrez.
```

1          THE PROSPECTIVE JUROR:  Yes.  I'm a nurse

2    practitioner, and --

3          THE COURT:  One more time?

4          THE PROSPECTIVE JUROR:  I'm a nurse practitioner, and

5    I work -- and I'm on call this week, all throughout Friday.

6    So, I do receive calls throughout the night, depending -- on my

7    phone.  And I work from 8:30 till five, but I'm on call

8    throughout the night.

9          THE COURT:  So, you work 8:30 to five during the day?

10         THE PROSPECTIVE JUROR:  And then I'm on call this

11   week, until Friday, throughout the night.  So, I might receive

12   calls depending yes or no.

13         THE COURT:  So, how often do you usually get called at

14   night?

15         THE PROSPECTIVE JUROR:  It's -- it's not a specific.

16   It depends if they're a sick child or not, because I work with

17   kids.  So, it depends if they get sick throughout the night, so

18   they call in.

19         THE COURT:  So, I mean in the past, do you get called

20   every night, every other night, once a week?

21         THE PROSPECTIVE JUROR:  No, I get calls every day at

22   random times.  Like, throughout the weekend, I receive like

23   five to 15 calls, depending.  Like, this weekend, I received

24   like ten calls throughout the day, and at night, like two to

25   three, from Friday to Sunday.  And then --

```
 1            THE COURT:  So, did you get any calls last night?
 2            THE PROSPECTIVE JUROR:  The last one was around nine.
 3   But I do receive at two, four, depending.
 4            THE COURT:  So, I guess my question to you is:  If the
 5   lawyers pick you on the jury, are you gonna be able to be here
 6   and pay attention and be a good juror?
 7            THE PROSPECTIVE JUROR:  Depends if I get awake or not
 8   at night.  That's what I mean.  If I'm gonna be sleepy or not.
 9   That's what I mean.
10            And, also, I have two kids that I have to pick up
11   before care and aftercare.
12            THE COURT:  So, what time do you drop them off in the
13   morning?
14            THE PROSPECTIVE JUROR:  7:30-ish.
15            THE COURT:  All right.  We don't start till nine, so
16   that won't be a problem.  What time do you pick them up at
17   night?
18            THE PROSPECTIVE JUROR:  Five, 5:15, more or less.
19            THE COURT:  Okay.  Thank you, Ms. Gutierrez.
20            THE PROSPECTIVE JUROR:  No problem.  Thank you.
21            THE COURT:  And that's Mr. Stephen?
22            THE PROSPECTIVE JUROR:  Correct.  Correct.
23            I drop my child off.  Her school starts at 9:30.
24            THE COURT:  So, what time do you drop them off?
25            THE PROSPECTIVE JUROR:  I generally leave the house
```

```
 1   around nine o'clock.
 2              THE COURT:  And what time do you pick up your child?
 3              THE PROSPECTIVE JUROR:  Yeah, the afternoon is okay.
 4   It's just the morning.  I drop off.
 5              THE COURT:  Okay.  Thank you, Mr. Stephen.
 6              THE PROSPECTIVE JUROR:  Okay.
 7              THE COURT:  And that's Ms. Smith?
 8              THE PROSPECTIVE JUROR:  Yes.  Uhm, my daughter, she's
 9   an autism child, and the bus come at 7:20 in the morning, and I
10   have to put her on the bus.  My husband leave for work by 4:15
11   or 4:30 to go to work.  And there's nobody else at home.  And I
12   have to pick her up by 2:45 or three o'clock.  Right now she is
13   out there with my husband.  He take the day off to bring me
14   here.  And I don't drive.
15              THE COURT:  Thank you, Ms. Smith.
16              THE PROSPECTIVE JUROR:  I take the bus.
17              THE COURT:  And that's Ms. Ertug Oban (sic)?
18              THE PROSPECTIVE JUROR:  Ozan, yes, sir.
19              I have to pick up my kids ten to two p.m. (sic).
20              THE COURT:  So, you pick up your kids at two o'clock?
21              THE PROSPECTIVE JUROR:  Yes.
22              THE COURT:  Thank you, Ms. Ertug Ozan.
23              THE PROSPECTIVE JUROR:  Thank you.
24              THE COURT:  Ms. Davila.
25              THE PROSPECTIVE JUROR:  Yes.  I have prescheduled time
```

```
 1   off for tomorrow, because my sister flies in from New York
 2   tonight --
 3           MR. COHEN:  Judge -- could you speak up, ma'am?  I'm
 4   sorry.  I'm having trouble hearing you.
 5           THE PROSPECTIVE JUROR:  I had plans to go to Orlando
 6   for tomorrow.  My sister's on vacation, so -- I had
 7   prescheduled time off.
 8           THE COURT:  So, if we picked you on the jury, and we
 9   didn't have trial tomorrow, you'd be okay?
10           THE PROSPECTIVE JUROR:  Yes.
11           THE COURT:  Thank you, Ms. Davila.
12           A PROSPECTIVE JUROR:  Hi.  I have plane tickets on
13   Friday to take my daughter to Atlanta.  She's 13.  I could send
14   her by herself, but I'd prefer not to have her fly at 13 by
15   herself.  So, Friday is my only problem.
16           THE COURT:  And that's Ms. Shanley?
17           THE PROSPECTIVE JUROR:  Yes.
18           THE COURT:  And what time on Friday are you flying to
19   Atlanta?
20           THE PROSPECTIVE JUROR:  I think it's like six o'clock,
21   six a.m.
22           THE COURT:  And then would you be back on Monday --
23           THE PROSPECTIVE JUROR:  Sunday night.
24           THE COURT:  Sunday night.  So, Friday is the only
25   problem for you.  So, if the lawyers picked you on the jury,
```

```
 1    and if we just didn't have trial on Friday, you'd be okay,
 2    Ms. Shanley?
 3              THE PROSPECTIVE JUROR:  Yes, sir.
 4              THE COURT:  Okay.
 5              A PROSPECTIVE JUROR:  I have a dental appointment to
 6    have work done on Thursday morning.
 7              THE COURT:  What time?
 8              THE PROSPECTIVE JUROR:  And I'm not sure if there's
 9    gonna be a follow-up.  They'll let me know on Thursday.
10              THE COURT:  What time on Thursday is your dentist
11    appointment?
12              THE PROSPECTIVE JUROR:  I think it's at 9:40 a.m.
13              THE COURT:  And that's Ms. Garbharran?
14              THE PROSPECTIVE JUROR:  Yes.
15              THE COURT:  Thank you, ma'am.
16              THE PROSPECTIVE JUROR:  Thank you.
17              A PROSPECTIVE JUROR:  Yes.  I work overnight at
18    American down in Miami, so --
19              THE COURT:  A little louder.
20              THE PROSPECTIVE JUROR:  I work for American Airlines
21    at night, overnight, from ten to 6:30, and I'm working every
22    day this week, picked up like four extra shifts.
23              THE COURT:  So, if the lawyers pick you on the jury,
24    are you going to be able to pay attention after working all
25    night?
```

```
 1              THE PROSPECTIVE JUROR:  Honestly, no.  I just came
 2    straight from work this morning.  I'm just really tired.
 3              THE COURT:  Okay.  Thank you, Mr. -- is it
 4    Mr. Johnson?
 5              THE PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  Okay.
 7              A PROSPECTIVE JUROR:  Hi.  I have custody of an
 8    eight-year-old and a ten-year-old.  And there's no one to be
 9    there for them in the evening when they get off the bus.  They
10    get out of school at three o'clock, and they get home about
11    3:10, and someone needs to be there.  I have no one to let them
12    in, and I can't leave them by themselves.
13              THE COURT:  And you're Ms. Bronson.
14              THE PROSPECTIVE JUROR:  Yes.
15              THE COURT:  Thank you, ma'am.
16              A PROSPECTIVE JUROR:  Hello.  I just have a question.
17    English is not my maternal language.  And I just worry if I
18    understand or -- I don't know.  I want to do a good job, so --
19    I'm not sure I gonna be a good juror.
20              THE COURT:  And you're Ms. Moya-Carmenate?
21              THE PROSPECTIVE JUROR:  Yes.
22              THE COURT:  And have you been able to understand me
23    okay?
24              THE PROSPECTIVE JUROR:  Yes.  I just worry about -- I
25    don't know -- some words that I no familiar to (sic), just
```

```
1    that.

2            THE COURT:  Okay.  Well, we'll see how you understand

3    everything so far --

4            THE PROSPECTIVE JUROR:  Yeah.

5            THE COURT:  -- later on, and then maybe we'll come

6    back to you and ask you how comfortable you are.  Okay?

7            THE PROSPECTIVE JUROR:  Okay.

8            THE COURT:  Thank you, ma'am.

9            Anybody else?

10           Okay.  We've got -- is it Ms. Peavey?

11           THE PROSPECTIVE JUROR:  Yes.  I don't really have a

12   reliable way to get here.  I took a cab on the way.  It was

13   $27.  So -- I'm expected to pay $30 going back.  My car, I have

14   the receipt stuff here, that it's getting repaired, but the

15   mechanic says it's over $300.  I only gave him a deposit.

16           THE COURT:  Where do you live in Broward County?

17           THE PROSPECTIVE JUROR:  I live in Plantation.  I have

18   the receipt for Yellow Cab.  It's gonna cost me $57 total

19   today.

20           THE COURT:  There's a bus station two blocks away from

21   the courthouse, just west of the courthouse.  And buses go to

22   Plantation.  I don't know how far the bus stop is from where

23   you live in Plantation.  It may be, if you get picked on the

24   jury, that there's somebody else that's on the jury that lives

25   in Plantation or nearby that might, you know, be able to give
```

```
 1   you a ride.  But I don't think you should be taking a cab to
 2   jury duty.
 3          So, do you think either of those possibilities might
 4   be something that you could do so that you wouldn't have to pay
 5   $50 a day to come do your civic duty?
 6          THE PROSPECTIVE JUROR:  I don't have a problem doing
 7   my civic duty, but I'm just feeling like financially I don't
 8   know where I'm gonna come up with the money to keep coming
 9   back.  And if I miss the bus -- I had to take the cab so early
10   this morning just to get here on time.
11          THE COURT:  I think the buses run pretty early.  I
12   mean, you know --
13          THE PROSPECTIVE JUROR:  I'm just pointing it out, that
14   if I'm inconsistent, it's because I don't have the financial
15   resources to continue to do it.
16          THE COURT:  Okay.  Thank you, Ms. Peavey.
17          THE PROSPECTIVE JUROR:  Thank you.
18          A PROSPECTIVE JUROR:  I work at a surgical center.  I
19   know that work isn't anything, but I am one of the only
20   technical staff members that's able to assist the surgeon.  We
21   have surgery patients tomorrow.  So, I'm really -- uhm,
22   tomorrow is kind of an off-the-table thing.  If I'm out, then
23   we don't have anyone to fill my -- fill my absence.
24          THE COURT:  So, if they picked you on the jury, and if
25   we didn't have the trial tomorrow, you'd be okay?
```

1        THE PROSPECTIVE JUROR:  Yeah.

2        THE COURT:  Okay.  Thank you, Ms. Lester.

3        A PROSPECTIVE JUROR:  Good morning.  I have an

4   eight-year old.  I just need to be -- if -- to pick up by 5:30.

5        THE COURT:  And whereabouts in Broward County do you

6   live?

7        THE PROSPECTIVE JUROR:  In Cooper City.

8        THE COURT:  So, if we broke the trial at 4:45, you

9   think you could still get --

10        THE PROSPECTIVE JUROR:  That's more than enough time.

11   That's okay.

12        THE COURT:  Okay.  Thank you, ma'am.

13        A PROSPECTIVE JUROR:  Good morning.  I have an

14   autistic son that I put on the bus in the morning, and I have

15   to be there when he arrives.  The bus gets there like 4:45.

16        THE COURT:  And whereabouts in Broward County do you

17   live?

18        THE PROSPECTIVE JUROR:  In Weston.

19        THE COURT:  Thank you, Ms. Hinton.

20        Anybody else that has a problem with being able to pay

21   attention and be a fair juror?  If so, please raise your hand.

22        Don't see any hands.

23        I mean in the things scheme of things, this is not a

24   long federal case.  I mean it may take a week to try.  There's

25   some federal trials that take six months to try.  So, if you

```
 1   don't get picked on this case, then you continue to call in the
 2   rest of this week and next week in the event that you're needed
 3   on another case.
 4            All right.  Let's go ahead and see if we can get the
 5   background information.  We're going to start with Ms. Barnes.
 6   And Terry will bring the microphone over to you.
 7            If you can stand up, Ms. Barnes.
 8            Whereabouts in Broward County do you live?
 9            THE PROSPECTIVE JUROR:  Lauderhill.
10            THE COURT:  And how long have you lived in south
11   Florida?
12            THE PROSPECTIVE JUROR:  All my life.
13            THE COURT:  What type of work do you do?
14            THE PROSPECTIVE JUROR:  A nurse.
15            THE COURT:  How about your marital status?
16            THE PROSPECTIVE JUROR:  I'm recently widowed.
17            THE COURT:  And when he was alive, what did your
18   husband do?
19            THE PROSPECTIVE JUROR:  He worked with Broward County
20   schools.
21            THE COURT:  Do you have any children?
22            THE PROSPECTIVE JUROR:  Two.
23            THE COURT:  Old enough to work?
24            THE PROSPECTIVE JUROR:  Yes.
25            THE COURT:  And what do they do?
```

```
 1            THE PROSPECTIVE JUROR:  One is a pharmacist, and one
 2   works in the Internet doing Internet work of -- with vitamins,
 3   like Vitacost.
 4            THE COURT:  Have you ever served on a jury before?
 5            THE PROSPECTIVE JUROR:  Yes.
 6            THE COURT:  In state court or in federal court?
 7            THE PROSPECTIVE JUROR:  State.
 8            THE COURT:  Civil or a criminal case?
 9            THE PROSPECTIVE JUROR:  I believe it was criminal.
10            THE COURT:  Were you the foreperson of the jury?
11            THE PROSPECTIVE JUROR:  No.
12            THE COURT:  Did you reach a verdict?
13            THE PROSPECTIVE JUROR:  Yes.
14            THE COURT:  Do you have any close friends or relatives
15   who are police officers?
16            THE PROSPECTIVE JUROR:  Uhm, not really.
17            THE COURT:  Have you or any member of your family ever
18   been arrested?
19            THE PROSPECTIVE JUROR:  No, not me, not my kids, not
20   my husband.  I may have a nephew who have been --
21            THE COURT:  What happened with your nephew?
22            THE PROSPECTIVE JUROR:  I think he had drugs or
23   something on him once.
24            THE COURT:  Have you or any member of your family ever
25   been the victim of a crime?
```

```
 1              THE PROSPECTIVE JUROR:  No.

 2              THE COURT:  Have you ever witnessed a crime?

 3              THE PROSPECTIVE JUROR:  Just kids fighting, but, no,

 4   not really.

 5              THE COURT:  And do you have any hobbies?

 6              THE PROSPECTIVE JUROR:  Racquetball.

 7              THE COURT:  Thank you, ma'am.

 8              THE PROSPECTIVE JUROR:  Okay.

 9              THE COURT:  And we'll move over to Mr. Dix.

10              Whereabouts in Broward County do you live?

11              THE PROSPECTIVE JUROR:  I live in Margate, Florida.

12              THE COURT:  And how long have you lived in south

13   Florida?

14              THE PROSPECTIVE JUROR:  South Florida?  Thirty years.

15              THE COURT:  What type of work do you do?

16              THE PROSPECTIVE JUROR:  I teach.

17              THE COURT:  How about your marital status?

18              THE PROSPECTIVE JUROR:  Married.

19              THE COURT:  And what does your spouse do?

20              THE PROSPECTIVE JUROR:  She teaches as well.

21              THE COURT:  Any children?

22              THE PROSPECTIVE JUROR:  Yes, two kids.  They're both

23   adults.  They live in Orlando.

24              THE COURT:  One of them named Walter?

25              THE PROSPECTIVE JUROR:  No.  I get that question all
```

1    the time.

2            THE COURT:  Different Dix.  I think his dad was a

3    teacher, too, though.

4            THE PROSPECTIVE JUROR:  Actually, he taught at the

5    school that I transferred to, Dania Elementary.  And his name

6    was Dix, and they thought I was the same guy.  But, anyway,

7    yeah, I get that question -- Walter Dix all -- all the time.

8            THE COURT:  Have you ever served on a jury before?

9            THE PROSPECTIVE JUROR:  Yes.

10           THE COURT:  In state court or in federal court?

11           THE PROSPECTIVE JUROR:  State.

12           THE COURT:  Civil or a criminal case?

13           THE PROSPECTIVE JUROR:  Criminal.

14           THE COURT:  Were you the foreman?

15           THE PROSPECTIVE JUROR:  No.

16           THE COURT:  Did you reach a verdict?

17           THE PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Do you have any close friends or relatives

19   who are policemen?

20           THE PROSPECTIVE JUROR:  No.  But my son works with the

21   Orange County criminal system.

22           THE COURT:  And what does he do with them?

23           THE PROSPECTIVE JUROR:  He processes, uhm -- let's

24   see, uhm... I don't know exactly what it is, but when they get

25   arrested, they see him to get the paperwork started.  And

```
 1    sometimes he may determine whether or not they go into a

 2    program, if they're drug addicted or alcohol addicted.  So, he

 3    works in the system.

 4              THE COURT:  Have you or any member of your family ever

 5    been arrested?

 6              THE PROSPECTIVE JUROR:  No.

 7              THE COURT:  Victim of a crime?

 8              THE PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  Tell me about that.

10              THE PROSPECTIVE JUROR:  When we lived in Pompano

11    Beach, we were burglarized.  When we lived there in Kendall

12    Green in Pompano Beach, the kids, I would say the teenagers

13    would sell drugs on the corner, they vandalized our cars,

14    because we called the cops all the time to try to clean up the

15    neighborhood.  Eventually, we left the neighborhood, you know,

16    to keep from getting into any more trouble.

17              THE COURT:  Other than that, have you witnessed any

18    crimes?

19              THE PROSPECTIVE JUROR:  No.

20              THE COURT:  And do you have any hobbies?

21              THE PROSPECTIVE JUROR:  I like to fish.

22              THE COURT:  Thank you, sir.

23              We'll move over to Ms. Gutierrez.

24              Whereabouts in Broward County do you live?

25              THE PROSPECTIVE JUROR:  Pembroke Pines.
```

```
1              THE COURT:  And how long have you lived in south
2    Florida?
3              THE PROSPECTIVE JUROR:  About eight years.
4              THE COURT:  Where you from originally?
5              THE PROSPECTIVE JUROR:  Dominican Republic.
6              THE COURT:  And we know that you're a nurse
7    practitioner?
8              THE PROSPECTIVE JUROR:  Yes, correct.
9              THE COURT:  How about your marital status?
10             THE PROSPECTIVE JUROR:  Married.
11             THE COURT:  What does your spouse do?
12             THE PROSPECTIVE JUROR:  He's a QA analysis (sic).
13   That's like computer science.
14             THE COURT:  And how many children do you have?
15             THE PROSPECTIVE JUROR:  Two.
16             THE COURT:  Old enough to work?
17             THE PROSPECTIVE JUROR:  No.
18             THE COURT:  Ever serve on a jury?
19             THE PROSPECTIVE JUROR:  No.
20             THE COURT:  Close friends or relatives who are
21   policemen?
22             THE PROSPECTIVE JUROR:  Yes, sir.
23             THE COURT:  Friends, relatives, or both?
24             THE PROSPECTIVE JUROR:  Friends.
25             THE COURT:  Anybody been arrested?
```

43

```
1              THE PROSPECTIVE JUROR:  No.

2              THE COURT:  Victim of a crime?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  Witness to a crime?

5              THE PROSPECTIVE JUROR:  No.

6              THE COURT:  Any hobbies?

7              THE PROSPECTIVE JUROR:  Reading.

8              THE COURT:  Thank you, ma'am.

9              THE PROSPECTIVE JUROR:  Thank you.

10             THE COURT:  We'll move over to Mr. Stephen.

11        Whereabouts in Broward County do you live?

12             THE PROSPECTIVE JUROR:  Sunrise.

13             THE COURT:  And how long have you lived in south

14   Florida?

15             THE PROSPECTIVE JUROR:  Good question.  Twenty-two

16   years?

17             THE COURT:  What type of work do you do?

18             THE PROSPECTIVE JUROR:  I'm a project manager.

19             THE COURT:  How about your marital status?

20             THE PROSPECTIVE JUROR:  Married.

21             THE COURT:  What does your spouse do?

22             THE PROSPECTIVE JUROR:  She's a family therapist,

23   school board.

24             THE COURT:  Any children?

25             THE PROSPECTIVE JUROR:  Yes.
```

44

```
1              THE COURT:  How many?
2              THE PROSPECTIVE JUROR:  Two.
3              THE COURT:  Old enough to work?
4              THE PROSPECTIVE JUROR:  No.
5              THE COURT:  Ever serve on a jury?
6              THE PROSPECTIVE JUROR:  No.
7              THE COURT:  Close friends or relatives who are
8    policemen?
9              THE PROSPECTIVE JUROR:  No.
10             THE COURT:  Anybody been arrested?
11             THE PROSPECTIVE JUROR:  No.
12             THE COURT:  Victim of a crime?
13             THE PROSPECTIVE JUROR:  My sister was burglarized a
14   couple years back.
15             THE COURT:  Ever witnessed a crime?
16             THE PROSPECTIVE JUROR:  No.
17             THE COURT:  Any hobbies?
18             THE PROSPECTIVE JUROR:  My child.
19             THE COURT:  Thank you, sir.
20             We'll move over to Mr. Stein.
21             Whereabouts in Broward County do you live?
22             THE PROSPECTIVE JUROR:  Coconut Creek.
23             THE COURT:  And how long have you lived in south
24   Florida?
25             THE PROSPECTIVE JUROR:  Four years.
```

```
 1            THE COURT:  Four?
 2            THE PROSPECTIVE JUROR:  Four, yes.
 3            THE COURT:  Where you from originally?
 4            THE PROSPECTIVE JUROR:  Massachusetts.
 5            THE COURT:  What type of work do you do?
 6            THE PROSPECTIVE JUROR:  I'm a retired educational
 7    psychologist.
 8            THE COURT:  How about your marital status?
 9            THE PROSPECTIVE JUROR:  Yes, been married 41 years.
10            THE COURT:  And what does your spouse do?
11            THE PROSPECTIVE JUROR:  She's a retired administrative
12    assistant.
13            THE COURT:  Any children?
14            THE PROSPECTIVE JUROR:  No.
15            THE COURT:  Ever serve on a jury?
16            THE PROSPECTIVE JUROR:  No.
17            THE COURT:  Close friends or relatives who are
18    policemen?
19            THE PROSPECTIVE JUROR:  Yes.  My father-in-law was a
20    lieutenant in the Connecticut State Police.
21            THE COURT:  Anybody been arrested?
22            THE PROSPECTIVE JUROR:  No.
23            THE COURT:  Victim of a crime?
24            THE PROSPECTIVE JUROR:  I had a car stolen many years
25    ago.
```

```
 1            THE COURT:  Ever witnessed a crime?
 2            THE PROSPECTIVE JUROR:  No.
 3            THE COURT:  And do you have any hobbies?
 4            THE PROSPECTIVE JUROR:  Yes.  Pickleball, going to the
 5    gym, that's -- president of my association in the condo.
 6            THE COURT:  Thank you, sir.
 7            THE PROSPECTIVE JUROR:  Thank you.
 8            THE COURT:  We'll move over to Ms. Shepherd.
 9            Whereabouts in Broward County do you live?
10            THE PROSPECTIVE JUROR:  Miramar.
11            THE COURT:  And how long have you lived in south
12    Florida?
13            THE PROSPECTIVE JUROR:  Thirty-two years.
14            THE COURT:  What type of work do you do?
15            THE PROSPECTIVE JUROR:  Manager at a restaurant.
16            THE COURT:  Your marital status?
17            THE PROSPECTIVE JUROR:  Single.
18            THE COURT:  Ever serve on a jury?
19            THE PROSPECTIVE JUROR:  No, no.
20            THE COURT:  Close friends or relatives who are
21    policemen?
22            THE PROSPECTIVE JUROR:  Yes.
23            THE COURT:  Friends, relatives, or both?
24            THE PROSPECTIVE JUROR:  Friends.
25            THE COURT:  Anybody been arrested?
```

```
 1              THE PROSPECTIVE JUROR:  No.

 2              THE COURT:  Victim of a crime?

 3              THE PROSPECTIVE JUROR:  Yes, about six years ago,

 4    burglary.

 5              THE COURT:  Ever witnessed a crime?

 6              THE PROSPECTIVE JUROR:  No.

 7              THE COURT:  Any hobbies?

 8              THE PROSPECTIVE JUROR:  No.

 9              THE COURT:  Thank you, ma'am.

10         We'll move over to Ms. Refkin.

11         Whereabouts in Broward County do you live?

12              THE PROSPECTIVE JUROR:  Plantation.

13              THE COURT:  And how long have you lived in south

14    Florida?

15              THE PROSPECTIVE JUROR:  Thirty-two years.

16              THE COURT:  What type of work do you do?

17              THE PROSPECTIVE JUROR:  Legal secretary, office

18    manager.

19              THE COURT:  For what type of a law firm?

20              THE PROSPECTIVE JUROR:  Steve Mason in Hollywood.

21    He -- everything.  We were general.  We did criminal, civil,

22    bankruptcy, real estate.

23              THE COURT:  Is he about my age?

24              THE PROSPECTIVE JUROR:  Yes, he is.

25              THE COURT:  I think we were public defenders
```

```
 1   together --
 2            THE PROSPECTIVE JUROR:  I bet you, you were.
 3            THE COURT:  -- 40 years ago.
 4            THE PROSPECTIVE JUROR:  Yes, I bet you were.
 5            THE COURT:  How about your marital status?
 6            THE PROSPECTIVE JUROR:  Married.
 7            THE COURT REPORTER:  Excuse me.
 8            THE PROSPECTIVE JUROR:  I'm sorry.
 9            THE COURT REPORTER:  Judge, the microphone is not
10   working.
11            THE COURT:  The microphone's not working?
12            THE PROSPECTIVE JUROR:  Speak into the mic.  Okay.
13   Sorry.
14            THE COURT:  Okay.  There we go.
15            And what does your spouse do?
16            THE PROSPECTIVE JUROR:  He is a real estate agent.
17            THE COURT:  Any children?
18            THE PROSPECTIVE JUROR:  Yes.
19            THE COURT:  How many?
20            THE PROSPECTIVE JUROR:  One.
21            THE COURT:  Old enough to work?
22            THE PROSPECTIVE JUROR:  Yes.
23            THE COURT:  What does he or she do?
24            THE PROSPECTIVE JUROR:  She's also in real estate -- I
25   mean -- I'm sorry -- insurance.
```

49

```
1              THE COURT:  Ever serve on a jury?
2              THE PROSPECTIVE JUROR:  Yes, I have.
3              THE COURT:  In state or federal court?
4              THE PROSPECTIVE JUROR:  State.
5              THE COURT:  Civil or a criminal case?
6              THE PROSPECTIVE JUROR:  Criminal.
7              THE COURT:  Were you the foreperson?
8              THE PROSPECTIVE JUROR:  No.
9              THE COURT:  Did you reach a verdict?
10             THE PROSPECTIVE JUROR:  Yes.
11             THE COURT:  Close friends or relatives who are
12  policemen?
13             THE PROSPECTIVE JUROR:  Yes.
14             THE COURT:  Friends, relatives, or both?
15             THE PROSPECTIVE JUROR:  Friends.
16             THE COURT:  Anybody been arrested?
17             THE PROSPECTIVE JUROR:  No.
18             THE COURT:  Victim of a crime?
19             THE PROSPECTIVE JUROR:  No.
20             THE COURT:  Witness to a crime?
21             THE PROSPECTIVE JUROR:  Uhm, I don't know, battery?  I
22  witnessed a battery.
23             THE COURT:  And do you have any hobbies?
24             THE PROSPECTIVE JUROR:  Needlepoint and reading.
25             THE COURT:  Thank you, ma'am.
```

```
 1              We'll move over to Ms. Prats.
 2              Whereabouts in Broward County do you live?
 3              THE PROSPECTIVE JUROR:  I live in Pembroke Pines.
 4              THE COURT:  And how long have you lived in south
 5    Florida?
 6              THE PROSPECTIVE JUROR:  Twenty-four years.
 7              THE COURT:  What type of work do you do?
 8              THE PROSPECTIVE JUROR:  I'm a student.
 9              THE COURT:  What are you studying?
10              THE PROSPECTIVE JUROR:  Radiography.
11              THE COURT:  How about your marital status?
12              THE PROSPECTIVE JUROR:  Single.
13              THE COURT:  Ever serve on a jury before?
14              THE PROSPECTIVE JUROR:  No.
15              THE COURT:  Close friends or relatives who are
16    policemen?
17              THE PROSPECTIVE JUROR:  Friends.
18              THE COURT:  Anybody been arrested?
19              THE PROSPECTIVE JUROR:  Uhm, not that I know of.
20              THE COURT:  Anybody been the victim of a crime?
21              THE PROSPECTIVE JUROR:  Yes.  Uhm, well, me and my
22    family were in Orlando, someone was speeding, and they hit one
23    of our cars that was parked in front of our house.
24              THE COURT:  And did they leave the scene or did they
25    stay?
```

| | |
|---|---|
| 1 | THE PROSPECTIVE JUROR:  Well, they were -- they had to |
| 2 | be taken to the hospital, because they were injured and -- |
| 3 | THE COURT:  Have you ever witnessed any crimes? |
| 4 | THE PROSPECTIVE JUROR:  I'm not sure if this would |
| 5 | count, but while I was in middle school, I was walking home, |
| 6 | and someone had a gun who was walking by me, and we had to run, |
| 7 | because we heard gunshots and.... |
| 8 | THE COURT:  And do you have any hobbies? |
| 9 | THE PROSPECTIVE JUROR:  Uhm, drawing, painting. |
| 10 | THE COURT:  Thank you, ma'am. |
| 11 | If you could pass the microphone behind you there to |
| 12 | Ms. Smith. |
| 13 | Whereabouts in Broward County do you live? |
| 14 | THE PROSPECTIVE JUROR:  Miramar. |
| 15 | THE COURT:  And how long have you lived in south |
| 16 | Florida? |
| 17 | THE PROSPECTIVE JUROR:  Eleven years. |
| 18 | THE COURT:  Eleven? |
| 19 | THE PROSPECTIVE JUROR:  Yes. |
| 20 | THE COURT:  What type of work do you do? |
| 21 | THE PROSPECTIVE JUROR:  I'm a stay-at-home mom.  I |
| 22 | also help at the church. |
| 23 | THE COURT:  How about your marital status? |
| 24 | THE PROSPECTIVE JUROR:  Married. |
| 25 | THE COURT:  And what does your spouse do? |

```
 1              THE PROSPECTIVE JUROR:  He's a janitor and also a
 2    cashier.
 3              THE COURT:  And how many children do you have?
 4              THE PROSPECTIVE JUROR:  Three.
 5              THE COURT:  Old enough to work?
 6              THE PROSPECTIVE JUROR:  Yes.  Two.
 7              THE COURT:  What do they do?
 8              THE PROSPECTIVE JUROR:  Uhm, one, she work with autism
 9    kids.  And my son, he go to Virginia University.  And my other
10    daughter, she's seven years old.  She go (sic) to the
11    elementary school.
12              THE COURT:  Ever serve on a jury before?
13              THE PROSPECTIVE JUROR:  No, sir.
14              THE COURT:  Close friends or relatives who are
15    policemen?
16              THE PROSPECTIVE JUROR:  No, sir.
17              THE COURT:  Anybody been arrested?
18              THE PROSPECTIVE JUROR:  Yes, my brother.
19              THE COURT:  And what happened with him?
20              THE PROSPECTIVE JUROR:  For a traffic ticket.
21              THE COURT:  Anybody been the victim of a crime?
22              THE PROSPECTIVE JUROR:  No, sir.
23              THE COURT:  Ever witnessed a crime?
24              THE PROSPECTIVE JUROR:  No, sir.
25              THE COURT:  Any hobbies?
```

```
 1              THE PROSPECTIVE JUROR:  I like to sing on the church
 2    choir.
 3              THE COURT:  Thank you, ma'am.
 4              We'll move over to Ms. Bemis.
 5              Whereabouts in Broward County do you live?
 6              THE PROSPECTIVE JUROR:  Deerfield Beach.
 7              THE COURT:  And how long have you lived in south
 8    Florida?
 9              THE PROSPECTIVE JUROR:  On and off since '89.
10              THE COURT:  What type of work do you do?
11              THE PROSPECTIVE JUROR:  I'm an IT consultant for an
12    accounting firm.
13              THE COURT:  How about your marital status?
14              THE PROSPECTIVE JUROR:  Single.
15              THE COURT:  Ever serve on a jury?
16              THE PROSPECTIVE JUROR:  No.
17              THE COURT:  Close friends or relatives who are
18    policemen?
19              THE PROSPECTIVE JUROR:  No.
20              THE COURT:  Anybody been arrested?
21              THE PROSPECTIVE JUROR:  No.
22              THE COURT:  Victim of a crime?
23              THE PROSPECTIVE JUROR:  No.
24              THE COURT:  Witness to a crime?
25              THE PROSPECTIVE JUROR:  No.
```

```
 1            THE COURT:  Any hobbies?
 2            THE PROSPECTIVE JUROR:  I'm a marathon runner and an
 3   avid shooter.
 4            THE COURT:  Thank you, ma'am.
 5            Ms. Giraldo, whereabouts in Broward County do you
 6   live?
 7            THE PROSPECTIVE JUROR:  Sunrise.
 8            THE COURT:  And how long have you lived in south
 9   Florida?
10            THE PROSPECTIVE JUROR:  Eight years.
11            THE COURT:  Where you from originally?
12            THE PROSPECTIVE JUROR:  Colombia.
13            THE COURT:  What type of work do you do?
14            THE PROSPECTIVE JUROR:  I'm an accountant.
15            THE COURT:  How about your marital status?
16            THE PROSPECTIVE JUROR:  Married.
17            THE COURT:  What does your spouse do?
18            THE PROSPECTIVE JUROR:  He's a tennis instructor.
19            THE COURT:  Tennis?
20            THE PROSPECTIVE JUROR:  Yes.
21            THE COURT:  Any children?
22            THE PROSPECTIVE JUROR:  Yes, two.
23            THE COURT:  How many?
24            THE PROSPECTIVE JUROR:  Two.
25            THE COURT:  Old enough to work?
```

```
1              THE PROSPECTIVE JUROR:  No.

2              THE COURT:  Ever serve on a jury?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  Close friends or relatives who are

5     policemen?

6              THE PROSPECTIVE JUROR:  My neighbor is a policeman.

7              THE COURT:  Anybody been arrested?

8              THE PROSPECTIVE JUROR:  No.

9              THE COURT:  Victim of a crime?

10             THE PROSPECTIVE JUROR:  No.

11             THE COURT:  Witness to a crime?

12             THE PROSPECTIVE JUROR:  No.

13             THE COURT:  Any hobbies?

14             THE PROSPECTIVE JUROR:  I don't have time.

15             THE COURT:  Thank you, ma'am.

16             Mr. Pinzur, whereabouts in Broward County do you live?

17             THE PROSPECTIVE JUROR:  East Hollywood.

18             THE COURT:  And what type of work do you do?

19             THE PROSPECTIVE JUROR:  I'm the vice president at a

20    health system in Miami.

21             THE COURT:  How about your marital status?

22             THE PROSPECTIVE JUROR:  Married.

23             THE COURT:  What does your spouse do?

24             THE PROSPECTIVE JUROR:  She owns her own public

25    relations firm.
```

```
 1          THE COURT:  Any children?
 2          THE PROSPECTIVE JUROR:  Yes, your Honor.
 3          THE COURT:  How many?
 4          THE PROSPECTIVE JUROR:  One.
 5          THE COURT:  Old enough to work?
 6          THE PROSPECTIVE JUROR:  No, your Honor.
 7          THE COURT:  Ever serve on a jury?
 8          THE PROSPECTIVE JUROR:  No, your Honor.
 9          THE COURT:  Close friends or relatives who are
10   policemen?
11          THE PROSPECTIVE JUROR:  Yes, your Honor.
12          THE COURT:  Friends, relatives, or both?
13          THE PROSPECTIVE JUROR:  Friend.
14          THE COURT:  Anybody been arrested?
15          THE PROSPECTIVE JUROR:  No, your Honor.
16          THE COURT:  Victim of a crime?
17          THE PROSPECTIVE JUROR:  No, your Honor.
18          THE COURT:  Witness to a crime?
19          THE PROSPECTIVE JUROR:  No, your Honor.
20          THE COURT:  Any hobbies?
21          THE PROSPECTIVE JUROR:  I'm a runner, and I serve on a
22   lot of civic boards in Miami.
23          THE COURT:  Thank you, sir.
24          We'll move over to Ms. Giboyeaux?
25          THE PROSPECTIVE JUROR:  Giboyeaux.
```

```
 1                    THE COURT:  Giboyeaux.
 2                    THE PROSPECTIVE JUROR:  Giboyeaux.
 3                    THE COURT:  And whereabouts in Broward County do you
 4      live?
 5                    THE PROSPECTIVE JUROR:  Sunrise.
 6                    THE COURT:  And how long have you lived in south
 7      Florida?
 8                    THE PROSPECTIVE JUROR:  Forty years.
 9                    THE COURT:  What type of work do you do?
10                    THE PROSPECTIVE JUROR:  Teacher.
11                    THE COURT:  Your marital status?
12                    THE PROSPECTIVE JUROR:  Married.
13                    THE COURT:  What does your spouse do?
14                    THE PROSPECTIVE JUROR:  Claims adjustor.
15                    THE COURT:  Any children?
16                    THE PROSPECTIVE JUROR:  No.
17                    THE COURT:  Ever serve on a jury?
18                    THE PROSPECTIVE JUROR:  No.
19                    THE COURT:  Close friends or relatives who are
20      policemen?
21                    THE PROSPECTIVE JUROR:  No.
22                    THE COURT:  Anybody been arrested?
23                    THE PROSPECTIVE JUROR:  Co-workers of husband's that
24      are --
25                    THE COURT:  Anybody been arrested?
```

```
1            THE PROSPECTIVE JUROR:  No.

2            THE COURT:  Victim of a crime?

3            THE PROSPECTIVE JUROR:  You said have I ever been

4    arrested?

5            THE COURT:  You or any member of your family ever been

6    arrested?

7            THE PROSPECTIVE JUROR:  Oh.  Well, my nephew,

8    unfortunately.

9            THE COURT:  What happened with your nephew?

10            THE PROSPECTIVE JUROR:  DUIs.

11            THE COURT:  Anybody been the victim of a crime?

12            THE PROSPECTIVE JUROR:  No.

13            THE COURT:  Ever witnessed a crime?

14            THE PROSPECTIVE JUROR:  No.

15            THE COURT:  And do you have any hobbies?

16            THE PROSPECTIVE JUROR:  Collectibles and travelling.

17            THE COURT:  Thank you, ma'am.

18            We'll move over to Ms. -- Mr. St. Rose.

19            Whereabouts in Broward County do you live?

20            THE PROSPECTIVE JUROR:  Riverland Village,

21    Fort Lauderdale.

22            THE COURT:  And how long have you lived in south

23    Florida?

24            THE PROSPECTIVE JUROR:  About 27 years.

25            THE COURT:  And what type of work do you do?
```

```
1              THE PROSPECTIVE JUROR:  Musician.

2              THE COURT:  That's right.  You told us that already.

3         How about your marital status?

4              THE PROSPECTIVE JUROR:  Married.

5              THE COURT:  What does your spouse do?

6              THE PROSPECTIVE JUROR:  Casino dealer at the Hard

7    Rock.

8              THE COURT:  Any children?

9              THE PROSPECTIVE JUROR:  Yes, two.

10             THE COURT:  Old enough to work?

11             THE PROSPECTIVE JUROR:  Yes.

12             THE COURT:  What do they do?

13             THE PROSPECTIVE JUROR:  Uhm, one is mechanical

14   engineer, and the other one is a secretary for a trucking

15   company.

16             THE COURT:  Ever serve on a jury?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  Close friends or relatives who are

19   policemen?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  Anybody been arrested?

22             THE PROSPECTIVE JUROR:  One time I did

23   disruptive (sic).

24             THE COURT:  Like disorderly conduct or what?

25             THE PROSPECTIVE JUROR:  Yeah.
```

1          THE COURT:  Anybody been the victim of a crime?

2          THE PROSPECTIVE JUROR:  My house was burglarized a

3    long time ago.

4          THE COURT:  Ever witnessed a crime?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Any hobbies?

7          THE PROSPECTIVE JUROR:  Uhm, music.

8          THE COURT:  Thank you, sir.

9          We'll move over to Mr. Bryan.

10         Whereabouts in Broward County do you live?

11         THE PROSPECTIVE JUROR:  Hollywood.

12         THE COURT:  And how long have you lived in south

13   Florida?

14         THE PROSPECTIVE JUROR:  Twenty-two years.

15         THE COURT:  What type of work do you do?

16         THE PROSPECTIVE JUROR:  Plumbing.

17         THE COURT:  How about your marital status?

18         THE PROSPECTIVE JUROR:  Married.

19         THE COURT:  What does your spouse do?

20         THE PROSPECTIVE JUROR:  She's an accountant.

21         THE COURT:  Any children?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Ever serve on a jury?

24         THE PROSPECTIVE JUROR:  No.

25         THE COURT:  Close friends or relatives who are

```
 1   policemen?
 2           THE PROSPECTIVE JUROR:  No.
 3           THE COURT:  Anybody been arrested?
 4           THE PROSPECTIVE JUROR:  No.
 5           THE COURT:  Victim of a crime?
 6           THE PROSPECTIVE JUROR:  Our house has been burglarized
 7   a few times, but nothing major.  They didn't get anything.
 8           THE COURT:  Ever witnessed a crime?
 9           THE PROSPECTIVE JUROR:  No.
10           THE COURT:  And do you have any hobbies?
11           THE PROSPECTIVE JUROR:  Yeah, boating.
12           THE COURT:  Thank you, sir.
13           If you could pass the microphone behind you to
14   Mr. Peiretti.
15           THE PROSPECTIVE JUROR:  Good morning.
16           THE COURT:  Whereabouts in Broward County do you live?
17           THE PROSPECTIVE JUROR:  Weston.
18           THE COURT:  And how long have you lived in south
19   Florida?
20           THE PROSPECTIVE JUROR:  Eighteen years.
21           THE COURT:  What type of work do you do?
22           THE PROSPECTIVE JUROR:  I'm a senior vice president of
23   marketing and products for a telecom firm.
24           THE COURT:  How about your marital status?
25           THE PROSPECTIVE JUROR:  Married.
```

```
 1            THE COURT:  What does your spouse do?
 2            THE PROSPECTIVE JUROR:  High school teacher.
 3            THE COURT:  Any children?
 4            THE PROSPECTIVE JUROR:  Two, 19 and 16.
 5            THE COURT:  Do either one of them work?
 6            THE PROSPECTIVE JUROR:  No.  They're students.
 7            THE COURT:  Ever serve on a jury?
 8            THE PROSPECTIVE JUROR:  No.
 9            THE COURT:  Close friends or relatives who are
10  policemen?
11            THE PROSPECTIVE JUROR:  No.
12            THE COURT:  Anybody been arrested?
13            THE PROSPECTIVE JUROR:  No.
14            THE COURT:  Victim of a crime?
15            THE PROSPECTIVE JUROR:  Only when I was six years old.
16            THE COURT:  And what happened then?
17            THE PROSPECTIVE JUROR:  That was back in Argentina.
18  My house -- my parents were kidnapped and stolen, you know,
19  burglary in the house, long time ago.
20            THE COURT:  Ever witnessed a crime?
21            THE PROSPECTIVE JUROR:  No.
22            THE COURT:  And do you have any hobbies?
23            THE PROSPECTIVE JUROR:  No.
24            THE COURT:  Thank you, sir.
25            Mr. Zorovich, whereabouts in Broward County do you
```

```
 1   live?
 2            THE PROSPECTIVE JUROR:  In Pompano.
 3            THE COURT:  And how long have you lived in south
 4   Florida?
 5            THE PROSPECTIVE JUROR:  Coming up on 30 years.
 6            THE COURT:  What type of work do you do?
 7            THE PROSPECTIVE JUROR:  I'm in the fire alarm
 8   business.
 9            THE COURT:  How about your marital status?
10            THE PROSPECTIVE JUROR:  Divorced.
11            THE COURT:  When you were married, what did your
12   spouse do?
13            THE PROSPECTIVE JUROR:  She worked for Costco.
14            THE COURT:  Do you have any children?
15            THE PROSPECTIVE JUROR:  No.
16            THE COURT:  Ever serve on a jury?
17            THE PROSPECTIVE JUROR:  No.
18            THE COURT:  Close friends or relatives who are
19   policemen?
20            THE PROSPECTIVE JUROR:  No.
21            THE COURT:  Anybody been arrested?
22            THE PROSPECTIVE JUROR:  I was.
23            THE COURT:  Tell me about that.
24            THE PROSPECTIVE JUROR:  Ten years ago, I had a DUI.
25            THE COURT:  Anybody been the victim of a crime?
```

```
 1            THE PROSPECTIVE JUROR:  No.

 2            THE COURT:  Ever witnessed a crime?

 3            THE PROSPECTIVE JUROR:  No.

 4            THE COURT:  Any hobbies?

 5            THE PROSPECTIVE JUROR:  Golfing, fishing.

 6            THE COURT:  Thank you, sir.

 7            THE PROSPECTIVE JUROR:  Thank you.

 8            THE COURT:  We'll move over to Mr. Guzman Castillo.

 9       Whereabouts in Broward County do you live?

10            THE PROSPECTIVE JUROR:  Weston.

11            THE COURT:  And how long have you lived in south

12  Florida?

13            THE PROSPECTIVE JUROR:  Thirteen years.

14            THE COURT:  What type of work do you do?

15            THE PROSPECTIVE JUROR:  Pool plumber.

16            THE COURT:  Your marital status?

17            THE PROSPECTIVE JUROR:  I live with my girlfriend.

18            THE COURT:  And what does she do?

19            THE PROSPECTIVE JUROR:  She's a seamstress.

20            THE COURT:  Any children?

21            THE PROSPECTIVE JUROR:  None.

22            THE COURT:  Ever serve on a jury before?

23            THE PROSPECTIVE JUROR:  No.

24            THE COURT:  Close friends or relatives who are

25  policemen?
```

```
 1              THE PROSPECTIVE JUROR:  A few neighbors.
 2              THE COURT:  Anybody been arrested?
 3              THE PROSPECTIVE JUROR:  No.
 4              THE COURT:  Victim of a crime?
 5              THE PROSPECTIVE JUROR:  I've had my car broken into.
 6              THE COURT:  Witnessed a crime?
 7              THE PROSPECTIVE JUROR:  I've seen people stealing at
 8       the mall, when I used to work there.
 9              THE COURT:  And do you have any hobbies?
10              THE PROSPECTIVE JUROR:  Mountain biking.
11              THE COURT:  Thank you, sir.
12              If you could pass the microphone over -- and, Karen,
13       my pen just ran -- oh, I got another pen here.  Okay.  Throw
14       that one away.
15              Ms. Cotton, whereabouts in Broward County do you live?
16              THE PROSPECTIVE JUROR:  Weston.
17              THE COURT:  And how long have you lived in south
18       Florida?
19              THE PROSPECTIVE JUROR:  Four years.
20              THE COURT:  Where you from originally?
21              THE PROSPECTIVE JUROR:  Maryland.
22              THE COURT:  What type of work do you do?
23              THE PROSPECTIVE JUROR:  Benefit director.
24              THE COURT:  How about your marital status?
25              THE PROSPECTIVE JUROR:  Married.
```

```
 1              THE COURT:  What does your spouse do?

 2              THE PROSPECTIVE JUROR:  He's a stay-at-home dad.

 3              THE COURT:  And how many children do you have?

 4              THE PROSPECTIVE JUROR:  Two.

 5              THE COURT:  Old enough to work?

 6              THE PROSPECTIVE JUROR:  No.

 7              THE COURT:  Ever serve on a jury?

 8              THE PROSPECTIVE JUROR:  No.

 9              THE COURT:  Close friends or relatives who are

10    policemen?

11              THE PROSPECTIVE JUROR:  No.

12              THE COURT:  Anybody been arrested?

13              THE PROSPECTIVE JUROR:  My sister.

14              THE COURT:  And what happened with her?

15              THE PROSPECTIVE JUROR:  Multiple times.  She's a drug

16    addict.

17              THE COURT:  Anybody been the victim of a crime?

18              THE PROSPECTIVE JUROR:  No.

19              THE COURT:  Ever witnessed a crime?

20              THE PROSPECTIVE JUROR:  No.

21              THE COURT:  And do you have any hobbies?

22              THE PROSPECTIVE JUROR:  Just my family.

23              THE COURT:  Thank you.

24              We'll move over to Ms. Peters.

25              Whereabouts in Broward County do you live?
```

```
1              THE PROSPECTIVE JUROR:  Coral Springs.
2              THE COURT:  And how long have you lived in south
3    Florida?
4              THE PROSPECTIVE JUROR:  Over ten years.
5              THE COURT:  What type of work do you do?
6              THE PROSPECTIVE JUROR:  I work for a mortgage company.
7              THE COURT:  How about your marital status?
8              THE PROSPECTIVE JUROR:  Single.
9              THE COURT:  Ever serve on a jury before?
10             THE PROSPECTIVE JUROR:  No.
11             THE COURT:  Close friends or relatives who are
12   policemen?
13             THE PROSPECTIVE JUROR:  Yes, friends.
14             THE COURT:  Anybody been arrested?
15             THE PROSPECTIVE JUROR:  No.
16             THE COURT:  Victim of a crime?
17             THE PROSPECTIVE JUROR:  No.
18             THE COURT:  Witness to a crime?
19             THE PROSPECTIVE JUROR:  No.
20             THE COURT:  Any hobbies?
21             THE PROSPECTIVE JUROR:  Writing.
22             THE COURT:  Thank you, ma'am.
23             THE PROSPECTIVE JUROR:  Um-hum.
24             THE COURT:  And, Mr. Quinones, whereabouts in Broward
25   County do you live?
```

```
 1              THE PROSPECTIVE JUROR:   Pembroke Pines.
 2              THE COURT:   And how long have you lived in south
 3    Florida?
 4              THE PROSPECTIVE JUROR:   Thirty-five years.
 5              THE COURT:   What type of work do you do?
 6              THE PROSPECTIVE JUROR:   Clinical psychology intern.
 7              THE COURT:   How about your marital status?
 8              THE PROSPECTIVE JUROR:   Single.
 9              THE COURT:   Ever serve on a jury?
10              THE PROSPECTIVE JUROR:   No.
11              THE COURT:   Close friends or relatives who are
12    policemen?
13              THE PROSPECTIVE JUROR:   No.
14              THE COURT:   Anybody been arrested?
15              THE PROSPECTIVE JUROR:   No.
16              THE COURT:   Victim of a crime?
17              THE PROSPECTIVE JUROR:   No.
18              THE COURT:   Witness to a crime?
19              THE PROSPECTIVE JUROR:   No.
20              THE COURT:   Any hobbies?
21              THE PROSPECTIVE JUROR:   Reading.
22              THE COURT:   Thank you, sir.
23              Ms. Crush, whereabouts in Broward County do you live?
24              THE PROSPECTIVE JUROR:   Fort Lauderdale, your Honor.
25              THE COURT:   And how long have you lived in south
```

1    Florida?

2              THE PROSPECTIVE JUROR:  Twenty-five years.

3              THE COURT:  What type of work do you do?

4              THE PROSPECTIVE JUROR:  I'm an attorney.

5              THE COURT:  And what type of law do you practice?

6              THE PROSPECTIVE JUROR:  Land use.

7              THE COURT:  Your marital status?

8              THE PROSPECTIVE JUROR:  Married.

9              THE COURT:  What does your spouse do?

10             THE PROSPECTIVE JUROR:  He's also an attorney.

11             THE COURT:  And what type of law does he practice?

12             THE PROSPECTIVE JUROR:  Land use.  We practice

13    together.

14             THE COURT:  Any children?

15             THE PROSPECTIVE JUROR:  One.

16             THE COURT:  Old enough to work?

17             THE PROSPECTIVE JUROR:  Yes, but he's a junior in

18    college.

19             THE COURT:  Ever serve on a jury?

20             THE PROSPECTIVE JUROR:  Yes.

21             THE COURT:  In state or federal court?

22             THE PROSPECTIVE JUROR:  New Jersey state.

23             THE COURT:  Civil or a criminal case?

24             THE PROSPECTIVE JUROR:  Civil.

25             THE COURT:  Were you the foreperson?

```
 1              THE PROSPECTIVE JUROR:  I was not.
 2              THE COURT:  And did the jury reach a verdict?
 3              THE PROSPECTIVE JUROR:  It did.
 4              THE COURT:  Close friends or relatives who are
 5     policemen?
 6              THE PROSPECTIVE JUROR:  Professional friends.
 7              THE COURT:  Anybody been arrested?
 8              THE PROSPECTIVE JUROR:  I have a nephew who was either
 9     arrested or cited for graffiti.
10              THE COURT:  Anybody been the victim of a crime?
11              THE PROSPECTIVE JUROR:  Had my car broken into once
12     with no one present.
13              THE COURT:  Ever witnessed a crime?
14              THE PROSPECTIVE JUROR:  I have not.
15              THE COURT:  And do you have any hobbies?
16              THE PROSPECTIVE JUROR:  Running.
17              THE COURT:  Thank you, ma'am.
18              THE PROSPECTIVE JUROR:  Thank you.
19              THE COURT:  All right.  We're gonna go out here in the
20     audience to Ms. Ertug Ozan.
21              Whereabouts in Broward County do you live?
22              THE PROSPECTIVE JUROR:  Hollywood.
23              THE COURT:  And how long have you lived in south
24     Florida?
25              THE PROSPECTIVE JUROR:  Fifteen years.
```

```
 1          THE COURT:  What type of work do you do?
 2          THE PROSPECTIVE JUROR:  Photographer.
 3          THE COURT:  Your marital status?
 4          THE PROSPECTIVE JUROR:  Married.
 5          THE COURT:  What does your spouse do?
 6          THE PROSPECTIVE JUROR:  Digital marketing.
 7          THE COURT:  Any children?
 8          THE PROSPECTIVE JUROR:  Twins.  They are six.
 9          THE COURT:  Two?
10          THE PROSPECTIVE JUROR:  Two, yes, twins.  Six-year
11   old (sic).
12          THE COURT:  Have you ever served on a jury before?
13          THE PROSPECTIVE JUROR:  No.
14          THE COURT:  Close friends or relatives who are
15   policemen?
16          THE PROSPECTIVE JUROR:  No.
17          THE COURT:  Anybody been arrested?
18          THE PROSPECTIVE JUROR:  No.
19          THE COURT:  Victim of a crime?
20          THE PROSPECTIVE JUROR:  No.
21          THE COURT:  Witness to a crime?
22          THE PROSPECTIVE JUROR:  No.
23          THE COURT:  Any hobbies?
24          THE PROSPECTIVE JUROR:  Photography.
25          THE COURT:  Thank you, ma'am.
```

```
 1              THE PROSPECTIVE JUROR:  Thank you.
 2              THE COURT:  Ms. Davila, whereabouts in Broward County
 3   do you live?
 4              THE PROSPECTIVE JUROR:  Sunrise.
 5              THE COURT:  And how long have you lived in south
 6   Florida?
 7              THE PROSPECTIVE JUROR:  Three years.
 8              THE COURT:  Where you from originally?
 9              THE PROSPECTIVE JUROR:  New York.
10              THE COURT:  What type of work do you do?
11              THE PROSPECTIVE JUROR:  I'm a workforce manager.
12              THE COURT:  Your marital status?
13              THE PROSPECTIVE JUROR:  Single.
14              THE COURT:  Ever serve on a jury before?
15              THE PROSPECTIVE JUROR:  No.
16              THE COURT:  Close friends or relatives who are
17   policemen?
18              THE PROSPECTIVE JUROR:  Both.  Friends and family.
19              THE COURT:  And tell me about your relatives.
20              THE PROSPECTIVE JUROR:  I have two cousins that are
21   police officers, as well as a close family friend, and two
22   uncles, correction officers.
23              THE COURT:  Where do the cousins work?
24              THE PROSPECTIVE JUROR:  One in Orlando, one in
25   New York.
```

```
 1            THE COURT:  Ever serve on a jury?

 2            THE PROSPECTIVE JUROR:  No.

 3            THE COURT:  Close friends -- oh, I already asked you

 4    that.

 5            Anybody been arrested?

 6            THE PROSPECTIVE JUROR:  No.

 7            THE COURT:  Victim of a crime?

 8            THE PROSPECTIVE JUROR:  Damage to my vehicle.

 9            THE COURT:  Ever witnessed a crime?

10            THE PROSPECTIVE JUROR:  Bank robbery.

11            THE COURT:  And do you have any hobbies?

12            THE PROSPECTIVE JUROR:  Travelling.

13            THE COURT:  Thank you, ma'am.

14            We'll move over to Ms. Dixon.

15            Whereabouts in Broward County do you live?

16            THE PROSPECTIVE JUROR:  Coral Springs.

17            THE COURT:  And how long have you lived in south

18    Florida?

19            THE PROSPECTIVE JUROR:  Thirty-two years.

20            THE COURT:  What type of work do you do?

21            THE PROSPECTIVE JUROR:  Preschool teacher.

22            THE COURT:  How about your marital status?

23            THE PROSPECTIVE JUROR:  Single.

24            THE COURT:  Ever serve on a jury before?

25            THE PROSPECTIVE JUROR:  No.
```

74

```
1              THE COURT:  Close friends or relatives who are
2    policemen?
3              THE PROSPECTIVE JUROR:  My father is a retired police
4    officer in the state of Michigan.
5              THE COURT:  Anybody been arrested?
6              THE PROSPECTIVE JUROR:  Yeah, quite a few.
7              THE COURT:  Tell me about that.
8              THE PROSPECTIVE JUROR:  Uhm, cousins arrested, just,
9    uhm, ex-boyfriends, drugs, car theft.
10             THE COURT:  Anybody been the victim of a crime?
11             THE PROSPECTIVE JUROR:  No.
12             THE COURT:  Ever witnessed a crime?
13             THE PROSPECTIVE JUROR:  No.
14             THE COURT:  Any hobbies?
15             THE PROSPECTIVE JUROR:  Pets.
16             THE COURT:  Thank you, ma'am.
17             Mr. Guistiani?
18             THE PROSPECTIVE JUROR:  Yes.
19             THE COURT:  Whereabouts in Broward County do you live?
20             THE PROSPECTIVE JUROR:  Plantation.
21             THE COURT:  And how long have you lived in south
22   Florida?
23             THE PROSPECTIVE JUROR:  Thirteen years.
24             THE COURT:  What type of work do you do?
25             THE PROSPECTIVE JUROR:  I'm a manager for an airline.
```

```
1           THE COURT:  Your marital status?
2           THE PROSPECTIVE JUROR:  Married.
3           THE COURT:  What does your spouse do?
4           THE PROSPECTIVE JUROR:  She's a hairstylist.
5           THE COURT:  Any children?
6           THE PROSPECTIVE JUROR:  No.
7           THE COURT:  Ever serve on a jury?
8           THE PROSPECTIVE JUROR:  Yes.
9           THE COURT:  State or federal court?
10          THE PROSPECTIVE JUROR:  State.
11          THE COURT:  Civil or a criminal case?
12          THE PROSPECTIVE JUROR:  Civil.
13          THE COURT:  Were you the foreman?
14          THE PROSPECTIVE JUROR:  Yes.
15          THE COURT:  Did you reach a verdict?
16          THE PROSPECTIVE JUROR:  Yes.
17          THE COURT:  Close friends or relatives who are
18   policemen?
19          THE PROSPECTIVE JUROR:  I know a lot of the deputies
20   at the airport.
21          THE COURT:  Anybody been arrested?
22          THE PROSPECTIVE JUROR:  I had a brother, he passed
23   away, he was arrested.
24          THE COURT:  What happened with him?
25          THE PROSPECTIVE JUROR:  Drinking and drugs.
```

```
 1          THE COURT:  Anybody been the victim of a crime?
 2          THE PROSPECTIVE JUROR:  No.
 3          THE COURT:  Ever witnessed a crime?
 4          THE PROSPECTIVE JUROR:  No.
 5          THE COURT:  And do you have any hobbies?
 6          THE PROSPECTIVE JUROR:  Just playing sports.
 7          THE COURT:  Thank you, sir.
 8          We'll move over to Ms. Gordon.
 9          Whereabouts in Broward County do you live?
10          THE PROSPECTIVE JUROR:  Margate.
11          THE COURT:  And how long have you lived in south
12   Florida?
13          THE PROSPECTIVE JUROR:  Forty-five years.
14          THE COURT:  What type of work do you do?
15          THE PROSPECTIVE JUROR:  I'm retired.
16          THE COURT:  What did you used to do?
17          THE PROSPECTIVE JUROR:  I was senior compliance and
18   legal support specialist.
19          THE COURT:  Your marital status?
20          THE PROSPECTIVE JUROR:  Married.
21          THE COURT:  What does your spouse do?
22          THE PROSPECTIVE JUROR:  He's retired.
23          THE COURT:  What did he used to do?
24          THE PROSPECTIVE JUROR:  Allstate insurance.
25          THE COURT:  Any children?
```

```
 1              THE PROSPECTIVE JUROR:  No.

 2              THE COURT:  Ever serve on a jury?

 3              THE PROSPECTIVE JUROR:  No.

 4              THE COURT:  Close friends or relatives who are

 5   policemen?

 6              THE PROSPECTIVE JUROR:  No.

 7              THE COURT:  Anybody been arrested?

 8              THE PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  Tell me about that.

10              THE PROSPECTIVE JUROR:  Nephew, DUI.

11              THE COURT:  Anybody been the victim of a crime?

12              THE PROSPECTIVE JUROR:  No.

13              THE COURT:  Ever witnessed a crime?

14              THE PROSPECTIVE JUROR:  No.

15              THE COURT:  Any hobbies?

16              THE PROSPECTIVE JUROR:  Reading.

17              THE COURT:  Thank you, ma'am.

18         Mr. Alvarez, whereabouts in Broward County do you

19   live?

20              THE PROSPECTIVE JUROR:  Coral Springs, sir.

21              THE COURT:  And how long have you lived in south

22   Florida?

23              THE PROSPECTIVE JUROR:  My whole life.

24              THE COURT:  What type of work do you do?

25              THE PROSPECTIVE JUROR:  I'm an administrator in a
```

1  state correctional facility for the Florida Department of

2  Juvenile Justice.

3            THE COURT:  How about your marital status?

4            THE PROSPECTIVE JUROR:  Married to a nurse.

5            THE COURT:  Any children?

6            THE PROSPECTIVE JUROR:  Eleven years old.

7            THE COURT:  Ever serve on a jury before?

8            THE PROSPECTIVE JUROR:  No, sir.

9            THE COURT:  Close friends or relatives who are

10  policemen?

11            THE PROSPECTIVE JUROR:  Multiple friends.

12            THE COURT:  Anybody been arrested?

13            THE PROSPECTIVE JUROR:  No, sir.

14            THE COURT:  Victim of a crime?

15            THE PROSPECTIVE JUROR:  No, sir.

16            THE COURT:  Witness to a crime?

17            THE PROSPECTIVE JUROR:  No, sir -- yes, yes, witness

18  to multiple crimes.

19            THE COURT:  In the facility or --

20            THE PROSPECTIVE JUROR:  Yeah, within the confines of

21  the correctional facility, yeah.

22            THE COURT:  And do you have any hobbies?

23            THE PROSPECTIVE JUROR:  Horseback riding and spear

24  fishing.

25            THE COURT:  Thank you, sir.

79

```
 1              We'll move over to Ms. Garbharran.
 2              THE PROSPECTIVE JUROR:  Yes.
 3              THE COURT:  And whereabouts in Broward County do you
 4    live?
 5              THE PROSPECTIVE JUROR:  In Sunrise.
 6              THE COURT:  And how long have you lived in south
 7    Florida?
 8              THE PROSPECTIVE JUROR:  Almost 16 years.
 9              THE COURT:  What type of work do you do?
10              THE PROSPECTIVE JUROR:  I'm a retired nurse.
11              THE COURT:  How about your marital status?
12              THE PROSPECTIVE JUROR:  Married.
13              THE COURT:  What does your spouse do?
14              THE PROSPECTIVE JUROR:  He's a retired university
15    professor.
16              THE COURT:  What did he teach?
17              THE PROSPECTIVE JUROR:  Geography.
18              THE COURT:  Any children?
19              THE PROSPECTIVE JUROR:  Yes, two grown children.
20              THE COURT:  And what do they do?
21              THE PROSPECTIVE JUROR:  Both are physicians.
22              THE COURT:  Ever serve on a jury?
23              THE PROSPECTIVE JUROR:  No.
24              THE COURT:  Close friends or relatives who are
25    policemen?
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
1              THE PROSPECTIVE JUROR:  No.

2              THE COURT:  Anybody been arrested?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  Victim of a crime?

5              THE PROSPECTIVE JUROR:  Yes, unfortunately.

6              THE COURT:  And what happened?

7              THE PROSPECTIVE JUROR:  My son, he lives in Chicago.

8    About three or four years ago, he and his friends were leaving

9    an event, and they were attacked by a group of youth.  And he

10   was hit on the head, and he had some concussion.

11             Also, my late brother was killed by a drunk driver.

12             And I have family members -- because I'm formerly from

13   South Africa, and there's a lot of crime there -- they have

14   been attacked in their homes and beaten.  One of my dear uncles

15   was hospitalized for a week.

16             THE COURT:  Have you ever witnessed a crime?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  And do you have any hobbies?

19             THE PROSPECTIVE JUROR:  Reading and walking.

20             THE COURT:  Thank you, ma'am.

21             THE PROSPECTIVE JUROR:  Thank you.

22             THE COURT:  We'll move over to Ms. Shanley.

23             Whereabouts in Broward County do you live?

24             THE PROSPECTIVE JUROR:  Coral Springs.

25             THE COURT:  And how long have you lived in south
```

```
 1   Florida?
 2             THE PROSPECTIVE JUROR:  Twenty-four years.
 3             THE COURT:  What type of work do you do?
 4             THE PROSPECTIVE JUROR:  Homemaker.
 5             THE COURT:  Your marital status?
 6             THE PROSPECTIVE JUROR:  Married.
 7             THE COURT:  What does your spouse do?
 8             THE PROSPECTIVE JUROR:  He's the CEO of the Broward
 9   Center for the Performing Arts.
10             THE COURT:  Any children?
11             THE PROSPECTIVE JUROR:  Three.
12             THE COURT:  Old enough to work?
13             THE PROSPECTIVE JUROR:  All students.
14             THE COURT:  Ever serve on a jury?
15             THE PROSPECTIVE JUROR:  No.
16             THE COURT:  Close friends or relatives who are
17   policemen?
18             THE PROSPECTIVE JUROR:  Yes, friends.
19             THE COURT:  Anybody been arrested?
20             THE PROSPECTIVE JUROR:  No.
21             THE COURT:  Victim of a crime?
22             THE PROSPECTIVE JUROR:  No.
23             THE COURT:  Witness to a crime?
24             THE PROSPECTIVE JUROR:  No.
25             THE COURT:  Any hobbies?
```

```
 1              THE PROSPECTIVE JUROR:  Serial volunteer.
 2              THE COURT:  Thank you, ma'am.  Behind you we'll move
 3    over to Mr. Johnson.
 4              Whereabouts in Broward County do you live, sir?
 5              THE PROSPECTIVE JUROR:  Miramar.
 6              THE COURT:  And how long have you lived in south
 7    Florida?
 8              THE PROSPECTIVE JUROR:  Going on 14 years.
 9              THE COURT:  And we know you work for American
10    Airlines.  How about your marital status?
11              THE PROSPECTIVE JUROR:  Single.
12              THE COURT:  Ever serve on a jury before?
13              THE PROSPECTIVE JUROR:  No.
14              THE COURT:  Close friends or relatives who are
15    policemen?
16              THE PROSPECTIVE JUROR:  No.
17              THE COURT:  Anybody been arrested?
18              THE PROSPECTIVE JUROR:  No.
19              THE COURT:  Victim of a crime?
20              THE PROSPECTIVE JUROR:  No.
21              THE COURT:  Witness to a crime?
22              THE PROSPECTIVE JUROR:  No.
23              THE COURT:  Any hobbies?
24              THE PROSPECTIVE JUROR:  Aviation photography.
25              THE COURT:  Thank you, sir.
```

```
 1              We'll move over to Ms. Rodriguez.

 2              Whereabouts in Broward County do you live?

 3              THE PROSPECTIVE JUROR:  Plantation.

 4              THE COURT:  And how long have you lived in south

 5    Florida?

 6              THE PROSPECTIVE JUROR:  Twenty-one years.

 7              THE COURT:  What type of work do you do?

 8              THE PROSPECTIVE JUROR:  VP in property management.

 9              THE COURT:  How about your marital status?

10              THE PROSPECTIVE JUROR:  Married.

11              THE COURT:  What does your spouse do?

12              THE PROSPECTIVE JUROR:  Medical research.

13              THE COURT:  Any children?

14              THE PROSPECTIVE JUROR:  Two.

15              THE COURT:  Old enough to work?

16              THE PROSPECTIVE JUROR:  I wish.

17              (Laughter)

18              THE COURT:  Ever serve on a jury?

19              THE PROSPECTIVE JUROR:  No.

20              THE COURT:  Close friends or relatives who are

21    policemen?

22              THE PROSPECTIVE JUROR:  No.

23              THE COURT:  Anybody been arrested?

24              THE PROSPECTIVE JUROR:  My sister, DUI.

25              THE COURT:  And what happened with her?
```

```
1              THE PROSPECTIVE JUROR:  DUI.

2              THE COURT:  Anybody been the victim of a crime?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  Ever witnessed --

5              THE PROSPECTIVE JUROR:  What?

6              THE COURT:  Ever witnessed a crime?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  And do you have any hobbies?

9              THE PROSPECTIVE JUROR:  CrossFit.

10             THE COURT:  Thank you.

11        We'll move over to Mr. Guzman.

12        Whereabouts in Broward County do you live?

13             THE PROSPECTIVE JUROR:  Sunrise.

14             THE COURT:  And how long have you lived in south

15   Florida?

16             THE PROSPECTIVE JUROR:  Two years.

17             THE COURT:  Where you from originally?

18             THE PROSPECTIVE JUROR:  Connecticut.

19             THE COURT:  What type of work do you do?

20             THE PROSPECTIVE JUROR:  Glass fabrication.

21             THE COURT:  How about your marital status?

22             THE PROSPECTIVE JUROR:  Single.

23             THE COURT:  Ever serve on a jury?

24             THE PROSPECTIVE JUROR:  No.

25             THE COURT:  Close friends or relatives who are
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
 1    policemen?
 2            THE PROSPECTIVE JUROR:  I have a cousin who just
 3    graduated the academy, but -- yeah.
 4            THE COURT:  What academy?
 5            THE PROSPECTIVE JUROR:  The police academy.
 6            THE COURT:  Here?
 7            THE PROSPECTIVE JUROR:  I want to say Dade?
 8            THE COURT:  Okay.  Anybody been arrested?
 9            THE PROSPECTIVE JUROR:  Yes.
10            THE COURT:  Tell me about that.
11            THE PROSPECTIVE JUROR:  I've been arrested, two of my
12    brothers and my mom have also been arrested.
13            THE COURT:  And what happened with you?
14            THE PROSPECTIVE JUROR:  Failure to appear after not
15    paying a ticket.
16            THE COURT:  And how about your brother?
17            THE PROSPECTIVE JUROR:  One was for joyriding.  One
18    was for assault.
19            THE COURT:  And how about your mom?
20            THE PROSPECTIVE JUROR:  For -- it was kind of a
21    misunderstanding, but for -- what's it called -- weapons
22    trafficking in Dominican Republic.
23            THE COURT:  Anybody been the victim of a crime?
24            THE PROSPECTIVE JUROR:  Yes.
25            THE COURT:  Tell me about that.
```

```
 1              THE PROSPECTIVE JUROR:  I've been mugged and attempted
 2    murder.
 3              THE COURT:  Other than that, have you witnessed any
 4    crimes?
 5              THE PROSPECTIVE JUROR:  Domestic violence.
 6              THE COURT:  And do you have any hobbies?
 7              THE PROSPECTIVE JUROR:  Drunken karaoke, I guess.
 8              (Laughter)
 9              THE COURT:  Thank you, sir.
10              We'll move over to Ms. Ferris.
11              Whereabouts in Broward County do you live?
12              THE PROSPECTIVE JUROR:  Hollywood.
13              THE COURT:  And how long have you lived in south
14    Florida?
15              THE PROSPECTIVE JUROR:  All my life.
16              THE COURT:  What type of work do you do?
17              THE PROSPECTIVE JUROR:  I'm a teacher.
18              THE COURT:  How about your marital status?
19              THE PROSPECTIVE JUROR:  I'm divorced.
20              THE COURT:  When you were married, what did your
21    husband do?
22              THE PROSPECTIVE JUROR:  He was a boat mechanic.
23              THE COURT:  I'm sorry?
24              THE PROSPECTIVE JUROR:  He was a boat -- boat
25    mechanic.
```

```
1          THE COURT:  Any children?

2          THE PROSPECTIVE JUROR:  Three.

3          THE COURT:  Old enough to work?

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  Ever serve on a jury?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Close friends or relatives who are

8     policemen?

9          THE PROSPECTIVE JUROR:  No.

10         THE COURT:  Anybody been arrested?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  Victim of a crime?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Witness to a crime?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Any hobbies?

17         THE PROSPECTIVE JUROR:  I like to travel.

18         THE COURT:  Thank you, ma'am.

19         We'll move over to Ms. Rauscher.

20         Whereabouts in Broward County do you live?

21         THE PROSPECTIVE JUROR:  East Hollywood.

22         THE COURT:  And how long have you lived in south

23    Florida?

24         THE PROSPECTIVE JUROR:  I'm a native, 47 years.

25         THE COURT:  What type of work do you do?
```

```
1                THE PROSPECTIVE JUROR:  Bookkeeping.

2                THE COURT:  How about your marital status?

3                THE PROSPECTIVE JUROR:  Twice divorced.

4                THE COURT:  What did your most recent husband do?

5                THE PROSPECTIVE JUROR:  Wood flooring.

6                THE COURT:  And how about the first one?

7                THE PROSPECTIVE JUROR:  Uhm, stay-at-home dad I guess

8    was the primary.

9                THE COURT:  So how many children do you have?

10               THE PROSPECTIVE JUROR:  Two.  They're both adults.

11   They are both working.

12               THE COURT:  What do they do?

13               THE PROSPECTIVE JUROR:  One is working in IT.  And the

14   other one works in retail, and he goes to college part-time.

15               THE COURT:  Ever serve on a jury?

16               THE PROSPECTIVE JUROR:  Yes.

17               THE COURT:  In state or federal court?

18               THE PROSPECTIVE JUROR:  Both.

19               THE COURT:  Civil or criminal cases?

20               THE PROSPECTIVE JUROR:  Criminal.

21               THE COURT:  Were you the foreperson on either one?

22               THE PROSPECTIVE JUROR:  I was not.

23               THE COURT:  Did you reach verdicts on both?

24               THE PROSPECTIVE JUROR:  Uhm, there was actually three

25   juries I served on.  The first one, we did reach a verdict.
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1    The second one, they decided to plea.  The third one, we

2    reached a verdict, and right before we announced we reached a

3    verdict, they decided to plea.

4           THE COURT:  And was one of them in federal court and

5    two in state court?

6           THE PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Close friends or relatives who are

8    policemen?

9           THE PROSPECTIVE JUROR:  No.

10          THE COURT:  Anybody been arrested?

11          THE PROSPECTIVE JUROR:  My nephew was arrested for

12   shoplifting many years ago.  And my most recent ex-husband was

13   arrested.

14          THE COURT:  And what happened with him?

15          THE PROSPECTIVE JUROR:  He was arrested for aggravated

16   assault with a deadly weapon.  And thus the reason why we're

17   now divorced.  So, I was the victim of that.

18          THE COURT:  Other than that, have you been the victim

19   of any other crimes?

20          THE PROSPECTIVE JUROR:  I worked for First

21   Union/Wachovia Bank, so I've been through seven bank robberies.

22   Three of them, I was the victim employee.

23          THE COURT:  Other than that, have you witnessed any

24   crimes?

25          THE PROSPECTIVE JUROR:  Domestic violence.

```
1            THE COURT:  And do you have any hobbies?
2            THE PROSPECTIVE JUROR:  Running and trying to stay
3   fit.
4            THE COURT:  Thank you, ma'am.
5            We'll move over to Ms. Rizzo.
6            Whereabouts in Broward County do you live?
7            THE PROSPECTIVE JUROR:  Coral Springs.
8            THE COURT:  And how long have you lived in south
9   Florida?
10           THE PROSPECTIVE JUROR:  Eight years.
11           THE COURT:  Where you from originally?
12           THE PROSPECTIVE JUROR:  New Jersey.
13           THE COURT:  What type of work do you do?
14           THE PROSPECTIVE JUROR:  I'm the director of customer
15   service.
16           THE COURT:  For what type of a company?
17           THE PROSPECTIVE JUROR:  Automotive.
18           THE COURT:  Your marital status?
19           THE PROSPECTIVE JUROR:  Married.
20           THE COURT:  And what does your spouse do?
21           THE PROSPECTIVE JUROR:  He's an executive for Capital
22   One.
23           THE COURT:  Any children?
24           THE PROSPECTIVE JUROR:  One 12-year old.
25           THE COURT:  Ever serve on a jury?
```

1           THE PROSPECTIVE JUROR:  No, sir.

2           THE COURT:  Close friends or relatives who are

3    policemen?

4           THE PROSPECTIVE JUROR:  Yes, in New Jersey, family.

5           THE COURT:  And what type of relatives are policemen

6    in New Jersey?

7           THE PROSPECTIVE JUROR:  Retired grandfather and my

8    uncle.

9           THE COURT:  Ever serve on a jury?

10          THE PROSPECTIVE JUROR:  No, sir.

11          THE COURT:  Anybody been arrested?

12          THE PROSPECTIVE JUROR:  No.

13          THE COURT:  Victim of a crime?

14          THE PROSPECTIVE JUROR:  My other home was broken into

15   a couple years ago, but besides that, nothing.

16          THE COURT:  Ever witnessed a crime?

17          THE PROSPECTIVE JUROR:  No.

18          THE COURT:  Any hobbies?

19          THE PROSPECTIVE JUROR:  Just a soccer mom.

20          THE COURT:  Thank you, ma'am.

21          Ms. Romano-Stoff, whereabouts in Broward County do you

22   live?

23          THE PROSPECTIVE JUROR:  Lauderhill.

24          THE COURT:  And how long have you lived in south

25   Florida?

```
 1              THE PROSPECTIVE JUROR:  My whole life.

 2              THE COURT:  What type of work do you do?

 3              THE PROSPECTIVE JUROR:  I'm a restaurant manager.

 4              THE COURT:  How about your marital status?

 5              THE PROSPECTIVE JUROR:  Married.

 6              THE COURT:  What does your spouse do?

 7              THE PROSPECTIVE JUROR:  He's retired.

 8              THE COURT:  What did he used to do?

 9              THE PROSPECTIVE JUROR:  We owned our own business, a

10    motorcycle store.

11              THE COURT:  Any children?

12              THE PROSPECTIVE JUROR:  No.

13              THE COURT:  Ever serve on a jury?

14              THE PROSPECTIVE JUROR:  Yes.

15              THE COURT:  In state or federal court?

16              THE PROSPECTIVE JUROR:  State.

17              THE COURT:  Civil or a criminal case?

18              THE PROSPECTIVE JUROR:  Civil.

19              THE COURT:  Were you the foreperson?

20              THE PROSPECTIVE JUROR:  No.

21              THE COURT:  Reach a verdict?

22              THE PROSPECTIVE JUROR:  No.

23              THE COURT:  What happened?

24              THE PROSPECTIVE JUROR:  It was a plea.

25              THE COURT:  They settled the case?
```

```
 1              THE PROSPECTIVE JUROR:  They settled.

 2              THE COURT:  Anybody been arrested?

 3              THE PROSPECTIVE JUROR:  No.

 4              THE COURT:  Victim of a crime?

 5              THE PROSPECTIVE JUROR:  No.

 6              THE COURT:  Witness to a crime?

 7              THE PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  Tell me about that.

 9              THE PROSPECTIVE JUROR:  I was in Walgreens, and they

10     were robbed at gunpoint.

11              THE COURT:  And do you have any hobbies?

12              THE PROSPECTIVE JUROR:  Photography.

13              THE COURT:  Thank you, ma'am.

14              We'll move over to Mr. Caulfield.

15              Whereabouts in Broward County do you live?

16              THE PROSPECTIVE JUROR:  Pembroke Pines.

17              THE COURT:  And how long have you lived in south

18     Florida?

19              THE PROSPECTIVE JUROR:  Seventeen years.

20              THE COURT:  What type of work do you do?

21              THE PROSPECTIVE JUROR:  I'm vice president of

22     information technology at a software company.

23              THE COURT:  Your marital status?

24              THE PROSPECTIVE JUROR:  Married.

25              THE COURT:  What does your spouse do?
```

94

```
1            THE PROSPECTIVE JUROR:  She's an IT manager at a
2   cruise line.
3            THE COURT:  Ever -- any children?
4            THE PROSPECTIVE JUROR:  Seven.
5            THE COURT:  And what do they do?
6            THE PROSPECTIVE JUROR:  One is a relationship manager
7   at a software company, one is a regional manager for a retail
8   company, one is a network engineer, one is a systems engineer
9   in the United States Navy, and one is between jobs, and then
10  two in high school.
11           THE COURT:  Ever serve on a jury?
12           THE PROSPECTIVE JUROR:  No.
13           THE COURT:  Close friends or relatives who are
14  policemen?
15           THE PROSPECTIVE JUROR:  My son-in-law is a corrections
16  officer in the New Jersey state prison system.
17           THE COURT:  Anybody been arrested?
18           THE PROSPECTIVE JUROR:  No.
19           THE COURT:  Victim of a crime?
20           THE PROSPECTIVE JUROR:  Burglary, muggings.
21           THE COURT:  Ever witnessed a crime?
22           THE PROSPECTIVE JUROR:  No.
23           THE COURT:  And do you have any hobbies?
24           THE PROSPECTIVE JUROR:  Scuba diving.
25           THE COURT:  Thank you, sir.  If you could pass the
```

1   microphone behind you there to Ms. Alubi.

2       Whereabouts in Broward County do you live?

3       THE PROSPECTIVE JUROR:  I actually live in Hialeah.

4       THE COURT:  So did you move?

5       THE PROSPECTIVE JUROR:  Yes.

6       THE COURT:  But lucky for you Hialeah is still in the

7   Southern District of Florida.

8       THE PROSPECTIVE JUROR:  Okay.

9       *(Laughter)*

10      THE COURT:  What type of work -- how long have you

11  lived in south Florida?

12      THE PROSPECTIVE JUROR:  Nine years.

13      THE COURT:  Where you from originally?

14      THE PROSPECTIVE JUROR:  Dominican Republic.

15      THE COURT:  What type of work do you do?

16      THE PROSPECTIVE JUROR:  Physicians' medical office.

17      THE COURT:  Your marital status?

18      THE PROSPECTIVE JUROR:  Single.

19      THE COURT:  Ever serve on a jury?

20      THE PROSPECTIVE JUROR:  No.

21      THE COURT:  Close friends or relatives who are

22  policemen?

23      THE PROSPECTIVE JUROR:  No.

24      THE COURT:  Anybody been arrested?

25      THE PROSPECTIVE JUROR:  No.

```
 1          THE COURT:  Victim of a crime?

 2          THE PROSPECTIVE JUROR:  No.

 3          THE COURT:  Witness to a crime?

 4          THE PROSPECTIVE JUROR:  No.

 5          THE COURT:  Any hobbies?

 6          THE PROSPECTIVE JUROR:  Travelling.

 7          THE COURT:  Thank you, ma'am.

 8          Ms. Hinton, whereabouts in Broward County do you live?

 9          THE PROSPECTIVE JUROR:  Weston.

10          THE COURT:  And how long have you lived in south

11   Florida?

12          THE PROSPECTIVE JUROR:  Pretty much all my life.

13          THE COURT:  What type of work do you do?

14          THE PROSPECTIVE JUROR:  Homemaker.

15          THE COURT:  Your marital status?

16          THE PROSPECTIVE JUROR:  Married.

17          THE COURT:  What does your spouse do?

18          THE PROSPECTIVE JUROR:  Tax accountant.

19          THE COURT:  And how many children do you have?

20          THE PROSPECTIVE JUROR:  Two.

21          THE COURT:  Old enough to work?

22          THE PROSPECTIVE JUROR:  One.

23          THE COURT:  And what does he or she do?

24          THE PROSPECTIVE JUROR:  He's in the U.S. military.

25          THE COURT:  Ever serve on a jury?
```

```
 1              THE PROSPECTIVE JUROR:  No.
 2              THE COURT:  Close friends or relatives who are
 3    policemen?
 4              THE PROSPECTIVE JUROR:  No.
 5              THE COURT:  Anybody been arrested?
 6              THE PROSPECTIVE JUROR:  No.
 7              THE COURT:  Victim of a crime?
 8              THE PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  Tell me about that.
10              THE PROSPECTIVE JUROR:  My car was vandalized, and my
11    purse was stolen.
12              THE COURT:  Ever witnessed a crime?
13              THE PROSPECTIVE JUROR:  No.
14              THE COURT:  And do you have any hobbies?
15              THE PROSPECTIVE JUROR:  Reading.
16              THE COURT:  Thank you, ma'am.
17              We'll move over to Ms. Linares-Prat.
18              Whereabouts in Broward County do you live?
19              THE PROSPECTIVE JUROR:  Cooper City.
20              THE COURT:  And how long have you lived in south
21    Florida?
22              THE PROSPECTIVE JUROR:  Fourteen years.
23              THE COURT:  What type of work do you do?
24              THE PROSPECTIVE JUROR:  I'm an office manager.
25              THE COURT:  How about your marital status?
```

```
1              THE PROSPECTIVE JUROR:  Divorced twice.
2              THE COURT:  And what did your most recent husband do?
3              THE PROSPECTIVE JUROR:  He's a financial adviser.
4              THE COURT:  And how about the first husband?
5              THE PROSPECTIVE JUROR:  Lives off his wife.
6              THE COURT:  I'm sorry?
7              THE PROSPECTIVE JUROR:  Lives off his wife.
8              (Laughter)
9              THE COURT:  And how many children do you have?
10             THE PROSPECTIVE JUROR:  Three.
11             THE COURT:  Any of them old enough to work?
12             THE PROSPECTIVE JUROR:  Yes, but he's a student.
13             THE COURT:  Ever serve on a jury?
14             THE PROSPECTIVE JUROR:  No.
15             THE COURT:  Close friends or relatives who are
16     policemen?
17             THE PROSPECTIVE JUROR:  No.
18             THE COURT:  Anybody been arrested?
19             THE PROSPECTIVE JUROR:  My son.
20             THE COURT:  And what happened with him?
21             THE PROSPECTIVE JUROR:  He was in a car with friends,
22     and they had marijuana on them.
23             THE COURT:  Anybody been the victim of a crime?
24             THE PROSPECTIVE JUROR:  No.
25             THE COURT:  Ever witnessed a crime?
```

```
 1              THE PROSPECTIVE JUROR:  No.

 2              THE COURT:  And do you have any hobbies?

 3              THE PROSPECTIVE JUROR:  Coaching soccer.

 4              THE COURT:  Thank you.

 5          We'll move over to Ms. Lessner.

 6          Whereabouts in Broward County do you live?

 7              THE PROSPECTIVE JUROR:  Fort Lauderdale.

 8              THE COURT:  And how long have you lived in south

 9     Florida?

10              THE PROSPECTIVE JUROR:  My whole life.

11              THE COURT:  And we know what you do for a living.  How

12     about your marital status?

13              THE PROSPECTIVE JUROR:  Single.

14              THE COURT:  Ever serve on a jury?

15              THE PROSPECTIVE JUROR:  No.

16              THE COURT:  Close friends or relatives who are

17     policemen?

18              THE PROSPECTIVE JUROR:  None.

19              THE COURT:  Anybody been arrested?

20              THE PROSPECTIVE JUROR:  No.

21              THE COURT:  Victim of a crime?

22              THE PROSPECTIVE JUROR:  No.

23              THE COURT:  Witness to a crime?

24              THE PROSPECTIVE JUROR:  No.

25              THE COURT:  Any hobbies?
```

```
 1              THE PROSPECTIVE JUROR:  Studying.  Not really much.
 2   Running.
 3              THE COURT:  Thank you, ma'am.
 4              We'll move over to Ms. Peavey.
 5              Whereabouts in Broward County do you live?
 6              THE PROSPECTIVE JUROR:  Plantation.
 7              THE COURT:  And how long have you lived in south
 8   Florida?
 9              THE PROSPECTIVE JUROR:  Three years in Broward County.
10   I've lived in Florida for nine.
11              THE COURT:  In Florida how long?
12              THE PROSPECTIVE JUROR:  Nine.
13              THE COURT:  And where you from originally?
14              THE PROSPECTIVE JUROR:  New Jersey.
15              THE COURT:  What type of work do you do?
16              THE PROSPECTIVE JUROR:  Right now, I'm a teacher,
17   science educator.
18              THE COURT:  How about your marital status?
19              THE PROSPECTIVE JUROR:  Single.
20              THE COURT:  Ever serve on a jury?
21              THE PROSPECTIVE JUROR:  No, I have not, sir.
22              THE COURT:  Close friends or relatives who are
23   policemen?
24              THE PROSPECTIVE JUROR:  Yes, but it's, uhm, law
25   enforcement, yes.
```

```
 1              THE COURT:  Anybody been arrested?

 2              THE PROSPECTIVE JUROR:  No.

 3              THE COURT:  Victim of a crime?

 4              THE PROSPECTIVE JUROR:  Three.

 5              THE COURT:  And what type of crimes?

 6              THE PROSPECTIVE JUROR:  Uhm, burglary, I witnessed

 7     that.  It was just a smash.  They broke the car window and took

 8     my stuff.

 9              The other one, I was a victim of a hit and run.  The

10     driver was drunk.  And, uhm, I was ejected from that vehicle.

11     And it took a long time through rehab to get back on my feet.

12     I was in graduate school.

13              And then the third one was -- I was a victim of racial

14     discrimination and retaliation.  And that was a federal

15     lawsuit.

16              THE COURT:  And other than those, have you witnessed

17     any crimes?

18              THE PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Tell me about that.

20              THE PROSPECTIVE JUROR:  A stabbing.

21              THE COURT:  And do you have any hobbies?

22              THE PROSPECTIVE JUROR:  I love reading.

23              THE COURT:  Thank you, ma'am.

24              We'll move over to Ms. Moya-Carmenate.

25              Whereabouts in Broward County do you live?
```

```
 1              THE PROSPECTIVE JUROR:  Pembroke Pines.
 2              THE COURT:  And how long have you lived in south
 3  Florida?
 4              THE PROSPECTIVE JUROR:  Seventeen year (sic).
 5              THE COURT:  What type of work do you do?
 6              THE PROSPECTIVE JUROR:  An accounting of my husband AC
 7  company (sic).
 8              THE COURT:  And do you have any children?
 9              THE PROSPECTIVE JUROR:  Yes, two.
10              THE COURT:  Old enough to work?
11              THE PROSPECTIVE JUROR:  Yes.  They are student (sic),
12  but one of them work with us.  He's a CAD designer.
13              THE COURT:  Ever serve on the jury?
14              THE PROSPECTIVE JUROR:  No.
15              THE COURT:  Close friends or relatives that are
16  policemen?
17              THE PROSPECTIVE JUROR:  My neighbors, and my brother
18  is a correction officer in Miami-Dade County.
19              THE COURT:  Anybody been arrested?
20              THE PROSPECTIVE JUROR:  Not on my sides.  My husband's
21  olders (sic) son, he has been, yeah, arrested for drugs,
22  possession.
23              THE COURT:  Anybody been the victim of a crime?
24              THE PROSPECTIVE JUROR:  My husband others -- the
25  youngest son, he have been assault (sic).
```

```
 1              THE COURT:  Have you ever witnessed a crime?
 2              THE PROSPECTIVE JUROR:  No.
 3              THE COURT:  And do you have any hobbies?
 4              THE PROSPECTIVE JUROR:  Travelling and reading.
 5              THE COURT:  And how do you think your English has been
 6    so far?
 7              THE PROSPECTIVE JUROR:  Ah, good.
 8              THE COURT:  Thank you, ma'am.
 9              All right.  We'll move over to Ms. Fynn.
10              Whereabouts in Broward County do you live?
11              THE PROSPECTIVE JUROR:  Fort Lauderdale.
12              THE COURT:  And how long have you lived in south
13    Florida?
14              THE PROSPECTIVE JUROR:  Eighteen years.
15              THE COURT:  What type of work do you do?
16              THE PROSPECTIVE JUROR:  I'm a tax attorney who works
17    as a consultant.
18              THE COURT:  Your marital status?
19              THE PROSPECTIVE JUROR:  Married.
20              THE COURT:  And what does your husband do?
21              THE PROSPECTIVE JUROR:  Civil litigator.
22              THE COURT:  Any children?
23              THE PROSPECTIVE JUROR:  No.
24              THE COURT:  Ever serve on a jury?
25              THE PROSPECTIVE JUROR:  No.
```

```
1              THE COURT:  Close friends or relatives who are
2    policemen?
3              THE PROSPECTIVE JUROR:  Yes, friends.
4              THE COURT:  Anybody been arrested?
5              THE PROSPECTIVE JUROR:  Yes, I have.
6              THE COURT:  And tell me about that.
7              THE PROSPECTIVE JUROR:  It was shoplifting.
8              THE COURT:  Anybody been the victim of a crime?
9              THE PROSPECTIVE JUROR:  No.
10             THE COURT:  Ever witnessed a crime?
11             THE PROSPECTIVE JUROR:  No.
12             THE COURT:  And do you have any hobbies?
13             THE PROSPECTIVE JUROR:  Reading.
14             THE COURT:  Thank you, ma'am.
15             Ms. Bronson, whereabouts in Broward County do you
16   live?
17             THE PROSPECTIVE JUROR:  Fort Lauderdale.
18             THE COURT:  And how long have you lived in south
19   Florida?
20             THE PROSPECTIVE JUROR:  Sixty-five years.
21             THE COURT:  What type of work do you do?
22             THE PROSPECTIVE JUROR:  Retired nurse.
23             THE COURT:  What did you used -- retired what?
24             THE PROSPECTIVE JUROR:  Nurse.
25             THE COURT:  Nurse.  And how about your marital status?
```

1          THE PROSPECTIVE JUROR:  Divorced.

2          THE COURT:  When you were married, what did your

3    husband do?

4          THE PROSPECTIVE JUROR:  He was -- he worked for the

5    City of Fort Lauderdale.  He was sanitation.

6          THE COURT:  Any children?

7          THE PROSPECTIVE JUROR:  I have three biological and

8    two that I have custody of.

9          THE COURT:  And what do they do?

10         THE PROSPECTIVE JUROR:  My daughter, she works for

11   BSO; she's a correctional aide.  And my one son, he's on

12   dialysis; he doesn't work.  And my other son, he drives truck.

13         THE COURT:  Ever serve on a jury?

14         THE PROSPECTIVE JUROR:  Yes.

15         THE COURT:  In state or federal court?

16         THE PROSPECTIVE JUROR:  State.

17         THE COURT:  Civil or a criminal case?

18         THE PROSPECTIVE JUROR:  Civil.

19         THE COURT:  Were you the foreperson of the jury?

20         THE PROSPECTIVE JUROR:  No.

21         THE COURT:  Did you reach a verdict?

22         THE PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Close friends or relatives who are

24   policemen?

25         THE PROSPECTIVE JUROR:  Yes.

1           THE COURT:  Friends, relatives, or both?

2           THE PROSPECTIVE JUROR:  Both.

3           THE COURT:  Tell me about your relatives.

4           THE PROSPECTIVE JUROR:  I have two cousins that

5    retire *(sic)* from BSO.  And one friend, she just retired this

6    year from BSO.

7           THE COURT:  Anybody been arrested?

8           THE PROSPECTIVE JUROR:  My grandson.

9           THE COURT:  Anybody been the victim of a crime?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Ever witnessed a crime?

12          THE PROSPECTIVE JUROR:  No.

13          THE COURT:  And do you have any hobbies?

14          THE PROSPECTIVE JUROR:  I love to read.

15          THE COURT:  I'm sorry.  Read?

16          THE PROSPECTIVE JUROR:  Reading.

17          THE COURT:  Thank you, ma'am.

18          All right.  Let's go back over there to Mr. Glancy.

19          Whereabouts in Broward County do you live, sir?

20          THE PROSPECTIVE JUROR:  Coral Springs.

21          THE COURT:  And how long have you lived in south

22    Florida?

23          THE PROSPECTIVE JUROR:  My whole life.

24          THE COURT:  What type of work do you do?

25          THE PROSPECTIVE JUROR:  I'm a financial analyst.

```
1            THE COURT:  And how about your marital status?
2            THE PROSPECTIVE JUROR:  Single.
3            THE COURT:  Ever serve on a jury?
4            THE PROSPECTIVE JUROR:  No.
5            THE COURT:  Close friends or relatives who are
6    policemen?
7            THE PROSPECTIVE JUROR:  No.
8            THE COURT:  Anybody been arrested?
9            THE PROSPECTIVE JUROR:  Yes.
10           THE COURT:  Tell me about that.
11           THE PROSPECTIVE JUROR:  Basically, leaving the scene
12   of the accident -- of an accident.
13           THE COURT:  Anybody been the victim of a crime?
14           THE PROSPECTIVE JUROR:  No.
15           THE COURT:  Ever witnessed a crime?
16           THE PROSPECTIVE JUROR:  No.
17           THE COURT:  And do you have any hobbies?
18           THE PROSPECTIVE JUROR:  Boating, mountain biking.
19           THE COURT:  Thank you, sir.
20           THE PROSPECTIVE JUROR:   Okay.
21           THE COURT:  We'll move over to Ms. Kantis.
22           Whereabouts in Broward County do you live?
23           THE PROSPECTIVE JUROR:  Plantation.
24           THE COURT:  And how long have you lived in south
25   Florida?
```

```
1              THE PROSPECTIVE JUROR:  My entire life, 41 years.

2              THE COURT:  What type of work do you do?

3              THE PROSPECTIVE JUROR:  I own a pet sitting business.

4              THE COURT:  Your marital status?

5              THE PROSPECTIVE JUROR:  Married.

6              THE COURT:  What does your husband do?

7              THE PROSPECTIVE JUROR:  He's an airplane broker.

8              THE COURT:  Any children?

9              THE PROSPECTIVE JUROR:  One.

10             THE COURT:  Old enough to work?

11             THE PROSPECTIVE JUROR:  No.

12             THE COURT:  Ever serve on a jury?

13             THE PROSPECTIVE JUROR:  No.

14             THE COURT:  Close friends or relatives who are

15     policemen?

16             THE PROSPECTIVE JUROR:  Just some friends.

17             THE COURT:  Anybody been arrested?

18             THE PROSPECTIVE JUROR:  No, sir.

19             THE COURT:  Victim of a crime?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  Witness to a crime?

22             THE PROSPECTIVE JUROR:  No.

23             THE COURT:  Any hobbies?

24             THE PROSPECTIVE JUROR:  Running and walking dogs.

25             THE COURT:  Thank you, ma'am.
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
1              And, finally, Ms. Prabu.

2              Whereabouts in Broward County do you live?

3              THE PROSPECTIVE JUROR:  Miramar.

4              THE COURT:  And how long have you lived in south

5    Florida?

6              THE PROSPECTIVE JUROR:  Twenty-one years.

7              THE COURT:  What type of work do you do?

8              THE PROSPECTIVE JUROR:  IT.

9              THE COURT:  Your marital status?

10             THE PROSPECTIVE JUROR:  Married.

11             THE COURT:  What does your spouse do?

12             THE PROSPECTIVE JUROR:  He's a quality assurance

13   analyst.

14             THE COURT:  Any children?

15             THE PROSPECTIVE JUROR:  Yes, two.

16             THE COURT:  Old enough to work?

17             THE PROSPECTIVE JUROR:  No.

18             THE COURT:  Ever serve on a jury?

19             THE PROSPECTIVE JUROR:  No.

20             THE COURT:  Close friends or relatives who are

21   policemen?

22             THE PROSPECTIVE JUROR:  No.

23             THE COURT:  Anybody been arrested?

24             THE PROSPECTIVE JUROR:  No.

25             THE COURT:  Victim of a crime?
```

```
1              THE PROSPECTIVE JUROR:  No.

2              THE COURT:  Witness to a crime?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  Any hobbies?

5              THE PROSPECTIVE JUROR:  Reading.

6              THE COURT:  Thank you, ma'am.

7              All right.  Some of you have served on juries in the

8    past, and I think you understand that there's a difference

9    between the role of the jury and the role of the judge.  But my

10   job is to kind of act as an umpire or a referee.  There may be

11   times during the trial where the lawyers are going to disagree

12   on some evidence, and one of them may stand up and object.  If

13   I sustain the objection to a question, you won't hear the

14   answer.  If I overrule the objection to a question, you will

15   hear the answer.  And you're not to place any significance in

16   whether I'm sustaining or overruling objections.  The lawyers

17   have an ethical obligation to object if they think something

18   inappropriate's going on.

19             So, that's one of my jobs.

20             Another one of my jobs is to tell you what the law is

21   at the end of the case.  Near the end of the case, I'll get

22   together with the lawyers, and we'll go over the jury

23   instructions, and I'll read you the law at the end of the case.

24   I'll actually give you a copy of the jury instructions so that

25   you can take it back and refer to them, if you want to, during
```

1   your deliberations.

2           So, in that respect, I'm the judge of the law.  I'm

3   gonna tell you what the law is.

4           You're gonna be the judges of the facts.  You're gonna

5   decide whether the government has proven any of these charges

6   against Mr. Joseph beyond a reasonable doubt.

7           And just the way we're gonna accept your assessment of

8   the facts when you come back either guilty or not guilty on a

9   particular charge, we're gonna accept that, you have to accept

10  what I tell you what the law is.

11          Does everybody understand that?

12          I mean, you may scratch your head and say, "That's a

13  silly law, I don't like the law."  The jury room is not the

14  place to change the law.  You can write your congressman or

15  congresswoman, maybe they'll change the law, but not in the

16  jury room.

17          Do we have an agreement on that?  Okay?  All right.

18          There are four different counts in the superseding

19  indictment.  We could have four different trials in front of

20  four different juries, but for efficiency's sake, we're going

21  to try all four of the counts in front of one jury.  But you're

22  to consider the evidence separately and distinctly as it

23  relates or it doesn't relate to each count.  So, you could come

24  back with four guilty verdicts, four not guilty verdicts, some

25  guilty, some not guilty.

1          Does everybody understand that you're to consider the

2   evidence separately and distinctly as it relates to each count?

3   Okay?  All right.

4          Some of you have been arrested in the past.  Is there

5   anybody here that had a negative experience with the criminal

6   justice system?  Maybe you weren't treated fairly, and it's

7   still bothering you today.  Maybe it wasn't even an arrest.

8   Maybe it was just a speeding ticket or a traffic ticket.  Is

9   there anybody still upset about how they were treated or a

10  loved one was treated by the criminal justice system in the

11  past?  If so, please raise your hand.

12          Don't see any hands.

13          A number of you know police officers, some are related

14  to police officers or former law enforcement officers.  Is

15  there anybody here that's gonna automatically believe a witness

16  just because of what they do for a living?  If so, please raise

17  your hand.

18          Don't see any hands.

19          So, you'll listen to what a police officer has to say,

20  but the fact that he's a police officer doesn't mean that he's

21  automatically believable or unbelievable.  Do we have an

22  agreement on that?  All right.

23          Some of you have been the victims of crimes.  And

24  maybe the crimes were never solved.  Is there anybody here

25  that's still upset about the fact that their crime wasn't

113

 1   solved that they were victimized of, and is there anybody here

 2   saying, "Well, they didn't catch the guy that victimized me,

 3   I'm going to take it out on Mr. Joseph and find him guilty"?

 4   Is there anybody thinking like that?  If so, please raise your

 5   hand.

 6        Don't see any hands.

 7        Maybe they didn't catch anybody because the police did

 8   a lousy job.  Is there anybody here that's going to hold it

 9   against law enforcement in this case because the police didn't

10   do a good job in your case?  If so, please raise your hand.

11        Don't see any hands.

12        Some of you have witnessed crimes.  There are going to

13   be witnesses that come in here and testify during the trial.

14   And sometimes they're asked tough questions on

15   cross-examination.  Is there anybody here that's going to be

16   feeling sorry for the witness or identifying with the witness

17   and hold it against the lawyer because they're asking the

18   witness tough questions?  If so, please raise your hand.

19        Don't see any hands.

20        Some of you have sat on juries in the past.  Did

21   anybody ever have a negative experience with their jury duty?

22   Maybe something happened during the trial, or you found out

23   something afterwards, and you said to yourself, "Gee, I hope I

24   never serve on a jury again."

25        Anybody ever have a negative experience with their

1   jury duty?  If so, please raise your hand.

2           Don't see any hands.

3           Some of you have sat on criminal cases.  Some of you

4   have sat on civil cases.  This is a criminal case.

5   Mr. Joseph's liberty's at stake, and the rules are a lot

6   different on a criminal case.

7           In a civil case, whoever proves they're more right

8   than the other side wins.  And usually civil cases are fighting

9   about money or property rights.  But, again, Mr. Joseph's

10  liberty's at stake in this case, so the rules are a lot

11  different.

12          In this case, a criminal case, the burden's entirely

13  on the government.  They went to the grand jury, they sought

14  and got the second superseding indictment, they brought the

15  charges.  The burden is on the government.  Mr. Cohen and

16  Mr. Joseph don't have any burden other than to be here and

17  behave, and I'm sure they're going to do that.

18          Does everybody understand that the burden of proving

19  the case is on the government?

20          And they have to prove it beyond a reasonable doubt,

21  which is the highest standard of proof that exists in American

22  law.  Does everybody understand that?

23          I'll tell you at the end of the case that there are

24  different elements to each crime.  Let's say that there are

25  four elements to a crime.  The government's got to prove each

1    element beyond a reasonable doubt before you can return a

2    verdict of guilty.  If they prove three out of four, that's not

3    good enough; your verdict would have to be not guilty.

4           Do you understand that?  Okay?  All right.

5           Mr. Joseph's presumed to be innocent, just like any

6    defendant anywhere in the country, no matter what they're

7    charged with.  Does everybody understand that Mr. Joseph is

8    presumed to be innocent?

9           And sometimes I'll ask a juror a trick question.

10   Sometimes I'll ask a juror, "If I sent you out right now, what

11   would your verdict be?"  And oftentimes the juror will say,

12   "Well, gee, Judge, I haven't heard anything, I couldn't come up

13   with a verdict."  Actually, you can.  Mr. Joseph is presumed to

14   be innocent.  That presumption of innocence stays with him the

15   whole trial, and it would only leave him in the jury room

16   during your deliberations if you're convinced beyond a

17   reasonable doubt of one or more of the counts in this case.

18          Does everybody understand that Mr. Joseph is presumed

19   to be innocent?  Okay.

20          Let's see.  What else?

21          Some people have religious, moral, or philosophical

22   beliefs that make it difficult for them to serve on a criminal

23   case.  They feel that it's up to a higher authority to judge.

24   And it's okay to feel that way, but we really need to know

25   about it now.  Is there anybody here that because of religious,

116

```
1   moral, or philosophical beliefs feels that they couldn't serve
2   on a criminal case and decide whether the government has proven
3   its case beyond a reasonable doubt?  If so, please raise your
4   hand.
5           All right.  I've got a hand there from -- that's
6   Ms. Peavey?
7           COURTROOM SECURITY OFFICER:  Here you go, ma'am.
8   Stand up, please.
9           THE COURT:  And if you could stand, Ms. Peavey.
10          THE PROSPECTIVE JUROR:  Yes.
11          THE COURT:  And you feel because of your religious
12  beliefs, that it would be difficult for you to serve on a
13  criminal case?
14          THE PROSPECTIVE JUROR:  I would do my duty, but I
15  would never decide whether the person -- I wouldn't cast a vote
16  either way.
17          THE COURT:  Well, that wouldn't be doing your duty if
18  you wouldn't cast a vote either way, because the verdict --
19          THE PROSPECTIVE JUROR:  I would be doing my duty to
20  God.
21          THE COURT:  I understand.  But how about your duty
22  under the Constitution of the United States?  Would you be able
23  to listen to the evidence, follow the instructions, and then
24  decide whether or not the case had been proven beyond a
25  reasonable doubt?
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1    THE PROSPECTIVE JUROR:  I don't think so.  I prefer to

2  be drafted.

3    THE COURT:  Thank you, Ms. Peavey.

4    Anybody else that feels that because of religious,

5  moral, or philosophical beliefs that they couldn't be a juror

6  and decide the case one way or the other?  If so, please raise

7  your hand.

8    Don't see any hands.

9    Sometimes after we've gone through all the

10  questioning, some of the other jurors' answers will jog a

11  juror's memory, and you'll say, "Gee, I did forget that."  You

12  are under oath.  So, is there anybody here that wants to add to

13  or amend their answers?  Maybe something that you now remember

14  that you forgot to mention before.

15    All right.  We've got a hand there from Mr. Stephen.

16    THE PROSPECTIVE JUROR:  Nothing drastic, because I

17  heard somebody talk about the bank.  Yeah, about ten, 11 years

18  ago, I was in a bank when they did one of those.  I guess they

19  had the notes.  I didn't even know it was happening until they

20  left, and the person ran out.  They said, "Hey, we just got

21  robbed."

22    THE COURT:  Thank you, Mr. Stephen.

23    All right.  We've got a hand there from Ms. Barnes.

24    THE PROSPECTIVE JUROR:  I remember my one cousin was

25  arrested multiple times also, for reasons I don't all --

```
 1   remember all of the reasons, but he was arrested for multiple
 2   times.  He had a lot of problems with policemens (sic) in the
 3   past.
 4           THE COURT:  Thank you, Ms. Barnes.
 5           Okay.  We've got a hand in the back row there.  That's
 6   Mr. Guzman Castillo.
 7           THE PROSPECTIVE JUROR:  Well, I've had enough friends
 8   lost to heroin and fentanyl use, so I don't see how I could be
 9   unbiased in this case.
10           THE COURT:  You don't think you could presume
11   Mr. Joseph to be innocent?  Let me ask you a question,
12   Mr. Guzman Castillo.  Let's say the government puts on its
13   case, and you say, "That's it, that's all they've got?"  Would
14   you find Mr. Joseph guilty because of the tragedies that's
15   happened with your friends?
16           THE PROSPECTIVE JUROR:  No.  It all depends on the
17   facts, but the bias is there.
18           THE COURT:  Thank you, Mr. Guzman Castillo.
19           All right.  I think we had a hand back there from
20   Ms. Ertug Ozan.
21           THE PROSPECTIVE JUROR:  Yes.  I actually realize that,
22   uhm, Mr. Dixon (sic) from Dania Elementary, the teacher, my --
23   actually, my daughter goes to the same school.  So, I just
24   realized.  I just wanted to mention.
25           THE COURT:  Okay.  Thank you, Ms. Ertug Ozan.
```

1          COURTROOM SECURITY OFFICER:  Pass this back, please?

2          A PROSPECTIVE JUROR:  I forgot to mention, I did

3   have -- someone hit me when I was at a red light.  So, I was a

4   victim of hit and run in addition.

5          THE COURT:  And that's Ms. Rizzo?

6          THE PROSPECTIVE JUROR:  Rauscher.

7          THE COURT:  Oh, I got the wrong one.  Okay.  Thank

8   you, Ms. Rauscher.

9          Anybody else that's remembered anything they want to

10  add to their answers?

11         Okay.  That -- well, it's kind of one last area that I

12  go over before I turn it over to the attorneys.

13         When we do select a jury in this case, I'm going to be

14  reading out the names of the 12 jurors and the two alternates

15  that have been selected.  And sometimes -- and then I'm going

16  to excuse everybody else.  And sometimes as everybody's pouring

17  out of the courtroom, except for those 14 people, one of the 14

18  people will raise their hand and say, "Gee, Judge, I didn't

19  think I was gonna get picked, I can't be fair."  And then I've

20  got to have Frank go all the way to the -- Terry go all the way

21  to the elevators, grab everybody, and bring everybody back and

22  start all over with.

23         So, it's kind of like speak now or forever hold your

24  peace.  Is there anybody that's sitting there saying to

25  themselves, "Gee, if the judge would just ask me about this,

```
 1    I'd tell him why I couldn't be fair"?  Is there anybody here,
 2    other than what we've already talked about, that has a reason
 3    why they shouldn't be serving on this case and be a fair juror
 4    for Mr. Joseph and for the government?  If so, please raise
 5    your hand.
 6              Don't see any hands.
 7              Ms. Rinku -- Ms. Tribuiani, you may inquire.
 8              MS. TRIBUIANI:  Thank you, your Honor.
 9              THE COURT:  Hold on a second.  I've got a hand there
10    from Mr. Stein.
11              COURTROOM SECURITY OFFICER:  Stand up, sir.
12              THE PROSPECTIVE JUROR:  I really need to use the men's
13    room.
14              (Laughter)
15              THE COURT:  All right.  Go ahead.  Go ahead.  You can
16    go.
17              THE PROSPECTIVE JUROR:  Thank you.
18              THE COURT:  It's about 20 more minutes before we take
19    a break.  Do you need to go to the bathroom also, Ms. Smith?
20              THE PROSPECTIVE JUROR:  Yeah, she has to go to the
21    bathroom also.
22              THE COURT:  Okay.
23              COURTROOM SECURITY OFFICER:  Go ahead, ma'am.
24              A PROSPECTIVE JUROR:  Your Honor, I want to know that
25    if I'm judging someone, I judge them right and not wrong, so I
```

```
 1    don't have to live with that guilt for the rest of my life.
 2            THE COURT:  Right.  And if you have a reasonable doubt
 3    about whether the government's proved the case, Mrs. Smith,
 4    it's your duty to come back with a not guilty verdict.  Do you
 5    understand that?
 6            THE PROSPECTIVE JUROR:  Yes.
 7            THE COURT:  All right.  But you have to prove it
 8    beyond a reasonable doubt.  Do you understand that?
 9            THE PROSPECTIVE JUROR:  Yes.
10            THE COURT:  I mean, the law isn't that you have to
11    prove it beyond all possible doubt; it's a reasonable doubt.
12    Do you understand that?
13            THE PROSPECTIVE JUROR:  Not really.  Could you explain
14    that to me?
15            THE COURT:  Well, that means that some people would
16    argue that you didn't see me come into the courtroom this
17    morning, so maybe I slept here all last night, and I live here,
18    and I sleep under this bench, and it's possible that I do that.
19            THE PROSPECTIVE JUROR:  Okay.
20            THE COURT:  But do you think you have a reasonable
21    doubt as to whether or not I have a house and slept in the
22    house and came in to the courtroom today, and I don't sleep
23    under the bench?
24            THE PROSPECTIVE JUROR:  Okay.
25            THE COURT:  Or do you think it's possible I could
```

122

```
1    sleep under the bench, and because it's possible, you couldn't

2    find me guilty of, you know, coming into the courtroom?

3             THE PROSPECTIVE JUROR:  Yes, it could be possible.

4    But, first, I did not see when the person slept underneath the

5    bench, and I did not see when the person slept at home.

6             THE COURT:  Right.

7             THE PROSPECTIVE JUROR:  So, that's why I said I don't

8    want to judge someone wrongfully --

9             THE COURT:  Right.

10            THE PROSPECTIVE JUROR:  -- when they don't deserve

11   that.

12            THE COURT:  Right.

13            THE PROSPECTIVE JUROR:  Because I have to live with

14   that guilt.

15            THE COURT:  And you weren't in Palm Beach County, you

16   know, last year from June --

17            THE PROSPECTIVE JUROR:  No.

18            THE COURT:  -- and July, right?  So, you didn't see

19   what happened or what didn't happen in Palm Beach County,

20   right?

21            THE PROSPECTIVE JUROR:  No.

22            THE COURT:  So, if the government comes in, and they

23   put on a lot of evidence, no matter what they put on, are you

24   gonna say, "I didn't see it, so I can't find Mr. Joseph

25   guilty"?
```

1           THE PROSPECTIVE JUROR:  Yes, I will say that,

2    because --

3           THE COURT:  Well, then that's something that we need

4    to know.  I appreciate your mentioning that, Mrs. Smith.

5           Anybody else that feels that if you didn't see it

6    yourself, you couldn't find somebody guilty?  If so, please

7    raise your hand.

8           Because if you saw it yourself, you would be a

9    witness, and you couldn't be a juror.  So, if that were the

10   case, we could never find anybody guilty, Ms. Smith.  But I

11   appreciate your candor and telling us how you feel.

12          All right.  We've got everybody back from the

13   bathroom.  And, again, we'll be taking a break in about

14   20 minutes.

15          Ms. Tribuiani, you may inquire.

16          MS. TRIBUIANI:  Thank you.

17          Thank you.

18          Ladies and gentlemen, once again, my name is Rinku

19   Tribuiani.  And with me is co-counsel, John Parnofiello.  We

20   are assistant United States attorneys.  And it is our honor to

21   represent the people of the United States in this case.

22          Now, as Judge Dimitrouleas informed you, the defendant

23   here is charged with several narcotics-related violations.  My

24   question for all of you here is:  Does anyone feel that

25   narcotics should be legalized?  Show of hands.

124

```
1            Does anyone feel like any sort of narcotics, marijuana
2    included, should be legalized?
3            Okay.  So, I have -- I see a few hands.
4            Now, of those of you raising your hands, let me ask
5    you this.  Do any of you feel as though heroin should be
6    legalized?  Does anyone feel that heroin should be legalized?
7            Okay.  So I see no hands.
8            Now, I know that a number of you indicated that you
9    know somebody who was involved in the criminal justice system,
10   specifically for drug-related offenses, and I'd like to call on
11   those people just for a brief moment.
12           Ms. Barnes.
13           THE PROSPECTIVE JUROR:  Yes.
14           MS. TRIBUIANI:  Yes, ma'am.  You indicated that you
15   had a nephew who was arrested for drugs?
16           THE PROSPECTIVE JUROR:  Yes.
17           MS. TRIBUIANI:  How long ago was that?
18           THE PROSPECTIVE JUROR:  Oh, it could have been
19   15 years ago, maybe.
20           MS. TRIBUIANI:  Okay.  So, a significant period of
21   time.
22           Were you, at the time, involved in his case?  Did you
23   make it a point to know what was happening with his case?  Were
24   you informed?
25           THE PROSPECTIVE JUROR:  I was just informed of what
```

125

```
1    happened, that he was arrested.

2              MS. TRIBUIANI:  Okay.  Did you participate in any way

3    in his case in determining what had occurred?  Did he end up

4    taking a plea or go to trial?

5              THE PROSPECTIVE JUROR:  He didn't go to trial.  I'm

6    not sure what happened exactly.

7              MS. TRIBUIANI:  Yes, ma'am.  Anything about that

8    experience that would affect your ability to be fair and

9    impartial here?

10             THE PROSPECTIVE JUROR:  No.

11             MS. TRIBUIANI:  No.  Thank you, ma'am.

12             And, Ms. Cotton, same questions for you, ma'am.  Who

13   was it that was involved in the criminal justice system?

14             THE PROSPECTIVE JUROR:  My sister.

15             MS. TRIBUIANI:  Okay.  And how long ago was that?

16             THE PROSPECTIVE JUROR:  She's been arrested many, many

17   times.  She's probably 35 years going on drug use.

18             MS. TRIBUIANI:  Okay.  I'm sorry, ma'am.

19             Are you familiar with the facts and circumstances of

20   those arrests?  Do you know what has happened with her cases?

21             THE PROSPECTIVE JUROR:  None of her arrests.  She's in

22   Maryland.  She's never been to jail.

23             MS. TRIBUIANI:  Okay.  Anything about her experience

24   that would affect your ability to be fair and impartial here?

25             THE PROSPECTIVE JUROR:  I don't think so.
```

```
1              MS. TRIBUIANI:  Thank you, ma'am.

2         Okay.  And Ms. Dixon.

3         Ma'am, you also indicated that you had a friend or

4    family member involved with the criminal justice system?

5              THE PROSPECTIVE JUROR:  Correct.

6              MS. TRIBUIANI:  And who was that?

7              THE PROSPECTIVE JUROR:  My cousin.

8              MS. TRIBUIANI:  Okay.  And how long ago was that?

9              THE PROSPECTIVE JUROR:  Within five to ten years.

10             MS. TRIBUIANI:  Okay.  Were you familiar with the case

11   as it was ongoing?

12             THE PROSPECTIVE JUROR:  Not particularly.

13             MS. TRIBUIANI:  Did your cousin end up pleading guilty

14   or going to trial?

15             THE PROSPECTIVE JUROR:  No.

16             MS. TRIBUIANI:  Which of the --

17             THE PROSPECTIVE JUROR:  No, just pled guilty.

18             MS. TRIBUIANI:  Pled guilty.  Okay.  Is there anything

19   about that case that would affect your ability to be fair and

20   impartial here?

21             THE PROSPECTIVE JUROR:  No.

22             MS. TRIBUIANI:  Thank you, ma'am.

23             THE PROSPECTIVE JUROR:  Thank you.

24             MS. TRIBUIANI:  And is it Mr. Guistiani?

25             THE PROSPECTIVE JUROR:  Yes.
```

```
 1            MS. TRIBUIANI:  Same questions for you, sir.  Who was
 2   involved in the criminal justice system?
 3            THE PROSPECTIVE JUROR:  My brother.
 4            MS. TRIBUIANI:  Okay.  And how long ago was that?
 5            THE PROSPECTIVE JUROR:  In the mid-'90s?  A little
 6   while ago.
 7            MS. TRIBUIANI:  Okay.  And were you familiar with the
 8   case as it was ongoing?
 9            THE PROSPECTIVE JUROR:  No.  He lived in a different
10   state.
11            MS. TRIBUIANI:  Did your brother ultimately plead
12   guilty or did he go to trial?
13            THE PROSPECTIVE JUROR:  I don't think he -- I just
14   think he got arrested.  I don't know really what happened.  My
15   father took care of it.  It was in Texas and Colorado.  My
16   father lived in Texas, and he was in Colorado.
17            MS. TRIBUIANI:  Yes, sir.
18            THE PROSPECTIVE JUROR:  I didn't really participate
19   too much into it.
20            MS. TRIBUIANI:  Okay.  And anything about that case
21   that would affect your ability to be fair and impartial here?
22            THE PROSPECTIVE JUROR:  No.
23            MS. TRIBUIANI:  Thank you, sir.
24            Does everyone here promise to give this defendant,
25   Balmy Joseph, a fair trial?
```

1          And even though I'm only going to be seated with my

2     co-counsel and my case agent, does everyone recognize that I,

3     too, have a client, the people of the United States?  Does

4     everyone promise to give the people of the United States a fair

5     trial, as well?

6          Now, as the judge explained to you, it is my burden to

7     prove this defendant's guilt beyond a reasonable doubt.  And I

8     want to accept that burden right now.  Does everyone promise to

9     hold me to that burden?

10          Now, having said that, my burden is to prove the

11     defendant's guilt beyond a reasonable doubt, not beyond all

12     doubt.  And there is a difference.  My question for all of you

13     now is:  Is there anyone who would require me to do more than

14     the law requires, which is, is there anyone here who would

15     require me to prove the defendant's guilt beyond all possible

16     doubt before they could convict?  Show of hands.

17          In essence, does everyone promise to follow the

18     instructions that you're given by the judge?

19          Does everyone here believe that people should be held

20     accountant for the choices that they make?

21          Does everyone here agree that people should be held

22     responsible for the choices that they make?

23          And last question, most importantly, does everyone

24     here have common sense?  Did anybody leave it outside?

25          Okay.  Does everybody promise to use your common sense

1    if you're selected to be a juror in this case?

2         All right.  Thank you all very much for your time and

3    your attention.

4         THE COURT:  Mr. Cohen.

5         MR. COHEN:  Yes, sir.  May it please the Court.

6         Ladies and gentlemen of the jury, can you all hear me

7    if I walk around on the microphone?  Is that -- are you having

8    any problems with that?

9         THE COURT:  But the court reporter probably can't.

10        MR. COHEN:  Oh, then, I'm not gonna be walking around.

11        *(Laughter)*

12        MR. COHEN:  Folks, we appreciate you being here.

13        This is a very important moment for Balmy Joseph as he

14   stands trial.  He's asserted that he's innocent.  He's entered

15   a plea of not guilty in this case, and that's why you're here.

16   That's why citizens like yourself are here to try this matter

17   fairly and evenhandedly.  So, I'm going to ask some of you some

18   questions, because what we want to do is we want to make sure

19   that we have the opportunity to have a fair and honest jury.

20        And, you know, a lot of times in a public place like

21   this, it's very difficult for us to find out what you're really

22   thinking unless you kind of search your heart, and you tell us

23   Well, for whatever reason, I just can't sit here.

24        So, the first question I'm gonna ask you -- and we may

25   not have asked you specific questions -- by a show of hands, is

1    there anyone here who, for whatever reason, doesn't think they

2    just can't give Mr. Joseph a fair trial today as he sits here

3    and he's appearing before you with that purpose in mind?

4            Okay.

5            So, I want to go over a few concepts with you, and his

6    Honor, Judge Dimitrouleas, has touched on them.  Do you

7    understand that as Mr. Joseph sits here, that he's presumed to

8    be innocent?  Do you all understand that?

9            There's something in this country called the

10   presumption of innocence.  And it's a very, very important

11   concept.  It means that the government has a burden of proof, a

12   heavy burden to prove a case -- and I'll get to that in just a

13   moment -- beyond and to the exclusion of a reasonable doubt.

14   So, as Mr. Joseph sits here, is there anyone who feels that

15   just because the government has brought charges, that he's

16   guilty by necessity of that?

17           And there's a corollary, his Honor,

18   Judge Dimitrouleas, read you a second super *(sic)* indictment in

19   this particular case.  This is it.  It has four charges in it.

20   The charges are conspiracy to possess with intent to distribute

21   heroin, possession with intent to distribute heroin, possession

22   with intent to distribute fentanyl, and possession with intent

23   to distribute heroin.

24           Are any of you giving, knowing that this is an

25   indictment, this piece of paper any particular weight?  Because

```
 1   you shouldn't at this point of the proceeding.  This is just a

 2   piece of paper.  It's not worth, in terms of proof in this

 3   case, the words that are printed on this second superseding

 4   indictment.  Do we all agree with that?  And by a show of

 5   hands, is there anyone who disagrees with that concept at this

 6   point?

 7        (No response)

 8        MR. COHEN:  So, as I said, Mr. Joseph is presumed

 9   innocent at this point as he sits here.  And he maintains that

10   innocence and remains that way unless or until the government,

11   through its prosecutors and through its witnesses, can prove

12   his guilt beyond and to the exclusion of a reasonable doubt.

13        How many of you know the difference, by a show of

14   hands, between a civil case and a criminal case?

15        Okay.  So, I'm not gonna ask 40 of you to stand up and

16   do that.  That would take the whole morning, and I know some

17   others of you may want to go to a bathroom eventually, me

18   included.  But that having been said, the fact of the matter

19   is, is that in a civil case -- you've probably heard this from

20   a lot of folks -- you just kind of tip the scales.  It's more

21   than 50 percent.  So, if you're in a civil cases, and there's a

22   civil litigation going on -- and I know we have some lawyers

23   here -- if you just get to that 51 percent, what we call a

24   preponderance of the evidence, in such a case, you can find for

25   the plaintiff against a defendant.  That's perfectly okay.
```

```
 1              But here in this courtroom, because such valuable
 2    rights are at stake and because liberty's at stake, as
 3    Judge Dimitrouleas told you, you have to find that the
 4    government has met this very heavy burden beyond and to the
 5    exclusion of a reasonable doubt.  Do all of us agree that in
 6    such a case as this, in such a serious case, you're gonna hold
 7    the government to that burden?  Is there anyone, by a show of
 8    hands, who can't do that in this particular case?
 9              (No response)
10              MR. COHEN:  And do you understand, as a corollary
11    matter, that therefore the burden of proof is on the government
12    in this particular case?  In other words, Mr. Joseph can sit
13    here and do nothing.  And Judge Dimitrouleas said, if he does
14    nothing, and the government doesn't sufficiently put proof into
15    the record through its witnesses or documents, or any way it
16    wishes to prove it, then you must find the defendant not guilty
17    in such a case, that he's presumed innocent, as
18    Judge Dimitrouleas told you.
19              Do we all agree with that as we sit here?
20              Okay.  Thanks very much, folks.  I appreciate that.
21              Now, let me see by a show of hands some of you folks
22    who had close friends or relatives who were police officers.
23              We'll start here.
24              Yes, sir.  Now, give me -- just refresh my
25    recollection for a moment, if you would --
```

133

```
 1              COURTROOM SECURITY OFFICER:  Stand up.
 2              MR. COHEN:  -- what that relationship was, sir.
 3              A PROSPECTIVE JUROR:  My father-in-law.
 4              MR. COHEN:  Yes.  Give me a second.  I just left a
 5    note over here.  I'm gonna get it.
 6              THE COURT:  And for the record, that's Mr. Stein.
 7              MR. COHEN:  Thank you very much.
 8              THE DEFENDANT:  You're welcome.
 9              MR. COHEN:  And I wanted to do that, Mr. Stein,
10    because the court reporter is taking down everything we say,
11    and there's a record that's made here for future purposes.  So,
12    I appreciate it.
13              Your father-in-law was, as you said, a police officer,
14    correct?
15              THE PROSPECTIVE JUROR:  Yes.
16              MR. COHEN:  Now, what about that?  Is that something
17    you think would enter into your deliberations here?  You're
18    gonna see police witnesses who are gonna come here and testify.
19    Some of them may be Palm Beach County Sheriff deputies.  Some
20    of them may be special agents for the United States Drug
21    Enforcement Administration.  How is that gonna sit with you?
22    Are you gonna give their testimony any more weight because of
23    this relationship you may have had than any other witness?
24              THE PROSPECTIVE JUROR:  No.
25              MR. COHEN:  Okay.  And, in fact, Judge Dimitrouleas is
```

134

1    gonna instruct you later on the type of force you should give

2    such witnesses, whether they're civilian or law enforcement

3    officers.  Do you think, sir, Mr. Fine *(sic)*, that just because

4    someone's a police officer, that they ought to be given more

5    credit for their testimony than a civilian witness, for

6    instance?

7            THE PROSPECTIVE JUROR:  No.

8            MR. COHEN:  Okay.

9            I think there was some relationships back here.

10           Yes, sir.  Go ahead.  You were gonna stand, the

11   gentleman with the glasses.  And your name for the record?

12           COURTROOM SECURITY OFFICER:  Hold on.  Let me get the

13   mic.

14           MR. COHEN:  Sure.

15           THE PROSPECTIVE JUROR:  I'm Mr. Guzman.

16           MR. COHEN:  Yes, Mr. Guzman.  Thank you.  And so, I'm

17   not gonna refer back, because I can't remember 45 names.

18           THE PROSPECTIVE JUROR:  Um-hum.

19           MR. COHEN:  And we wouldn't want you to feel that I

20   was insulting you by forgetting your name, so I'll ask your

21   forgiveness in advance.

22           So, Mr. Guzman, your relationship again, if you would,

23   with police officers?

24           THE PROSPECTIVE JUROR:  I have a cousin that graduated

25   the police academy recently.

1         MR. COHEN:  Okay.  How do you feel, that relationship

2    being what it is, you would give either more or less effect to

3    his testimony than that of a civilian witness, for instance?

4         THE PROSPECTIVE JUROR:  If anything, it makes me feel

5    like it's more fair, because I understand that they are just as

6    human as anybody else.

7         MR. COHEN:  Okay.  So, you could be evenhanded.

8         THE PROSPECTIVE JUROR:  Yes.

9         MR. COHEN:  Is there anyone here who have police

10   officers who are either family members or friends who are going

11   to give that police officer, in your heart of hearts, more

12   credit just because they're a police officer or a correction

13   officer?  By a show of hands, is there anyone who is going to

14   be doing that in this case?  Anyone at all.  In your heart of

15   hearts, you would, in a close case, find that finding if they

16   had to?

17        And the record will reflect no one has raised their

18   hands, your Honor.

19        Have any of you ever gotten a traffic ticket?  I think

20   probably we'll get about 40 or 50 hands raised at that point.

21   Just about everyone in the jury raised their hand.  So, what

22   I'm going to do -- and I think that would be Mr. Pinzur?  Is

23   that right, Mr. Pinzur?  If you could just stand up for a

24   second.  I'll let the deputy give you that microphone.

25        So, Mr. Pinzur, when you got that traffic ticket, how

```
 1    did you feel about it?
 2            THE PROSPECTIVE JUROR:  Oh, I haven't got -- it's
 3    probably been 20 years.  I was speeding, and I knew it.
 4            MR. COHEN:  Okay.  If you can go back 20 years,
 5    though, could you see a situation where maybe you weren't
 6    speeding, where you'd want to contest that particular ticket?
 7            THE PROSPECTIVE JUROR:  Sure.
 8            MR. COHEN:  You feel you'd have a right to do that?
 9            THE PROSPECTIVE JUROR:  Sure.
10            MR. COHEN:  You feel my client has a right to be here
11    and contest these charges that he feels may have been unjustly
12    brought by the government?
13            THE PROSPECTIVE JUROR:  Yes.
14            MR. COHEN:  Okay.  Are you going to be able to weigh
15    the evidence in a way that gives him every benefit of the doubt
16    based on the instruction that Judge Dimitrouleas gives you?
17            THE PROSPECTIVE JUROR:  Yes.
18            MR. COHEN:  Okay.  I appreciate it.
19            So, let me all tell you -- and Judge Dimitrouleas kind
20    of hinted at it -- that there are different functions in this
21    particular trial that you're going to fulfill, basically.
22            Ms. Bemis.
23            THE PROSPECTIVE JUROR:  Yes.
24            MR. COHEN:  May I have you take the microphone for
25    just a moment?
```

```
 1              So, do you understand that you're going to be a judge
 2      of the facts in this particular case?
 3              THE PROSPECTIVE JUROR:  Correct.
 4              MR. COHEN:  Okay.  So, you're gonna hear evidence.
 5      His Honor's gonna make rulings on objections and when evidence
 6      comes.  You can't really speculate as to what might not come
 7      into evidence.  You understand that distinction.
 8              THE PROSPECTIVE JUROR:  Correct.
 9              MR. COHEN:  And his Honor, Judge Dimitrouleas, is a
10      judge of the law.  Are you going to be able to follow the law
11      he gives you, apply it to the facts, and then ultimately come
12      up with a verdict?
13              THE PROSPECTIVE JUROR:  Yes.
14              MR. COHEN:  Okay.
15              Do you folks all understand that, that you're
16      basically all judges of the facts in this particular case?
17      Okay.  And you can't speculate about evidence that you don't
18      hear?  Okay.  And that you're gonna come up with a verdict
19      based on the law that Judge Dimitrouleas gives you.  Can you
20      all do that?
21              A PROSPECTIVE JUROR:  Yes.
22              MR. COHEN:  Okay.  And can you follow the law?  Let's
23      say you disagree with it.
24              Ms. Smith, may I ask you?  Let's say, if you could --
25      and I'll wait for the microphone to be given to you for just a
```

1  moment.  Let's say you disagree with the law for just a moment.

2  Would you be able to put that conception of what you believe

3  the law should be aside, understanding that you must follow the

4  law that Judge Dimitrouleas gives you?

5       THE PROSPECTIVE JUROR:  I would not put it aside,

6  because the law is the law.  But at the end of the day, I'm a

7  Christian, and I will pray about it.  But I would not put it

8  aside.

9       MR. COHEN:  Okay.  So, you could follow the law --

10       THE PROSPECTIVE JUROR:  Yes.

11       MR. COHEN:  -- that the judge gives you.

12       THE PROSPECTIVE JUROR:  Yes.

13       MR. COHEN:  And you'd do that.

14       THE PROSPECTIVE JUROR:  Yes.

15       MR. COHEN:  Can everyone promise to do that, to follow

16  the law?  Whether you agree with it or whether you don't agree

17  with it, can you follow the law that his Honor,

18  Judge Dimitrouleas, gives you?

19       Okay.

20       THE COURT:  Mr. Cohen, your time has elapsed.  If you

21  wanted to ask one more question, you could.

22       MR. COHEN:  No, folks, I think that -- we appreciate

23  the fact that you're here.  All we ask is you give my client a

24  fair trial based on the evidence.  In my opening statement, I'm

25  gonna explain how that gets put together kind of like a jigsaw

1   puzzle.  But I appreciate your fairness and your courtesy in

2   answering my questions.

3           Thank you very much.

4           Thank you, Judge.

5           THE COURT:  All right, members of the jury, we're

6   going to take a recess.  During this recess and any recess in

7   the case, you're not to discuss the case or allow it to be

8   discussed in your presence.  Now, you know virtually nothing

9   about the case, but I am going to instruct you:  Do not discuss

10  the case, do not allow it to be discussed in your presence.

11          If you bump into the lawyers or Mr. Joseph during this

12  break, or any break in the trial, and they walk right by you,

13  they don't even say hi, they're not being rude.  They're just

14  following the rules of court, and that is that they are to have

15  no contact with jurors.

16          I mean, if you were talking down the hall, and one of

17  the lawyers walked by you, and you said, "Good morning," and

18  the lawyer said, "Good morning" back, and someone way down the

19  hall couldn't hear what you were saying but saw you talk, that

20  wouldn't look right.  So, to avoid the appearance of

21  impropriety, the lawyers won't have any contact with you during

22  the trial.  In fact, if you go to get on an elevator, and a

23  lawyer gets off the elevator, they're not commenting on your

24  personal hygiene; they're just avoiding any possible inference

25  of impropriety.

```
 1              When we do come back from the break, I'm gonna ask you
 2    to take the same exact seat that you're in right now.  So,
 3    count down from the end or see who's sitting next to you.  And
 4    I'm gonna ask you that you come back in about 15 minutes and
 5    wait outside in the lobby, and then we'll bring you back in and
 6    tell you who we picked on the jury.
 7              So, remember my admonition not to discuss the case or
 8    allow it to be discussed in your presence.  And we'll see you
 9    back out in the lobby in about 15 minutes.
10              COURTROOM SECURITY OFFICER:  All rise.
11              Front row?
12              THE COURT:  I think Terry was talking about the other
13    front row, but that's okay.  We'll get you out of here in a
14    minute.
15              Now the rest of you can go.  Go ahead.
16              (Laughter)
17              (The prospective jurors exited the courtroom)
18              THE COURT:  All right.  So, we're outside the presence
19    of the jury.  If you want a few moments to confer, and then
20    we'll do the challenges.
21              MS. TRIBUIANI:  Thank you.
22              (Discussion had off the record between counsel and
23    client)
24              MR. COHEN:  May I take a break for a moment?
25              THE COURT:  Go ahead.
```

1       MR. COHEN:  It was easier at 30 than it is in your

2   60s.  As an experienced judge, I figure you can appreciate

3   that.

4       THE COURT:  It's been a long time since I've been a

5   trial lawyer.

6       MR. COHEN:  Thank you, Judge.

7       *(Mr. Cohen exited the courtroom)*

8       *(Pause)*

9       *(Mr. Cohen entered the courtroom)*

10      MR. COHEN:  Thank you.

11      *(Pause)*

12      MR. COHEN:  We're almost done, Judge.  Bear with us.

13      THE COURT:  Okay.

14      MR. COHEN:  Almost halfway through.

15      *(Discussion had off the record between counsel and

16  client)*

17      *(Pause)*

18      THE COURT:  All right.  Any challenges for cause?

19      MS. TRIBUIANI:  Yes, your Honor.

20      Your Honor, there were several jurors who indicated

21  that they work at night and might be tired during the --

22      THE COURT:  Let's just go one at a time.

23      MS. TRIBUIANI:  Yes, sir.  Juror Number 10.

24      THE COURT:  Any objection to Mr. St. Rose?

25      MR. COHEN:  If we can just have it on the record as to

1    why --

2            THE COURT REPORTER:  I'm sorry, Mr. Cohen, I need you

3    on the microphone.

4            MR. COHEN:  I'm so sorry.  I turned it away while I

5    was talking to my client.

6            If we could just put it on the record as to why

7    Ms. Tribuiani's moving to excuse them for cause, please?

8            THE COURT:  I think she did.  She said he works at

9    night.

10           MR. COHEN:  I think that's true, Judge.

11           THE COURT:  Okay.  So, I'll grant the challenge for

12   cause on Juror Number 10, Mr. St. Rose.

13           Next one?

14           MS. TRIBUIANI:  Juror Number 15.

15           MR. COHEN:  I don't think -- what she said, Judge, she

16   had a problem unless the evidence was there.  She wasn't like

17   the other juror who said she had a religious conviction about

18   judging.  So, I would object to her being excused for cause.

19           THE COURT:  Well, I think that I've got a reasonable

20   doubt as to whether or not she can follow the law, given my

21   questions that I asked her.  But even if I didn't, she's got to

22   pick up her kids at 2:45.  I'm not going to break the trial at

23   two o'clock for her to go pick up her kids.

24           MR. COHEN:  That's true.  I neglected to remember

25   that.  Yeah, Judge, we wouldn't, on that basis, Judge, object.

```
1              THE COURT:  Okay.  So, I'll grant the challenge for
2    cause on Juror Number 15, Mrs. Smith.
3              Next one?
4              MS. TRIBUIANI:  Juror Number 18.  He indicated --
5              THE COURT:  Mr. Guzman is leaving Wednesday through
6    Sunday.
7              MS. TRIBUIANI:  Correct.
8              MR. COHEN:  No problem with that, Judge.
9              THE COURT:  Okay.  I'll grant the challenge for cause
10   on Juror Number 18, Mr. Guzman Castillo.
11             Next one?
12             MS. TRIBUIANI:  Juror Number 23.
13             THE COURT:  She's got to pick up kids at two o'clock.
14   Any objection?
15             MR. COHEN:  No objection.
16             THE COURT:  I'll grant the challenge for cause on
17   Juror Number 23, Mrs. Ertug Oban *(sic)*.
18             MS. TRIBUIANI:  Juror Number 24.
19             MR. COHEN:  Reason?
20             MS. TRIBUIANI:  Leaving town tomorrow.
21             MR. COHEN:  Sorry?
22             MS. TRIBUIANI:  She's leaving town tomorrow.
23             THE COURT:  She's just gonna be gone tomorrow, but
24   we'd have to break the trial tomorrow for Ms. Davila.
25             MR. COHEN:  No objection to excusing her, Judge.
```

144

1              THE COURT:  Okay.  I'll grant the challenge for cause

2    on Juror Number 24, Ms. Davila.

3              MS. TRIBUIANI:  Juror Number 38.

4              THE COURT:  It's Mr. Johnson, who works at night at

5    American Airlines.

6              MR. COHEN:  Judge, on -- what -- did she say what her

7    hours were, your Honor?

8              THE COURT:  It's a "he."

9              MR. COHEN:  He, excuse me.

10             THE COURT:  He said he was tired, that he worked last

11   night.

12             MR. COHEN:  We don't object.

13             THE COURT:  Okay.  I'll grant the challenge for cause

14   on Juror Number 38, Mr. Johnson.

15             MS. TRIBUIANI:  Juror Number 42.

16             THE COURT:  That's the surgical nurse that it's gonna

17   be a hardship on her.  They won't be able to do surgeries

18   tomorrow?

19             MS. TRIBUIANI:  Correct.

20             MR. COHEN:  Yeah, we don't have an objection to that,

21   Judge.

22             THE COURT:  Okay.  I'll grant the challenge for cause

23   on Juror Number 42, Ms. Lessner.

24             MS. TRIBUIANI:  Juror Number 43.

25             MR. COHEN:  Yeah, she had a religious belief problem

145

1   and no way to get here, she said.  So, we don't have an

2   objection to that, Judge.

3        THE COURT:  Okay.  I'll grant the challenge for cause

4   on Juror Number 43, Ms. Peavey.

5        MS. TRIBUIANI:  Juror Number 46.

6        MR. COHEN:  Can we have the reason for that, please?

7        MS. TRIBUIANI:  She indicated --

8        MR. COHEN:  I have "a problem" next to the name, but I

9   didn't articulate it.

10       MS. TRIBUIANI:  She indicated she can't be here.

11  She's the sole caretaker of an autistic child.

12       MR. COHEN:  Right.  That's right.  We don't have an

13  objection to that, Judge.

14       THE COURT:  Yeah, I think she said she's got to pick

15  up kids at three o'clock.

16       MR. COHEN:  Yeah, she said that too.

17       THE COURT:  So, I'll grant the challenge for cause on

18  Juror Number 46, Ms. Bronson.

19       MS. TRIBUIANI:  That's all I have, Judge.

20       THE COURT:  Any other challenges for cause, Mr. Cohen?

21       MR. COHEN:  No.  I think we've covered that, Judge.

22       THE COURT:  Mrs. Shanley, Juror Number 30, can't be

23  here on Friday.  Are we going to break the trial on Friday if

24  it's still going on?

25       MR. COHEN:  I think, just in case, Judge, we should

1   excuse her for cause.

2              MS. TRIBUIANI:  Your Honor, this case is gonna be

3   wrapped up before Friday.  I don't think that's gonna be a

4   problem.

5              MR. COHEN:  But why take a chance, Judge?

6              THE COURT:  Well, I'll defer on her.

7              How about Juror Number 29, Mrs. Garbharran?  Didn't

8   she have to do something on Thursday?

9              MS. TRIBUIANI:  She has a dentist appointment Thursday

10  morning at 9:40.  Again, your Honor, I don't see this trial

11  going into Thursday.

12             MR. COHEN:  We don't have a problem excusing her,

13  Judge.

14             THE COURT:  Okay.  I'll excuse Juror Number 29,

15  Mrs. Garbharran.

16             Juror Number 40, Mrs. Hinton, has to pick up her kids

17  at 4:45 in Weston.

18             MR. COHEN:  Yeah, that could be a problem, your Honor.

19  We don't have a problem excusing her for cause.

20             MS. TRIBUIANI:  That's correct.

21             THE COURT:  Okay.  I'll grant the challenge for cause

22  on Juror Number 40, Mrs. Hinton.

23             Juror Number 4, Mr. Stephen, has to drop his kids off

24  at nine, which means we'd have to start later.

25             MR. COHEN:  Yeah, that's gonna be a problem for him,

1    Judge.

2          MS. TRIBUIANI:  I don't have a problem excusing him,

3    your Honor.

4          THE COURT:  Okay.  I'll grant the challenge for cause

5    on Juror Number 4, Mr. Stephen.

6          Juror Number 3, Mrs. Gutierrez, I think has to leave

7    at 5:15, and she's concerned about getting calls during the

8    night.

9          MR. COHEN:  I'd rather have an attentive jury.  I

10   don't have a problem excusing her for cause, your Honor.

11         MS. TRIBUIANI:  That's correct.

12         THE COURT:  Okay.  I'll grant the challenge for cause

13   on Juror Number 3, Mrs. Gutierrez.

14         Any other challenges for cause?

15         MS. TRIBUIANI:  Your Honor, Juror Number 41 indicated

16   that she has to leave at 4:30, if my notes are correct.

17         THE COURT:  I put down that she has to pick up her

18   kids at 5:30.  Then I asked her if she left at 4:45, can she

19   get to Cooper City by then, and I thought she said she could.

20   So, let's leave her on at this point.

21         MS. TRIBUIANI:  Yes, sir.

22         MR. COHEN:  I agree, Judge.

23         THE COURT:  And I think Ms. Moya Carmenate,

24   Number 44's English is okay.

25         MR. COHEN:  She seemed to be.  She expressed a problem

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

148

```
 1   in the beginning, but as we were talking to her, your Honor, I
 2   think she was okay.
 3              THE COURT:  Yeah, I think so, too.
 4              All right.  So, any peremptory challenges from the
 5   government through Juror Number 16, Mr. Peiretti?
 6              MS. TRIBUIANI:  We would strike Juror Number 1,
 7   Ms. Barnes.
 8              THE COURT:  Juror Number 1, Ms. Barnes.
 9              That puts us up to Juror Number 17, Mr. Zorovich.
10              Mr. Cohen.
11              MR. COHEN:  Judge, we would strike for cause -- and
12   we're just gonna list them one by one?
13              THE COURT:  You can do one at a time, or you can do
14   multiple ones up through 17.
15              MR. COHEN:  Are we going back and forth between the
16   government and us at this point?
17              THE COURT:  I'm sorry?
18              MR. COHEN:  Are we going back and forth between the
19   government and us?
20              THE COURT:  Yes.
21              MR. COHEN:  If I excuse someone, will it then be
22   incumbent upon the government to excuse the next one through
23   17?
24              THE COURT:  Right.  If you excuse one, then it will
25   move up to 19 when I turn to the government.
```

```
1            MR. COHEN:  Right.

2            THE COURT:  If you excuse two, then it would move up

3   to 20.

4            MR. COHEN:  Right.  Understood.  Okay.

5            Richia R. Dix, that I can excuse.

6            THE COURT:  Number 2.

7            Okay.  That puts us up to Juror Number 19,

8   Mrs. Cotton.

9            Ms. Tribuiani.

10           MS. TRIBUIANI:  We're gonna excuse Juror Number 7,

11  your Honor, Ms. Refkin.

12           THE COURT:  Ms. Refkin.

13           That puts us up to Juror Number 20, Ms. Peters.

14           Mr. Cohen.

15           MR. COHEN:  We'll excuse Mr. Stein, Juror Number 5.

16           THE COURT:  Juror Number 5.

17           That puts us up to Juror Number 21, Mr. Quinones.

18           Ms. Tribuiani.

19           MS. TRIBUIANI:  Judge, we'll excuse Mr. Quinones.

20           THE COURT:  Number 21.

21           That puts us up to Juror Number 22, Mrs. Crush.

22           Mr. Cohen.

23           MR. COHEN:  Judge, we would thank and excuse

24  Number 26.

25           THE COURT:  We're not there yet.  We're up to 22.
```

1          MR. COHEN:  Twenty-two?  I'm sorry, Judge.

2          So, we would thank and excuse number -- did we excuse

3    18?  No.  He's out.

4          THE COURT:  Eighteen's gone.

5          MR. COHEN:  Eighteen's gone.

6          And what number are we up to again now, Judge?

7          THE COURT:  Up to 22.

8          MR. COHEN:  If we haven't already, we'd thank and

9    excuse Ms. Crush, 22.

10         THE COURT:  Twenty-two.  Okay.

11         That puts us up to Juror Number 25, Ms. Dixon.

12         Ms. Tribuiani.

13         MR. COHEN:  How many total have they used of their

14   total strikes coming to them?

15         THE COURT:  They've used three.  You've used three.

16         MR. COHEN:  It's three and three, so we have... a

17   number of them.

18         MS. TRIBUIANI:  Your Honor, we would excuse Juror

19   Number 8, Ms. Prats.

20         THE COURT:  That puts us up to Juror Number 26,

21   Mr. Guistiani.

22         Mr. Cohen.

23         MR. COHEN:  We would thank and excuse Number 26,

24   Mr. Guistiani.

25         THE COURT:  That's puts us up to Juror Number 27,

1    Mrs. Gordon.

2              Ms. Tribuiani.

3              *(Pause)*

4              MS. TRIBUIANI:  Your Honor, we're going to excuse

5    Juror Number 6, Ms. Shepherd.

6              THE COURT:  Juror Number 6.

7              That puts us up to Juror Number 28, Mr. Alvarez.

8              Mr. Cohen.

9              *(Discussion had off the record between counsel and*

10   *client)*

11             MR. COHEN:  Yeah, we'd thank and excuse Mr. Alvarez.

12             THE COURT:  Juror Number 28.

13             That puts us up to Juror Number 30, Mrs. Shanley.

14             Ms. Tribuiani.

15             MS. TRIBUIANI:  We'll accept the panel, Judge.

16             MR. COHEN:  Judge, how many do we have left?

17             THE COURT:  I think you've used five strikes.

18             MR. COHEN:  Leaving us with the --

19             THE COURT:  Five.

20             MR. COHEN:  Five left.  And we're up to what number,

21   sir?

22             THE COURT:  Ms. Shanley, Number 30.

23             MR. COHEN:  Number 30, okay.  We would thank and

24   excuse Number 27.

25             THE COURT:  Ms. Gordon.

152

```
 1              MR. COHEN:  Ms. Gordon.

 2              We would -- that gives us I believe four left, your

 3    Honor?

 4              THE COURT:  Right.

 5              MR. COHEN:  Thank and excuse Ms. Rizzo.

 6              Thank and excuse Ms. Rauscher.

 7              THE COURT:  Slow down just a little bit.

 8              MR. COHEN:  That's 33 and 34.

 9              THE COURT:  We're not up there yet.  We're up to

10    Caulfield.

11              MR. COHEN:  We accept Caulfield.

12              But prior to that, Judge, I apologize, if we haven't

13    already, we move to excuse Stanley (sic), Juror Number 30.

14              THE COURT:  Shanley.  Okay.  That's Number 30.

15              So that puts us up to 32, Mrs. Romano-Stoff.

16              Ms. Tribuiani.

17              MS. TRIBUIANI:  Judge, I'd accept the panel.

18              THE COURT:  Mr. Cohen.

19              MR. COHEN:  Number we're up to, Judge?

20              THE COURT:  Thirty-two, Mrs. Romano-Stoff.

21              (Discussion had off the record between counsel and

22    client)

23              MR. COHEN:  If I don't take my option at this point,

24    Judge, is the jury at this point accepted?

25              THE COURT:  If there's no backstrikes, it is.
```

```
 1              (Discussion had off the record between counsel and
 2    client)
 3              MR. COHEN:  Give me one second, your Honor?
 4              THE COURT:  Okay.
 5              (Discussion had off the record between counsel and
 6    client)
 7              MR. COHEN:  We would thank and excuse Mr. Pinzur,
 8    Number 12.
 9              That takes us to what number, your Honor?
10              THE COURT:  So Juror Number 12, Mr. Pinzur.  Okay.
11              So that moves us up to Juror Number 33, Mrs. Rizzo.
12              Ms. Tribuiani.
13              MS. TRIBUIANI:  We would accept the panel, your Honor.
14              THE COURT:  Mr. Cohen.
15              MR. COHEN:  Thank and excuse Ms. Rizzo.
16              THE COURT:  Okay.  That moves us up to Juror
17    Number 34, Ms. Rauscher.
18              Ms. Tribuiani.
19              MS. TRIBUIANI:  We would accept.
20              THE COURT:  Mr. Cohen.
21              MR. COHEN:  Thank and excuse Ms. Rauscher.
22              THE COURT:  That's your last strike.
23              MR. COHEN:  Yes, sir.
24              THE COURT:  That moves us up to Juror Number 35,
25    Ms. Ferris.
```

1          Ms. Tribuiani.

2          MS. TRIBUIANI:  One moment, your Honor.

3          *(Discussion had off the record between counsel)*

4          MS. TRIBUIANI:  We accept, your Honor.

5          THE COURT:  Let me see if I've got this right.  So,

6     the 12 jurors would be Juror Number 9, Mr. Bryan; Number 11,

7     Ms. Giboyeaux; Number 13, Ms. Giraldo; Number 14, Ms. Bemis;

8     Number 16, Mr. Peiretti; Number 17, Mr. Zorovich; Number 19,

9     Mrs. Cotton; Number 20, Ms. Peters; Number 25, Ms. Dixon.

10         MR. COHEN:  That's right.

11         THE COURT:  Number 31, Mr. Caulfield; Number 32,

12    Mrs. Romano-Stoff; and Number 35, Ms. Ferris.

13         Are those 12 jurors acceptable to the government?

14         MS. TRIBUIANI:  Yes, your Honor.

15         THE COURT:  To the defense?

16         MR. COHEN:  Yes, sir.

17         THE COURT:  Those 12 jurors okay with you, Mr. Joseph?

18         THE DEFENDANT:  *(No response)*

19         MR. COHEN:  Are those 12 jurors we've picked, which we

20    circled, okay with you, Mr. Joseph?  So, these are the ones

21    I've circled.

22         *(Discussion had off the record between counsel and*

23    *client)*

24         THE DEFENDANT:  Yes.

25         THE COURT:  I didn't hear you.

1              THE DEFENDANT:  Yes.

2              THE COURT:  Okay.  Let's pick two alternate jurors.

3      Each of you will have one strike for the alternate.

4              Are Mr. Guzman and Mrs. Rodriguez acceptable to the

5      government?

6              MS. TRIBUIANI:  We would strike Guzman, your Honor.

7              THE COURT:  Okay.  So, the government strikes Guzman.

8      That means the alternates will be Mrs. Rodriguez and

9      Ms. Alubi, unless the defense strikes one of them, and then the

10     second alternate would be Mrs. Linares-Prat.

11             MR. COHEN:  We would move to strike Ms. Rodriguez.

12             THE COURT:  Okay.  So that means the first alternate

13     is Ms. Alubi, but the second alternate is Ms. Linares-Prat, who

14     would have to leave by 4:45 to get to Cooper City.  Do we want

15     to break the trial at 4:45 every day for the second alternate,

16     or do we want to use either Jurors 44 or 45 as the second

17     alternate?

18             MR. COHEN:  It's okay with us, Judge, as far as

19     adjourning 15 minutes before five.  We have no problem with

20     that.

21             MS. TRIBUIANI:  Judge, I would prefer, frankly, if we

22     could use one of the other jurors, just so we don't have to

23     adjourn early, and we can get this trial finished.

24             THE COURT:  Yeah, I'm not excited about breaking

25     early, and I'm not sure that she can get from downtown

```
 1   Fort Lauderdale leaving at 4:45 to Cooper City at 5:30.  She

 2   might not even get to I-95 trying to get out of downtown

 3   Fort Lauderdale.

 4         So, I'm going to grant the challenge for cause on

 5   Juror Number 49 -- excuse me -- Juror Number 46 (sic),

 6   Ms. Linares-Prat.

 7         So that means Ms. Moya-Carmenate, who had some concern

 8   about English, would be the second alternate, unless you want

 9   to agree on not using her, and we can go to Juror Number 45,

10   Mrs. Flynn (sic).

11         MR. COHEN:  I think Ms. Carmenate -- Moya-Carmenate

12   was fine, Judge.  I -- we saw her reactions to our questions.

13   I think she's okay.  We're okay with her.

14         MS. TRIBUIANI:  As am I, your Honor.

15         THE COURT:  All right.  So, she'll be our second

16   alternate.

17         Okay.  Let's bring in the jury.

18         COURTROOM SECURITY OFFICER:  All rise.

19         (The prospective jurors entered the courtroom)

20         THE COURT:  You can have a seat when you come in.

21         (The prospective jurors entered the courtroom)

22         THE COURT:  Please be seated.

23         Counsel concede the presence of the jury and waive its

24   polling?

25         MR. COHEN:  Yes, sir.
```

1          MS. TRIBUIANI:  Yes, your Honor.

2          THE COURT:  And did everyone follow my admonition not

3    to discuss the case or allow it to be discussed in your

4    presence?

5          All right.  We've selected the 12 jurors and two

6    alternates that are going to serve on this case.  If your name

7    is not called, you're excused with the Court's thanks.  And I

8    need you to continue to call in the rest of this week and next

9    week in the event that you're needed on another case.  And if

10   you could hand your juror badges to Terry on the way out, I'd

11   appreciate it.

12         But the 14 jurors who will serve on this case and who

13   I will ask to remain in their seats are:  Mr. Bryan,

14   Ms. Giboyeaux, Ms. Giraldo, Ms. Bemis, Mr. Peiretti,

15   Mr. Zorovich, Ms. Cotton -- Ms. Cotton -- Ms. Peters,

16   Ms. Dixon, Mr. Caulfield, Mrs. Romano-Stoff, Ms. Ferris,

17   Ms. Alubi, and Mrs. Moya-Carmenate.  And if you 14 jurors could

18   remain in your seats, the other jurors are excused with the

19   Court's thanks.  Have a nice afternoon.

20         COURTROOM SECURITY OFFICER:  All rise.

21         (The prospective jurors exited the courtroom)

22         THE COURT:  I didn't pronounce your name right.

23         THE PROSPECTIVE JUROR:  That's fine, your Honor.

24         THE COURT:  Giboyeaux?

25         THE PROSPECTIVE JUROR:  Giboyeaux.

```
 1                THE COURT:  All right.  We're going to rearrange
 2    everybody just a little bit.
 3                Mr. Bryan, you're okay where you're at.
 4                Ms. Giboyeaux, if you could move one seat to your
 5    left.
 6                Ms. Giraldo, if you could take the third seat.
 7                Ms. Bemis, the fourth seat in that middle row.
 8                Mr. Peiretti, the fifth seat in the middle row.
 9                Mr. Zorovich, the sixth seat in the middle row.
10                Mrs. Cotton, you're in the last seat in the middle
11    row.
12                Ms. Peters, you're in the first seat in the back row.
13                Ms. Dixon, the second seat in the back row.
14                Mr. Caulfield, the third seat in the back row.
15                Mrs. Romano-Stoff, the fourth seat in the back row.
16                Ms. Ferris, the fifth seat in the back row.
17                Ms. Alubi, the sixth seat in the back row.
18                And, Mrs. Moya-Carmenate, the last seat in the back
19    row.
20                And, Karen, if we could swear the panel.
21                ROOM CLERK:  Please stand.  Please raise your right
22    hand.
23                Do you and each of you solemnly swear that you will
24    well and truly try the issues herein and render a true verdict
25    according to the law and the evidence, so help you God?
```

1          THE JURORS:  I do.

2          ROOM CLERK:  Thank you.  You may be seated.

3          THE COURT:  All right, members of the jury, I'm going

4    to give you some preliminary instructions, and then we're going

5    to break for lunch.

6          Members of the jury, now that you have been sworn, I

7    need to explain some basic principles about a criminal trial

8    and your duty as jurors.  These are preliminary instructions.

9    At the end of the trial, I will give you more detailed

10   instructions.

11         It will be your duty to decide what happens so you can

12   determine whether the defendant is guilty or not guilty of the

13   crimes charged in the indictment.

14         At the end of the trial, I will explain the law that

15   you must follow to reach your verdict.  You must follow the law

16   as I explain it to you, even if you do not agree with the law.

17         You must decide the case solely on the evidence

18   presented here in the courtroom.  Evidence can come in many

19   forms.  It can be testimony about what someone saw or heard or

20   smelled.  It can be an exhibit admitted into evidence.  It can

21   be someone's opinion.

22         Some evidence proves a fact indirectly, such as a

23   witness who saw wet grass outside and people walking into the

24   courthouse carrying wet umbrellas.  Indirect evidence,

25   sometimes called circumstantial evidence, is simply a chain of

160

1  circumstances that proves a fact.  As far as the law is

2  concerned, it makes no difference whether evidence is direct or

3  indirect.  You may choose to believe or disbelieve either kind,

4  and you should give every piece of evidence whatever weight you

5  think it deserves.

6          Certain things are not evidence and must not be

7  considered.  I will list them for you now.

8          One, statements and arguments of the lawyers.  In

9  their opening statements and closing arguments, the lawyers

10  will discuss the case, but their remarks are not evidence.

11          Two, questions and objections of the lawyers.  The

12  lawyers' questions are not evidence.  Only the witnesses's

13  answers are evidence.  You should not think that something is

14  true just because a lawyer's question suggests that it is.

15          For instance, if a lawyer asks a witness, "You saw the

16  defendant hit his sister, didn't you," that question is no

17  evidence whatsoever of what the witness saw or what the

18  defendant did unless the witness agrees with it.

19          There are rules of evidence that control what can be

20  received into evidence.  When a lawyer asks a question or

21  offers an exhibit, and a lawyer on the other side thinks that

22  it is not permitted by the rules of evidence, that lawyer may

23  object.  If I overrule the objection, then the question may be

24  answered or the exhibit received.  If I sustain the objection,

25  then the question cannot be answered and the exhibit cannot be

1    received.

2         Whenever I sustain an objection to a question, you

3    must ignore the question and not try to guess what the answer

4    would have been.

5         Sometimes I may order that evidence be stricken and

6    that you disregard or ignore the evidence.  That means when you

7    are deciding the case, you must not consider that evidence.

8         Some evidence is admitted only for a limited purpose.

9    When I instruct you that an item of evidence has been admitted

10   for a limited purpose, you must consider it only for that

11   limited purpose and no other.

12        In reaching your verdict, you may have to decide what

13   testimony to believe and what testimony not to believe.  You

14   may believe everything a witness says or part of it or none of

15   it.  In considering the testimony of any witness, you may take

16   into account:  One, the opportunity and ability of the witness

17   to see or hear or know the things testified to; two, the

18   witness's memory; three, the witness's manner while testifying;

19   four, the witness's interest in the outcome of the case and any

20   bias or prejudice; five, whether other evidence contradicted

21   the witness's testimony; six, the reasonableness of the

22   witness's testimony in light of all the evidence; and, seven,

23   any other factor that bears on believability.

24        I will give you additional guidelines for determining

25   credibility of witnesses at the end of the case.

1          As you know, this is a criminal case.  There are three

2     basic rules about a criminal case that you must keep in mind.

3          First, the defendant is presumed innocent until proven

4     guilty.  The indictment against the defendant, brought by the

5     government, is only an accusation, nothing more.  It is not

6     proof of guilt or anything else.  The defendant therefore

7     starts out with a clean slate.

8          Second, the burden of proof is on the government until

9     the very end of the case.  The defendant has no burden to prove

10     his innocence or to present any evidence or to testify.  Since

11     the defendant has the right to remain silent and may choose

12     whether to testify, you cannot legally put any weight on a

13     defendant's choice not to testify.  It is not evidence.

14          Third, the government must prove the defendant's guilt

15     beyond a reasonable doubt.  You will be given further

16     instructions on this point later.  But bear in mind that the

17     level of proof required is high.

18          Our law requires jurors to follow certain instructions

19     regarding their personal conduct in order to help assure a just

20     and fair trial.  I will now give you those instructions.

21          One, do not talk, either among yourselves or with

22     anyone else, about anything related to the case.  You may tell

23     the people with whom you live and your employer that you are a

24     juror and give them information about when you will be required

25     to be in court.  But you may not discuss with them, or anyone

1    else, anything related to the case.

2            Two, do not at any time during the trial request,

3    accept, agree to accept, or discuss with any person any type of

4    payment or benefit in return for supplying any information

5    about the trial.

6            Three, you must promptly tell me about any incident

7    you know of involving an attempt by any person to improperly

8    influence you or any member of the jury.

9            Four, do not visit or view the premises or place where

10   the charged crime was allegedly committed or any other premises

11   or place involved in the case.  And you must not use Internet

12   Maps or Google Earth or any other program or device to search

13   for a view of any location discussed in the testimony.

14           Five, do not read, watch, or listen to any accounts or

15   discussions related to the case which may be reported by

16   newspapers, television, radio, the Internet, or any other news

17   media.

18           Six, do not attempt to research any fact, issue, or

19   law related to this case, whether by discussions with others,

20   by library or Internet research, or by any other means or

21   source.

22           In this age of instant electronic communications and

23   research, I want to emphasize that in addition to not talking

24   face-to-face with anyone about the case, you must not

25   communicate with anyone about the case by any other means,

1  including by telephone, text messages, email, Internet chat,

2  chat rooms, blogs, or social networking websites, such as

3  Facebook, MySpace, or Twitter.

4        You must not provide any information about the case to

5  anyone by any means whatsoever, and that includes posting

6  information about the case or what you are doing in the case on

7  any device or Internet site, including blogs, chat rooms,

8  social websites, or any other means.

9        You also must not use Google or otherwise search for

10  any information about the case, or the law that applies to the

11  case, or the people involved in the case, including the

12  defendant, the witnesses, the lawyers, or me.

13        It is important that you understand why these rules

14  exist and why they are so important.

15        Our law does not permit jurors to talk with anyone

16  else about the case or to permit anyone to talk to them about

17  the case, because only jurors are authorized to render a

18  verdict.  Only you have been found to be fair, and only you

19  have promised to be fair.  No one else is so qualified.

20        Our law also does not permit jurors to talk among

21  themselves about the case until the Court tells them to begin

22  deliberations, because premature discussions can lead to a

23  premature final decision.

24        Our law also does not permit you to visit a place

25  discussed in the testimony.  First, you can't be sure that the

1  place is in the same condition as it was on the day in

2  question.  Second, even if it were in the same condition, once

3  you go to a place discussed in the testimony to evaluate the

4  evidence in light of what you see, you become a witness, not a

5  juror.  As a witness, you may now have a mistaken view of the

6  scene that neither party may have a chance to correct.  That is

7  not fair.

8       Finally, our law requires that you not read or listen

9  to any news accounts of the case, and that you not attempt to

10  research any fact, issue, or law related to the case.

11       Your decision must be based solely on the testimony

12  and other evidence presented in this courtroom.

13       Also, the law often uses words and phrases in special

14  ways, so it's important that any definitions you hear come only

15  from me and not from any other source.  It wouldn't be fair to

16  the parties for you to base your decision on some reporter's

17  view or opinion or upon other information you acquire outside

18  the courtroom.

19       These rules are designed to help guarantee a fair

20  trial.  And our law accordingly sets forth serious consequences

21  if the rules are not followed.

22       I trust that you understand and appreciate the

23  importance of following these rules, and in accord with your

24  oath and promise, I know you will do so.

25       Moving on now, if you wish, you may take notes to help

1    remember what witnesses said.  If you do take notes, please

2    keep them to yourself until you and your fellow jurors go to

3    the jury room to decide the case.  Do not let notetaking

4    distract you so that you do not hear other answers by

5    witnesses.

6         When you leave the courtroom, your notes should be

7    left in the jury deliberation room.  Don't leave them out here

8    on your chairs, don't take them home with you.  They'll be safe

9    in the jury deliberation room.  And whether or not you take

10   notes, you should rely upon your own memory of what was said.

11   Notes are to assist your memory only.  They are not entitled to

12   any greater weight than your memory or impression about the

13   testimony.

14        Now, the trial's going to begin after lunch.  First,

15   the government will make an opening statement, which is simply

16   an outline to help you understand the evidence as it comes in.

17   Next, defense counsel may, but does not have to, make an

18   opening statement.  Opening statements are neither evidence nor

19   argument.

20        The government will then present its witnesses, and

21   counsel for the defendant may cross-examine them.  Following

22   the government's case, the defendant may, if he wishes, present

23   witnesses whom the government may cross-examine.

24        After all the evidence is in, the attorneys will

25   present their closing arguments to summarize and interpret the

1  evidence for you, and I will instruct you on the law.  After

2  that, you will go to the jury room to decide your verdict.

3        All right.  So, from now on, you're not going to enter

4  the courtroom through those two front doors.  You'll be

5  entering the courtroom through that side door that Karen's

6  standing next to.  And Karen will show you how you can get from

7  the lobby into the jury deliberation room, which is right

8  behind where you're seated now.

9        You're welcome to stay in the jury deliberation room

10  during this break in the trial, any lunch breaks in the trial,

11  or any breaks in the trial, if you want to.

12        If you do go outside, though, to go to lunch, be

13  careful that you don't put yourself in a position where you're

14  overhearing conversations, because there may be witnesses

15  waiting outside to testify.

16        Remember my admonition not to discuss the case or

17  allow it to be discussed in your presence.  And I'm gonna ask

18  you to come back at 1:30 and be in the jury deliberation room

19  at that point.  And if you want to take notes, at this time,

20  Karen will give you notebooks and pens and pencils so that you

21  can take notes.

22        So have a nice lunch.  We'll see you back at 1:30.

23        ROOM CLERK:  Right this way, please.

24        COURTROOM SECURITY OFFICER:  All rise.

25        *(The jury exited the courtroom)*

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
1            THE COURT:  And if there's nothing else to come before

2    the Court, we'll be in recess until 1:30 on this case, 1:15 on

3    other matters.

4            MR. COHEN:  Thank you, your Honor.

5            COURTROOM SECURITY OFFICER:  All rise.

6            (The Judge exited the courtroom)

7            (Luncheon recess taken at 12:21 p.m.)

8                            -  -  -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       **<u>MONDAY, JANUARY 7, 2019, 1:38 P.M.</u>**

2              *(The Judge is presently on the bench)*

3              MR. COHEN:  Judge, do you want us still kind of over

4       here?

5              THE COURT:  You can sit wherever you want.  The only

6       reason we had Mr. Joseph over here was so jurors back there

7       couldn't see the leg irons.

8              MR. COHEN:  Right.

9              THE COURT:  So, on this side here, he's fine.

10             MR. COHEN:  Yeah, I mean it's obviously better for me

11      if I'm closer to the jury too, Judge.  So that's fine.

12             THE COURT:  Okay.

13             *(Pause)*

14             THE COURT:  All right.  We're back on the record.

15             Counsel are present.  Mr. Joseph's present.

16             Do we have all the jurors?

17             Karen, do we have all the jurors?

18             COURTROOM SECURITY OFFICER:  Yes.

19             THE COURT:  Anything to come before the Court before

20      we bring the jury in?

21             Ready, Ms. Tribuiani?

22             MS. TRIBUIANI:  Yes, your Honor.  I'm sorry.

23             THE COURT:  Ready, Mr. Cohen?

24             MR. COHEN:  All ready, Judge.

25             THE COURT:  Okay.  Let's bring in the jury.

OPENING STATEMENT - TRIBUIANI

1          COURTROOM SECURITY OFFICER:  All rise.

2          (The jury entered the courtroom)

3          THE COURT:  You can be seated as soon as you come in.

4          Counsel concede the presence of the jury and waive its

5     polling?

6          MS. TRIBUIANI:  Yes, your Honor.

7          MR. COHEN:  Yes, sir.

8          THE COURT:  And did everyone follow my admonition not

9     to discuss the case or allow it to be discussed in your

10    presence?

11         All right.  I think we're ready for the opening

12    statements of the attorneys.

13         Ms. Tribuiani, you may proceed.

14         MS. TRIBUIANI:  Thank you, your Honor.

15         May it please the Court, Counsel.

16         Ladies and gentlemen, this is a case about making

17    choices and taking chances.  You will learn that Defendant

18    Balmy Joseph made a choice, he took a chance, and he got

19    caught.

20         July 7th, 2018, the Palm Beach County Sheriff's Office

21    detectives were on surveillance watching a gray four-door Honda

22    Accord in the Normandy Isles apartment complex.  Now, that

23    Honda Accord was part of an unrelated investigation, but

24    detectives watched that Honda Accord to see if anyone would

25    attempt to access the car or attempt to enter the car.

OPENING STATEMENT - TRIBUIANI

1          Detectives watched that Honda Accord for hours.  As

2     they watched, a black Cadillac Escalade pulled into the

3     Normandy Isles apartment complex.  The Escalade circled the

4     parking lot and finally parked in a spot that gave the Escalade

5     and its occupants a clear view of that Honda Accord.  That

6     Cadillac Escalade was driven by a man named Delson Marc.  Also

7     in that Cadillac Escalade was Defendant Balmy Joseph.  Now,

8     there were also two other individuals in that Cadillac

9     Escalade, a man named Benson Charles and a man named Brandon

10    Gracey.  The occupants of that Cadillac Escalade sat and

11    watched the Honda Accord for hours.  And detectives watched the

12    Cadillac Escalade as it watched the Honda Accord.

13         Sometime later, the Cadillac Escalade left the parking

14    lot of the apartment complex.  It returned a short time later.

15    And this time, it was followed by a tow truck.  The tow truck

16    pulled up next to that Honda Accord.  Brandon Gracey -- excuse

17    me -- Benson Charles, who had been seated inside the Cadillac

18    Escalade, got out of the Cadillac Escalade and met with the tow

19    truck driver.  He handed the tow truck driver something.  And

20    with that, the tow truck driver entered the Honda Accord and

21    drove it on to the flatbed of the tow truck.

22         After the Honda Accord had been loaded on to the

23    flatbed of the tow truck, the tow truck driver and Benson

24    Charles reentered the tow truck.  At that point, the Cadillac

25    Escalade, occupied by this defendant, Delson Marc, and Brandon

OPENING STATEMENT - TRIBUIANI

1   Gracey, drove out of that apartment complex.  They were

2   followed by the tow truck that was carrying the Honda Accord.

3        Now, detectives attempted to make a traffic stop on

4   the tow truck.  The driver of the tow truck pulled over.

5   Delson Marc, who was ahead of the tow truck in the Cadillac

6   Escalade, noticed that the tow truck was no longer behind him.

7   So, he circled back, came back around, and when he saw the

8   police officers, the Cadillac Escalade and its occupants took

9   off.  They took off at a high rate of speed.  The police

10  officers attempted to stop the Cadillac Escalade, but the

11  Cadillac Escalade ran a red light and fled from the police.

12       Now, detectives were forced to discontinue the chase

13  for public safety reasons.  However, the sheriff's office

14  helicopter continued to follow the Cadillac Escalade and its

15  occupants, including this defendant.

16       A short distance later, the occupants of that Cadillac

17  Escalade abandoned the vehicle, and they fled on foot.  The

18  aerial unit was able to communicate the location of the

19  Cadillac Escalade to detectives on the ground.  They found the

20  now abandoned Escalade, and they began looking for the

21  occupants.  And you will learn that this defendant and Delson

22  Marc got away.  The third occupant, Brandon Gracey, was

23  located, and he was arrested.

24       Now, detectives went back to the Cadillac Escalade,

25  they searched the area outside of the Cadillac Escalade

OPENING STATEMENT - TRIBUIANI

1    immediately around the vehicle, and they located a purple Crown

2    Royal bag that had inside of it capsules filled with heroin.

3         Detectives later acquired a search warrant for the

4    Cadillac Escalade, and inside that vehicle they found

5    correspondence belonging to Delson Marc, and they found four

6    cell phones.  And after acquiring search warrants for each of

7    those cell phones, detectives were able to link one of those

8    cell phones to this defendant, Balmy Joseph.

9         Thereafter, detectives searched for Delson Marc, who

10   by now had an arrest warrant in the system for fleeing and

11   eluding.  You will learn that on July 12th, 2018, detectives

12   finally located Delson Marc.  He was the front seat passenger

13   in a black Nissan Maxima that was stationary.  And as

14   detectives moved in to arrest him, the driver of that Nissan

15   Maxima and the back seat passenger fled the scene.  They

16   carried with them a small black backpack.

17        Delson Marc remained seated in the front passenger

18   seat.  He was taken into custody, and he had on him over $2,000

19   in cash and seven cell phones.

20        In the days leading up to the search for Delson Marc,

21   detectives utilized several investigative tools to try and find

22   him.  And one of the tools they used was a tag reader.  They

23   received a tag reader hit, a license plate reader hit from the

24   Luma apartment complex.  This is a different apartment complex

25   than the Normandy Isles apartment complex I mentioned earlier.

OPENING STATEMENT - TRIBUIANI

1    This is the Luma apartment complex in West Palm Beach.  And

2    what the data told detectives was that on the morning of

3    July 6th, 2018, that Cadillac Escalade was parked in the

4    parking lot of the Luma apartment complex.

5          So, detectives went to that Luma apartment complex,

6    and they spoke with the leasing personnel there.  They showed

7    them a photograph.  The photograph contained an image of this

8    defendant, Delson Marc, and some of their associates.

9          The leasing personnel with whom they spoke, a woman

10   named Stephanie Simmons, said, "Well, I don't know Delson Marc,

11   but I know this guy," and she pointed to the defendant, Balmy

12   Joseph.

13         But there was a problem.  You see, she didn't know him

14   as Balmy Joseph.  She knew him by a different name.  She knew

15   him as "Wilbert Desir."  The leasing records showed that Balmy

16   Joseph had rented an apartment at the Luma apartment complex --

17   Apartment 5304 -- and in doing so, he used Desir's name, Social

18   Security number, and date of birth.

19         Desir -- excuse me -- Mr. Joseph also paid an extra

20   $100 -- $150 per month to rent the garage associated with that

21   apartment.  So, he rented the apartment and its garage using

22   the identity of Wilbert Desir.

23         Now, detectives eventually interviewed the real

24   Wilbert Desir, and he said, "I don't know Balmy Joseph, and I

25   certainly didn't give him permission to use or steal my

OPENING STATEMENT - TRIBUIANI

1    identity."

2         On July 18th, 2018, officers obtained and executed a

3    search warrant at the apartment belonging to this defendant.

4    As they arrived to execute that search warrant, detectives saw

5    the defendant standing outside the leasing office.  As he saw

6    them approach, this defendant took from his pocket two cell

7    phones and literally snapped them in half.  They were flip

8    phones, and he was able to snap them in half as he saw the

9    officers approaching him.

10        When the officers told the defendant that they were

11   there to search his apartment, the defendant spontaneously

12   stated, "I don't live here.  I'm just here visiting a friend."

13        Well, unfortunately for the defendant, the officers

14   found the key to Apartment 5304 in his pocket.  They also found

15   two additional iPhones, and they found $761.

16        During the search of the defendant's apartment,

17   detectives found correspondence in the name of Balmy Joseph,

18   Wilbert Desir, the identity he had stolen, and Delson Marc.

19   They also found in his jacket that was hanging in his bedroom

20   closet 14 grams of fentanyl and 55 grams of heroin, with a

21   street value of approximately $11,000.

22        You will learn that the plastic bag containing the

23   heroin that was located in the defendant's pocket was also

24   later found to contain the defendant's fingerprint.

25        Now, detectives also located evidence that Delson Marc

OPENING STATEMENT - TRIBUIANI

1   shared the apartment with this defendant.  Delson Marc occupied

2   the smaller of the two bedrooms.  And inside Delson Marc's

3   apartment *(sic)*, who by now, remember, was in jail, having been

4   arrested for the fleeing case, officers located the black

5   backpack that the two individuals in the Nissan Maxima had

6   carried away with them at the time that Delson was arrested.

7   And inside that black backpack that was in the bedroom occupied

8   by Delson Marc, which was fully accessible to this defendant,

9   officers located $26,000 wrapped in rubber bands and keys,

10  several different keys.  They also located a garage door

11  clicker labeled "G303."

12       Detectives took the garage door clicker, they went to

13  the garage, they were able to open the garage door, and they

14  saw inside the garage big tires.  They also saw a padlocked

15  freezer chest.  And they used the keys from the key ring to

16  open the freezer chest.  And inside that freezer chest,

17  detectives located over seven kilograms of heroin with a street

18  value of $1.4 million.

19       Now, the heroin that was located in the defendant's

20  jacket pocket was the same color and consistency as some of the

21  heroin in the garage freezer.

22       The items in the garage, including the freezer, the

23  locks, were processed for fingerprint and DNA evidence both.

24  Now, unfortunately, we weren't able to obtain any latent prints

25  of value from those items.  And you're going to learn that

OPENING STATEMENT - TRIBUIANI

1   doesn't mean that nobody touched those items.  It just means

2   that the CSIs were not able to locate any prints of value.  And

3   we'll talk about what that means during the course of the

4   trial.

5           The CSIs also attempted to obtain DNA evidence from

6   the freezer in the garage.  Unfortunately, again, most of the

7   swabs contained an insufficient amount of DNA for comparison

8   purposes.

9           There was one swab, however, that was able to be

10  compared, and it was found to contain DNA belonging to Delson

11  Marc.  There were additional swabs that were found to contain

12  DNA belonging to two different people.  However, again,

13  unfortunately, the amount of DNA was insufficient for

14  identification purposes.  But I would remind you that the

15  apartment was occupied by this defendant and Delson Marc.

16          Now, I mentioned that detectives recovered multiple

17  cell phones from this defendant and Delson Marc.  And you will

18  learn that detectives located some text messages on one of

19  those phones, specifically the phone that was abandoned by this

20  defendant in the black Cadillac Escalade following the chase

21  from police.  And in that cell phone, detectives located a

22  series of text messages between the defendant and a heroin

23  customer, during which the customer asked to buy, quote,

24  "3-4-50," three for 50, which you will hear is consistent with

25  the price of heroin capsules.

178

1          It's that simple, ladies and gentlemen.  Balmy Joseph

2     and Delson Marc were partners, and they were coconspirators.

3     The defendant rented the apartment, using a stolen identity.

4     And he and Delson Marc worked together to distribute heroin and

5     fentanyl.

6          Now, you are armed with three tools.  You have the

7     facts, the law, and your God-given common sense.  If you use

8     all three tools during the course of this trial, the conclusion

9     will be clear.  At the close of this trial, I'm going to ask

10    you to hold this defendant accountable for the choices that he

11    made.  I'm going to ask you to hold him responsible for the

12    chances that he took.  And I'm going to ask you to find him

13    guilty as charged.

14         Thank you.

15         MR. COHEN:  Judge, I have a motion.  May we go

16    sidebar?

17         THE COURT:  All right.

18         (At the bench out of the hearing of the jury)

19         MR. COHEN:  Your Honor, you granted a 404(b) motion in

20    this case regarding any other alleged wrongs or acts that may

21    have been committed by my client.

22         THE COURT:  I thought it was prior convictions.

23         MR. COHEN:  Well, prior convictions, but it went to

24    prior acts as well.  Even if it didn't, Judge, what I'm saying

25    is, is I'm gonna be moving for a mistrial, because the

```
1    defendant is charged with narcotics law offenses in Counts 1

2    through 4 of this indictment.

3         The prosecutor, in all due respect, referred to a

4    stolen identity for Balmy Joseph, and the fact that there were

5    stolen identification documents in the apartment.  These are,

6    in fact, the subject of a totally unrelated matter, which is

7    the identity theft allegations that would concern my client.

8    It's certainly more prejudicial than probative.  It certainly

9    puts the jury in a situation where they're gonna be focusing on

10   something else entirely unrelated to this case.  And I would

11   move, respectfully, for a mistrial as a result of those

12   assertions in opening argument.

13        THE COURT:  I think that evidence is inextricably

14   intertwined into the drugs charges.  I'll give the jury a

15   cautionary instruction, if you want, that Mr. Joseph's only on

16   trial for the four counts in the indictment and not to consider

17   other instances except as it relates to those four counts.

18        MR. COHEN:  Well, Judge, you can give them a curative

19   instruction.  I don't have a problem with that.  But I don't

20   think, respectfully, even if you do that, Judge, the bell can

21   be unrung at this point.  So, I'm gonna continue to assert my

22   motion for a mistrial.

23        THE COURT:  The motion for mistrial is denied.  Do you

24   want a curative instruction?

25        MR. COHEN:  Yes, sir.
```

1          MS. TRIBUIANI:   Your Honor, this was all -- this was

2    covered in my response to counsel's 404(b) motion, where he

3    only sought to limit evidence of the defendant's prior

4    convictions, which we agreed to.  But in my response, I filed a

5    pleading which set forth all of the inextricably intertwined

6    evidence, including the use of stolen identity to rent the

7    apartment.  I never once mentioned the fact that there were

8    stolen documents inside of the apartment.  I didn't do that.

9    But the fact that he rented the apartment using stolen identity

10   goes to consciousness of guilt, and that is something I should

11   be able to argue.

12          THE COURT:   Well, I've said it's inextricably

13   intertwined.  The question is:  Do I tell them that he's not on

14   trial for acts not charged in the indictment?

15          MR. COHEN:   Judge, the horns of the dilemma I'm on is,

16   I don't want to waive my objection for a mistrial, as you

17   understand.

18          THE COURT:   Right.

19          MR. COHEN:   Your Honor can do whatever he thinks

20   appropriate under these circumstances.  My position is, again,

21   respectfully to the prosecution --

22          MS. TRIBUIANI:   Um-hum.

23          MR. COHEN:   -- is that the bell can't be unrung.  We

24   have here a narcotics case; now we're talking about stolen

25   identities.  So, you know, they're gonna hold all of those bad

1    acts against my client, Judge.

2         THE COURT:  Okay.  Well, I mean --

3         MR. COHEN:  That's up to the Court as to whether it

4    wants to give a curative instruction.

5         THE COURT:  Well, I'm only going to give a jury

6    instruction if you ask for a curative instruction.  Basic

7    instruction B10.2 says:  "I caution you that the defendant is

8    on trial only for the specific crimes charged in the

9    indictment."  That's what I'm likely to tell the jury at the

10   end of the case, and if you want me to tell them again that

11   now, I will do that.

12        MR. COHEN:  Judge, you can do it at the end of the

13   case.  I think that's the more appropriate time to do it.  But

14   I want to assert my motion for a mistrial at this point.

15        THE COURT:  Okay.  Motion for mistrial denied.  Do you

16   want that curative instruction now?

17        MR. COHEN:  Not at this point, Judge.  I think it will

18   do more harm than good to Mr. Joseph at this point.

19        THE COURT:  Okay.

20        *(The foregoing proceedings were had at sidebar)*

21        MR. COHEN:  Judge, I just want to consult my client

22   for a moment.

23        THE COURT:  Okay.

24        MR. COHEN:  Thank you.

25        *(Discussion had off the record between counsel and*

OPENING STATEMENT - COHEN

1    client)

2         MR. COHEN:  Your Honor, may it please the Court,

3    Counsels, plural, for the government, good afternoon.  Ladies

4    and gentlemen of the jury, good afternoon.

5         This is the opening statement.  It's our opportunity

6    to tell you what we as lawyers believe that the evidence will

7    show in this particular case.  As Judge Dimitrouleas may have

8    alluded to you earlier today, and as you're going to hear in

9    his instructions on the law later on, what we say is not

10   evidence.  So, nothing that the government has said so far is

11   evidence.  It's their outline of what they think the evidence

12   will show, subject to objections, what legally may come in.

13   Nor is what I necessarily say what the evidence will be, but it

14   does give you a basic outline of what the case is all about.

15   And please remember that the defense is vigorously contesting

16   the government's rendition of events.

17        So, remember I told you earlier when we spoke that the

18   second superseding indictment is what brings this case to you.

19   And if you look at it, you have to look at each word of the

20   indictment to understand the significance of it.  Because

21   unlike many TV shows you will have seen on TV and read about --

22   and mystery novels that you may have read about, this is the

23   real world, where you have to have real charges with real

24   elements and what you have to put together to come to a verdict

25   in this courtroom.

OPENING STATEMENT - COHEN

1          So, Count 1 charges my client, Balmy Joseph, with

2   possession with intent to distribute one kilogram or more of

3   heroin.

4          Count 2 of the same second superseding indictment --

5   and, ultimately, you'll have an opportunity to look at it --

6   charges him with possession with intent to distribute

7   one kilogram or more of heroin.

8          Count 3 of the same second superseding indictment

9   charges him with possession with intent to distribute a

10  completely different substance -- fentanyl.

11         And Count 4 of the indictment charges him with

12  possession to distribute heroin.

13         And, again, those charges are brought by this paper.

14  They're just allegations.  They don't mean anything.  They're

15  just assertions.  And as I told you before, it has no force and

16  effect unless it's supported by the proof that the government

17  seeks to put into evidence.  It means nothing until this

18  happens.

19         And, moreover, the evidence that the government has to

20  put in has to be proven beyond a reasonable doubt.  And how

21  that's defined, it comes in through an instruction by the judge

22  of the law, Judge Dimitrouleas, and how he will give it to you.

23         So, how do you put together a case in real life in

24  court?  It's something like a puzzle.

25         As I told you before in voir dire, you're judges of

OPENING STATEMENT - COHEN

1  the facts.  So, you have to take those facts, and

2  Judge Dimitrouleas, who is the judge of the law, will give you

3  the road map by which you put that all together, just like, as

4  I said, a jigsaw puzzle.  And by plugging the facts into the

5  law, only then will you be in a position to reach a verdict.

6       When you put that puzzle together, I want you,

7  therefore, to concentrate on certain words.  You'll see certain

8  words in the indictment, in the four counts of the second

9  superseding indictment.

10       In Count 1, the words that are important are

11  "knowingly and willfully conspired to possess with intent to

12  distribute."  And an emphasis on "knowingly and

13  willingly *(sic)*."

14       In Count 2, the second count of the indictment, second

15  superseding indictment, again those very important words,

16  "knowingly and intentionally possess with intent to

17  distribute," are there in that count.  And I want you to focus

18  on that.

19       In Count 3, again the very important words, "knowingly

20  and intentionally possess with intent to distribute."

21       And in Count 4, again those important words,

22  "knowingly and intentionally possess with intent to

23  distribute."

24       So, Judge Dimitrouleas is going to define it.  Don't

25  depend on what I say those words mean.  But what he'll say is

OPENING STATEMENT - COHEN

1    something like this:  That knowing *(sic)* and intentionally

2    means an act voluntarily done, not by accident or mistake.  And

3    he'll tell you that "willfully" means doing something

4    voluntarily and purposely with intent to do something the law

5    forbids.

6        Most importantly, he'll tell you simply being present

7    at the scene of an event or merely associating with certain

8    people doesn't establish proof of a conspiracy or, for that

9    matter, any other crime.

10       So, when you look at the evidence in this case, you

11   must look at it in that light in terms of those words and those

12   instructions that Judge Dimitrouleas will give you later.  Yes,

13   Balmy Joseph knew his friend, Delson Marc.  And he may have

14   associated with him.  But he did not commit a crime with him of

15   conspiracy or, for that matter, any crime at all.

16       The fact that he was merely present at the scene of

17   that apartment, which you heard the prosecution refer to when

18   she said Mr. Joseph told the agents, "I don't live here, I was

19   just visiting a friend," more than tells you why these words

20   and these instructions that the judge will tell you about

21   merely being present at the scene of the crime are so

22   important.  Because they don't constitute guilt under the law

23   of the United States.

24       When you hear the evidence that the government

25   referred to, one of the other things you're going to have to do

OPENING STATEMENT - COHEN

1    is decide, how is it coming in?  Is it coming in from

2    government agents?  And you'll be able to look at whether they

3    have bias for or against their position.  Do they have an

4    interest in the outcome of the case?  His Honor is going to

5    give you a whole list of criteria that you can use to determine

6    why a person may testify in a certain matter.  So, just

7    remember, when you go back to deliberate at some point in time

8    in this case, you're going to have to determine, did someone

9    have an ax to grind?  Was someone telling the truth?  Did they

10   have an opportunity to observe what was going on?

11          So, that's very important for you to do.

12          And so, when you're looking at texts, which the

13   government says allegedly my client sent on a cell phone, how

14   are they going to prove that?  I assert to you they're gonna

15   prove it by having an agent come in and say, "I've been an

16   expert forever, and I know what these words mean."  No.  You

17   have to look at that witness's interest in the outcome of the

18   case and why they're testifying the way that they're

19   testifying.  And you have to use your common sense to determine

20   whether what they say makes sense when they assert that my

21   client knew certain things or didn't know certain things about

22   the evidence in this case.

23          The majority of the heroin in this case, well over a

24   million dollars the prosecution says, was found in the garage

25   of the residence.  My client didn't live in that residence,

OPENING STATEMENT - COHEN

1    according to what he said that night.  He certainly didn't have

2    anything to do with that refrigerator, even by the government's

3    own assertions.  No DNA was found on that refrigerator, no

4    fingerprints were found on that refrigerator.

5           Instead, they point to what they say is a limited

6    amount of narcotics found in a jacket that my client allegedly

7    was wearing.

8           How they prove this up may be of some interest.  But,

9    again, we don't even know, since we believe that the evidence

10   will show that Delson Marc resided in this apartment and not my

11   client, that Delson Marc may very well have worn that jacket on

12   certain days, even though it may have belonged to my client.

13          So, again, you can't leave your common sense at the

14   courthouse door.  You're allowed to look at the evidence and

15   determine what we say the evidence will show proves nothing

16   more than my client was a friend of Delson Marc, and that he

17   visited him, as he said, the day that he was arrested.

18          What we think the evidence will show, therefore,

19   ladies and gentlemen, is that my client knew Delson Marc, was

20   Delson Marc's friends *(sic)*, but the fact that he may have

21   been, and the fact that he may have associated with him, and

22   the fact that he may have been visiting him does not make him

23   guilty of any crimes.

24          So, we're gonna ask you to keep those assertions in

25   mind when you go back to deliberate.  After you've heard all

BOOTH - DIRECT/TRIBUIANI

1    the evidence in this case, we believe, after you've done that,

2    that the only fair and equitable verdict in this case will be a

3    verdict of not guilty.

4            Thank you, Judge.

5            THE COURT:  The government may call its first witness.

6            MS. TRIBUIANI:  The United States calls Detective Chad

7    Booth.

8            ROOM CLERK:  Please raise your right hand.

9            *(CHARLES BOOTH, GOVERNMENT'S WITNESS, WAS SWORN)*

10           ROOM CLERK:  Thank you.  You may be seated.

11           Please state your name.  Please spell your name for

12   the record.

13           THE WITNESS:  Detective Charles Booth, B-O-O-T-H.

14                       **DIRECT EXAMINATION**

15   BY MS. TRIBUIANI:

16   Q.  Sir, what is your occupation?

17   A.  I'm a detective with special investigations division of the

18   Palm Beach County Sheriff's Office.

19   Q.  How long have you been with the Palm Beach County Sheriff's

20   Office?

21   A.  Approximately seven-and-a-half years, since July of 2011.

22   Q.  What is your educational background?

23   A.  I completed 780 hours of law enforcement academy.  I've

24   continued to further my education with seminars, conferences,

25   on-the-job training, hundreds and hundreds of hours specialized

BOOTH - DIRECT/TRIBUIANI

1   in narcotics and wiretap and drug trafficking organizations.

2   Q.  Have you actually been designated as a task force officer

3   with the Drug Enforcement Administration and the Federal Bureau

4   of Investigation for specific purposes?

5   A.  Yes, I have.

6   Q.  For how long have you worked narcotics cases?

7   A.  Approximately seven-and-a-half years.

8   Q.  During your career, approximately how many narcotics

9   investigations have you conducted?

10  A.  I've been a part of thousands.  I've conducted hundreds.

11  Q.  In that capacity, have you ever acted in an undercover

12  capacity to sell drugs to individuals?

13  A.  Yes, I have.

14  Q.  Have you ever acted in an undercover capacity to buy drugs

15  from individuals?

16  A.  Yes, I have.

17  Q.  Have you also participated in wiretap investigations

18  involving drug trafficking organizations?

19  A.  Yes, ma'am.

20  Q.  What is a "wiretap"?

21  A.  A "wiretap" is the lawful intercept of telecommunications,

22  so cell phone, text messages, audio, any type of phone,

23  telecommunication.

24  Q.  Have you listened to intercepted communications between

25  drug dealers?

BOOTH - DIRECT/TRIBUIANI

1   A.   Yes, I have.

2   Q.   Approximately how many hours of these types of

3   communications have you listened to?

4   A.   Tens of thousands of calls.  Some hours long, so thousands

5   of hours.

6   Q.   And as a result, have you become familiar with some of the

7   more common slang words or phrases that drug dealers use?

8   A.   Yes, very common.

9   Q.   Have you, yourself, arrested drug dealers?

10  A.   Yes, ma'am.

11  Q.   And, again, approximately how many times?

12  A.   Hundreds.

13  Q.   More specifically, sir, have you investigated heroin drug

14  dealers?

15  A.   Yes.

16  Q.   As a result of these investigations, have you become

17  familiar with the street value of heroin?

18  A.   Yes, I have.

19  Q.   And does that street value change from time to time?

20  A.   It does, depending on how much is out there.  You -- it

21  depends what type of user you are.  There's a bunch of

22  different variables.  It's all around the same price, though.

23  Q.   Have you also become familiar with the typical dosage unit

24  of heroin?

25  A.   Yes, ma'am.

BOOTH - DIRECT/TRIBUIANI

1   Q.   And when I say "dosage unit," what does that mean?

2   A.   What a user would purchase or use that amount of time.  It

3   could possibly -- anywhere from .3 grams to a gram, depending

4   on what somebody wants to buy and use and their threshold that

5   they can handle.

6   Q.   Are you familiar with the ways in which heroin is packaged

7   for street-level distribution?

8   A.   Yes, ma'am.

9   Q.   And, again, how are you familiar with all of this

10  information?

11  A.   Through the hundreds of hours of training and on-the-job

12  investigations, doing my job every single day.

13  Q.   How is heroin, in your experience, packaged for

14  street-level distribution?

15  A.   Most commonly it is packaged in capsules now, similar to

16  a -- any type of prescription medication that you -- you would

17  buy and in capsule form where there's a powder inside.  It

18  could also be packaged in baggies.  There's different ways, but

19  most commonly through capsules.

20  Q.   And heroin that's actually packaged in a capsule, does that

21  mean a user ingests the capsule?

22  A.   It would not.  That most likely would be fatal.

23  Q.   Okay.  So, even though heroin can be transported in these

24  capsules, a user does not actually swallow the capsule, is that

25  right?

BOOTH - DIRECT/TRIBUIANI

1   A.   That is correct.

2   Q.   A user would utilize the heroin in additional -- or

3   different ways, is that right?

4   A.   It could be snorted, smoked, or most commonly it's injected

5   through a syringe.

6   Q.   Sir, are you also familiar with fentanyl?

7   A.   I am.

8   Q.   What is "fentanyl"?

9   A.   "Fentanyl" is an opiate that's a hundred times stronger

10  than morphine, and it's responsible for the majority of

11  overdose deaths in the recent years.

12  Q.   Now, does your sheriff's office have special procedures in

13  place when handling fentanyl?

14  A.   Yes.

15  Q.   What are those procedures?

16  A.   If you are going to test it, they suggest that you do not

17  test anything that you think contains fentanyl.

18          MR. COHEN:   Judge, I have a motion.

19          THE COURT:   Okay.  Approach the bench sidebar.

20          *(At the bench out of the hearing of the jury)*

21          MR. COHEN:   I prefer to do it this way than making

22  noise in front of the jury.

23          When he talked about the fentanyl, he talked about the

24  fact that it was responsible for most overdose deaths.  It

25  wasn't in response to the question.  It now puts in front of

BOOTH - DIRECT/TRIBUIANI

1   the jury the fact that my client, who's not on trial for

2   murder, is responsible for dealing in a drug that causes death.

3        I think that's highly prejudicial.  I think it was a

4   spontaneous utterance by this man.  It wasn't in response to

5   this prosecutor's question.  And I think your Honor should give

6   a curative instruction to the jury at this point to explain to

7   them that it has nothing to do with this case, Judge.

8        THE COURT:  If anybody on that jury doesn't know that

9   heroin and fentanyl are dangerous and responsible for deaths,

10  they've been living under a rock for a long period of time.

11       I don't know that he's qualified as an expert to say

12  that fentanyl is dangerous or that it's resulted in a lot of

13  deaths.  You didn't object to that.

14       MR. COHEN:  Well, I said I could do it, Judge, but I

15  prefer to do it here.  I don't want to bring it -- I'm

16  objecting to it here.  I don't want to bring attention to it.

17  The jury --

18       THE COURT:  The objection is untimely, is what I'm

19  saying.  If you want to object, you have to object when it's

20  coming in.  You can't wait until later on, so that if I

21  overrule the objection, then the jury doesn't, you know, know

22  why I'm overruling the objection.

23       MR. COHEN:  Understood.  It was right after the

24  question --

25       THE COURT:  If you hang back, you take your chances.

BOOTH - DIRECT/TRIBUIANI

1          MR. COHEN:  Understood.

2          THE COURT:  So, if you want a curative instruction,

3   I'll give you a curative instruction.

4          MR. COHEN:  Again, I don't think the bell can be

5   unrung.  I just want to move for the mistrial accordingly,

6   Judge.

7          THE COURT:  Mistrial is denied.

8          MR. COHEN:  Okay.

9          *(The foregoing proceedings were had at sidebar)*

10  BY MS. TRIBUIANI:

11  Q.  Detective, when you're dealing with suspected fentanyl,

12  what precautions do you take?

13  A.  I would wear a mask, gloves, and goggles to not expose

14  myself to it, because if you are not immune or used to it, it

15  could kill you.

16         MR. COHEN:  Objection.  Same -- renew motion.

17         THE COURT:  Sustain.  Denied.

18  BY MS. TRIBUIANI:

19  Q.  Sir, let me turn your attention now to July 7th of 2018.

20         Were you conducting an investigation that day?

21  A.  I was.

22  Q.  Where were you initially conducting your investigation on

23  that day?

24  A.  The investigation brought us to the Normandy Isles

25  subdivision.

BOOTH - DIRECT/TRIBUIANI

1   Q.  Is that in Palm Beach County, Florida?

2   A.  It is.

3   Q.  And did all the events to which you're testifying here

4   today occur in Palm Beach County, Florida?

5   A.  They did.

6   Q.  Now, what were you doing at that apartment complex on

7   July 7th?

8   A.  We were conducting surveillance on a Honda Accord on an

9   unrelated investigation.

10  Q.  Were you alone or were there other detectives also present?

11  A.  We had numerous detectives and agents.

12  Q.  Initially, sir, where were you located in that apartment

13  complex?

14  A.  In the very beginning of my surveillance, I was located in

15  the leasing office, where I had a view of the vehicle that we

16  were watching, the area that the vehicle was in, and also the

17  entrance to the complex itself, which was The Preserve, which

18  was inside Normandy Isles.

19  Q.  Now, for approximately how long were you watching that

20  Honda Accord initially?

21  A.  Initially, we began watching it for hours.  It was

22  approximately four or five hours.

23  Q.  Describe for the jury what you saw as you watched the Honda

24  Accord.

25  A.  As I was in the parking lot, I observed a black Cadillac

BOOTH - DIRECT/TRIBUIANI

1  Escalade approach me coming straight on.  I observed two black

2  males sitting -- one driver and one passenger.  The truck

3  turned about three feet from me and parked about 50 feet away

4  from me.

5  Q.  Describe the lighting conditions at that point.

6  A.  It was approximately four o'clock, 4:30 in the afternoon.

7  It was a July day, it was summer and very sunny.

8  Q.  Was there anything obstructing your view?

9  A.  There was not.

10  Q.  Did you observe the driver of the Cadillac Escalade?

11  A.  I did.

12  Q.  For how long did you observe the driver of that Escalade?

13  A.  I observed that driver for approximately an hour.

14  Q.  And was that driver known to you?

15  A.  He was.

16  Q.  Who was the driver of the Escalade?

17  A.  Delson Marc.

18  Q.  Did you also have an opportunity to observe the passengers

19  inside the vehicle?

20  A.  I did.

21  Q.  And specifically the front passenger?

22  A.  Yes.

23  Q.  Who was the front passenger of that Cadillac Escalade?

24  A.  It was Balmy Joseph.

25  Q.  Do you see Balmy Joseph in this courtroom?

BOOTH - DIRECT/TRIBUIANI

1   A.  Yes, I do.

2   Q.  Can you please identify him by an item of clothing he's

3   wearing?

4   A.  He's got a checkered tie on.

5       MS. TRIBUIANI:  May the record reflect the detective

6   has identified the defendant?

7       THE COURT:  The record will so reflect.

8   BY MS. TRIBUIANI:

9   Q.  Did the Cadillac Escalade occupied by this defendant and

10  Delson Marc continue to watch that Honda Accord?

11  A.  Yes, it did.

12  Q.  And at some point, did you see any other occupants inside

13  the Cadillac Escalade?

14  A.  Yes, I did.

15  Q.  How did that occur?

16  A.  While I was still in the initial position, the rear

17  passenger leaned out and spit outside the vehicle while I was

18  there.  Nobody else entered or exited the vehicle the entire

19  time.

20  Q.  And as the rear passenger spit, were you able to see him?

21  A.  I was.

22  Q.  And who was the rear passenger?

23  A.  He was later identified as Brandon Gracey.

24  Q.  Describe for the jury what happened with that Cadillac

25  Escalade.

BOOTH - DIRECT/TRIBUIANI

1   A.   Due to the operation integrity and everything else, I moved

2   my location, because I had had prior dealings with these

3   individuals.   I moved to a spot where I had a clear and

4   unobstructed view of the vehicle the entire time it sat there.

5   I watched as nobody entered or exited that vehicle.

6         After approximately an hour and a half or two hours,

7   the vehicle backed out of the parking spot that it was in,

8   turned to exit The Preserve complex, did not leave Normandy

9   Isles, and immediately made a U-turn to turn back in.  Once he

10  made the U-turn, the tow truck was following behind him.

11  Benson Charles, who I knew from prior investigations, exited

12  the driver's side rear, exited the Escalade and entered the tow

13  truck.   The tow truck and the Escalade then drove to the

14  location where the Honda Accord was parked.

15  Q.   Did you see the tow truck driver exit the tow truck?

16  A.   I did.

17  Q.   And what did the driver of the tow truck do?

18  A.   He entered the driver's seat of the Honda, which was backed

19  into a parking space, and he drove it on to the flatbed of the

20  tow truck.

21  Q.   Was Benson Charles still seated inside the passenger

22  compartment of that tow truck?

23  A.   He was.

24  Q.   So, once the Honda Accord is on the back -- the flatbed of

25  the tow truck, what happens after that?

BOOTH - DIRECT/TRIBUIANI

1  A.  At this point, radio communication was with everybody.  We

2  were going to attempt to stop both the Escalade and the tow

3  truck to take the occupants in for questioning --

4  Q.  Did the Escalade drive out of the apartment complex?

5  A.  Yes, prior to the tow truck.

6  Q.  And was it followed by the tow truck?

7  A.  It was followed by the tow truck.

8  Q.  Did detectives attempt to stop the tow truck?

9  A.  Yes, we did.

10  Q.  And did the tow truck pull over?

11  A.  The tow truck pulled over immediately.

12  Q.  Now, was the Cadillac Escalade ahead of the tow truck?

13  A.  It was.

14  Q.  At some point did the Cadillac Escalade return to your

15  position?

16  A.  Yes, it did.

17  Q.  And as it returned, what did you observe the Cadillac

18  Escalade do?

19  A.  I observed the Cadillac Escalade, eastbound on Forest Hill

20  Boulevard, turn back into the Normandy Isles subdivision, and I

21  saw him followed by a marked PBSO canine sergeant.  And as soon

22  as he turned the corner and saw that law enforcement was behind

23  him and also had the tow truck pulled over, I immediately heard

24  his tires squeal, and he fled.

25  Q.  Were those events captured on the dashcam video of the

BOOTH - DIRECT/TRIBUIANI

1  patrol vehicle?

2  A.  Yes, ma'am.

3  Q.  Have you had an opportunity to view the content of that

4  video?

5  A.  Yes, ma'am.

6  Q.  And does it fairly and accurately depict the events as they

7  occurred that day?

8  A.  It does.

9        MS. TRIBUIANI:  One moment, your Honor.

10       May I approach the witness?

11       THE COURT:  All right.

12       (Discussion had off the record between counsel)

13  BY MS. TRIBUIANI:

14  Q.  Sir, I've handed you what's going to be marked as

15  Government's Exhibit 1, a copy of the dashcam video.  And, sir,

16  have you had an opportunity, again, to view the contents of

17  this video?

18       (Government's Exhibit Number 1 marked for

19  identification)

20  A.  Yes, ma'am.

21       MS. TRIBUIANI:  Your Honor, I would move to introduce

22  Government's 1 into evidence.

23       MR. COHEN:  Voir dire, your Honor?

24       THE COURT:  Okay.

25       MR. COHEN:  Thank you.

BOOTH - VOIR DIRE/COHEN

**VOIR DIRE EXAMINATION**

BY MR. COHEN:

Q.  Sir, as to that video, can you tell me how it was

preserved, sir?

A.  This video was preserved on our arbitrator system.  It was

immediately -- or it was uploaded to the server, the Palm Beach

County Sheriff's Office, where the dashcam videos are uploaded

to.

Q.  Now, this system -- how does that system work?

A.  That system stores any dashcam video that we have in a

server, and then it is removed from that server and put on to a

disk.

Q.  Was there a person who authenticated that process, that

part of the process, before you got the final video product?

A.  Our audio/video technicians, yes.

Q.  And did that audio/video technician appear here today to

explain how that was preserved before you got the video/audio

portion of it?

A.  I have spoke (*sic*) to him in the past.

Q.  Okay.  He's not here today, is he?

A.  He is not.

Q.  He's not here to explain how that was preserved, is he?

A.  He is not.

Q.  Okay.  And so, we don't know what the process was

underlying the original downloading of that document and

BOOTH - VOIR DIRE/COHEN

1   whether or not it reflects the events that happened back in

2   July without him being here, correct?

3   A.   No, I viewed the video, and I know that that is what

4   happened, because I was there and witnessed it as well.  It's a

5   fair and accurate depiction of the events that day.

6   Q.   Okay.  How long a period of time were you there visualizing

7   that surveillance?

8   A.   I was there for hours that day, sir.

9   Q.   Okay.  And does this video/audio depict all of those hours?

10  A.   It does not.  It depicts the actions of him fleeing at the

11  time.

12  Q.   And so, you can't say it completely depicts everything that

13  happened during your surveillance, correct?

14  A.   Not the entire time during the surveillance, but I

15  witnessed him flee from Sergeant Newcombe, which this dash

16  video had -- depicts.

17         MR. COHEN:  Judge, I would object based on

18  foundational grounds.

19         THE COURT:  I mean maybe Sergeant Newcombe's a better

20  witness to introduce the video, but I think that it's up to the

21  jury to give what weight they want to give to the video.  So,

22  I'll overrule the objection.

23         Government's Exhibit 1 will be received.

24         (Government's Exhibit Number 1 admitted into evidence)

25         MS. TRIBUIANI:  May I publish?

BOOTH - VOIR DIRE/COHEN

```
 1              THE COURT:  Yes.
 2              MS. TRIBUIANI:  Your Honor, are the monitors on?  Can
 3    we turn them on?
 4              (Discussion had off the record between the court
 5    reporter and counsel)
 6              THE COURT:  All right, members of the jury, let's take
 7    a ten-minute recess.  Remember my admonition not to discuss the
 8    case or allow it to be discussed in your presence.  I'm gonna
 9    ask you that you be back in the jury room in about ten minutes,
10    and hopefully we'll get the video problems resolved.
11              COURTROOM SECURITY OFFICER:  All rise.
12              (The jury exited the courtroom)
13              THE COURT:  And if there's nothing else to come before
14    the Court, we'll be in recess for ten minutes.
15              MR. COHEN:  Thank you, Judge.
16              (The Judge exited the courtroom)
17              (Recess taken at 2:32 p.m. until 2:50 p.m.)
18              (The Judge entered the courtroom)
19              THE COURT:  Please be seated.
20              All right.  We're back on the record.
21              Counsel are present.  Mr. Joseph's present.
22              Detective Booth, you understand you're still under
23    oath?
24              THE WITNESS:  Yes, sir.
25              THE COURT:  Do we have the equipment all fixed?
```

BOOTH - DIRECT/TRIBUIANI

1          THE COURT REPORTER:  Yes.

2          MS. TRIBUIANI:  Yes, sir.

3          THE COURT:  Anything to come before the Court before

4     we bring the jury in?

5          MS. TRIBUIANI:  No, your Honor.

6          MR. COHEN:  No, your Honor.

7          THE COURT:  All right.  Let's bring in the jury.

8          COURTROOM SECURITY OFFICER:  All rise.

9          *(The jury entered the courtroom)*

10          THE COURT:  Counsel concede the presence of the jury

11     and waive its polling?

12          MS. TRIBUIANI:  Yes, your Honor.

13          MR. COHEN:  Yes, your Honor.

14          THE COURT:  And did everyone follow my admonition not

15     to discuss the case or allow it to be discussed in your

16     presence?

17          All right.  I think we've got the equipment working.

18          Ms. Tribuiani, you may proceed.

19          MS. TRIBUIANI:  Thank you, sir.

20          *(Video playing)*

21              **DIRECT EXAMINATION (CONTINUED)**

22     BY MS. TRIBUIANI:

23     Q.  All right, sir, I'm gonna play Government's 1 again and

24     just ask you to describe what it is that we're watching.

25     A.  They started this video here is Sergeant Newcombe *(sic)*.

BOOTH - DIRECT/TRIBUIANI

1    He's westbound on Forest Hill Boulevard approaching the

2    Normandy Isles subdivision.  The subdivision is gonna be on the

3    right-hand side of your screen.  He -- as he approaches the

4    intersection, he's notified via our radio that the vehicle is

5    eastbound.  So, he's attempting to make a U-turn right here

6    when he sees the Cadillac Escalade turn in front of him.

7    Q.   Is that the Cadillac Escalade that we see?

8    A.   It is.  He immediately gets behind it, and his lights are

9    activated at the time that you start hearing audio.

10        *(Video playing)*

11   A.   The Cadillac Escalade runs through the red light there,

12   causing those vehicles to stop.  Sergeant Newcombe has to stop

13   to safely clear the intersection, and you can no longer see the

14   Cadillac Escalade, it fled so fast.  But once he got through

15   the intersection, the Cadillac Escalade was already gone.

16   Q.   Did officers continue to chase the Cadillac Escalade?

17   A.   They did not.

18   Q.   Why not?

19   A.   Policies and procedures will not allow us to at the

20   sheriff's office due to citizen safety.

21   Q.   However, did someone else continue to pursue the Cadillac

22   Escalade?

23   A.   Yes.

24   Q.   Who was that?

25   A.   That was our PBSO helicopter and pilots.

206

BOOTH - DIRECT/TRIBUIANI

1   Q.  Did the Cadillac Escalade eventually come to a stop?

2   A.  It did.

3   Q.  Where did it come to a stop?

4   A.  It came to a stop on Glen Cove Lane, which is near the

5   intersection of Forest Hill and Haverhill.

6   Q.  Did officers respond to that location?

7   A.  We did.  We immediately saturated the area.

8   Q.  Did you respond to that location as well?

9   A.  I did.

10  Q.  And what did you see upon your arrival?

11  A.  Once I got there, the Cadillac Escalade was backed in to a

12  residence on Glen Cove Lane.  It was backed into -- right up

13  against a house.  There was narcotics, heroin capsules on the

14  ground just outside the door, and there was also a purple Crown

15  Royal bag that also contained heroin and narcotics.

16  Q.  What happened to the occupants of the Cadillac Escalade?

17  A.  They fled prior to law enforcement's arrival.  Since we

18  were not able to chase, we were not there immediately, so they

19  were able to exit the vehicle and flee.

20  Q.  Were Delson Marc and Balmy Joseph able to get away?

21  A.  They were able to evade capture.

22  Q.  Was Brandon Gracey, however, arrested?

23  A.  He was.

24  Q.  Now, after your arrival, did you canvass the neighborhood?

25  A.  We did.

BOOTH - DIRECT/TRIBUIANI

1  Q.  What were you looking for?

2  A.  Any type of surveillance video or anything that could

3  depict what happened when law enforcement was not there.

4  Q.  Were you able to obtain a surveillance video?

5  A.  I was.

6  Q.  Where did the surveillance video come from?

7  A.  It came from a residence which was just to the east of

8  where the Cadillac Escalade was parked.

9         MS. TRIBUIANI:  May I approach the witness?

10        THE COURT:  All right.

11  BY MS. TRIBUIANI:

12  Q.  Sir, I've handed you what's been marked for identification

13  as Government's Exhibit 2.  Will you tell me what that is?

14        (Government's Exhibit Number 2 marked for

15  identification)

16  A.  This is a DVD video of the surveillance video from the

17  residence just to the east to where the Escalade was finally

18  parked and recovered.

19  Q.  Have you viewed the contents of that disk?

20  A.  Yes, ma'am.

21  Q.  And do they fairly and accurately depict what the

22  surveillance camera in that location captured?

23  A.  It does.

24        MS. TRIBUIANI:  Your Honor, at this time, I would move

25  Government's Exhibit 2 into evidence.

208

BOOTH - VOIR DIRE/COHEN

1      MR. COHEN:  Voir dire, Judge?

2      THE COURT:  Okay.

3              **VOIR DIRE EXAMINATION**

4  BY MR. COHEN:

5  Q.  Did you determine how that video was originally made before

6  you came in contact with it, Detective?

7  A.  I did not determine how it was made, no.  When I came in

8  contact with it, it was what I observed.

9  Q.  Did you determine how it was preserved before you came in

10  contact with it?

11  A.  I did not.

12  Q.  Did you determine whether it was deleted or altered in any

13  way before you came in contact with it?

14  A.  It was not deleted.  It was obtained with a search warrant

15  from -- and it was taken right from the server of the

16  residence.

17  Q.  Okay.  And did you determine how the server of that

18  residence would preserve such a video?

19  A.  I do not know.

20  Q.  Well, who preserved such a video on the server of that

21  residence?

22  A.  The resident who owned it advised me that it saves for

23  30 days.  I came back within 30 days with a search warrant and

24  obtained the video.

25  Q.  Was it preserved along with other depictions on that video?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

BOOTH - VOIR DIRE/COHEN

 1   A.   It was.

 2   Q.   Okay.  How did you obtain that particular portion of the

 3   video which is going to be played in court today?

 4   A.   I observed the video in its entirety, and we -- once the --

 5   the Cadillac Escalade showed up, we preserved it from that

 6   point and put it on a disk.

 7   Q.   So, you were the one who made the determination to preserve

 8   it and put it on a disk, correct?

 9   A.   Yes.  I was there.

10   Q.   No one from the defense was notified about visualizing it

11   along with you at the time, correct?

12   A.   No.

13        MR. COHEN:  Same foundational objection, Judge.

14        THE COURT:  Are there time and date stamps on the

15   video?

16        THE WITNESS:  Yes, there is.

17        THE COURT:  And did that assist in your deciding what

18   portion of the video to capture?

19        THE WITNESS:  It did, along with the content of the

20   video itself.  It matched.

21        THE COURT:  I think your objection goes to the weight.

22   I'm going to overrule the objection.

23        Two will be received.

24        *(Government's Exhibit Number 2 admitted into evidence)*

25        MS. TRIBUIANI:  May I publish, your Honor?

BOOTH - DIRECT/TRIBUIANI

1      THE COURT:  Okay.

2      *(Video playing)*

3      THE COURT:  Would you stop it?

4      What's the audio?

5      MS. TRIBUIANI:  The audio is from the homeowners, your

6  Honor.

7      THE COURT:  Why do we need to hear that?

8      MS. TRIBUIANI:  We don't, Judge.  It's just part of

9  the video, but I can mute it.

10     *(Video playing)*

11                 **DIRECT EXAMINATION (CONTINUED)**

12  BY MS. TRIBUIANI:

13  Q.  All right, sir.  I know the angle in the video was a little

14  bit hard to see.  Did you see individuals exit the black

15  Cadillac Escalade there?

16  A.  Yes.

17  Q.  And, specifically, what does the video depict?

18  A.  If you look closely at the top, you can see that the

19  passenger's door opens, and then a male flees a short time

20  later on the opposite side of the vehicle.  And shortly after

21  that, the driver exits the vehicle and flees on foot towards

22  the west.

23  Q.  The angle of the video shows the black Cadillac Escalade,

24  and you mention that there were items also located on the

25  ground next to that Cadillac Escalade.  Can we see those items

BOOTH - DIRECT/TRIBUIANI

1   depicted in this video?

2   A.  You cannot.  They are on the opposite side of the vehicle.

3   There's a bag of heroin -- or capsules found just outside the

4   passenger compartment side of the vehicle.  And then the Crown

5   Royal bag is about ten feet away from that, thrown

6   underneath -- just barely underneath of an adjacent vehicle.

7   Q.  You mentioned that we can see one passenger -- or a

8   passenger exit and flee from the vehicle.  Do we see the

9   entirety of the vehicle on this video?

10  A.  You do not.  You cannot see the passenger side.

11          MS. TRIBUIANI:  May I approach?

12          THE COURT:  Okay.

13          *(Discussion had off the record between counsel)*

14  BY MS. TRIBUIANI:

15  Q.  Sir, I'm showing you what's been marked for government's --

16  as Government's Exhibits 3A, 3B, 3C, and 3D, ask you to take a

17  look at those photographs and tell me what they depict.

18          *(Government's Exhibit Numbers 3A, 3B, 3C, and 3D*

19  *marked for identification)*

20  A.  Yes, ma'am.

21          This is a still photo of the Cadillac Escalade backed

22  into 5167 Glen Cove Lane.  This is a picture of the passenger

23  side.  It's 3A.

24          3B is a close-up of the narcotics that were found on

25  the ground just outside the vehicle.

BOOTH - VOIR DIRE/COHEN

```
 1              3C is going to be the purple Crown Royal bag at 5171,
 2    which is directly adjacent to where the vehicle was parked.
 3              And 3D is a close-up of that Crown Royal bag.
 4    Q.  Do these photographs fairly and accurately depict those
 5    items as they appeared adjacent to the Cadillac Escalade on
 6    that day?
 7    A.  Yes, ma'am.
 8              MS. TRIBUIANI:  Your Honor, I would move to introduce
 9    Government's 3A through D into evidence.
10              MR. COHEN:  Voir dire quickly, Judge?
11              THE COURT:  All right.
12                        VOIR DIRE EXAMINATION
13    BY MR. COHEN:
14    Q.  Detective, who took those photographs?
15    A.  Detective Kevin Drummin.
16    Q.  Were you there that day?
17    A.  I was.
18    Q.  And were you there when he took those photographs?
19    A.  I was.
20    Q.  And do those photographs fairly and accurately depict what
21    you saw that day?
22    A.  Yes, sir.
23    Q.  Okay.
24              MR. COHEN:  All right, Judge.
25              THE COURT:  All right.  3A, B, C, and D will be
```

BOOTH - DIRECT/TRIBUIANI

1   received.

2          (Government's Exhibits Numbers 3A, 3B, 3C, and 3D

3   admitted into evidence)

4          MS. TRIBUIANI:  May I publish, your Honor?

5          THE COURT:  All right.

6          MS. TRIBUIANI:  Fran?

7          (Discussion had off the record between counsel and

8   court reporter)

9                  DIRECT EXAMINATION (CONTINUED)

10  BY MS. TRIBUIANI:

11  Q.  All right, sir.  I'm showing you Government's 3A, ask you

12  to describe for the jury here what they're seeing.

13  A.  Yes, ma'am.

14          That's a view of the passenger side of the Cadillac

15  Escalade.  And just on the ground just outside next to that

16  bush is a plastic sandwich baggie which contained heroin

17  capsules.

18  Q.  I'm gonna point to an object here.

19          Is that the heroin bag?

20  A.  Yes, ma'am.

21          THE COURT REPORTER:  Ms. Tribuiani, just move the

22  microphone towards you.

23  BY MS. TRIBUIANI:

24  Q.  Showing you Government's 3B.  What's depicted here?

25  A.  That is a close-up of the baggie itself which contained the

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

BOOTH - DIRECT/TRIBUIANI

1    heroin capsules.

2    Q.  Showing you Government's 3C.

3    A.  That is going to be adjacent -- if you -- to the right side

4    of that picture is where the Cadillac Escalade was parked in

5    the hedge.  And if you look underneath the red vehicle right

6    there, there is a purple Crown Royal bag.

7    Q.  So, in this photograph with the Cadillac Escalade would

8    have been over here to the right-hand side *(sic)*?

9    A.  Yes, just to the right-hand side of your pen.

10   Q.  And Government's 3D?

11   A.  That was a close-up of the Crown Royal bag underneath of

12   the vehicle adjacent to the Cadillac, and that also contained

13   heroin.

14   Q.  Would this position have lined up with the passenger

15   compartment of the Cadillac Escalade?

16   A.  Yes, ma'am.

17   Q.  Was the purple Royal Crown bag and its contents taken into

18   evidence?

19   A.  They were.

20          MS. TRIBUIANI:  May I approach?

21          THE COURT:  All right.

22          *(Discussion had off the record between counsel)*

23   BY MS. TRIBUIANI:

24   Q.  Sir, I'm handing you what's been marked for identification

25   as Government's Exhibit 4, ask you to take a look at that

BOOTH - VOIR DIRE/COHEN

1    evidence bag for me and tell me what it contains.

2              (Government's Exhibit Number 4 marked for

3    identification)

4    A.  This bag contains a purple cloth bag, the Crown Royal bag

5    pictured, and a small cardboard box, which was also inside the

6    bag.

7    Q.  And what are the date and times listed on the evidence bag?

8    A.  Evidence bag is 7-7 of '18 at 1800 hours, six o'clock.

9              MS. TRIBUIANI:  Your Honor, at this time, I would move

10   Government's 4 into evidence.

11             MR. COHEN:  May I, Judge?

12             THE COURT:  All right.

13                    **VOIR DIRE EXAMINATION**

14   BY MR. COHEN:

15   Q.  How was that bag obtained that particular day?  Who first

16   picked it up underneath the -- was it underneath the Crown

17   Royal, as I understand it?

18   A.  I'm sorry?

19   Q.  I'm sorry.

20             It was a Crown Royal bag.  Was it underneath another

21   vehicle or was it underneath the black Escalade?

22   A.  It was underneath the other vehicle, as it was in the

23   picture, just to the west of the Cadillac Escalade.

24   Q.  And what kind of vehicle was that other vehicle?

25   A.  It looks like a red Honda SUV of some kind.

BOOTH - VOIR DIRE/COHEN

1    Q.  Okay.  And who was the first person who obtained custody of

2    that bag, that Crown Royal bag?

3    A.  Detective Drummin took custody of the bag.

4    Q.  Is he here today?

5    A.  He is not.  I was with him.

6    Q.  Okay.  Did you witness him putting his initials on that

7    bag?

8    A.  I did.

9    Q.  You did not.

10   A.  I did.

11   Q.  You did.

12        Can you identify his initials on that bag?

13   A.  Yes.

14   Q.  Are those his initials?

15   A.  Yes, they are.

16   Q.  Where did it go after that, the bag?

17   A.  It went to evidence.

18   Q.  Okay.  Who took it to evidence?

19   A.  We dropped it into evidence at the lab -- or at

20   headquarters.  I was with him.

21   Q.  Did it remain continually in your custody from the time

22   Detective Drummin put his initials on it to the time you had it

23   in your custody and dropped it into evidence?

24   A.  Yes, sir.

25   Q.  Was it changed in any way?

BOOTH - VOIR DIRE/COHEN

1   A.   It was not.

2   Q.   How was it retrieved before it came to court today?

3   A.   I picked it up from evidence.

4   Q.   Okay.  Did anyone else handle that bag -- excuse me -- that

5   evidence, purported Exhibit 4, before you picked it up and

6   brought it to court today?

7   A.   The only people would have been evidence technicians.

8   Q.   Okay.  Are their initials on the bag?

9   A.   They are not.

10  Q.   Okay.  And did, in fact, evidence technicians handle that

11  exhibit before you picked it up today?

12  A.   Not the bag itself.

13  Q.   Okay.  How about the envelope?

14  A.   Yes, they have handled the envelope.

15  Q.   Okay.  Are they here today?

16  A.   They are not.

17  Q.   To determine whether they're correctly in the chain of

18  custody?

19  A.   They are not here.

20  Q.   Okay.

21          MR. COHEN:  Foundational objection, Judge.  Same

22  objection.

23          THE COURT:  Overruled, subject to a motion to strike

24  if it's not tied up.

25          Four will be received.

BOOTH - DIRECT/TRIBUIANI

1      *(Government's Exhibit Number 4 admitted into evidence)*

2                    **DIRECT EXAMINATION (CONTINUED)**

3    BY MS. TRIBUIANI:

4    Q.   Detective, I'm gonna ask you to go ahead and open the bag

5    for me and pull out its contents, if you wouldn't mind.

6            Do you need gloves?

7    A.   Yes, please.

8            Thank you.

9    Q.   All right.  So, if you'll hold up the -- the first item

10   appears to be a purple bag.  Was this the bag that was located

11   at the scene adjacent to the Cadillac Escalade?

12   A.   Yes, ma'am.

13   Q.   And what was the other bag you've got there?

14   A.   This is a cardboard box, some type of prescription

15   medication, and it was inside the bag, which also contained

16   narcotics.

17   Q.   Were the narcotics that were inside of the bag, again

18   located adjacent to the Cadillac Escalade -- were those also

19   submitted into evidence and then eventually to the laboratory

20   for testing?

21   A.   Yes, ma'am.

22            MS. TRIBUIANI:  May I approach, your Honor?

23            THE COURT:  All right.

24            *(Discussion had off the record between counsel)*

25            *(Government's Exhibit Numbers 5 and 6 marked for*

BOOTH - DIRECT/TRIBUIANI

1   *identification)*

2   BY MS. TRIBUIANI:

3   Q.  I've handed you what's been premarked for identification as

4   Government's Exhibits 5 and 6.

5         Tell us first, what's Government's Exhibit 5?

6   A.  Government's Exhibit 5 is going to be heroin capsules and

7   heroin --

8         MR. COHEN:  Judge, I'm going to object until such time

9   as the contents of that bag are properly subject to expert

10  opinion as to what they are.

11        THE COURT:  Sustain.

12  BY MS. TRIBUIANI:

13  Q.  Without telling us the actual substance -- well, strike

14  that.

15        The substances that were taken at the scene next to

16  the Cadillac Escalade, sir, were those field tested?

17  A.  Yes, they were.

18  Q.  Okay.  And what did they field test as?

19        MR. COHEN:  Objection, your Honor, until we have

20  expert testimony of the standard required at this jury trial.

21        THE COURT:  You can talk about it being suspected

22  whatever it is.

23  A.  It was field tested as suspected opiate.

24  Q.  Okay.  And, specifically, what did Government's 5 field

25  test as?  What did you suspect it to be?

BOOTH - DIRECT/TRIBUIANI

1   A.   Heroin.

2   Q.   And what was Government's 6 suspected to be?

3   A.   Government's 6 was also suspected to be heroin.

4   Q.   Were those items of heroin actually contained within

5   capsules, as you indicated?

6        MR. COHEN:  Move to strike as to "items of heroin,"

7   Judge.

8        THE COURT:  Suspected items of heroin.

9        MS. TRIBUIANI:  Sorry, Judge.

10  BY MS. TRIBUIANI:

11  Q.   Was the suspected heroin contained within capsules?

12  A.   Yes, ma'am.

13  Q.   Okay.

14       MS. TRIBUIANI:  Your Honor, I would at this point move

15  to admit Government's 5 and 6 into evidence.

16       MR. COHEN:  Objection, Judge.  She hasn't established

17  a predicate of what it is, nor has the chain of custody been

18  finalized.

19       MS. TRIBUIANI:  Your Honor --

20       THE COURT:  Overruled.

21       Five and 6 will be received, subject to a motion to

22  strike if it's not tied up.

23       *(Government's Exhibit Numbers 5 and 6 admitted into*

24  *evidence)*

25

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

221

BOOTH - DIRECT/TRIBUIANI

```
1   BY MS. TRIBUIANI:
2   Q.  Now, what happened to the capsules in which the heroin was
3   located?
4   A.  They were --
5           MR. COHEN:  Objection as to characterization, your
6   Honor.
7           MS. TRIBUIANI:  Suspected heroin.
8           THE COURT:  Okay.
9   A.  They were emptied for testing.
10  Q.  What happened to the Cadillac Escalade?
11  A.  It was towed to the PBSO impound lot pending a search
12  warrant.  It was sealed on scene.
13  Q.  Did you apply for and receive a search warrant for that
14  Escalade?
15  A.  Yes.  Detectives applied for a search warrant for that
16  Escalade.
17  Q.  Were you present when the Escalade was searched?
18  A.  I was.
19          MS. TRIBUIANI:  May I approach the witness?
20          THE COURT:  All right.
21          (Discussion had off the record between counsel)
22  BY MS. TRIBUIANI:
23  Q.  All right, sir.  I've handed you what's been premarked for
24  identification as Government's 7A through P.
25          What do those photographs depict?
```

BOOTH - DIRECT/TRIBUIANI

1            *(Government's Exhibits Numbers 7A through 7P marked*

2    *for identification)*

3    A.   It depicts the Cadillac Escalade and the search thereof.

4    Q.   Do those photographs fairly and accurately depict the

5    Cadillac Escalade as it appeared when you were searching it?

6    A.   Yes, ma'am.

7            MS. TRIBUIANI:  Your Honor, I would move to introduce

8    Government's 7A through P into evidence.

9            MR. COHEN:  No objection.

10           THE COURT:  7A through P will be received.

11           *(Government's Exhibit Numbers 7A through 7P admitted*

12   *into evidence)*

13           MS. TRIBUIANI:  May I publish?

14           THE COURT:  All right.

15   BY MS. TRIBUIANI:

16   Q.   All right, sir.  Describe for us what we're seeing in 7A.

17   A.   7A is a picture of the Cadillac Escalade with the hood and

18   passenger side door open.

19   Q.   7B?

20   A.   The driver's side, along with the evidence tape that was

21   used to seal the vehicle until the search warrant was authored

22   and executed.

23   Q.   7C?

24   A.   That is the rear of the Cadillac Escalade depicting the

25   license plate, the evidence tag in the top right corner of the

BOOTH - DIRECT/TRIBUIANI

1   window, and more evidence tape.

2   Q.  Does the evidence tape mean that nobody entered that

3   vehicle until such time as a search warrant was obtained and it

4   was searched?

5   A.  Yes, ma'am.  The vehicle was also locked.

6   Q.  7D?

7   A.  That's the passenger side rear quarter panel.

8   Q.  7E?

9   A.  That is the driver door and driver compartment of the

10  Cadillac Escalade.

11  Q.  7F?

12  A.  That is the center console area of the Cadillac Escalade.

13  There's a couple cell phones and miscellaneous items.

14  Q.  7G?

15  A.  That is the driver's side rear passenger door open and the

16  passenger compartment of the Cadillac Escalade.

17  Q.  7H?

18  A.  That is correspondence in the name of Delson Marc.

19  Q.  And 7I?

20  A.  That is an up-close picture where you can read the

21  correspondence for a prescription of some kind, which was

22  removed from the vehicle.

23  Q.  7J?

24  A.  It is a close-up of the center console with the cell phone

25  and some other miscellaneous items to include chewing gum.

BOOTH - DIRECT/TRIBUIANI

1    Q.   And, specifically, are those the two cell phones?

2    A.   Those are two iPhones, yes, a white one and a black one

3    there.

4    Q.   7K?

5    A.   Those are the faces of the iPhones that were taken from the

6    center console.

7    Q.   7L?

8    A.   That is the back of the phones taken from the center

9    console.

10   Q.   7M?

11   A.   That is a flip phone that was also taken from the center

12   console.

13   Q.   7N?

14   A.   The flip phone open from the center console.

15   Q.   7O?

16   A.   That is the flip phone that was taken from the passenger

17   rear seat.

18   Q.   And 7P?

19   A.   That is another picture of the same cell phone just open.

20   Q.   Now, did detectives apply for and receive search warrants

21   to examine the contents of the four cellular phones found in

22   the Cadillac Escalade?

23   A.   Yes, they did.

24   Q.   And this last cell phone that we're seeing here in 7P, was

25   that taken into evidence?

BOOTH - DIRECT/TRIBUIANI

1   A.  Yes, it was.

2         MS. TRIBUIANI:  May I approach?

3         THE COURT:  All right.

4         *(Discussion had off the record between counsel)*

5   BY MS. TRIBUIANI:

6   Q.  I've handed you what's been marked for identification as

7   Government's Exhibit 8A.  Can you tell me what that is?

8         *(Government's Exhibit Number 8A marked for*

9   *identification)*

10  A.  This is the black LG AT&T flip phone from the passenger

11  rear seat.

12  Q.  And is that the same phone depicted in Government's 7P?

13  A.  Yes, ma'am.

14  Q.  Were you present when that phone was located and seized

15  from the Cadillac Escalade?

16  A.  I was.

17        MS. TRIBUIANI:  Your Honor, at this time, I would

18  admit into evidence Government's 8A.

19        MR. COHEN:  No objection, Judge.

20        THE COURT:  8A will be received.

21        *(Government's Exhibit Number 8A admitted into*

22  *evidence)*

23  BY MS. TRIBUIANI:

24  Q.  Sir, you indicated that a search warrant was obtained for

25  that telephone.  Was the data on that cell phone later

BOOTH - DIRECT/TRIBUIANI

1    analyzed?

2    A.  Yes, ma'am.

3    Q.  By whom?

4    A.  Myself and Detective James Evans.

5    Q.  Now, did you, after July 7th, 2018, apply for and receive

6    an arrest warrant for Delson Marc?

7    A.  I did.

8    Q.  What was the basis for that arrest warrant?

9    A.  It was for fleeing to elude.

10   Q.  And thereafter did you search for Delson Marc?

11   A.  I did.

12   Q.  Was Delson Marc eventually located and arrested?

13   A.  He was.

14   Q.  On what day did that occur?

15   A.  That was July 12th of 2018.

16   Q.  Were you present for his arrest?

17   A.  I was.

18   Q.  Describe briefly, if you would, the circumstances of his

19   arrest.  And by that, specifically the actions taken by the

20   driver and the rear seat passenger of the vehicle in which

21   Mr. Marc was located.

22   A.  Located Mr. Marc in a truck yard, Benoist Farms Road, in

23   Palm Beach County.  I observed him enter the truck yard in a

24   black Nissan Altima.  He was in the front passenger seat.  I

25   notified other detectives and agents in the area to respond to

227

BOOTH - DIRECT/TRIBUIANI

1   the location to assist in apprehending him.  At that point, I

2   continued to maintain surveillance on Delson Marc in the truck

3   yard until other agents and detectives arrived.

4          Upon other detectives and agents arriving to the area,

5   we attempted a traffic stop where the driver of the Nissan fled

6   immediately through the truck yard, almost causing numerous

7   wrecks and wrecking himself.  Ultimately, he got blocked in by

8   a couple semis, and the driver and the rear seat passenger

9   immediately bailed and fled the scene.  We immediately took

10  Delson Marc into custody and were not able to -- we did not

11  have any charges to chase after the other individuals at the

12  time.

13  Q.  Did you see whether the driver and the back seat passenger

14  of that Nissan carried with them anything?

15  A.  Yes, I did.  They had a small black backpack.

16  Q.  Was Delson Marc arrested?

17  A.  Delson was arrested.

18  Q.  And was he searched?

19  A.  He was searched.

20  Q.  What items did he have on his person?

21  A.  He had approximately $2,000 and seven cell phones.

22  Q.  Of those seven cell phones, sir, do you recall how many

23  were iPhones?

24  A.  I believe three were iPhones and four were flip phones.

25          MS. TRIBUIANI:  May I approach the witness?

228

BOOTH - DIRECT/TRIBUIANI

1      THE COURT:  Okay.

2      *(Discussion had off the record between counsel)*

3  BY MS. TRIBUIANI:

4  Q.  Sir, I've handed what's been premarked for identification

5  as Government's Exhibit 8B.  Can you tell me what this is?

6      *(Government's Exhibit Number 8B marked for*

7  *identification)*

8  A.  This is the evidence bag, and inside the bag it contains a

9  black iPhone, a gold and white iPhone, and a rose and white

10  iPhone.  And those are colors -- I'm sorry -- of the phones

11  themselves.

12  Q.  And were those phones taken from Delson Marc's person?

13  A.  They were.

14  Q.  Were those phones later analyzed pursuant to search

15  warrants?

16  A.  They were.

17  Q.  Was the data analyzed from those search warrants?

18  A.  Yes, ma'am.

19  Q.  And who analyzed that data?

20  A.  Myself and Detective Evans.

21      MS. TRIBUIANI:  Your Honor, at this time, I would move

22  to introduce into evidence Government's 8B.

23      MR. COHEN:  No objection.

24      THE COURT:  8B will be received.

25      *(Government's Exhibit Number 8B admitted into*

BOOTH - DIRECT/TRIBUIANI

1    *evidence)*

2    BY MS. TRIBUIANI:

3    Q.  Was Delson Marc booked and taken to the Palm Beach County

4    jail?

5    A.  Yes, he was.

6    Q.  And, again, on what date did that occur?

7    A.  Seven -- July 12th of 2018.

8    Q.  All right.  Let's backtrack just a little bit.

9         Did your initial search for Delson Marc lead you to an

10   apartment complex?

11   A.  It did.

12   Q.  And, specifically, what apartment complex?

13   A.  7100 Okeechobee Boulevard.  It was Luma apartment complex.

14   Q.  Is that also in Palm Beach County in the Southern District

15   of Florida?

16   A.  Yes, ma'am.

17   Q.  How did you arrive at that apartment complex?

18   A.  While we were looking for Mr. Marc, we ran the tag of the

19   Cadillac Escalade to see previous locations that it had been

20   prior to us taking custody of it, and there was a tag reader

21   hit on July 6th, 2018, in the Luma apartment complex.  So, we

22   began our search at that location.

23   Q.  Did detectives, including yourself, speak to the leasing

24   personnel at Luma apartment complex?

25   A.  Yes, ma'am.

BOOTH - DIRECT/TRIBUIANI

1   Q.  And, specifically, who did you speak with?

2   A.  Stephanie Simmons.

3   Q.  Without telling us what she told you, did you and other

4   detectives show Ms. Simmons a photograph?

5   A.  Yes, ma'am.

6   Q.  Which individuals were depicted in the photograph?

7        MR. COHEN:  Objection.  Best evidence rule.

8        THE COURT:  If he knows who the pictures were, he can

9   say.

10       MS. TRIBUIANI:  I'm sorry, your Honor, I didn't hear?

11       THE COURT:  If he knows who's in the pictures and how

12  he knows it, he can say.

13  BY MS. TRIBUIANI:

14  Q.  Sir, where did the picture come from?

15  A.  It came from Facebook.

16  Q.  And did you pull it?

17  A.  I did.

18  Q.  Who was depicted in the picture?

19  A.  There was --

20       MR. COHEN:  Same objection, Judge.  It's conclusory.

21       THE COURT:  He's got to say how he knows it.

22       Sustain.

23  A.  Delson Marc.

24       MR. COHEN:  Objection.

25       MS. TRIBUIANI:  I'm sorry.

BOOTH - DIRECT/TRIBUIANI

1          THE COURT:  Sustain.

2   BY MS. TRIBUIANI:

3   Q.  Are you familiar with the individuals who were depicted in

4   the photograph?

5   A.  Yes, ma'am.

6   Q.  Do you know what they look like?

7   A.  I do.

8   Q.  So, when you pulled the photograph, were you looking for

9   specific individuals?

10  A.  I was.

11  Q.  Okay.  And who was depicted in the photograph that you

12  pulled?

13  A.  Delson Marc, Balmy Joseph, and --

14          MR. COHEN:  Objection.  Objection, Judge, unless we

15  see the photograph itself.  At that time -- based on what he

16  knew at that time.

17          THE COURT:  Overruled.

18  BY MS. TRIBUIANI:

19  Q.  Sir, who was depicted in the photograph?

20  A.  Delson Marc, Balmy Joseph, Antonio Williamson, and a couple

21  other individuals I was not aware of.

22          MS. TRIBUIANI:  May I approach the witness?

23          THE COURT:  All right.

24          (Discussion had off the record between counsel)

25

BOOTH - DIRECT/TRIBUIANI

1  BY MS. TRIBUIANI:

2  Q.  Sir, going slightly out of order, I've just handed you

3  what's been premarked for identification as Government's

4  Exhibit 10.  What did I hand to you?

5      *(Government's Exhibit Number 10 marked for*

6  *identification)*

7  A.  This is the photograph that I showed to the Luma apartment

8  complex, which depicted the individuals that I knew.

9      MS. TRIBUIANI:  Your Honor, at this time, I would move

10  to admit Government's Exhibit 10 into evidence.

11      MR. COHEN:  If the predicate is established, your

12  Honor.

13      THE COURT:  Overruled.

14      Ten will be received.

15      *(Government's Exhibit Number 10 admitted into*

16  *evidence)*

17  BY MS. TRIBUIANI:

18  Q.  All right, sir.  Looking at a photograph here containing,

19  it looks like, one, two, three, four -- five individuals, who

20  was depicted in this photograph and which number position are

21  they?

22  A.  If we start from the right, and the male in the red shirt,

23  I'm not sure who that is.

24  Q.  Okay.

25  A.  The next individual is Defendant Balmy Joseph.  He's

BOOTH - DIRECT/TRIBUIANI

1  wearing the white T-shirt.  The next individual, who your pen

2  is on, is Antonio Williamson.  The third -- fourth individual,

3  wearing the gray shirt, is Delson Marc.  And I'm not sure who

4  the fifth individual was at the time.

5  Q.  And, again, is this the photograph that you and other

6  detectives showed to the leasing personnel at the office?

7  A.  Yes, it is.

8  Q.  Why was this photograph shown to the leasing personnel?

9  A.  This photograph in specific was shown because Delson Marc

10  at the time had a noticeable limp, and in this photograph, it

11  depicts him with a cast on his leg.  He was in a motorcycle

12  accident.  So, it was a way to help identify Delson Marc as the

13  individual who we were looking for.

14  Q.  And without telling us what was told to you by the leasing

15  personnel, based upon your conversation with them, did

16  detectives apply for and receive a search warrant for a

17  specific apartment in the Luma apartment complex?

18  A.  Yes, ma'am.

19  Q.  For which apartment did you receive a search warrant?

20  A.  5304.

21  Q.  On what day was that search warrant executed?

22  A.  That was on July 18th, 2018.

23       MS. TRIBUIANI:  Your Honor, that's all I have for this

24  witness at this time.  He is subject to recall.

25       THE COURT:  Cross-examination.

BOOTH - CROSS/COHEN

1          MR. COHEN:   Thank you, Judge.

2                    **CROSS-EXAMINATION**

3    BY MR. COHEN:

4    Q.   Detective Booth, how are you this afternoon?

5    A.   Good, sir.   How are you?

6    Q.   How long have you been with the Palm Beach Sheriff's

7    Office?

8    A.   Approximately seven-and-a-half years.

9    Q.   Okay.  And you are familiar with a number of things that

10   you testified about.  I'd like to bring you, though, back to

11   the initial surveillance of the Escalade.  When did that take

12   place?

13   A.   That was on July 7th of 2018.

14   Q.   Okay.  And where did you go at that point?  I think you

15   testified to the Normandy Isles apartment complex, is that

16   right?

17   A.   Yes.  The initial surveillance was not on the Escalade.

18   Q.   Okay.  Mr. Joseph has nothing to do with the Normandy Isles

19   apartment complex, does he?

20   A.   Yes, he does.

21   Q.   Okay.  Well, you're not claiming he lived there, are you?

22   A.   I am not.

23   Q.   Okay.  So, in that sense, he has nothing to do with it from

24   the standpoint of living there, correct?

25   A.   He has something to do with it in regards to the

BOOTH - CROSS/COHEN

1    investigation we were conducting at the time.

2    Q.  Well, I'm not asking you about that, sir.  He didn't live

3    there, is all I'm saying.

4    A.  Correct.  He did not.

5    Q.  Okay.  Okay.  And tell me again what you saw regarding the

6    Honda and the car -- the Cadillac Escalade and the tow truck.

7    A.  While we were conducting surveillance on the Honda Accord,

8    the Cadillac Escalade arrived at the location.  He had a -- the

9    Cadillac Escalade parked in a location where it had a view of

10   the area where the Honda Accord was.  And also a view of the

11   entrance to see anybody coming and going from the apartment

12   complex.  We continued to conduct investigation -- or our

13   surveillance until the Escalade left the parking lot only to

14   meet the tow truck driver to then follow and pick up the Honda

15   Accord and leave the subdivision when the Escalade fled.

16   Q.  Now, you said you identified a man named "Brandon"?  What

17   was his last name?

18   A.  Brandon Gracey.

19   Q.  Brandon Gracey.

20        He was in the rear of the Escalade, correct?

21   A.  At some point, he was in the rear.

22   Q.  Okay.  Now, when the Escalade first arrived, you did not

23   observe my client, Mr. Joseph, in it at that time, correct?

24   A.  That is not true.  I did.  He was in the front passenger

25   seat at the time when the Cadillac Escalade arrived.

BOOTH - CROSS/COHEN

1  Q.  But you didn't know who he was at that point.

2  A.  Yes, I did.

3  Q.  You did?

4  A.  I --

5  Q.  Had you already shown that photograph to the leasing

6  personnel later that you talked about in the Luma apartment

7  complex?

8  A.  I had not.  Because at that time, the arrest warrant had

9  not been secured.

10  Q.  Okay.  Well, so -- but you knew who Balmy Joseph was, is

11  what you're saying.

12  A.  Yes, sir.

13  Q.  That's how you could identify him.

14  A.  Yes, sir.

15  Q.  Okay.  He was not driving that vehicle, correct?

16  A.  He was not.  He was the front passenger when I observed

17  him.

18  Q.  Okay.  So, he couldn't control the vehicle, correct?

19  A.  Correct.

20  Q.  Okay.  He couldn't stop and start that vehicle at that

21  time, correct?

22  A.  Correct.

23  Q.  He couldn't accelerate that vehicle at that time, correct?

24  A.  That is correct.

25  Q.  Okay.  He had no control over what that vehicle did while

BOOTH - CROSS/COHEN

1  he was sitting there as a passenger, isn't that right?

2  A.  Yes, sir.

3  Q.  Okay.  So, uhm, there comes a time, you said, when

4  Mr. Benson Charles exits that vehicle, is that right?

5  A.  Yes, sir.

6  Q.  Is he another person in that vehicle?

7  A.  He is.

8  Q.  Okay.  So, who do you see in that vehicle all told, three

9  people?

10  A.  There were four people total in the vehicle.

11  Q.  And who was it that you see in there?

12  A.  I saw Delson Marc as the driver, Balmy Joseph as the front

13  seat passenger initially, I saw Brandon Gracey lean out of the

14  vehicle and spit, and I saw Benson Charles exit the vehicle and

15  get into the tow truck.

16  Q.  Now, Delson Marc then does what with regard to the Honda

17  and the tow truck?

18  A.  Delson Marc was the driver of the Escalade.  He drove to

19  where the Honda was parked.  The tow truck driver exited the

20  tow truck, drove the Honda Accord on to the flatbed, and then

21  Delson left the apartment complex driving with Balmy Joseph and

22  Brandon Gracey in the Cadillac.  Benson Charles was in the tow

23  truck.

24  Q.  And at that time, Balmy Joseph you say was the front

25  passenger still in that Cadillac Escalade, correct?

238

BOOTH - CROSS/COHEN

1  A.  I know that he was still in the vehicle, because nobody
2  exited or entered at that time.  But I cannot tell you if
3  anybody moved around in that vehicle while we were conducting
4  surveillance.
5  Q.  Right.  So, you can't say at all whether he drove that
6  vehicle at any time, correct?
7  A.  Correct.
8  Q.  You can't say whether he accelerated that vehicle at any
9  time, correct?
10  A.  That is correct, sir.
11  Q.  You can't say that he tried to control that vehicle and
12  elude police at any time -- that time, correct?
13  A.  That is correct.
14  Q.  Okay.  And then the Escalade -- you make some
15  communications at that point back to some of the other police
16  officers on the scene?
17  A.  We were in constant communication the entire time.  I was
18  actually on my cell phone, because I was on foot.
19  Q.  Okay.  And the Escalade is followed by the tow truck, is
20  that correct?
21  A.  That is not correct.  The Escalade was in front of the tow
22  truck.
23  Q.  Excuse me.  The Escalade was in front of the tow truck.
24  But they're driving independently of each other, correct?
25  A.  Yes, sir.

BOOTH - CROSS/COHEN

1   Q.   Okay.  And you do not see Balmy Joseph at that time driving

2   the Escalade, correct?

3   A.   I at no time saw Balmy Joseph driving the Escalade.

4   Q.   Because you then refer to the cam video at a point when the

5   said Escalade -- if I said Escalade, I'm sorry -- when the

6   Escalade accelerated at some point, correct?

7   A.   Yes, sir.

8   Q.   Why did the Escalade, in your view, accelerate at some

9   point in time?

10  A.   Are you asking my opinion, or are you asking --

11  Q.   No, what you saw.

12  A.   Oh, what I saw?  I saw the Escalade, what was depicted in

13  the video, the Escalade turned eastbound -- or was going

14  eastbound and turned northbound into the Normandy Isles

15  subdivision.  That's when I observed the Escalade again after

16  it had initially left the neighborhood.  Once it turned in, I

17  observed Sergeant Newcombe pull behind the Escalade, as

18  depicted in the video.  And then I immediately heard the

19  squealing of the tires of the Escalade.  I watched the Escalade

20  flee as Sergeant Newcombe activated his emergency lights and

21  sirens in his marked vehicle.

22  Q.   Okay.  And at that point, you did not see Balmy Joseph

23  driving the Cadillac Escalade, correct?

24  A.   That is correct.

25  Q.   No one, in fact, from the Palm Beach County Sheriff's

BOOTH - CROSS/COHEN

1  Office ever saw Balmy Joseph driving that Escalade at that

2  point.

3  A.  That is correct.

4  Q.  Okay.  You knew at that point that Balmy Joseph was friends

5  of Delson Marc?

6  A.  I did.

7  Q.  Okay.  Now, the video itself, nowhere in that video --

8  because I watched it, and I think members of the jury had an

9  opportunity to do that too -- nowhere in that video was Balmy

10  Joseph depicted, in fact, in that video, is that right?

11  A.  Correct.

12  Q.  Okay.  Nowhere in that video is Balmy Joseph depicted

13  having possession of that Crown Royal bag, correct?

14  A.  That is correct.

15  Q.  Okay.  Nowhere in that video is Balmy Joseph depicted

16  having custody of any of the evidence which you recovered,

17  including the heroin capsules, on that day, correct?

18  A.  Other than constructive, no.

19  Q.  Okay.

20        MR. COHEN:  Well, move to strike, Judge.

21        THE COURT:  Overrule.

22  BY MR. COHEN:

23  Q.  So, there's nothing that connects, on that video, Balmy

24  Joseph with the driving or control of that vehicle on that July

25  day, isn't that so?

BOOTH - CROSS/COHEN

1    A.   That is correct.

2    Q.   Okay.  Ultimately, what happens to the Cadillac Escalade?

3    A.   The Cadillac is sealed pending a search warrant --

4    Q.   No, I mean as far as the chase is concerned.  You said the

5    vehicle -- the members of the people in there, did you see what

6    happens to them?  What do they do?

7    A.   At that point, nobody pursued them.  So, there was no law

8    enforcement on the ground in the area.  The PBSO helicopter and

9    pilots were radioing the Cadillac's movements to the officers

10   on the ground, as well as myself, and were giving the best

11   description as they could of where the occupants fled after

12   it -- after they bailed out of the vehicle.  They had a little

13   bit of an issue because of the trees in the area.

14   Q.   When you say "they bailed out of the vehicle," is this all

15   information that you're receiving from the people in the

16   helicopter?

17   A.   Yes.  And the surveillance video from --

18   Q.   Okay.  Well, we already talked about the surveillance

19   video.  We agree that Mr. Joseph is nowhere on that

20   surveillance video, correct?

21   A.   No.

22   Q.   Okay.  So, you have no firsthand knowledge of whether

23   Mr. Joseph fled or didn't flee.  You didn't see that with your

24   own eyes, correct?

25   A.   I listened to what the helicopter pilots depicted at the

BOOTH - CROSS/COHEN

1    time.

2    Q.   But that's what you heard that someone else was saying,

3    right?

4    A.   And I also saw in the surveillance video from the house

5    next door that the passenger side door opened.

6    Q.   Well --

7    A.   Can I tell you that it's Balmy Joseph --

8    Q.   We didn't get there yet.  The fact is, we're now on the

9    observations of the helicopter and not what you heard from the

10   helicopter.  There's no way you can say, yourself, that Balmy

11   Joseph fled the scene that day based other than on a hearsay

12   basis, correct?

13   A.   That is incorrect.

14   Q.   Okay.  You saw Balmy Joseph flee from that vehicle that

15   day?

16   A.   I saw Balmy Joseph in that vehicle.  I never saw him exit

17   that vehicle.  Hence, he would have had to flee from the

18   vehicle at the time that the vehicle was parked.

19   Q.   Well, why do you say "flee"?  Maybe he walked away, if you

20   never saw him exit the vehicle.  How do you know what he did?

21   A.   He quite possibly could have walked away.  But he exited

22   the vehicle at the time that it was parked and left the scene.

23   Q.   Well, that's the whole point.  When you say "flee" in front

24   of a jury, that denotes that someone realizes there's something

25   wrong that's going on.  You can't say that he fled that day,

BOOTH - CROSS/COHEN

1   can you?

2   A.  I can say that he did not stay around for law enforcement

3   presence.

4   Q.  Okay.  We can agree that a lot of people wouldn't, I

5   suppose.  But, in any event, the bottom line is, you never saw

6   him fleeing, right?

7   A.  I did not see him flee.

8   Q.  Thank you, sir.

9   A.  I know that he exited the vehicle at some point.

10  Q.  All you know is he exited the vehicle, because he wasn't

11  there after the vehicle was impounded, correct?

12  A.  Yes, sir.

13  Q.  Okay.  And that video I think was referred to as

14  Government's Exhibit 2, is that correct?

15  A.  Yes.  That is surveillance video from the neighbor's house.

16  Q.  Okay.  So, you said the door was open.  Which door was

17  opened, and how did you first see that the door was open to the

18  Escalade?

19  A.  Of the Escalade?  The rear passenger door, you can tell

20  just barely by looking at it because of the top of the screen

21  and the angle of the camera.  You actually see the car move a

22  little bit.  And then you see just shortly after that a male

23  run southbound from that location, a little bit further down

24  the street.  We also had the eagle that was above that told us

25  that three occupants had left, two had gone north and one had

BOOTH - CROSS/COHEN

1    gone south.

2    Q.   Okay.   The person who ran from the vehicle, is that

3    information, again, you received from other individuals in the

4    helicopter?

5    A.   That is the information that was relayed via our radio

6    communication.

7    Q.   So, you have no firsthand knowledge of how any of those

8    people -- or the directions that those people went in.   This

9    was all relayed to you on a hearsay basis, correct?

10   A.   And the view that I had from the surveillance video, I can

11   see what the eagle pilots were telling us on the ground.   That

12   was at a later time, though.

13   Q.   Okay.   And no one ever -- you never saw, personally, Balmy

14   Joseph or how he may have left the vehicle that day, correct?

15   A.   I did not see how he left the vehicle that day.

16   Q.   Okay.   Okay.

17          Now, when you came to the site where the Escalade was

18   parked, it was parked next to another purple vehicle, correct?

19   A.   In -- it shows in the picture there is some space between

20   them.   The way the garages are set up there, it's -- I think

21   it's a quadplex -- or duplex, but I think there's four homes,

22   and there was driveways where two vehicles can go.   The

23   Escalade pulled up, backed into one.   There was a little bit of

24   space.   He took up the entire driveway of the one.   And then

25   the Honda was parked in the next driveway over, the one that

BOOTH - CROSS/COHEN

1   was adjacent to it, with space for another vehicle.

2   Q.  Right.  And there were, I think --

3           MR. COHEN:  Judge, if I may, if we have it here.  And

4   we may not have these pictures here.  I just need a moment to

5   look, your Honor.

6           THE COURT:  Okay.

7           MR. COHEN:  Do you have 3A to 3D?

8           *(Discussion had off the record between counsel)*

9   BY MR. COHEN:

10  Q.  So --

11          MR. COHEN:  With the Court permission's to publish

12  them again.

13  BY MR. COHEN:

14  Q.  So, this is 3A, correct?

15  A.  Yes, sir.

16  Q.  Okay.  And 3A is the Cadillac Escalade after it came to

17  rest that day?

18  A.  Yes, sir.

19  Q.  Okay.  And to the left area, where you see my finger, was

20  there anything of significance found in that area?

21  A.  Yes, sir.  There is a plastic bag just on the edge of the

22  concrete there right before the hedge.

23  Q.  Okay.  And, uhm, that's this plastic bag over there,

24  correct?

25  A.  Yes, sir.

BOOTH - CROSS/COHEN

1   Q.  Okay.  And what were in -- the contents of that bag?

2   A.  Heroin capsules.

3   Q.  Heroin capsules.

4        Okay.  Did you ever see Balmy Joseph handle that bag

5   that day?

6   A.  I did not.

7   Q.  Did you ever see Balmy Joseph handle the heroin capsules

8   inside that bag that day?

9   A.  No, sir.

10  Q.  Were any fingerprints -- withdrawn on that question.

11       Then we have another photo, which is 3B -- let me do

12  this in order -- 3B found as well.  What of significance, if

13  anything, are these items to the left?

14  A.  They're pine needles.

15  Q.  Okay.  So, I was wondering what significance, if any, they

16  have.  They don't have any significance.  That's the plastic

17  bag.

18  A.  Yes, sir.

19  Q.  And you can't see anything in that plastic bag, can you?

20  A.  Not from the picture.  I could see with my normal eye.  We

21  took the picture for evidence purposes.

22  Q.  Okay.  Well, it doesn't appear that you can see through

23  that bag, wouldn't you agree with that?

24  A.  No.  You can see through the bag.  It's a sandwich bag.  It

25  was just the way the photograph was taken at the time.

BOOTH - CROSS/COHEN

1   Q.  And in that bag was what?

2   A.  Capsules filled with suspected heroin.

3   Q.  Okay.  And you do agree, though, that you certainly can't

4   see it from this picture.

5   A.  From this picture, you cannot.

6   Q.  Okay.  And, again, this is the vehicle in 3C which was

7   the -- what I characterized as the perfect -- purple vehicle,

8   rather.  And what kind of car was that?

9   A.  It appears to be some type of a Honda SUV, I believe.

10  Q.  Okay.  And that's the Crown Royal bag over there?

11  A.  Yes, sir.

12  Q.  Underneath it?

13      And 3D is depicted with that Royal Crown bag too.

14  What was in it?

15  A.  There was narcotics.  There was other heroin capsules, as

16  well as this cardboard container.

17  Q.  So, nothing connecting Balmy Joseph with that bag that day,

18  correct?

19  A.  No, sir.

20  Q.  Okay.  So, there was nothing there at all that connected

21  Balmy Joseph with that alleged crime that day, correct?

22  A.  Other than being an occupant of the Cadillac Escalade

23  and --

24  Q.  Well, being an occupant -- you agree that being an occupant

25  of a vehicle, just merely being present there doesn't make you

BOOTH - CROSS/COHEN

```
 1   guilty of anything, correct?
 2            MS. TRIBUIANI:  Objection, your Honor.
 3            THE COURT:  Sustain.
 4   BY MR. COHEN:
 5   Q.  The prescription box was found inside that Crown Royal bag,
 6   along with the suspected residue, also?
 7   A.  Yes, sir.
 8   Q.  Okay.  What was that prescription for?
 9   A.  Some type of antibiotic topical solution.
10   Q.  Okay.  Whose name was it in?
11   A.  There is no name on it.  The name is ripped off.
12   Q.  You agree that there's nothing illegal about prescription
13   antibiotics, correct?
14   A.  Correct.
15   Q.  Okay.  And then I think that you said that that Cadillac
16   Escalade was then ultimately taken to the impound lot, is that
17   right?
18   A.  Correct.
19   Q.  Okay.  When was that done, sir?
20   A.  That was done immediately, on 7-18.
21   Q.  Okay.
22   A.  Or -- I'm sorry -- 7-7.
23   Q.  That would have been after the date that the initial chase
24   took place on the 6th, correct?
25   A.  No.  It was sealed immediately and towed from the scene
```

BOOTH - CROSS/COHEN

1   to --

2   Q.   Same day?

3   A.   Same day, to the PBSO impound lot.

4   Q.   Okay.  So, there was a number of items found there.  7O and

5   7P were what, a cell phone, or photos of a cell phone?

6   A.   Correct.

7   Q.   Okay.  And, uhm, you examined that phone, as well as the

8   other items of evidence taken that day?

9   A.   I was there as they were all collected, packaged, and

10  submitted into evidence.  After we secured the search warrant

11  for the telephone, yes, I examined the contents of the

12  telephone.

13  Q.   Is there any way, regardless of whether O and P belonged

14  to -- whoever it belonged to, you can tell whether, from a

15  forensic standpoint, the phone was loaned to another individual

16  other than its owner?

17  A.   Yes, you can.

18  Q.   How do you do that?

19  A.   The contents of the calls and who's speaking to them, and

20  the call volume and the number saved in the phone.

21  Q.   Well, what if I give an iPhone to you, and you then post on

22  that iPhone communications that don't come from me.  That can

23  happen, can't it?

24  A.   Very certainly.

25  Q.   Okay.  So, certainly, just because you have an iPhone, and

BOOTH - CROSS/COHEN

1   it's my iPhone -- here's my iPhone -- and I give it to you, and

2   it's open, you know the code, and you transmit a text message

3   on it, that doesn't mean that I sent it, right?

4   A.  It does not mean that you sent that particular message.

5   Q.  Right.  In fact, in that scenario, where I just asked you

6   about it, and I said you were the one who would send it from my

7   phone, you would be the one sending it, right?

8   A.  Yes.

9   Q.  Okay.  And so, therefore, the indicia of who may own that

10  cell phone depicted in 7P or 7O wouldn't necessarily prove who

11  sent a message on it, under that scenario of facts I just gave

12  you, correct?

13  A.  I'm sorry.  I'm sorry.  Under that scenario, no, but when

14  there's --

15  Q.  All right.  That's all I'm asking you, sir.  Thank you.

16          And I think you said it was you and Detective Evans

17  who analyzed the data on that phone and the other phones

18  depicted in those photographs taken from the impound lot?

19  A.  The phones that were able to be analyzed, yes.

20  Q.  Okay.  So, now back to July 18th.

21          I think there was an arrest warrant applied for, for

22  Delson Marc, correct?

23  A.  No.  The arrest warrant was applied for prior to July 12th.

24  I believe it was the 9th or the 10th that I applied for this --

25  arrest warrant was granted, the arrest warrant, and began

BOOTH - CROSS/COHEN

1   searching for Mr. Marc.

2   Q.  Yeah, and you're right about that, because he was arrested

3   on about July 12th.  So, if I'm not mistaken, you would have

4   applied for the warrant immediately that day?

5   A.  The warrant was applied for prior to.  We looked for him

6   for a couple days.

7   Q.  Okay.  Thanks.

8            And what happened at Benoist Farms?

9   A.  Benoist Farms?  I observed Delson Marc in the passenger

10  seat of the Nissan Maxima -- Altima, one of the two.  It was a

11  black four-door Nissan.  The -- I immediately relayed to

12  U.S. marshals and other detectives and agents in the area that

13  we were -- that I had spotted Delson Marc.  They responded to

14  the area.  I continued to maintain surveillance on the vehicle

15  and Delson Marc in the tow yard until the vehicle began to

16  exit.  We attempted to traffic stop the vehicle that Delson

17  Marc was in, and two individuals fled from the scene, one of

18  which was carrying a black backpack, after the vehicle fled and

19  realized it that could not have aid (sic) law enforcement at

20  that time.

21  Q.  That black backpack which was in the custody of an

22  individual, that wasn't Mr. Joseph, correct?

23  A.  It very possibly could have been.

24  Q.  No, but you don't know for a fact that it was, do you?

25  A.  I do not know for a fact, but it was the same physical

BOOTH - CROSS/COHEN

1   description.  All I saw was the very back of them.

2   Q.  Okay.  So, let's be honest now in front of this jury.  You

3   don't know that that was my client, Balmy Joseph, in that --

4   holding that black bag in that Nissan Altima, correct?

5   A.  I know that Balmy Joseph was not the driver, but the

6   driver's demeanor did not match Balmy Joseph, and I physically

7   saw the driver.  I could not see the rear passenger that fled

8   in the vehicle prior to him fleeing, and I only saw his back.

9   Q.  Well, Detective, it's a very simple question.  You can't

10  positively ID anyone in that Nissan Altima as Balmy Joseph that

11  day, correct?

12  A.  That is correct.

13  Q.  Okay.  Thank you, sir.

14          In your investigation, you recovered I think seven

15  phones, four iPhones and three flip phones, you said, is that

16  right?

17  A.  Yes.

18  Q.  And where were they, the phones?  Where were they located?

19  A.  It was either three and four or four and three.  It was one

20  of the two.  I believe it was four iPhones, three flip phones,

21  you're correct.

22  Q.  Okay.  And that was in the back seat?

23  A.  No.  That was on Delson Marc's person and in the immediate

24  area where he was sitting.

25  Q.  What about in the black bag, what was found there, anything

BOOTH - REDIRECT/TRIBUIANI

1  of interest?

2  A.  The black bag was not recovered in that time.

3  Q.  Okay.

4  A.  The individuals that fled with the black bag were not

5  pursued.  We did not have charges for them at the time.

6  Q.  Okay.  And I think then you said you went to the Luma

7  apartment complex.  You had a hit on the license plate there.

8  Is that how you found yourself in the Luma apartment complex

9  later on, on July 12th?

10  A.  Yeah --

11  Q.  Or after July 12th?

12  A.  While conducting our investigation to try and locate Delson

13  Marc, we -- that was one of the leads that we followed, was the

14  tag reader hit for the Cadillac Escalade that we now had in our

15  possession.  And that brought us to Luma apartment complex.

16  Q.  Okay.

17          MR. COHEN:  Nothing further, Judge.

18          THE COURT:  Redirect?

19                  **REDIRECT EXAMINATION**

20  BY MS. TRIBUIANI:

21  Q.  Detective, we've established this defendant was not driving

22  the black Cadillac Escalade.  However, was he an occupant of

23  that black Cadillac Escalade?

24  A.  He was.

25  Q.  When you initially saw him, in what seat was he seated?

BOOTH - REDIRECT/TRIBUIANI

1    A.   He was sitting in the front passenger seat.

2    Q.   Now, other than the fact that you've testified that no one,

3    other than the four individuals you've mentioned, entered or

4    exited the black Cadillac Escalade, could you see from your

5    vantage point if anyone inside the Escalade switched seats?

6    A.   Initially, I could not.  When I changed my location, uhm,

7    the front seat passenger was no longer sitting in the front

8    seat.  There was only one male, who was Delson Marc, was

9    sitting in the front seat of that Escalade.  And that was

10   approximately 30 minutes after it had initially parked.

11   Q.   So, based upon that observation, was Balmy Joseph, this

12   defendant, no longer seated in the front passenger seat of the

13   Cadillac Escalade?

14   A.   Correct.

15   Q.   However, did you see him exit the Cadillac Escalade at that

16   time?

17   A.   Nobody entered or exited until the tow truck showed up.

18   Q.   So, safe to say that Mr. Joseph now occupied a different

19   seat in that Cadillac Escalade.

20        MR. COHEN:   Objection.  Speculation.

21        THE COURT:   Overruled.

22   A.   Yes, ma'am.

23   Q.   Now, as the Cadillac Escalade came to a stop on Glen Cove

24   Lane -- and we've talked about the items that were found

25   outside of the Cadillac Escalade -- based upon the surveillance

BOOTH - REDIRECT/TRIBUIANI

1  video, which is in Government's 2 -- or has been admitted into

2  evidence as Government's 2, what do you see in terms of the

3  individuals who get out of the Cadillac Escalade, specifically

4  the direction in which they run?

5  A.  The -- all you can see from the vantage point of the view

6  that we have from that surveillance camera is that the

7  passenger side doors -- the rear doors open, and at least one

8  occupant flees.

9       Now, the helicopter pilot --

10 Q.  Without telling us what was said.  Without telling us what

11 was said.  Just what you can see on the video.

12 A.  What you can see is that at least one person exited and

13 fled from the vehicle and then fled southbound.

14 Q.  Is it possible that more than one passenger fled from the

15 vehicle?

16      MR. COHEN:  Objection.  Speculation.

17      THE COURT:  Overruled.

18 A.  Yes, it is.

19 Q.  The items that were recovered on the ground adjacent to the

20 Cadillac Escalade, would they have lined up directionally with

21 the passenger side of the Cadillac Escalade?

22 A.  Yes, it would have.

23 Q.  Now, how quickly did you and other detectives get to the

24 scene of the abandoned Cadillac Escalade?

25 A.  After the Escalade parked and Delson Marc exited, I believe

BOOTH - REDIRECT/TRIBUIANI

1    we were still a minute, a minute and a half behind.

2    Q.  But one, maybe one-and-a-half minutes behind, is that

3    right?

4    A.  Yes, ma'am.

5    Q.  Did canine units join you in looking for the occupants of

6    that Cadillac Escalade?

7    A.  Yes, ma'am.

8    Q.  And, in fact, is that how passenger Brandon Gracey was

9    captured?

10   A.  Yes, it is.

11   Q.  So, if Balmy Joseph had strolled away from the Cadillac

12   Escalade and had not fled, as Mr. Cohen indicated, would

13   officers, such as yourself, have been on scene within one to

14   one-and-a-half minutes?

15   A.  It would have taken at least one-and-a-half, yeah,

16   one-and-a-half minutes.

17   Q.  And if someone strolled away from the Cadillac Escalade,

18   would you have been in a position, upon your arrival

19   one-and-a-half moments later, to see them?

20            MR. COHEN:  Judge, this is speculation upon

21   speculation.

22            THE COURT:  Sustain.

23            MS. TRIBUIANI:  I'll withdraw the question.

24            Nothing further.

25            THE COURT:  Thank you, Detective.  You may step down.

BOOTH - REDIRECT/TRIBUIANI

1      (Witness excused)

2          THE COURT:  All right, members of the jury, we're

3  going to take another ten-minute recess.  Remember my

4  admonition not to discuss the case or allow it to be discussed

5  in your presence.  We'll see you back in the jury room in about

6  ten minutes.

7          COURTROOM SECURITY OFFICER:  All rise.

8      (The jury exited the courtroom)

9          THE COURT:  And if there's nothing else to come before

10  the Court, we'll be in recess for about ten minutes.

11         MR. COHEN:  Thank you, Judge.

12         COURTROOM SECURITY OFFICER:  All rise.

13     (The Judge exited the courtroom)

14     (Recess taken at 4:01 p.m. until 4:11 p.m.)

15     (The Judge entered the courtroom)

16         THE COURT:  Please be seated.

17         All right.  We're back on the record.

18         Counsel are present.  Mr. Joseph's present.

19         Anything to come before the Court before we bring the

20  jury in?

21         MS. TRIBUIANI:  No, your Honor.

22         MR. COHEN:  Not from the defense, your Honor.

23         THE COURT:  All right.  If we have all the jurors,

24  let's bring them in.

25         COURTROOM SECURITY OFFICER:  All rise.

SIMMONS - DIRECT/TRIBUIANI

1      *(The jury entered the courtroom)*

2          THE COURT:  Counsel concede the presence of the jury

3    and waive its polling?

4          MS. TRIBUIANI:  Yes, your Honor.

5          MR. COHEN:  We do, your Honor.

6          THE COURT:  And did everyone follow my admonition not

7    to discuss the case or allow it to be discussed in your

8    presence?

9          All right.  The government may call its next witness.

10         MS. TRIBUIANI:  The United States calls Stephanie

11   Simmons.

12         THE COURT REPORTER:  Please raise your right hand.

13       *(STEPHANIE SIMMONS, GOVERNMENT'S WITNESS, WAS SWORN)*

14         THE COURT REPORTER:  Please sit down.

15         Please state your full name for the record, spelling

16   your last name.

17         THE WITNESS:  Stephanie Simmons, S-I-M-M-O-N-S.

18                       **DIRECT EXAMINATION**

19   BY MS. TRIBUIANI:

20   Q.  Good afternoon.

21   A.  Hi.

22   Q.  Ms. Simmons, for what company do you work?

23   A.  JMG Realty.

24   Q.  What is your title?

25   A.  Assistant manager.

SIMMONS - DIRECT/TRIBUIANI

1  Q.  Can you tell us a little bit about your duties and

2  responsibilities?

3  A.  Uhm, I lease apartments, deal with residents, take the

4  rent, that type of thing.

5  Q.  How long have you had this job?

6  A.  With the company about five years.

7  Q.  Back in July of 2018, were you working at the Luma

8  apartment complex?

9  A.  Yes.

10  Q.  Is that in West Palm Beach in the Southern District of

11  Florida?

12  A.  Yes.

13  Q.  During the course of your work at Luma, approximately how

14  many times did you take a rental application from a prospective

15  tenant?

16  A.  Daily.

17  Q.  After the rental application was filled out, what happened

18  to that paperwork?

19  A.  We started processing it.

20  Q.  Where was the paperwork actually kept and maintained?

21  A.  We had filing cabinets.

22  Q.  And were those applications and lease agreements kept and

23  maintained in the ordinary course of the business at Luma

24  apartment complex?

25  A.  Yes.

SIMMONS - DIRECT/TRIBUIANI

1          MS. TRIBUIANI:  May I approach?

2          THE COURT:  All right.

3          *(Discussion had off the record between counsel)*

4    BY MS. TRIBUIANI:

5    Q.  Ma'am, I'm handing you what's been premarked for

6    identification as Government's Exhibit 9.  Would you take a

7    look at that and tell me what this document is.

8          *(Government's Exhibit Number 9 marked for*

9    *identification)*

10   A.  This is the application.

11   Q.  Is it a rental application, ma'am?

12   A.  Yes, rental application.

13   Q.  And is it also the lease agreement?

14   A.  Yes.

15   Q.  And were these papers kept and maintained in the ordinary

16   course of business at the Luma apartment complex?

17   A.  Yes.

18         MS. TRIBUIANI:  Your Honor, at this time, I would move

19   to admit Government's Exhibit 9 into evidence.

20         MR. COHEN:  Sidebar, Judge, if we can.  Objection.

21         THE COURT:  Okay.  Approach the bench sidebar.

22         *(At the bench out of the hearing of the jury)*

23         MR. COHEN:  First of all, Judge, we don't have the

24   predicates.  I'm gonna object to that in the presence of the

25   jury as far as that's concerned.  But in addition to that, for

SIMMONS - DIRECT/TRIBUIANI

1    purposes of relevancy and other bad acts, this would show that

2    my client was engaged in identity theft involving Wilbert

3    Desir, the name of the individual the government is claiming he

4    used when he signed these rental applications.

5            There were a number of items found in the apartment --

6    I don't know if the government's going to go into it -- on a

7    computer, with stolen identities, Social Security numbers and

8    the like.  So, for that reason, Judge, because it's more

9    prejudicial than probative under 403, the fact that it is in

10   violation of, I believe, a bad act situation under 404, I move

11   to object to the admissibility of these documents.

12           THE COURT:  My ruling's the same.  Overruled.

13           MR. COHEN:  Okay.

14           (The foregoing proceedings were had at sidebar)

15           THE COURT:  Nine will be received.

16           (Government's Exhibit Number 9 admitted into evidence)

17           MR. COHEN:  Judge, also on the basis of the predicate

18   not being established.

19           THE COURT:  Same ruling.

20           MR. COHEN:  Yes, sir.

21           MS. TRIBUIANI:  May I publish, your Honor?

22           THE COURT:  All right.

23   BY MS. TRIBUIANI:

24   Q.  All right, ma'am.  Let me start by asking you, what is this

25   first page that we're seeing here depicted as Government's

SIMMONS - DIRECT/TRIBUIANI

1   Exhibit 9?  And, specifically, I see a name written at the very

2   top of this first page.  Whose name is that?

3   A.  That's mine.

4   Q.  Is that your name?

5   A.  Yes.

6   Q.  Does that indicate that you are the individual who actually

7   accepted this rental application?

8   A.  Yes, it is.

9   Q.  Ma'am --

10          THE COURT REPORTER:  I'm sorry.  I need you --

11  A.  Yes.

12  Q.  Make sure you pull that microphone down in front of you.

13  Thank you.

14          All right.  And according to this rental application,

15  who is applying to rent an apartment?

16  A.  Wilbert Desir.

17  Q.  Do you see the man known to you as Wilbert Desir in this

18  courtroom?

19  A.  I can't see everyone's face.

20  Q.  Okay.  Do you see the person here?

21  A.  I can't see anyone.  I can't see -- I think it's him, but I

22  can't see his face.

23  Q.  Oh, was he leaning down?

24  A.  Yes.

25  Q.  Okay.  Now that -- now can you see his face?

SIMMONS - DIRECT/TRIBUIANI

1    A.  Yes, that's him.

2    Q.  Okay.  Can you identify him by an item of clothing he's

3    wearing?

4    A.  Striped tie.

5         MS. TRIBUIANI:  Your Honor, may the record reflect the

6    witness has identified the defendant, Balmy Joseph?

7         THE COURT:  The record will so reflect.

8    BY MS. TRIBUIANI:

9    Q.  Now, turning back to Government's Exhibit 9, ma'am, whose

10   handwriting do we see on the application?

11   A.  That would be his handwriting.

12   Q.  And when you say "his," are you referring to Defendant

13   Balmy Joseph?

14   A.  Yes.

15   Q.  While the application was being filled out, ma'am, was

16   Balmy Joseph seated in front of you?

17   A.  Yes.  He was in the office from what I remember, yeah.

18   Q.  Okay.  So, the information contained on this application,

19   where would the information have come from?

20   A.  From him.

21   Q.  From Mr. Balmy Joseph?

22   A.  Yes.

23   Q.  It indicates the name of the applicant as "Wilbert Desir,"

24   and it lists an address, and it lists a Social Security number

25   and date of birth.  Again, who filled out this information?

SIMMONS - DIRECT/TRIBUIANI

1   A.  Uhm, Wilbert Desir.

2   Q.  The man known to you as Wilbert Desir?

3   A.  Yes.

4   Q.  And is that actually this defendant?

5   A.  Yes.

6   Q.  Likewise, did the information contained in the current home

7   address section, cell phone, email address, all of this

8   information, did that all come from the defendant?

9   A.  Yes.

10  Q.  Now, turning to the second page of the application, we see

11  here the date of the leasing agreement.  Can you tell me what

12  dates the agreement was for?

13  A.  Nine -- September 20th, 2017, to September 19, 2018.

14  Q.  What was going to be the total monthly rent for the

15  apartment?

16  A.  Uhm, it's 1795 -- you're giving me math.  Hold on.

17  Q.  Take your time.

18  A.  It would be 1970 total.  On the lease agreement, it says

19  "1970" total.

20  Q.  Okay.  So, $1970 was the total amount of rent for this

21  apartment?

22  A.  Yes.

23  Q.  Was the application signed by the defendant?

24  A.  Yes.

25  Q.  And did he sign it as "Wilbert Desir"?

SIMMONS - DIRECT/TRIBUIANI

1   A.   Yes.

2   Q.   And on what date was it signed?

3   A.   September 18, 2017.

4   Q.   I see a signature down here where it says "for office use

5   only."  Whose signature is that?

6   A.   That should have been mine.  Yeah, that is mine.

7   Q.   Is that your signature?

8   A.   Yeah.  I can't see it on there, but I'm looking at the --

9   yes, it is mine.

10  Q.   Okay.  And, again, does that signify that you're the one

11  who accepted this application?

12  A.   Yes.

13  Q.   For what apartment was the application?  What was the

14  apartment number?

15  A.   5304.

16  Q.   5-3-0-4.

17  A.   Yes.

18  Q.   We have some other pages in the application.  I'm gonna

19  skip over here, it's page 4, and it's entitled "employment

20  verification."  What is this form?

21  A.   This is to verify their employment.

22  Q.   Okay.  And who fills out this form?

23  A.   I would send it to their employer, so the employer.

24  Q.   So, is this the form that you would send to the listed

25  employer of the prospective tenant?

SIMMONS - DIRECT/TRIBUIANI

1   A.  Yes.

2   Q.  Okay.  And what's the purpose of this form?

3   A.  To verify that they've had employment for at least two

4   years.

5   Q.  Did you, in fact, send this form to the employer Balmy

6   Joseph listed on the rental application?

7   A.  Yes.

8   Q.  And did you receive information back from the employer?

9   A.  Yes.

10  Q.  And is that information contained on this page?

11  A.  Yes.

12  Q.  And, again, is that your signature at the bottom of the

13  page?

14  A.  It is.

15  Q.  Turning to page 5 of our packet, what do we see here?

16  A.  That is their income statement.

17  Q.  Who provided you with this statement?

18  A.  Uhm, Wilbert.

19  Q.  The man known to you as "Wilbert"?

20  A.  Yes.  Sorry.

21  Q.  Okay.  And, in fact, is that this defendant, Balmy Joseph?

22  A.  Yes.

23  Q.  Turning next to the page entitled "rental verification,"

24  what is this page?

25  A.  This is to verify their rental.

SIMMONS - DIRECT/TRIBUIANI

1  Q.  To verify what, I'm sorry?

2  A.  That they've had rental for at least two years.

3  Q.  A previous rental?

4  A.  Yes.

5  Q.  And would you have submitted this verification?

6  A.  Yes.  I sent it over.

7  Q.  And who did you send it to?

8  A.  Uhm, the person they rented from.

9  Q.  The person whom the defendant told you he had previously

10  rented from?

11  A.  Yes.

12  Q.  Now, we come to the apartment lease contract.  Is this the

13  actual contract that Mr. Balmy Joseph signed?

14  A.  Yes.

15  Q.  Okay.  Now, let's go through this.

16       Again, we've got, number one, the parties to the

17  agreement; it says Wilbert Desir and Luma.  And the apartment

18  number is listed as what?

19  A.  5-3-0-4.

20  Q.  Now, number two, occupants, if the defendant was going to

21  have a roommate, would he have been required to list that

22  information here?

23  A.  Yes.

24  Q.  You indicated that the total monthly rent was $1970.  Is

25  that reflected here?

SIMMONS - DIRECT/TRIBUIANI

1   A.  Yes.

2   Q.  Gonna skip ahead a little bit.

3        Let me show you the page that's titled "lease addendum

4   for garage, carport and/or storage unit."

5        Now, this form lists the resident as "Wilbert Desir,"

6   correct?

7   A.  Yes.

8   Q.  Did Mr. Balmy Joseph, using the name Wilbert Desir -- did

9   he indicate that he wanted to also rent a garage space?

10  A.  Yes.

11  Q.  And did he, in fact, rent a garage space?

12  A.  Yes.

13  Q.  What was the garage number that was assigned to him?

14  A.  G303.

15  Q.  Was there an extra charge, an extra monthly charge for him

16  to rent the garage space?

17  A.  Yes.

18  Q.  How much?

19  A.  150.

20  Q.  150 per month?

21  A.  Yes.

22  Q.  Was the defendant at the time he took occupancy given a

23  clicker for the garage?

24  A.  Yes.

25  Q.  Let me ask you, this one -- about this page, and it's

SIMMONS - DIRECT/TRIBUIANI

1  entitled "lease addendum liability insurance required of

2  resident."  Did Luma require all of their residents to obtain

3  renters insurance?

4  A.  Yes.

5  Q.  And would the defendant have had to obtain that renters

6  insurance prior to occupying the residence?

7  A.  Yes.

8  Q.  How large was the apartment that Balmy Joseph rented?

9  A.  Two bedroom, two bath.

10 Q.  Prior to taking possession of the apartment and the garage,

11 would someone from the leasing office have inspected the

12 premises along with the defendant?

13 A.  Yes.

14 Q.  And was -- is it safe to say that both the apartment and

15 the garage were empty at the time that the defendant took

16 possession of those places?

17 A.  Yes, yes.

18 Q.  Was there an electrical outlet in the garage?

19 A.  There might be one on the top of the garage.

20 Q.  Now, you mentioned a garage door clicker.

21        MS. TRIBUIANI:  May I approach the witness?

22        THE COURT:  All right.

23        (Discussion had off the record between counsel)

24 BY MS. TRIBUIANI:

25 Q.  I'm gonna show you for identification what's been marked as

SIMMONS - DIRECT/TRIBUIANI

1  Government's Exhibit 28.  Without taking the item out of the

2  bag, just take a look at it for me and tell me if you recognize

3  it.

4          (Government's Exhibit Number 28 marked for

5  identification)

6  A.  Yes.

7  Q.  What do you recognize Government's 28 to be?

8  A.  The garage clicker.

9  Q.  For which garage?

10  A.  Garage G303.

11  Q.  Was that the clicker given to this defendant, Balmy Joseph?

12  A.  Yes.

13  Q.  Now, after he moved in to the apartment, did you see Balmy

14  Joseph, known to you as Wilbert Desir?

15  A.  Yes.

16  Q.  And did Balmy Joseph represent himself to be Wilbert Desir?

17  A.  Yes.

18  Q.  Did you say, "Hi, Wilbert"?

19  A.  Yes.

20  Q.  And did he respond back to you as Wilbert?

21  A.  Yes.

22  Q.  Do you know how Balmy Joseph paid his rent?

23  A.  I believe cashier's checks.

24  Q.  In July 2018, did police officers approach you and show you

25  a photograph?

271
SIMMONS - DIRECT/TRIBUIANI

1   A.  Yes.

2   Q.  I'm gonna show you what's been admitted into evidence as

3   Government's Exhibit 10, ask you if you recognize Government's

4   Exhibit 10?

5   A.  Yes.

6   Q.  What do you recognize it to be?

7   A.  Balmy -- Balmy Joseph.

8   Q.  Is that the photograph that detectives showed you?

9   A.  Yes.

10  Q.  And did you positively identify Balmy Joseph in this

11  photograph?

12  A.  Yeah.

13  Q.  Did you tell detectives the name that Balmy Joseph --

14  A.  Yeah, I said, "That's Wilbert."

15  Q.  Now, also present in that --

16          MR. COHEN:  I didn't hear her response, Judge.  I'm

17  sorry.

18          THE COURT:  I think she said yes.

19          THE WITNESS:  I said yes.

20  BY MS. TRIBUIANI:

21  Q.  Did you say, "Yes," or did you say, "Yes, that's Wilbert"?

22  A.  Yes, that's Wilbert.

23  Q.  Also in this photograph, ma'am, is a man -- well, strike

24  that.

25          Do you recognize anybody else in this photograph?

SIMMONS - CROSS/COHEN

1   A.   No.

2   Q.   So, of the individuals in this photograph, is Balmy Joseph

3   the only person who was known to you?

4   A.   Yes.

5           MS. TRIBUIANI:  I tender the witness.

6           THE COURT:  Cross-examination.

7           MR. COHEN:  Thank you, Judge.

8                        **CROSS-EXAMINATION**

9   BY MR. COHEN:

10  Q.   Ms. Simmons, good afternoon.

11          So, where is Luma complex located exactly by way of

12  major thoroughfare?

13  A.   It's on Okeechobee right by Jog Road.

14  Q.   Okeechobee by Jog Road.  Okay.

15          And you said that you are -- you been working for how

16  long a period of time?

17  A.   With the company, about five years, but it's a brand new

18  property, so we just opened it last year.

19  Q.   Okay.  So, how long have you actually been working at the

20  Luma apartment complex?

21  A.   Uhm, try to think... almost a year.

22  Q.   Okay.  So, the only period of time for which you worked

23  there was approximately one year from when to when?

24  A.   I started there I believe in May of 2017, and I just,

25  uhm -- I stopped working there I think it was May of this year.

SIMMONS - CROSS/COHEN

1   Q.  Um-hum.  And the lease itself I believe was signed -- let

2   me see if we have the exact date -- can you see the date from

3   that?

4   A.  Well, that's the application, but --

5   Q.  Yeah, the application.  Can you see from that when it may

6   have been signed?

7   A.  The second page.

8   Q.  That's Government's Exhibit 9, um-hum.

9          Is that it there, about 9-18, where my finger is

10  pointed on the screen *(indicating)*?

11  A.  Yes.

12  Q.  Would that be about right, 9-18-17?

13  A.  Yes.

14  Q.  Well, was that -- excuse me, I'm sorry -- was that the only

15  date that was significant in terms of the signing of all of the

16  paperwork that we have behind -- in front of us, in

17  Government's Exhibit 9?

18  A.  Yes.

19  Q.  Okay.  And so, uhm, the one time that you -- how many times

20  did you see the gentleman who you've identified here as being

21  Wilbert Desir signing this paperwork in front of you?  Was it

22  just on that one occasion?

23  A.  Yes.

24  Q.  Okay.  So, you had just one opportunity to observe him sign

25  these papers, is that right?

SIMMONS - CROSS/COHEN

1   A.  Um-hum, yes.

2   Q.  Okay.  And in all of this paperwork, he signed this no more

3   than one time in front of you, correct?

4   A.  Well, this -- this paper -- this application,

5   yes *(indicating)*.

6   Q.  Okay.  And so that would have been, since you started in

7   May, about four months after you started, correct?

8   A.  Yes.

9   Q.  And then you would have sent this paperwork out, and it

10  would have come back from some of the individual's employment

11  verifications and so forth who you sent it to, correct?

12  A.  Yes.

13  Q.  Okay.  How many times in total would you say that you saw

14  this man who you've identified in this courtroom, you actually

15  seen him in terms of number of times?

16  A.  I mean almost every month when he paid the rent.

17  Q.  Okay.  So, you saw him September, October, November, like

18  once a month, right?

19  A.  Yeah.

20  Q.  In total -- only when he paid the rent, correct?

21  A.  Yes.

22  Q.  Okay.  Now, after he paid the rent, apart from seeing him

23  signing this application, apart from seeing him paying the

24  rent, did you ever go to that apartment, 5304, to do a home

25  inspection to see if he was living there?

SIMMONS - CROSS/COHEN

1   A.  No.

2   Q.  Okay.  So, you can't say, as you testify here today, that

3   he was actually physically in that apartment at any time.  You

4   never saw him in that apartment, correct?

5        MS. TRIBUIANI:  Objection, your Honor.  Calls for

6   speculation.

7        THE COURT:  Overrule.

8   A.  Yes.

9   Q.  Okay.  So, you never saw him in that apartment.

10  A.  No.

11  Q.  You don't know if he lived in that apartment.

12  A.  Technically, no.

13  Q.  Okay.  You don't know if he was renting that apartment to

14  someone else, correct?

15  A.  No.

16  Q.  Okay.  You never checked on whether, as emphasized by the

17  assistant U.S. attorney, anyone else was living there or not

18  living there with him, correct?

19  A.  Right.

20  Q.  You identified no one else in that photograph, correct?

21  A.  Correct.

22  Q.  Okay.  So, in fact, showing you, again, what's Government's

23  Exhibit 10, okay, you don't know -- apart from this man, who

24  you say identified himself as Mr. Desir, you don't anyone else

25  in that photograph, correct?

SIMMONS - CROSS/COHEN

1   A.  Correct.

2   Q.  And you don't know -- you identified apparently an envelope

3   with a garage clicker, correct?

4   A.  Yes.

5   Q.  You don't know if this individual ever maintained custody

6   of that clicker after you gave it to him, correct?

7   A.  Correct.

8   Q.  Okay.  Were there keys given to him?

9   A.  Yes.

10  Q.  You don't know if those keys that were given to him were

11  ever given to another individual, correct?

12  A.  Correct.

13  Q.  What were all of the items that were given to Mr. Joseph

14  concomitant with that apartment, 5304, in the Luma apartment

15  complex?  He got the clicker?

16  A.  He got the clicker, apartment keys, mailbox keys, and a

17  garage key.

18  Q.  And a garage key.

19          So, you don't know if he gave that mailbox key to

20  anybody else, correct?

21  A.  Correct.

22  Q.  You don't know if he gave that garage clicker to anyone

23  else, correct?

24  A.  Correct.

25  Q.  You don't know if he gave that key to the mailbox to anyone

SIMMONS - REDIRECT/TRIBUIANI

1    else, correct?

2    A.   Correct.

3    Q.   You don't know if he gave that key to the garage to anyone

4    else, correct?

5    A.   Correct.

6    Q.   There's no way, as you sit here, that you can truthfully

7    say to this jury that he was present in that apartment at any

8    time, correct?

9    A.   Correct.

10   Q.   And you can't say, other than the fact that he came to pay

11   the rent, and other than the fact you gave him these items,

12   that he spent one second in that apartment, correct?

13   A.   Correct.

14            MR. COHEN:   Nothing further, Judge.

15            THE COURT:   Redirect?

16                        **REDIRECT EXAMINATION**

17   BY MS. TRIBUIANI:

18   Q.   Ma'am, turning back to Government's Exhibit 9, the first

19   page, specifically looking at the driver's license number,

20   where did that information come from?

21   A.   From his driver's license.

22   Q.   Whose driver's license?

23   A.   Balmy.

24   Q.   The defendant's driver's license?

25   A.   Yes.

SIMMONS - REDIRECT/TRIBUIANI

1   Q.  Did you actually see the driver's license?

2   A.  Yes.

3   Q.  Did he give it to you?

4   A.  Yes.

5   Q.  Did you make sure that the photograph on that driver's

6   license was --

7          MR. COHEN:  Objection.  Objection, Judge, for reasons

8   stated previously.

9          THE COURT:  Sustain.

10          MR. COHEN:  And a motion, Judge.  And also a motion.

11          THE COURT:  Okay.  You can make it later.

12   BY MS. TRIBUIANI:

13   Q.  The information -- the driver's license number listed here,

14   did it come from the driver's license that the defendant handed

15   to you?

16   A.  Yes.

17   Q.  How many apartment keys did Mr. Joseph receive?

18   A.  Uhm, he should have gotten two apartment, two mailbox.

19   Q.  Two apartment and two mailbox, is that right?

20   A.  Yeah, that's what he should have gotten.  I'm just trying

21   to see on the application.  Yes, it's two apartment, one

22   mailbox.

23   Q.  So, two apartment and one mailbox is what he eventually

24   received.

25   A.  Yes.

SIMMONS - RECROSS/COHEN

1    Q.  And you indicated that you saw Mr. Joseph at least once a

2    month, when he paid his rent.

3    A.  Right, yes.

4    Q.  Did he give those funds to you?

5    A.  Yes.

6            MS. TRIBUIANI:  May I have one moment, Judge?

7            THE COURT:  All right.

8            *(Discussion had off the record between counsel)*

9            MS. TRIBUIANI:  Nothing further for this witness.

10           MR. COHEN:  One follow-up question, Judge?

11           THE COURT:  I usually don't allow recross, but I'll

12   let you ask one question.

13           MR. COHEN:  Thank you.

14                       **RECROSS-EXAMINATION**

15   BY MR. COHEN:

16   Q.  You never actually physically received any driver's license

17   from this gentleman, did you?  You don't have any recollection

18   of that, right?

19   A.  I mean, we have to take a driver's license from whoever

20   comes to tour the apartment community.

21   Q.  But you don't have a specific recollection of that, do you?

22   A.  I mean, I do it to every single prospect, so....

23   Q.  Is your answer based on what you do generally, or do you

24   have a specific recollection of it?

25   A.  What I do generally.

SIMMONS - RE-REDIRECT/TRIBUIANI

1   Q.  Okay.  Thank you.

2           THE COURT:  Anything further?

3           MR. COHEN:  Sidebar.

4           MS. TRIBUIANI:  May I be able to follow up on that,

5   your Honor?

6           MR. COHEN:  I apologize.

7           THE COURT:  Okay.

8                   **RE-REDIRECT EXAMINATION**

9   BY MS. TRIBUIANI:

10  Q.  Ma'am, what is your normal practice in terms of identifying

11  the individual who comes before you to fill out a rental

12  application?

13  A.  We have to verify their identity, so we take their driver's

14  license to do that.

15  Q.  And what are you looking at that when you look at their

16  driver's license?

17  A.  Their picture.

18  Q.  Are you making sure the person sitting in front of you

19  matches the picture on the driver's license?

20  A.  Yes.

21  Q.  And in this case, did that occur?

22  A.  Yes.

23  Q.  Did the driver's license the defendant handed to you

24  contain his photograph?

25  A.  Yes.

SIMMONS - RE-REDIRECT/TRIBUIANI

1  Q.  Did it contain the name "Wilbert Desir"?

2  A.  Yes.

3           MS. TRIBUIANI:  Nothing further.

4           THE COURT:  Anything further, Mr. Cohen?

5           MR. COHEN:  No, just sidebar, Judge.

6           THE COURT:  Thank you, ma'am.  You may step down.

7  You're excused.

8           THE WITNESS:  Thank you.

9           *(Witness excused)*

10          THE COURT:  The government may call its next witness.

11          MS. TRIBUIANI:  The government calls Wilbert Desir.

12          THE COURT:  Right up here, if you would, sir.

13          THE COURT REPORTER:  Please raise your right hand.

14          *(WILBERT DESIR, GOVERNMENT'S WITNESS, WAS SWORN)*

15          THE COURT REPORTER:  Please sit down.

16          Please state your full name for the record, spelling

17  your last name.

18          THE WITNESS:  Yes.  My name is Wilbert Desir.

19          THE COURT REPORTER:  And the spelling?

20          MR. COHEN:  Can we go sidebar now, Judge?

21          THE WITNESS:  W-I-L-B-E-R-T.  My last name is

22  D-E-S-I-R.

23          THE COURT:  Okay.  Approach the bench sidebar.

24          *(At the bench out of the hearing of the jury)*

25          MR. COHEN:  So, Judge, just for record purposes of

DESIR - DIRECT/TRIBUIANI

1   course, obviously this is going to be evidence of identity

2   theft.  I think it's evidence of a separate crime.  I think

3   it's more prejudicial than probative.  I think it violates 403.

4   I think it violates 404.  And I'd ask the Court exclude this

5   testimony as not being probative of the facts in this case

6   relating to a drug conspiracy.  It's probative, perhaps, of an

7   identity theft situation, but not of a drug conspiracy, your

8   Honor.

9           THE COURT:  And, again, if you want a curative

10  instruction, I'll give a curative instruction.  I think it's

11  relevant.  I'm gonna limit the inquiry to basically:  Did you

12  give Mr. Joseph permission to use your name and identification?

13  Okay?

14          MR. COHEN:  Judge, a curative instruction would

15  probably be worse than anything else at this point.

16          THE COURT:  Okay.

17          MR. COHEN:  Please note my objection, your Honor.

18          THE COURT:  Okay.

19          MR. COHEN:  And my motion, accordingly, for a

20  mistrial.

21          THE COURT:  Denied.

22          *(The foregoing proceedings were had at sidebar)*

23                    **DIRECT EXAMINATION**

24  BY MS. TRIBUIANI:

25  Q.  Mr. Desir, in what city do you live?

DESIR - DIRECT/TRIBUIANI

1    A.  West Palm Beach.

2    Q.  Sir, have you ever filled out a rental application for an

3    apartment in the Luma apartment complex?

4    A.  No, never.

5    Q.  Have you ever visited the Luma apartment complex?

6    A.  Never.

7    Q.  Let me show you what's been admitted into evidence as

8    Government's Exhibit 9, and ask you, sir, have you ever lived

9    at Seminole Lake Drive?

10   A.  No.

11   Q.  Does your driver's license number end in '4500?

12   A.  Yes.

13   Q.  Does your Social Security number end in '8865?

14   A.  Correct.

15   Q.  Correct?

16   A.  Yes.

17   Q.  Is your date of birth 12-10-1978?

18   A.  Yes.

19           MR. COHEN:  Judge, I'm gonna renew my objection.

20           THE COURT:  Sustain.

21           Let's just move on to whether he gave anybody

22   permission to use his name.

23           MS. TRIBUIANI:  Yes, your Honor.

24   BY MS. TRIBUIANI:

25   Q.  Sir --

1    MR. COHEN:  And my motion, your Honor.

2    THE COURT:  Okay.  You can make it later.

3  BY MS. TRIBUIANI:

4  Q.  Sir, do you know Balmy Joseph?

5  A.  No.  I never met him.

6  Q.  Have you ever given Mr. Joseph permission to use your

7  identity?

8  A.  I don't know him.  How can I give him my permission?  I

9  never met him, and I don't know him.

10    MS. TRIBUIANI:  Nothing further.

11    THE COURT:  Cross-examination.

12    MR. COHEN:  Nothing, Judge.

13    THE COURT:  Thank you, sir.  You may step down.

14  You're excused.  Thank you.

15    THE WITNESS:  All right.

16    THE COURT:  You can go.

17    THE WITNESS:  Thank you.

18    *(Witness excused)*

19    THE COURT:  The government may call its next witness.

20    MS. TRIBUIANI:  Your Honor, our next witness is going

21  to be lengthy.

22    THE COURT:  All right.  So, we'll go ahead and recess.

23    Members of the jury, we're going to go ahead and

24  recess for the evening.  Remember my admonition not to discuss

25  the case or allow it to be discussed in your presence.  I've

1   got a nine o'clock hearing that should take about five minutes

2   tomorrow, so I'm gonna ask that you be here about 9:05.

3        So have a nice evening.  We'll see you back tomorrow a

4   little after nine.

5        COURTROOM SECURITY OFFICER:  All rise.

6        *(The jury exited the courtroom)*

7        THE COURT:  You got a motion, Mr. Cohen?

8        MR. COHEN:  Are they out, Judge?

9        Yes.  The whole series of questions leading up to the

10  identity theft issues, Judge, I wanted the record to reflect I

11  was making a motion for mistrial before Mr. Desir took the

12  stand.  Also, when he took the stand, after we had the sidebar,

13  the prosecutor could have just asked that limited question, and

14  they didn't.  So, for that reason, I'm moving for a motion for

15  mistrial.

16       THE COURT:  Okay.  Motion for mistrial is denied.

17       As I indicated, I think the government doesn't have to

18  try its case in a vacuum.  I think that it has some relevancy,

19  particularly when you come to a constructive possession case

20  where knowledge is gonna be an issue in the case.  If someone

21  is possessing an apartment or a garage under a fictitious name,

22  that may be something that the jury might take into account to

23  decide whether there's guilty knowledge.  I think it also is

24  relevant to show how the police officers did what they did.

25  But I'm not gonna let it become a feature of the trial.

286

```
1              And, again, if Mr. Joseph or Mr. Cohen want me to tell
2     the jury what I would normally tell the jury at the end of the
3     case, I'll be more than happy to tell the jury when they come
4     back tomorrow, and that is that Mr. Joseph is not on trial for
5     anything other than the four counts in the indictment.
6              MR. COHEN:  Judge, are you gonna be doing that in the
7     closing instructions, I assume?
8              THE COURT:  Yes, I mean that's part of the standard
9     instructions.
10             MR. COHEN:  Right.  That's what my reason is, Judge.
11    I don't want --
12             THE COURT:  That's fine.
13             MR. COHEN:  My feeling is that the bell has been rung.
14    It's hard to unring it.  And if I were to ask your Honor, as I
15    have throughout these portions of the trial, to do that, I
16    think that would unduly emphasize guilt, and I think it would
17    be more problematic for Mr. Joseph.  So, I'm not going to be
18    doing it at this point.  But I am going to ask the Court to
19    please make sure that that instruction is included in the
20    closing instructions.
21             THE COURT:  It will be.  And, again, you know, you and
22    Mr. Joseph go over what your trial strategy is, and I'm
23    assuming that he's in agreement with your strategy, so I'm not
24    going to give a curative instruction at this point.
25             MR. COHEN:  Yes, sir.
```

1          THE COURT:  And, again, if there's nothing else to

2     come before the Court, we'll be in recess until a little bit

3     after nine tomorrow on this case, nine o'clock on other

4     matters.

5          MR. COHEN:  So, we're here at 9:15, your Honor?

6          THE COURT:  No, 9:05.

7          MR. COHEN:  9:05.  Okay, Judge.

8          I can't say you're not prompt, your Honor.

9          *(The Judge exited the courtroom)*

10         *(Proceedings adjourned at 4:49 p.m.)*

11                    -   -   -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

| | |
|---|---|
| **OPENING STATEMENT** | **PAGE** |

By Ms. Tribuiani                                    170

By Mr. Cohen                                       182

- - - - -

**INDEX OF WITNESSES**

| | |
|---|---|
| **GOVERNMENT'S WITNESS** | **PAGE** |

**Charles Booth**
Direct by Ms. Tribuiani                            188
Voir Dire by Mr. Cohen                             201
Direct by Ms. Tribuiani (Continued)               204
Voir Dire by Mr. Cohen                             208
Direct by Ms. Tribuiani (Continued)               210
Voir Dire by Mr. Cohen                             212
Direct by Ms. Tribuiani (Continued)               213
Voir Dire by Mr. Cohen                             215
Direct by Ms. Tribuiani (Continued)               218
Cross by Mr. Cohen                                 233
Redirect by Ms. Tribuiani                          253

**Stephanie Simmons**
Direct by Ms. Tribuiani                            258
Cross by Mr. Cohen                                 271
Redirect by Ms. Tribuiani                          277
Recross by Mr. Cohen                               279
Re-Redirect by Ms. Tribuiani                       279

**Wilbert Desir**
Direct by Ms. Tribuiani                            202

- - - - -

```
 1                    INDEX OF EXHIBITS

 2     GOVERNMENT'S EXHIBITS:           MARKED        RECEIVED

 3      1                               200            202
        2                               207            209
 4      3A, 3B, 3C, and 3D              211            213
        4                               215            217
 5      5 and 6                         218            220
        7A through 7P                   221            222
 6      8A                              225            225
        8B                              227            228
 7     10                               231            232
        9                               259            261
 8     28                               269

 9                         -    -    -    -    -

10

11

12

13

14

15

16

17              C E R T I F I C A T E

18         I hereby certify that pursuant to Section 753,

19     Title 28, United States Code, the foregoing is a true and

20     correct transcript from the record of proceedings in the

21     above-entitled matter.

22

23

24     _____     __5-4-2019_____
       Francine C. Salopek, RMR-CRR            Date
25     Official Court Reporter
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

**A PROSPECTIVE JUROR: [14]** 27/2 27/8 31/11 32/4 32/16 33/6 33/15 35/17 36/2 36/12 119/1 120/23 133/2 137/20

**COURTROOM SECURITY OFFICER: [25]** 3/9 11/11 18/10 18/13 18/23 27/18 116/6 118/25 120/10 120/22 132/25 134/11 140/9 156/17 157/19 167/23 168/4 169/17 169/25 203/10 204/7 257/6 257/11 257/24 285/4

**MR. COHEN: [239]**
**MR. PARNOFIELLO: [2]** 4/9 17/5
**MS. TRIBUIANI: [154]**
**ROOM CLERK: [7]** 13/11 13/17 158/20 159/1 167/22 188/7 188/9
**THE AGENT: [1]** 17/11
**THE COURT REPORTER: [11]** 48/6 48/8 142/1 203/25 213/20 258/11 258/13 262/9 281/12 281/14 281/18
**THE COURT: [1093]**
**THE DEFENDANT: [5]** 17/20 133/7 154/17 154/23 154/25
**THE JURORS: [1]** 158/25
**THE JURY PANEL: [2]** 13/16 14/2
**THE PROSPECTIVE JUROR: [854]**
**THE WITNESS: [11]** 188/12 203/23 209/15 209/18 258/16 271/18 281/7 281/17 281/20 284/14 284/16

**$**

**$1.4 [1]** 176/18
**$1.4 million [1]** 176/18
**$100 [1]** 174/20
**$11,000 [1]** 175/21
**$150 [1]** 174/20
**$1970 [2]** 264/20 267/24
**$2,000 [2]** 173/18 227/21
**$26,000 [1]** 176/9
**$27 [1]** 34/13
**$30 [1]** 34/13
**$300 [1]** 34/15
**$50 [1]** 35/5
**$57 [1]** 34/18
**$761 [1]** 175/15

**'**

**'18 [1]** 215/8
**'4500 [1]** 283/11
**'8865 [1]** 283/13
**'89 [1]** 53/9
**'90s [1]** 127/5

**.**

**.3 [1]** 191/3
**.3 grams [1]** 191/3

**1**

**10 [10]** 141/23 142/12 232/4 232/5 232/10 232/15 271/3 271/4 275/23 289/7
**10th [1]** 250/24
**11 [1]** 154/6

**11 years [1]** 117/17
**12 [11]** 15/1 15/12 22/12 119/14 153/8 153/10 154/6 154/13 154/17 154/19 157/5
**12-10-1978 [1]** 283/17
**12-year [1]** 90/24
**12:21 [1]** 168/7
**12th [7]** 173/11 226/15 229/7 250/23 251/3 253/9 253/11
**13 [3]** 31/13 31/14 154/7
**14 [7]** 22/20 82/8 119/17 119/17 154/7 157/12 157/17
**14 grams [1]** 175/20
**15 [3]** 28/23 142/14 143/2
**15 minutes [3]** 140/4 140/9 155/19
**15 years [1]** 124/19
**150 [2]** 268/19 268/20
**16 [4]** 62/4 79/8 148/5 154/8
**17 [5]** 148/9 148/14 148/23 154/8 273/12
**170 [1]** 288/3
**1795 [1]** 264/16
**18 [6]** 143/4 143/10 150/3 248/20 265/3 273/9
**18-80153-CR-WPD [1]** 1/4
**1800 hours [1]** 215/8
**182 [1]** 288/4
**188 [1]** 288/8
**18th [7]** 24/6 24/20 25/3 25/10 175/2 233/22 250/20
**19 [5]** 62/4 148/25 149/7 154/8 264/13
**1970 [2]** 264/18 264/19
**1978 [1]** 283/17
**1:15 [4]** 6/14 15/19 15/19 168/2
**1:30 [6]** 6/15 15/3 15/19 167/18 167/22 168/2
**1:38 [1]** 169/1

**2**

**20 [4]** 120/18 149/3 149/13 154/9
**20 minutes [1]** 123/14
**20 years [3]** 9/11 136/3 136/4
**20-year [1]** 9/22
**200 [1]** 289/3
**201 [1]** 288/9
**2011 [1]** 188/21
**2017 [3]** 264/13 265/3 272/24
**2018 [18]** 24/6 24/6 24/19 24/20 170/20 173/11 174/3 175/2 194/19 226/5 226/15 229/7 229/21 233/22 234/13 259/7 264/13 270/24
**2019 [4]** 1/7 3/1 169/1 289/23
**202 [2]** 288/18 289/3
**204 [1]** 288/9
**205F [1]** 2/10
**207 [1]** 289/3
**208 [1]** 288/10
**209 [1]** 289/3
**20th [1]** 264/13
**21 [2]** 149/17 149/20
**210 [1]** 288/10
**211 [1]** 289/4
**212 [1]** 288/11

**213 [2]** 288/11 289/4
**215 [2]** 288/12 289/4
**217 [1]** 289/4
**218 [2]** 288/12 289/5
**22 [4]** 149/21 149/25 150/7 150/9
**220 [1]** 289/5
**221 [1]** 289/5
**222 [1]** 289/5
**225 [2]** 289/6 289/6
**227 [1]** 289/6
**228 [1]** 289/6
**23 [2]** 143/12 143/17
**231 [1]** 289/7
**232 [1]** 289/7
**233 [1]** 288/13
**24 [2]** 143/18 144/2
**25 [2]** 150/11 154/9
**253 [1]** 288/13
**258 [1]** 288/15
**259 [1]** 289/7
**26 [3]** 149/24 150/24 150/23
**261 [1]** 289/7
**269 [1]** 289/8
**27 [3]** 58/24 150/25 151/24
**271 [1]** 288/15
**277 [1]** 288/16
**279 [2]** 288/16 288/17
**28 [7]** 151/7 151/12 270/1 270/4 270/7 289/8 289/19
**29 [2]** 146/7 146/14
**299 [1]** 2/10
**29th [2]** 24/6 24/19
**2:32 [1]** 203/17
**2:45 [2]** 30/12 142/22
**2:50 [1]** 203/17

**3**

**3-4-50 [1]** 177/24
**30 [8]** 63/5 141/1 145/22 151/13 151/22 151/23 152/13 152/14
**30 days [2]** 208/23 208/23
**30 minutes [1]** 254/10
**31 [1]** 154/11
**32 [2]** 152/15 154/11
**33 [2]** 152/8 153/11
**33301 [1]** 2/10
**33309 [1]** 2/7
**33401 [1]** 2/4
**34 [2]** 152/8 153/17
**35 [2]** 153/24 154/12
**35 years [1]** 125/19
**38 [2]** 144/3 144/14
**3:10 [1]** 33/11
**3A [11]** 211/16 211/18 211/23 212/9 212/25 213/2 213/11 245/7 245/14 245/16 289/4
**3B [8]** 211/16 211/18 211/24 213/2 213/24 246/11 246/12 289/4
**3C [7]** 211/16 211/18 212/1 213/2 214/2 247/6 289/4
**3D [8]** 211/16 211/18 212/3 213/2 214/10 245/7 247/13 289/4

**4**

**40 [5]** 48/3 131/15 135/20 146/16

**4**

**40... [1]** 146/22
**40 years [1]** 10/22
**400 [1]** 2/4
**403 [2]** 261/9 282/3
**404 [4]** 178/19 180/2 261/10 282/4
**41 [1]** 147/15
**41 years [2]** 45/9 108/1
**42 [2]** 144/15 144/23
**43 [2]** 144/24 145/4
**44 [1]** 155/16
**44's [1]** 147/24
**45 [3]** 134/17 155/16 156/9
**46 [3]** 145/5 145/18 156/5
**47 years [1]** 87/24
**49 [1]** 156/5
**4:01 [1]** 257/14
**4:11 [1]** 257/14
**4:15 [1]** 30/10
**4:30 [3]** 30/11 147/16 196/6
**4:45 [7]** 36/8 36/15 146/17 147/18 155/14 155/15 156/1
**4:49 [1]** 287/10

**5**

**5-3-0-4 [2]** 265/16 267/19
**5-4-2019 [1]** 289/23
**50 [3]** 135/20 177/24 177/24
**50 feet [1]** 196/3
**50 percent [1]** 131/21
**500 [1]** 2/3
**505 [1]** 2/7
**51 percent [1]** 131/23
**5167 Glen [1]** 211/22
**5171 [1]** 212/1
**5304 [6]** 174/17 175/14 233/20 265/15 274/24 276/14
**55 grams [1]** 175/20
**5657 [1]** 2/11
**5:15 [2]** 29/18 147/7
**5:30 [3]** 36/4 147/18 156/1

**6**

**60s [1]** 141/2
**6400 [1]** 2/6
**6:30 [1]** 32/21
**6th [3]** 174/3 229/21 248/24

**7**

**7-18 [1]** 248/20
**7-7 [2]** 215/8 248/22
**7100 [1]** 229/13
**753 [1]** 289/18
**769-5657 [1]** 2/11
**780 hours [1]** 188/23
**7:20 [1]** 30/9
**7:30-ish [1]** 29/14
**7A [8]** 221/24 222/1 222/8 222/10 222/11 222/16 222/17 289/5
**7B [1]** 222/19
**7C [1]** 222/23
**7D [1]** 223/6
**7E [1]** 223/8
**7F [1]** 223/11

**7G [1]** 223/14
**7H [1]** 223/17
**7I [1]** 223/19
**7J [1]** 223/23
**7K [1]** 224/4
**7L [1]** 224/7
**7M [1]** 224/10
**7N [1]** 224/13
**7O [3]** 224/15 249/4 250/10
**7P [8]** 222/1 222/11 224/18 224/24 225/12 249/5 250/10 289/5
**7th [5]** 170/20 194/19 195/7 226/5 234/13

**8**

**844 [2]** 8/22 10/9
**851 [1]** 9/16
**8:30 [2]** 28/7 28/9
**8:59 [2]** 1/8 3/1
**8A [6]** 225/7 225/8 225/18 225/20 225/21 289/6
**8B [6]** 228/5 228/6 228/22 228/24 228/25 289/6

**9**

**9-18 [1]** 273/9
**9-18-17 [1]** 273/12
**95 [1]** 156/2
**954 [1]** 2/11
**9:03 [1]** 3/13
**9:05 [4]** 6/20 285/2 287/6 287/7
**9:15 [1]** 287/5
**9:30 [1]** 29/23
**9:40 [1]** 146/10
**9:40 a.m [1]** 32/12
**9th [1]** 250/24

**A**

**a.m [5]** 1/8 3/1 3/13 31/21 32/12
**abandoned [4]** 172/17 172/20 177/19 255/24
**ability [7]** 18/2 20/23 125/8 125/24 126/19 127/21 161/16
**above [2]** 243/24 289/21
**above-entitled [1]** 289/21
**absence [1]** 35/23
**abundance [1]** 5/8
**AC [1]** 102/6
**academy [5]** 85/3 85/4 85/5 134/25 188/23
**accelerate [2]** 236/23 239/8
**accelerated [2]** 238/8 239/6
**accept [12]** 111/7 111/9 111/9 128/8 151/15 152/11 152/17 153/13 153/19 154/4 163/3 163/3
**acceptable [2]** 154/13 155/4
**accepted [3]** 152/24 262/7 265/11
**access [1]** 170/25
**accessible [1]** 176/8
**accident [4]** 107/12 107/12 185/2 233/12
**accord [22]** 165/23 170/22 170/23 170/24 171/1 171/5 171/11 171/12 171/16 171/20 171/22 172/2 195/8

**195/20 195/24 197/10 198/14 198/24 235/7 235/10 235/15 237/20**
**according [3]** 158/25 187/1 262/14
**accordingly [3]** 165/20 194/5 282/19
**account [2]** 161/16 285/22
**accountable [1]** 178/10
**accountant [4]** 54/14 60/20 96/18 128/20
**accounting [2]** 53/12 102/6
**accounts [2]** 163/14 165/9
**accurate [1]** 202/5
**accurately [5]** 200/6 207/21 212/4 212/20 222/4
**accusation [1]** 162/5
**acquire [1]** 165/17
**acquired [1]** 173/3
**acquiring [1]** 173/6
**across [1]** 5/20
**act [3]** 110/10 185/2 261/10
**acted [2]** 189/11 189/14
**acting [1]** 26/1
**actions [2]** 202/10 226/19
**activated [2]** 205/9 239/20
**acts [5]** 178/20 178/24 180/14 181/1 261/1
**add [3]** 11/2 117/12 119/10
**added [1]** 10/24
**addendum [2]** 268/3 269/1
**addict [1]** 66/16
**addicted [2]** 41/2 41/2
**addition [3]** 119/4 163/23 260/25
**address [4]** 16/24 263/24 264/7 264/7
**adjacent [9]** 211/6 212/2 212/5 214/3 214/12 218/11 218/18 245/1 255/19
**adjourn [1]** 155/23
**adjourned [1]** 287/10
**adjourning [1]** 155/19
**adjustor [1]** 57/14
**Administration [3]** 20/8 133/21 189/3
**administrative [1]** 45/11
**administrator [1]** 77/25
**admissibility [1]** 261/11
**admit [4]** 220/15 225/18 232/10 260/19
**admitted [16]** 159/20 161/8 161/9 202/24 209/24 213/3 218/1 220/23 222/11 225/21 228/25 232/15 255/1 261/16 271/2 283/7
**admonition [9]** 140/7 157/2 167/16 170/8 203/7 204/14 257/4 258/6 284/24
**adults [2]** 39/23 88/10
**advance [1]** 134/21
**advised [1]** 208/22
**adviser [1]** 98/3
**aerial [1]** 172/18
**affairs [1]** 22/25
**affect [6]** 18/1 20/23 125/8 125/24 126/19 127/21
**affirm [1]** 13/14
**afraid [1]** 27/10
**Africa [1]** 80/13
**aftercare [1]** 29/11

**A**

**afternoon [10]**  15/3 15/17 30/3 157/19 182/3 182/4 196/6 234/4 258/20 272/10
**afterwards [1]**  113/23
**age [2]**  47/23 163/22
**agent [4]**  17/8 48/16 128/2 186/15
**agents [8]**  133/20 185/18 186/2 195/11 226/25 227/3 227/4 251/12
**aggravated [1]**  89/15
**agree [18]**  23/16 24/9 128/21 131/4 132/5 132/19 138/16 138/16 147/22 156/9 159/16 163/3 241/19 243/4 246/23 247/3 247/24 248/12
**agreement [8]**  111/17 112/22 260/13 264/11 264/12 264/18 267/17 286/23
**agreements [1]**  259/22
**agrees [3]**  8/1 8/2 160/18
**Ah [1]**  103/7
**aid [1]**  251/19
**aide [1]**  105/11
**airline [1]**  74/25
**Airlines [3]**  32/20 82/10 144/5
**airplane [1]**  108/7
**airport [1]**  75/20
**alarm [1]**  63/7
**alcohol [1]**  41/2
**alive [1]**  37/17
**allegations [2]**  179/7 183/14
**alleged [3]**  24/11 178/20 247/21
**allegedly [3]**  163/10 186/13 187/6
**allow [13]**  139/7 139/10 140/8 157/3 167/17 170/9 203/8 204/15 205/19 257/4 258/7 279/11 284/25
**allowed [1]**  187/14
**Allstate [1]**  76/24
**alluded [2]**  8/9 182/8
**almost [6]**  79/8 141/12 141/14 227/6 272/21 274/16
**alone [1]**  195/10
**altered [1]**  208/12
**alternate [9]**  155/2 155/3 155/10 155/12 155/13 155/15 155/17 156/8 156/16
**alternates [5]**  15/1 22/12 119/14 155/8 157/6
**Altima [4]**  226/24 251/10 252/4 252/10
**Alubi [10]**  12/22 12/22 13/1 18/21 19/16 95/1 155/9 155/13 157/17 158/17
**Alvarez [4]**  12/13 77/18 151/7 151/11
**amend [1]**  117/13
**AMERICA [1]**  1/6
**American [5]**  32/18 32/20 82/9 114/21 144/5
**amount [9]**  24/16 24/24 25/7 25/14 177/7 177/13 187/6 191/2 264/20
**Amy [1]**  20/6
**analysis [1]**  42/12
**analyst [2]**  106/25 109/13
**analyzed [6]**  226/1 228/14 228/7 228/19 250/17 250/19
**and/or [1]**  268/4

**Andrews [1]**  2/6
**angle [3]**  210/13 210/23 243/21
**announce [1]**  4/6
**announced [1]**  89/2
**answer [6]**  13/15 22/5 110/14 110/15 161/3 279/23
**answers [9]**  16/12 16/14 16/18 22/1 117/10 117/13 119/10 160/13 166/4
**antibiotic [1]**  248/9
**antibiotics [1]**  248/13
**anticipate [1]**  11/1
**Antonio [2]**  231/20 233/2
**apartment [87]**
**Apartment 5304 [2]**  174/17 175/14
**apartments [1]**  259/3
**apologize [2]**  152/12 280/6
**appearance [1]**  139/20
**appearances [2]**  2/1 4/6
**applicant [1]**  263/23
**application [23]**  259/14 259/17 260/10 260/11 260/12 262/7 262/14 263/10 263/15 263/18 264/10 264/23 265/11 265/13 265/18 266/6 273/4 273/5 274/4 274/23 278/21 280/12 283/2
**applications [2]**  259/22 261/4
**applied [6]**  221/15 250/21 250/23 250/24 251/4 251/5
**applies [1]**  164/10
**apply [7]**  9/16 9/19 137/11 221/13 224/20 226/5 233/16
**applying [1]**  262/15
**appointment [3]**  32/5 32/11 146/9
**appreciate [12]**  11/8 123/4 123/11 129/12 132/20 133/12 136/18 138/22 139/1 141/2 157/11 165/22
**apprehending [1]**  227/1
**approach [17]**  175/6 192/19 196/1 200/10 207/9 211/11 214/20 218/22 221/19 225/2 227/25 231/22 260/1 260/21 269/21 270/24 281/23
**approaches [1]**  205/3
**approaching [2]**  175/9 205/1
**approximately [16]**  175/21 188/21 189/7 189/8 190/2 190/11 195/19 195/22 196/6 196/13 198/6 227/21 234/8 254/10 259/13 272/23
**arbitrator [1]**  201/5
**area [15]**  119/11 172/25 195/16 206/7 223/12 226/25 227/4 235/10 241/8 241/13 245/19 245/20 251/12 251/14 252/24
**Argentina [1]**  62/17
**argue [2]**  121/16 180/11
**argument [2]**  166/19 179/12
**arguments [3]**  160/8 160/9 166/25
**armed [1]**  178/6
**arrest [12]**  112/7 173/10 173/14 226/6 226/8 226/16 226/19 236/8 250/21 250/23 250/25 250/25
**arrested [79]**
**arrests [2]**  125/20 125/21
**arrival [4]**  206/10 206/17 206/24 256/18

**arrive [1]**  229/17
**arrived [5]**  175/4 227/3 235/8 235/22 235/25
**arrives [1]**  36/15
**arriving [1]**  227/4
**articulate [1]**  145/9
**Arts [1]**  81/9
**assault [3]**  85/18 89/16 102/25
**assert [4]**  179/21 181/14 186/14 186/20
**asserted [1]**  129/14
**assertions [4]**  179/12 183/15 187/3 187/24
**assessment [1]**  111/7
**assigned [1]**  268/13
**assist [4]**  35/20 166/11 209/17 227/1
**assistant [6]**  2/3 17/2 45/12 123/20 258/25 275/17
**associated [3]**  174/20 185/14 187/21
**associates [1]**  174/8
**associating [1]**  185/7
**association [1]**  46/5
**assume [2]**  6/3 286/7
**assuming [1]**  286/23
**assurance [1]**  109/12
**assure [1]**  162/19
**Atlanta [2]**  31/13 31/19
**attacked [2]**  80/9 80/14
**attempt [7]**  163/7 163/18 165/9 170/25 170/25 199/2 199/8
**attempted [6]**  86/1 172/3 172/10 177/5 227/5 251/16
**attempting [1]**  205/5
**attentive [1]**  147/9
**attorney [4]**  69/4 69/10 103/16 275/17
**attorneys [9]**  2/3 17/3 18/1 22/9 23/6 119/12 123/20 166/24 170/12
**attributable [1]**  24/12
**audience [1]**  70/20
**audio [8]**  189/22 201/15 201/16 201/17 202/9 205/9 210/4 210/5
**audio/video [2]**  201/15 201/16
**Australian [1]**  2/3
**authenticated [1]**  201/13
**authored [1]**  222/21
**authority [1]**  115/23
**authorized [1]**  164/17
**autism [2]**  30/9 52/8
**autistic [2]**  36/14 145/11
**automatically [2]**  112/15 112/21
**Automotive [1]**  90/17
**Avenue [2]**  2/3 2/6
**Aviation [1]**  82/24
**avid [1]**  54/3
**avoid [1]**  139/20
**avoiding [1]**  139/24
**awake [2]**  27/23 29/7
**aware [1]**  231/21
**ax [1]**  186/9

**B**

**B-O-O-T-H [1]**  188/13
**B. [1]**  4/12

## B

**B. Cohen [1]** 4/12
**B10.2 [1]** 181/7
**background [6]** 21/23 21/25 22/7 22/8 37/5 188/22
**backpack [6]** 173/16 176/5 176/7 227/15 251/18 251/21
**backstrikes [1]** 152/25
**backtrack [1]** 229/8
**badges [1]** 157/10
**bag [59]**
**baggie [2]** 213/16 213/25
**baggies [1]** 191/18
**bailed [3]** 227/9 241/12 241/14
**BALMY [79]**
**bands [1]** 176/9
**bank [5]** 73/10 89/21 89/21 117/17 117/18
**bankruptcy [1]** 47/22
**barely [2]** 211/6 243/20
**Barnes [10]** 6/7 11/16 22/3 37/5 37/7 117/23 118/4 124/12 148/7 148/8
**base [1]** 165/16
**basic [4]** 159/7 162/2 181/6 182/14
**basis [5]** 142/25 226/8 242/12 244/9 261/17
**bath [1]** 269/9
**bathroom [4]** 120/19 120/21 123/13 131/17
**battery [2]** 49/21 49/22
**Beach [37]** 2/4 17/10 20/2 20/3 20/5 20/6 20/7 20/9 20/12 21/7 21/8 21/9 21/11 24/7 24/20 25/4 25/11 41/11 41/12 53/6 122/15 122/19 133/19 170/20 174/1 188/18 188/19 195/1 195/4 201/6 226/23 229/3 229/14 234/6 239/25 259/10 283/1
**bear [2]** 141/12 162/16
**bears [1]** 161/23
**beaten [1]** 80/14
**bedroom [3]** 175/19 176/7 269/9
**bedrooms [1]** 176/2
**began [5]** 172/20 195/21 229/22 250/25 251/15
**begin [2]** 164/21 166/14
**beginning [2]** 148/1 195/14
**behave [1]** 114/17
**behind [14]** 5/14 51/11 61/13 82/2 95/1 167/8 172/6 198/10 199/22 205/8 239/17 256/1 256/2 273/16
**belief [1]** 144/25
**beliefs [4]** 115/22 116/1 116/12 117/5
**believability [1]** 161/23
**believable [1]** 112/21
**believe [23]** 10/6 27/7 38/9 112/15 128/19 138/2 152/2 160/3 161/13 161/13 161/14 182/6 187/9 188/1 227/24 247/9 250/24 252/20 255/25 261/10 270/23 272/24 273/1
**bell [5]** 20/17 179/20 180/23 194/4 286/13
**belonged [3]** 187/12 249/13 249/14
**belonging [4]** 173/5 175/3 177/10

177/12
**Bemis [5]** 53/4 136/22 154/7 157/14 158/7
**bench [12]** 121/18 121/23 122/1 122/5 169/2 178/18 192/19 192/20 260/21 260/22 281/23 281/24
**benefit [3]** 65/23 136/15 163/4
**Benoist [3]** 226/22 251/8 251/9
**Benson [8]** 171/9 171/17 171/23 198/11 198/21 237/4 237/14 237/22
**besides [1]** 91/15
**bet [2]** 48/2 48/4
**beyond [17]** 111/6 114/20 115/1 115/16 116/3 116/24 121/8 121/11 128/7 128/11 128/11 128/15 130/13 131/12 132/4 162/15 183/20
**bias [4]** 26/11 118/17 161/20 186/3
**biking [2]** 65/10 107/18
**Bill [1]** 13/20
**biological [1]** 105/7
**birth [3]** 174/18 263/25 283/17
**black [26]** 171/2 173/13 173/16 176/4 176/7 177/20 195/25 196/1 210/14 210/23 215/21 224/2 225/10 226/24 227/15 228/9 251/11 251/18 251/21 252/4 252/25 253/2 253/4 253/22 253/23 254/4
**blocked [1]** 227/7
**blocks [1]** 34/20
**blogs [2]** 164/2 164/7
**Blvd [1]** 2/10
**board [1]** 43/23
**boards [1]** 56/22
**boat [3]** 86/22 86/24 86/24
**boating [2]** 61/11 107/18
**booked [1]** 229/3
**Bookkeeping [1]** 88/1
**Booth [7]** 17/11 188/7 188/9 188/13 203/22 234/4 288/8
**bothering [1]** 112/7
**bottom [2]** 243/5 266/12
**Boulevard [3]** 199/20 205/1 229/13
**box [3]** 215/5 218/14 248/5
**boyfriends [1]** 74/9
**brand [1]** 272/17
**Brandon [12]** 171/9 171/16 171/25 172/22 197/23 206/22 235/16 235/18 235/19 237/13 237/22 256/8
**Brandy [1]** 20/9
**break [16]** 15/13 15/16 15/18 15/20 120/19 123/13 139/12 139/12 140/1 140/24 142/22 143/24 145/23 155/15 159/5 167/10
**breaking [1]** 155/24
**breaks [2]** 167/10 167/11
**brief [2]** 22/9 124/11
**broke [2]** 36/8 101/7
**broken [3]** 65/5 70/11 91/14
**broker [1]** 108/7
**Bronson [6]** 12/23 12/25 13/3 33/13 104/15 145/18
**brother [7]** 52/18 75/22 80/11 85/16 102/17 127/3 127/11
**brothers [1]** 85/12

**Broward [58]**
**Bryan [5]** 11/21 60/9 154/6 157/13 158/3
**BSO [3]** 105/11 106/5 106/6
**bump [1]** 139/11
**bunch [1]** 190/21
**burden [14]** 114/15 114/16 114/18 128/6 128/8 128/9 128/10 130/11 130/12 132/4 132/7 132/11 162/8 162/9
**burden's [1]** 114/12
**Bureau [1]** 189/3
**burglarized [4]** 41/11 44/13 60/2 61/6
**burglary [4]** 47/4 62/19 94/20 101/6
**bus [9]** 30/9 30/10 30/16 33/9 34/20 34/22 35/9 36/14 36/15
**buses [2]** 34/21 35/11
**bush [1]** 213/16
**business [4]** 63/8 92/9 108/3 259/23 260/16
**buy [4]** 177/23 189/14 191/4 191/17

## C

**cab [4]** 34/12 34/18 35/1 35/9
**cabinets [1]** 259/21
**CAD [1]** 102/12
**Cadillac [97]**
**Cadillac's [1]** 241/9
**calendar [2]** 6/17 8/8
**call [16]** 6/18 8/8 15/4 28/5 28/7 28/10 28/18 37/1 124/10 131/23 157/8 188/5 249/20 258/9 281/10 284/19
**called [7]** 28/13 28/19 41/14 85/21 130/9 157/7 159/25
**calls [13]** 28/6 28/12 28/21 28/23 28/24 29/1 147/7 188/6 190/4 249/19 258/10 275/5 281/11
**cam [1]** 239/4
**camera [3]** 207/22 243/21 255/6
**candor [1]** 123/11
**canine [2]** 199/21 256/5
**canvass [1]** 206/24
**capacity [3]** 189/11 189/12 189/14
**Capital [1]** 90/21
**capsule [4]** 191/17 191/20 191/21 191/24
**capsules [19]** 173/2 177/25 191/15 191/19 191/24 206/13 211/3 213/17 214/1 219/6 220/5 220/11 221/2 240/17 246/2 246/3 246/7 247/2 247/15
**capture [2]** 206/21 209/18
**captured [3]** 199/25 207/22 256/9
**car [13]** 34/13 45/24 65/5 70/11 74/9 97/10 98/21 101/7 170/25 170/25 235/6 243/21 247/8
**cardboard [3]** 215/5 218/14 247/16
**career [1]** 189/8
**careful [3]** 11/22 12/4 167/13
**caretaker [1]** 145/11
**Carlton [2]** 16/3 16/3
**Carlton-DeAngelus [1]** 16/3
**Carmenate [9]** 13/2 33/20 101/24

**C**

**Carmenate... [6]** 147/23 156/7 156/11 156/11 157/17 158/18
**carport [1]** 268/4
**carried [3]** 173/16 176/6 227/14
**carry [2]** 10/4 10/21
**carrying [3]** 159/24 172/2 251/18
**cars [2]** 41/13 50/23
**cash [1]** 173/19
**cashier [1]** 52/2
**cashier's [1]** 270/23
**Casino [1]** 59/6
**cast [3]** 116/15 116/18 233/11
**Castillo [6]** 27/5 64/8 118/6 118/12 118/18 143/10
**catch [2]** 113/2 113/7
**caught [1]** 170/19
**Caulfield [7]** 12/17 93/14 152/10 152/11 154/11 157/16 158/14
**cause [23]** 23/14 141/18 142/7 142/12 142/18 143/2 143/9 143/16 144/1 144/13 144/22 145/3 145/17 145/20 146/1 146/19 146/21 147/4 147/10 147/12 147/14 148/11 156/4
**causes [1]** 193/2
**causing [2]** 205/12 227/6
**caution [2]** 5/8 181/7
**cautionary [1]** 179/15
**cell [22]** 173/6 173/7 173/8 173/19 175/6 177/17 177/21 186/13 189/22 223/13 223/24 224/1 224/19 224/24 225/25 227/21 227/22 238/18 249/5 249/5 250/10 264/7
**cellular [1]** 224/21
**center [8]** 35/18 81/9 223/12 223/24 224/6 224/8 224/11 224/14
**CEO [1]** 81/8
**certify [1]** 289/18
**cetera [1]** 6/4
**Chad [2]** 17/11 188/6
**chain [3]** 159/25 217/17 220/17
**chairs [1]** 166/8
**challenge [16]** 23/7 23/10 23/15 142/11 143/1 143/9 143/16 144/1 144/13 144/22 145/3 145/17 146/21 147/4 147/12 156/4
**challenges [9]** 4/19 23/9 23/12 23/14 140/20 141/18 145/20 147/14 148/4
**challenging [1]** 23/8
**chance [5]** 11/5 22/6 146/5 165/6 170/18
**chances [3]** 170/17 178/12 193/25
**characterization [1]** 221/5
**characterized [1]** 247/7
**charge [6]** 16/4 16/23 24/1 111/9 268/15 268/15
**charged [9]** 9/2 115/7 123/23 159/13 163/10 178/13 179/1 180/14 181/8
**charges [29]** 8/6 8/12 14/18 23/24 24/5 24/17 24/19 25/1 25/3 25/8 25/10 25/15 25/17 25/25 111/5 114/15 130/15 130/19 130/20 136/11 179/14 182/23 183/1 183/6 183/9 183/11 183/13 227/11 253/5

**Charles [11]** 171/9 171/17 171/24 188/9 188/13 198/11 198/21 237/4 237/14 237/22 288/8
**chart [1]** 3/8
**chase [7]** 172/12 177/20 205/16 206/18 227/11 241/4 248/23
**chat [3]** 164/1 164/2 164/7
**check [2]** 18/1 20/22
**checked [1]** 275/16
**checkered [1]** 197/4
**checks [1]** 270/23
**chest [3]** 176/15 176/16 176/16
**chewing [1]** 223/25
**Chicago [1]** 80/7
**child [7]** 26/25 28/16 29/23 30/2 30/9 44/18 145/11
**children [37]** 37/21 39/21 42/14 43/24 45/13 48/17 52/3 54/21 56/1 57/15 59/8 60/21 62/3 63/14 64/20 66/3 69/14 71/7 75/5 76/25 78/5 79/18 79/19 81/10 83/13 87/1 88/9 90/23 92/11 94/3 96/19 98/9 102/8 103/22 105/6 108/8 109/14
**choice [2]** 162/13 170/18
**choices [4]** 128/20 128/22 170/17 178/10
**choir [1]** 53/2
**choose [2]** 160/3 162/11
**Christian [1]** 138/7
**church [2]** 51/22 53/1
**circled [4]** 154/20 154/21 171/3 172/7
**circumstances [4]** 125/19 160/1 180/20 226/18
**circumstantial [1]** 159/25
**cited [1]** 70/9
**citizen [3]** 14/7 14/8 205/20
**citizens [1]** 129/16
**city [7]** 36/7 97/19 105/5 147/19 155/14 156/1 282/25
**civic [3]** 35/5 35/7 56/22
**civil [22]** 14/14 38/8 40/12 47/21 49/5 69/23 69/24 75/11 75/12 88/19 92/17 92/18 103/21 105/17 105/18 114/4 114/7 114/8 131/14 131/19 131/21 131/22
**civilian [3]** 134/2 134/5 135/3
**claiming [2]** 234/21 261/3
**Claims [1]** 57/14
**clean [2]** 41/14 162/7
**clear [4]** 171/5 178/9 198/3 205/13
**clerk [1]** 16/4
**clicker [11]** 176/11 176/12 268/23 269/20 270/8 270/11 276/3 276/6 276/15 276/16 276/22
**client [34]** 6/1 6/12 7/16 17/16 17/18 128/3 136/10 138/23 140/23 141/16 142/5 151/10 152/22 153/2 153/6 154/23 178/21 179/7 181/1 181/21 182/1 183/1 186/13 186/21 186/25 187/6 187/11 187/12 187/16 187/19 193/1 235/23 252/3 261/2
**Clinical [1]** 68/6
**close [59]**

**close-up [5]** 211/24 212/3 213/25 214/11 223/24
**closely [1]** 210/18
**closer [1]** 169/11
**closest [4]** 6/5 11/16 11/21 12/1
**closet [1]** 175/20
**closing [5]** 27/2 160/9 166/25 286/7 286/20
**cloth [1]** 215/4
**clothing [2]** 197/2 263/2
**co [3]** 57/23 123/19 128/2
**co-counsel [2]** 123/19 128/2
**Co-workers [1]** 57/23
**Coaching [1]** 99/3
**coconspirators [1]** 178/2
**Coconut [1]** 44/22
**code [2]** 250/2 289/19
**Cohen [50]** 2/5 2/6 3/13 3/25 4/2 4/12 7/22 17/6 17/13 17/15 20/14 114/15 129/4 138/20 141/7 141/9 142/2 145/20 148/10 149/14 149/22 150/22 151/8 152/18 153/14 153/20 169/23 201/2 208/4 212/13 215/14 234/3 240/22 245/9 245/13 248/4 256/12 272/9 279/15 281/4 285/7 286/1 288/4 288/9 288/10 288/11 288/12 288/13 288/15 288/16
**collected [1]** 249/9
**Collectibles [1]** 58/16
**college [2]** 69/18 88/14
**colloquy [1]** 8/4
**Colombia [1]** 54/12
**color [1]** 176/20
**Colorado [2]** 127/15 127/16
**colors [1]** 228/10
**combine [1]** 24/8
**comfortable [1]** 34/6
**commenting [1]** 139/23
**commit [1]** 185/14
**committed [2]** 163/10 178/21
**common [7]** 128/24 128/25 178/7 186/19 187/13 190/7 190/8
**commonly [3]** 191/15 191/19 192/4
**communicate [2]** 163/25 172/18
**communication [3]** 199/1 238/17 244/6
**communications [5]** 163/22 189/24 190/3 238/15 249/22
**communities [1]** 21/2
**community [1]** 279/20
**company [10]** 59/15 67/6 90/16 93/22 94/7 94/8 102/7 258/22 259/6 272/17
**compared [1]** 177/10
**comparison [1]** 177/7
**compartment [5]** 198/22 211/4 214/15 223/9 223/16
**completed [1]** 188/23
**complex [40]** 170/22 171/3 171/14 172/1 173/24 173/24 173/25 174/1 174/4 174/5 174/16 195/6 195/13 195/17 198/8 199/4 229/10 229/12 229/13 229/17 229/21 229/24 232/8 233/17 234/15 234/19 235/12 236/7

**C**

**complex...** [12] 237/21 253/7 253/8 253/15 259/8 259/24 260/16 272/11 272/20 276/15 283/3 283/5
**compliance** [1] 76/17
**computer** [3] 1/24 42/13 261/7
**concede** [4] 156/23 170/4 204/10 258/2
**concentrate** [1] 184/7
**concept** [2] 130/11 131/5
**conception** [1] 138/2
**concepts** [1] 130/5
**concern** [2] 156/7 179/7
**concerned** [4] 147/7 160/2 241/4 260/25
**concerning** [2] 22/18
**conclusion** [1] 178/8
**conclusory** [1] 230/20
**concomitant** [1] 276/14
**concrete** [1] 245/22
**concussion** [1] 80/10
**Conde** [1] 19/25
**condition** [2] 165/1 165/2
**conditions** [1] 196/5
**condo** [1] 46/5
**conduct** [5] 24/13 24/14 59/24 162/19 235/12
**conducted** [2] 189/9 189/10
**conducting** [7] 194/20 194/22 195/8 235/1 235/7 238/3 253/12
**confederate** [1] 24/8
**confer** [1] 140/19
**conferences** [1] 188/24
**confines** [1] 78/20
**confirm** [1] 21/14
**congressman** [1] 111/14
**congresswoman** [1] 111/15
**connected** [1] 247/20
**Connecticut** [2] 45/20 84/18
**connecting** [1] 247/17
**connects** [1] 240/23
**consciousness** [1] 180/10
**consecutive** [3] 11/17 12/19 12/24
**consequences** [1] 165/20
**consistency** [1] 176/20
**consistent** [1] 177/24
**console** [6] 223/12 223/24 224/6 224/9 224/12 224/14
**conspiracy** [8] 9/3 24/12 24/17 130/20 185/8 185/15 282/6 282/7
**conspirators** [1] 24/14
**conspire** [1] 24/8
**conspired** [1] 184/11
**constant** [1] 238/17
**constitute** [1] 185/22
**Constitution** [1] 116/22
**constructive** [2] 240/18 285/19
**consult** [1] 181/21
**consultant** [2] 53/11 103/17
**contact** [6] 139/15 139/21 208/6 208/8 208/10 208/13
**contain** [5] 175/24 177/10 177/11 280/24 281/1
**contained** [12] 174/7 177/7 206/15

213/16 213/25 214/12 218/15 220/4 220/11 263/18 264/6 266/10
**container** [1] 247/16
**containing** [4] 24/15 24/24 175/22 232/18
**contains** [4] 192/17 215/1 215/4 228/8
**contemplate** [1] 7/23
**content** [2] 200/3 209/19
**contents** [9] 200/16 207/19 214/17 218/5 219/9 224/21 246/1 249/11 249/19
**contest** [2] 136/6 136/11
**contesting** [1] 182/15
**continually** [1] 216/21
**continuance** [1] 6/18
**continued** [13] 172/14 188/24 204/21 210/11 213/9 218/2 227/2 235/12 251/14 288/9 288/10 288/11 288/12
**continuing** [2] 24/6 24/20
**contract** [2] 267/12 267/13
**contradicted** [1] 161/20
**control** [6] 16/8 160/19 236/18 236/25 238/11 240/24
**controlled** [5] 24/11 24/12 24/23 25/6 25/14
**conversation** [1] 233/15
**conversations** [1] 167/14
**convict** [1] 128/16
**convicted** [1] 14/13
**conviction** [1] 142/17
**convictions** [3] 178/22 178/23 180/4
**convinced** [1] 115/16
**Cooper** [5] 36/7 97/19 147/19 155/14 156/1
**cops** [1] 41/14
**copy** [2] 110/24 200/15
**Coral** [6] 67/1 73/16 77/20 80/24 90/7 106/20
**corner** [3] 41/13 199/22 222/25
**corollary** [2] 130/17 132/10
**correction** [3] 72/22 102/18 135/12
**correctional** [2] 78/1 78/21 105/11
**corrections** [1] 94/15
**correspondence** [4] 173/5 175/17 223/18 223/21
**Costco** [1] 63/13
**Cotton** [5] 65/15 125/12 149/8 154/9 157/15 157/15 158/10
**counsel** [40] 4/6 5/25 6/11 7/15 7/19 123/19 128/2 140/22 141/15 151/9 152/21 153/1 153/5 154/3 154/22 156/23 166/17 166/21 169/15 170/4 170/15 181/25 200/12 203/5 203/21 204/10 211/13 213/7 214/22 218/24 221/21 225/4 228/2 231/24 245/8 257/18 258/2 260/3 269/23 279/8
**counsel's** [2] 17/13 180/2
**Counsels** [1] 182/3
**count** [25] 7/7 9/4 9/22 10/11 24/17 24/19 25/1 25/3 25/8 25/10 25/15 51/5 111/23 112/2 140/3 183/1 183/4 183/8 183/11 184/10 184/14 184/14 184/17 184/19 184/21

**Count 1** [5] 9/22 10/11 24/17 183/1 184/10
**Count 2** [4] 24/19 25/1 183/4 184/14
**Count 3** [4] 25/3 25/8 183/8 184/19
**Count 4** [4] 25/10 25/15 183/11 184/21
**country** [2] 115/6 130/9
**counts** [11] 8/24 9/9 10/1 111/18 111/21 115/17 179/1 179/16 179/17 184/8 286/5
**Counts 1** [2] 8/24 179/1
**Counts 3** [1] 10/1
**County** [86]
**court** [51] 1/1 2/8 2/9 2/9 7/18 11/2 13/21 16/1 16/4 16/9 16/22 18/4 26/18 38/6 38/6 40/10 40/10 49/3 69/21 75/9 88/17 89/4 89/5 92/15 105/15 129/5 129/9 133/10 139/14 162/25 164/21 168/2 169/19 170/15 181/3 182/2 183/24 203/4 203/14 204/3 209/3 213/8 217/2 217/6 245/11 257/10 257/19 282/4 286/18 287/2 289/24
**Court's** [2] 157/7 157/19
**courtesy** [1] 139/1
**courthouse** [4] 34/21 34/21 159/24 187/14
**courtroom** [48] 3/2 3/5 3/11 3/12 3/13 3/25 4/2 11/13 16/6 16/12 16/23 22/6 22/22 26/17 119/17 121/16 121/22 122/2 132/1 140/17 141/7 141/9 156/19 156/21 157/21 159/18 165/12 165/18 166/6 167/4 167/5 167/25 168/6 170/2 182/25 196/25 203/12 203/16 203/18 204/9 257/8 257/13 257/15 258/1 262/18 274/14 285/6 287/9
**cousin** [5] 85/2 117/24 126/7 126/13 134/24
**cousins** [4] 72/20 72/23 74/8 106/4
**Cove** [4] 206/4 206/12 211/22 254/23
**covered** [2] 145/21 180/2
**CR** [1] 1/4
**credibility** [1] 161/25
**credit** [2] 134/5 135/12
**Creek** [1] 44/22
**crime** [104]
**crimes** [14] 41/18 51/3 78/18 86/4 89/19 89/24 101/5 101/17 112/23 112/24 113/12 159/13 181/8 187/23
**criminal** [35] 8/9 13/22 14/17 21/24 38/8 38/9 40/12 40/13 40/21 47/21 49/5 49/6 69/23 75/11 88/19 88/20 92/17 105/17 112/5 112/10 114/3 114/4 114/6 114/12 115/22 116/2 116/13 124/9 125/13 126/4 127/2 131/14 159/7 162/1 162/2
**criteria** [1] 186/5
**cross** [10] 113/15 166/21 166/23 233/25 234/2 272/6 272/8 284/11 288/13 288/15
**cross-examination** [6] 113/15 233/25 234/2 272/6 272/8 284/11
**cross-examine** [2] 166/21 166/23

**C**

CrossFit [1] 84/9
Crown [16] 173/1 206/14 211/4 212/1 212/3 214/6 214/11 214/17 215/4 215/16 215/20 216/2 240/13 247/10 247/13 248/5
CRR [2] 2/8 289/24
cruise [1] 94/2
Crush [5] 12/3 18/9 68/23 149/21 150/9
CSI [2] 20/5 20/6
CSIs [2] 177/2 177/5
curative [12] 179/18 179/24 181/4 181/6 181/16 193/6 194/2 194/3 282/9 282/10 282/14 286/24
custody [15] 16/7 33/7 105/8 173/18 216/1 216/3 216/21 216/23 217/18 220/17 227/10 229/20 240/16 251/21 276/5
customer [3] 90/14 177/23 177/23

**D**

D-E-S-I-R [1] 281/22
dad [3] 40/2 66/2 88/7
Dade [2] 85/7 102/18
Daily [1] 259/16
Damage [1] 73/8
dangerous [2] 193/9 193/12
Dania [2] 40/5 118/22
dash [1] 202/15
dashcam [4] 199/25 200/15 201/7 201/10
data [5] 174/2 225/25 228/17 228/19 250/17
date [14] 25/10 174/18 209/14 215/7 229/6 248/23 263/25 264/11 265/2 273/2 273/2 273/15 283/17 289/24
dates [1] 264/12
daughter [5] 30/8 31/13 52/10 105/10 118/23
daughter's [3] 19/11 19/14 19/15
Davila [6] 12/9 30/24 31/11 72/2 143/24 144/2
DEA [4] 19/25 20/1 20/10 20/11
deadly [1] 89/16
dealer [1] 59/6
dealers [4] 189/25 190/7 190/9 190/14
dealings [1] 198/2
deAngelis [1] 16/4
DeAngelus [1] 16/3
dear [1] 80/14
death [1] 193/2
deaths [4] 192/11 192/24 193/9 193/13
decide [12] 111/5 116/2 116/15 116/24 117/6 159/11 159/17 161/12 166/3 167/2 186/1 285/23
decided [2] 89/1 89/3
decision [5] 8/14 22/16 164/23 165/11 165/16
decorum [1] 16/23
Deepa [1] 20/11
Deerfield [1] 53/6

defects [1] 26/7
defendant [66]
defendant's [12] 24/2 128/7 128/11 128/15 162/13 162/14 175/16 175/23 175/24 176/19 180/3 277/24
defenders [1] 47/25
defense [7] 17/13 154/15 155/9 166/17 182/15 209/10 257/22
defer [1] 146/6
defined [1] 183/21
definitions [1] 165/14
deleted [2] 208/12 208/14
deliberate [2] 186/7 187/25
deliberating [1] 15/12
deliberation [5] 166/7 166/9 167/7 167/9 167/18
deliberations [5] 15/13 111/1 115/16 133/17 164/22
Delson [64]
demeanor [1] 252/6
denied [6] 179/23 181/15 194/7 194/17 282/21 285/16
denotes [1] 242/24
dental [1] 32/5
dentist [2] 32/10 146/9
Department [1] 78/1
depend [1] 184/25
depending [8] 8/21 8/24 28/6 28/12 28/23 29/3 190/20 191/3
depends [5] 28/16 28/17 29/7 118/16 190/21
depict [10] 200/6 202/9 207/3 207/21 210/17 211/17 212/4 212/20 221/25 222/4
depicted [20] 211/1 213/24 225/12 230/6 230/18 231/3 231/11 231/19 232/8 232/20 239/12 239/18 240/10 240/12 240/15 241/25 247/13 250/10 250/18 261/25
depicting [1] 222/24
depiction [1] 202/5
depictions [1] 208/25
depicts [5] 202/10 202/12 202/16 222/3 233/11
deposit [1] 34/15
deputies [2] 75/19 133/19
deputy [3] 18/3 20/4 135/24
describe [7] 195/23 196/5 197/24 204/24 213/12 222/16 226/18
description [2] 241/11 252/1
deserve [1] 122/10
deserves [1] 160/5
designated [1] 189/2
designed [1] 165/19
designer [1] 102/12
Desir [27] 19/25 174/15 174/19 174/22 174/24 175/18 261/3 262/16 262/17 263/23 264/1 264/2 264/25 267/17 268/5 268/8 270/14 270/16 273/21 275/24 281/1 281/11 281/14 281/18 282/25 285/11 288/18
Desir's [1] 174/17
detailed [1] 159/9
detectable [4] 24/16 24/24 25/7

25/14
detective [21] 17/11 20/1 188/6 188/13 188/17 194/11 197/5 203/22 208/6 212/14 212/15 216/3 216/22 218/4 226/4 228/20 234/4 250/16 252/9 253/21 256/25
Detective Booth [1] 203/22
Detective Chad [2] 17/11 188/6
Detective Drummin [2] 216/3 216/22
Detective Evans [2] 228/20 250/16
Detective James [1] 20/1
detectives [41] 170/21 170/24 171/1 171/11 172/3 172/12 172/19 172/24 173/3 173/7 173/9 173/11 173/14 173/21 174/2 174/5 174/23 175/4 175/17 175/25 176/12 176/17 177/16 177/18 177/21 195/10 195/11 199/8 221/15 224/20 226/25 227/3 227/4 229/23 230/4 233/6 233/16 251/12 255/23 271/8 271/13
determination [1] 209/7
determine [12] 41/1 159/12 186/5 186/8 186/19 187/15 208/5 208/7 208/9 208/12 208/17 217/17
determining [3] 22/16 125/3 161/24
device [2] 163/12 164/7
dialysis [1] 105/12
Diaz [1] 20/1
difference [5] 8/9 110/8 128/12 131/13 160/2
difficult [3] 115/22 116/12 129/21
Digital [1] 71/6
dilemma [1] 180/15
Dimitrouleas [20] 1/14 13/20 123/22 130/6 130/18 132/3 132/13 132/18 133/25 136/16 136/19 137/9 137/19 138/4 138/18 182/7 183/22 184/2 184/24 185/12
dire [16] 4/22 22/14 22/15 22/20 183/25 200/23 201/1 208/1 208/3 212/10 212/12 215/13 288/9 288/10 288/11 288/12
direct [15] 160/2 188/14 204/21 210/11 213/9 218/2 258/18 282/23 288/8 288/9 288/10 288/11 288/12 288/15 288/18
direction [1] 255/4
directionally [1] 255/20
directions [1] 244/8
directly [1] 212/2
director [2] 65/23 90/14
disagree [3] 110/11 137/23 138/1
disagrees [1] 131/5
disbelieve [1] 160/3
discontinue [1] 172/12
discrimination [1] 101/14
discuss [15] 11/5 139/7 139/9 140/7 157/3 160/10 162/25 163/3 167/16 170/9 203/7 204/15 257/4 258/7 284/24
discussed [14] 139/8 139/10 140/8 157/3 163/13 164/25 165/3 167/17 170/9 203/8 204/15 257/4 258/7 284/25

**D**

**Discussion [27]** 5/25 6/11 7/15 7/18
140/22 141/15 151/9 152/21 153/1
153/5 154/3 154/22 181/25 200/12
203/4 211/13 213/7 214/22 218/24
221/21 225/4 228/2 231/24 245/8
260/3 269/23 279/8
**discussions [4]** 9/25 163/15 163/19
164/22
**disk [4]** 201/12 207/19 209/6 209/8
**disorderly [1]** 59/24
**disqualify [1]** 20/25
**disregard [1]** 161/6
**disruptive [1]** 59/23
**distance [1]** 172/16
**distinction [1]** 137/7
**distinctly [2]** 111/22 112/2
**distract [1]** 166/4
**distribute [23]** 10/3 10/4 24/10 24/18
24/23 25/2 25/6 25/9 25/13 25/16
130/20 130/21 130/22 130/23 178/4
183/2 183/6 183/9 183/12 184/12
184/17 184/20 184/23
**distribution [2]** 191/7 191/14
**DISTRICT [15]** 1/1 1/2 1/15 2/9 13/21
13/21 21/10 21/12 24/7 24/21 25/4
25/11 95/7 229/14 259/10
**diving [1]** 94/24
**division [2]** 1/3 188/17
**divorced [6]** 63/10 86/19 88/3 89/17
98/1 105/1
**Dix [5]** 39/9 40/2 40/6 40/7 149/5
**Dixon [8]** 12/10 73/14 118/22 126/2
150/11 154/9 157/16 158/13
**DNA [7]** 176/23 177/5 177/7 177/10
177/12 177/13 187/3
**document [2]** 201/25 260/7
**documents [4]** 132/15 179/5 180/8
261/11
**dogs [1]** 108/24
**dollars [1]** 186/24
**Domestic [2]** 86/5 89/25
**Dominican [3]** 42/5 85/22 95/14
**door [19]** 167/5 170/21 176/10
176/12 176/13 187/14 206/14 210/19
222/18 223/9 223/15 242/5 242/5
243/16 243/16 243/17 243/19 251/11
269/20
**doors [3]** 167/4 255/7 255/7
**Doraida [1]** 20/1
**dosage [2]** 190/23 191/1
**doubt [22]** 111/6 114/20 115/1
115/17 116/3 116/25 121/2 121/8
121/11 121/11 121/21 128/7 128/11
128/12 128/16 130/13 131/12 132/5
136/15 142/20 162/15 183/20
**downloading [1]** 201/25
**downtown [2]** 155/25 156/2
**drafted [1]** 117/2
**drastic [1]** 117/16
**drawing [1]** 51/9
**dressed [1]** 5/17
**Drinking [1]** 75/25
**drive [3]** 30/14 199/4 283/9

**driven [1]** 171/6
**driver [29]** 80/11 101/10 171/19
171/19 171/20 171/23 172/4 173/14
196/2 196/10 196/12 196/13 196/14
196/16 198/15 198/17 210/21 223/9
223/9 226/20 227/5 227/8 227/13
235/14 237/12 237/18 237/19 252/5
252/7
**driver's [20]** 198/12 198/18 222/20
223/15 252/6 277/19 277/21 277/22
277/24 278/1 278/5 278/13 278/14
279/16 279/19 280/13 280/16 280/19
280/23 283/11
**drives [1]** 105/12
**driveway [2]** 244/24 244/25
**driveways [1]** 244/22
**driving [9]** 236/15 237/21 238/24
239/1 239/3 239/23 240/1 240/24
253/21
**drop [5]** 29/12 29/23 29/24 30/4
146/23
**dropped [3]** 7/11 216/19 216/23
**drove [5]** 171/21 172/1 198/13
198/19 237/18 237/20 238/5
**drug [16]** 20/8 41/2 66/15 124/10
125/17 133/20 189/1 189/3 189/18
189/25 190/7 190/9 190/13 193/2
282/6 282/7
**drug-related [1]** 124/10
**drugs [9]** 38/22 41/13 74/9 75/25
102/21 124/15 179/14 189/12 189/14
**Drummin [3]** 212/15 216/3 216/22
**drunk [2]** 80/11 101/10
**Drunken [1]** 86/7
**DUI [4]** 63/24 77/10 83/24 84/1
**DUIs [1]** 58/10
**duplex [1]** 244/21
**duties [1]** 259/1
**duty [13]** 26/8 35/2 35/5 35/7 113/21
114/1 116/14 116/17 116/19 116/21
121/4 159/8 159/11
**DVD [1]** 207/16

**E**

**eagle [2]** 243/24 244/11
**early [6]** 24/6 24/19 35/9 35/11
155/23 155/25
**earmuffs [1]** 16/15
**earphones [1]** 16/16
**Earth [1]** 163/12
**easier [2]** 16/20 141/1
**east [4]** 55/17 87/21 207/7 207/17
**eastbound [2]** 199/19 205/5 239/13
239/14
**edge [1]** 245/21
**education [1]** 188/24
**educational [2]** 45/6 188/22
**educator [1]** 100/17
**effect [2]** 135/2 183/16
**efficiency's [1]** 111/20
**eight [11]** 5/20 5/22 5/22 5/22 5/22
11/15 33/8 36/4 42/3 54/10 90/10
**eight-year [1]** 36/4
**eight-year-old [1]** 33/8

**Eighteen [2]** 61/20 103/14
**Eighteen's [2]** 150/4 150/5
**ejected [1]** 101/10
**elapsed [1]** 138/20
**electrical [1]** 269/18
**electronic [1]** 267/5
**element [1]** 115/1
**elementary [3]** 40/5 52/11 118/22
**elements [3]** 114/24 114/25 182/24
**elevator [2]** 139/22 139/23
**elevators [1]** 119/21
**Eleven [3]** 51/17 51/18 78/6
**elimination [1]** 23/6
**elude [2]** 226/9 238/12
**eluding [1]** 173/11
**email [2]** 164/1 264/7
**emergency [1]** 239/20
**Emily [1]** 20/3
**emphasis [1]** 184/12
**emphasize [2]** 163/23 286/16
**emphasized [1]** 275/16
**employee [1]** 89/22
**employer [7]** 162/23 265/23 265/23
265/25 266/5 266/8
**employment [4]** 265/19 265/21 266/3
274/10
**emptied [1]** 221/9
**empty [1]** 269/15
**enforcement [13]** 20/8 100/25
112/14 113/9 133/21 134/2 188/23
189/3 199/22 207/3 241/8 243/2
251/19
**enforcement's [1]** 206/17
**engaged [1]** 261/2
**engineer [3]** 59/14 94/8 94/8
**English [4]** 33/17 103/5 147/24 156/8
**enhanced [1]** 9/17
**enter [4]** 133/17 167/3 170/25 226/23
**entirely [2]** 114/12 179/10
**entirety [2]** 209/4 211/9
**entitled [5]** 166/11 265/19 266/23
269/1 289/21
**entrance [2]** 195/17 235/11
**envelope [3]** 217/13 217/14 276/2
**equipment [2]** 203/25 204/17
**equitable [1]** 188/2
**Ertug [10]** 12/5 12/5 12/6 12/8 30/17
30/22 70/20 118/20 118/25 143/17
**Ertug Ozan [1]** 12/5
**Escalade [139]**
**Esq [1]** 2/5
**essence [1]** 128/17
**establish [1]** 185/8
**established [4]** 220/16 232/11
253/21 261/18
**estate [4]** 27/1 47/22 48/16 48/24
**et [1]** 6/4
**et cetera [1]** 6/4
**ethical [1]** 110/17
**evade [1]** 206/21
**evaluate [1]** 165/3
**Evans [4]** 20/2 226/4 228/20 250/16
**evenhanded [1]** 135/7
**evenhandedly [1]** 129/17

**E**

**evening [3]**  33/9 284/24 285/3
**event [6]**  15/5 37/2 80/9 157/9 185/7
 243/5
**events [6]**  182/16 195/3 199/25
 200/6 202/1 202/5
**everybody [19]**  11/17 12/7 13/19
 14/5 14/7 14/20 111/11 112/1 114/18
 114/22 115/7 115/18 119/16 119/21
 119/21 123/12 128/25 158/2 199/1
**everybody's [3]**  14/1 22/6 119/16
**everyone [17]**  12/18 12/24 14/10
 127/24 128/2 128/4 128/8 128/17
 128/19 128/21 128/23 135/21 138/15
 157/2 170/8 204/14 258/6
**everyone's [1]**  262/19
**evidence [120]**
**ex [2]**  74/9 89/12
**ex-boyfriends [1]**  74/9
**ex-husband [1]**  89/12
**examination [24]**  22/15 22/15 22/20
 113/15 188/14 201/1 204/21 208/3
 210/11 212/12 213/9 215/13 218/2
 233/25 234/2 253/19 258/18 272/16
 272/8 277/16 279/14 280/8 282/23
 284/11
**examine [3]**  166/21 166/23 224/21
**examined [2]**  249/7 249/11
**examiner [1]**  20/3
**excited [1]**  155/24
**exclude [1]**  282/4
**exclusion [3]**  130/13 131/12 132/5
**excuse [36]**  23/7 48/7 119/16 142/7
 144/9 146/1 146/14 148/21 148/22
 148/24 149/2 149/5 149/10 149/15
 149/19 149/23 150/2 150/2 150/9
 150/18 150/23 151/4 151/11 151/24
 152/5 152/6 152/13 153/7 153/15
 153/21 156/5 171/16 174/19 217/4
 238/23 273/14
**excused [11]**  23/10 23/15 23/18
 142/18 157/7 157/18 257/1 281/7
 281/9 284/14 284/14
**excusing [5]**  143/25 146/12 146/19
 147/2 147/10
**execute [1]**  175/4
**executed [3]**  175/2 222/22 233/21
**executive [1]**  90/21
**exhibit [49]**  159/20 160/21 160/24
 160/25 200/15 200/18 202/23 202/24
 207/13 207/14 207/25 209/24 211/18
 214/25 215/2 217/5 217/11 218/1
 218/25 219/5 219/6 220/23 222/11
 225/7 225/8 225/21 228/5 228/6
 228/25 232/4 232/5 232/10 232/15
 243/14 260/6 260/8 260/19 261/16
 262/1 263/9 270/1 270/4 271/3 271/4
 273/8 273/17 275/23 277/18 283/8
**Exhibit 1 [2]**  200/15 202/23
**Exhibit 10 [5]**  232/4 232/10 271/3
 271/4 275/23
**Exhibit 2 [3]**  207/13 207/25 243/14
**Exhibit 28 [1]**  270/1
**Exhibit 4 [2]**  214/25 217/5

**Exhibit 5 [2]**  219/5 219/6
**Exhibit 8A [1]**  225/7
**Exhibit 8B [1]**  228/5
**Exhibit 9 [8]**  260/6 260/19 262/1
 263/9 273/8 273/17 277/18 283/8
**Exhibits [6]**  211/16 213/2 219/4
 222/1 289/1 289/2
**Exhibits 3A [1]**  211/16
**Exhibits 5 [1]**  219/4
**exist [1]**  164/14
**exists [1]**  114/21
**exit [10]**  198/8 198/15 206/19 210/14
 211/8 237/14 242/16 242/20 251/16
 254/15
**exited [26]**  3/11 3/25 140/17 141/7
 157/21 167/25 168/6 197/18 198/5
 198/11 198/12 203/12 203/16 237/19
 238/2 242/21 243/9 243/10 254/4
 254/17 255/12 255/25 257/8 257/13
 285/6 287/9
**exits [2]**  210/21 237/4
**expect [1]**  15/23
**expected [1]**  34/13
**experience [7]**  22/18 112/5 113/21
 113/25 125/8 125/23 191/13
**experienced [1]**  141/2
**expert [4]**  186/16 193/11 219/9
 219/20
**explain [8]**  121/13 138/25 159/7
 159/14 159/16 193/6 201/17 201/22
**explained [1]**  128/6
**expose [1]**  194/13
**expressed [1]**  147/25
**extra [4]**  32/22 174/19 268/15 268/15
**eye [1]**  246/20
**eyes [1]**  241/24

**F**

**fabrication [1]**  84/20
**face [7]**  9/25 19/8 163/24 163/24
 262/19 262/22 262/25
**face-to-face [1]**  163/24
**Facebook [2]**  164/3 230/15
**faces [1]**  224/5
**facility [3]**  78/1 78/19 78/21
**fact [38]**  20/24 24/3 112/20 112/25
 131/18 133/25 138/23 139/22 159/22
 160/1 163/18 165/10 179/4 179/6
 180/7 180/9 185/16 187/20 187/21
 187/22 192/24 193/1 217/10 239/25
 240/10 242/8 250/5 251/24 251/25
 254/2 256/8 261/9 266/5 266/21
 268/11 275/22 277/10 277/11
**factor [2]**  22/23 161/23
**facts [13]**  111/4 111/8 118/17 125/19
 137/2 137/11 137/16 178/7 184/1
 184/1 184/4 250/11 282/5
**Failure [1]**  85/14
**fairness [1]**  139/1
**family [13]**  38/17 38/24 41/4 43/22
 50/22 58/5 66/22 72/18 72/21 80/12
 91/4 124/6 135/10
**Farms [3]**  226/22 251/8 251/9
**farther [1]**  15/21

**fast [1]**  205/14
**fatal [1]**  191/22
**father [6]**  45/19 74/3 127/15 127/16
 133/3 133/13
**father-in-law [3]**  45/19 133/3 133/13
**feature [1]**  285/25
**federal [13]**  36/24 36/25 38/6 40/10
 49/3 69/21 75/9 88/17 89/4 92/15
 101/14 105/15 189/3
**fellow [1]**  166/2
**felony [1]**  14/14
**fentanyl [16]**  25/7 25/9 118/8 130/22
 175/20 178/5 183/10 192/6 192/8
 192/9 192/13 192/17 192/23 193/9
 193/12 194/11
**Ferris [5]**  86/10 153/25 154/12
 157/16 158/16
**fictitious [1]**  285/21
**field [4]**  219/16 219/18 219/23
 219/24
**Fifteen [1]**  70/25
**fifth [3]**  158/8 158/16 234/4
**fighting [2]**  39/3 114/8
**figure [1]**  141/2
**filed [3]**  6/18 7/22 180/4
**filing [1]**  259/21
**fill [3]**  35/23 35/23 280/11
**filled [6]**  173/2 247/2 259/17 263/15
 263/25 283/2
**fills [1]**  265/22
**final [2]**  164/23 201/14
**finalized [1]**  220/18
**finally [5]**  109/1 165/8 171/4 173/12
 207/17
**financial [3]**  35/14 98/3 106/25
**financially [1]**  35/7
**fine [7]**  11/11 134/3 156/12 157/23
 169/9 169/11 286/12
**finger [2]**  245/19 273/9
**fingerprint [3]**  20/3 175/24 176/23
**fingerprints [2]**  187/4 246/10
**finish [4]**  13/23 15/10 15/22 21/20
**finished [1]**  155/23
**fire [1]**  63/7
**firm [4]**  47/19 53/12 55/25 61/23
**firsthand [2]**  241/22 244/7
**fish [1]**  41/21
**fishing [2]**  64/5 78/24
**fit [1]**  90/3
**five o'clock [3]**  6/24 15/7 15/14
**five-year [1]**  10/21
**fixed [1]**  203/25
**FL [1]**  2/7
**flatbed [5]**  171/21 171/23 198/19
 198/24 237/20
**fled [21]**  172/11 172/17 173/15
 199/24 205/14 206/17 227/5 227/9
 235/15 241/11 241/23 242/11 242/25
 251/17 251/18 252/7 253/4 255/13
 255/13 255/14 256/12
**flee [10]**  202/15 206/19 211/8 239/20
 241/23 242/14 242/17 242/19 242/23
 243/7
**fleeing [6]**  173/10 176/4 202/10

**F**

**fleeing... [3]** 226/9 243/6 252/8
**flees [3]** 210/19 210/21 255/8
**flies [1]** 31/1
**flip [8]** 175/7 224/11 224/14 224/16 225/10 227/24 252/15 252/20
**flooring [1]** 88/5
**FLORIDA [69]**
**flown [1]** 15/9
**fly [2]** 15/11 31/14
**flying [1]** 31/18
**Flynn [2]** 13/2 156/10
**focus [1]** 184/17
**focusing [1]** 179/9
**folks [7]** 17/14 129/12 131/20 132/20 132/21 137/15 138/22
**follow-up [2]** 32/9 279/10
**foot [3]** 172/17 210/21 238/18
**forbids [1]** 185/5
**force [4]** 20/7 134/1 183/15 189/2
**forced [1]** 172/12
**foregoing [5]** 181/20 194/9 261/14 282/22 289/19
**foreman [2]** 40/14 75/13
**forensic [2]** 20/8 249/15
**foreperson [6]** 38/10 49/7 69/25 88/21 92/19 105/19
**foreseeable [1]** 24/14
**Forest [3]** 199/19 205/1 206/5
**forfeiture [2]** 7/7 7/13
**forget [1]** 117/11
**forgetting [1]** 134/20
**forgiveness [1]** 134/21
**forgot [2]** 117/14 119/2
**form [8]** 22/1 191/17 265/20 265/22 265/24 266/2 266/5 268/5
**formal [1]** 24/1
**former [1]** 112/14
**formerly [1]** 80/12
**forms [1]** 159/19
**FORT [12]** 1/3 1/7 2/7 2/10 58/21 68/24 99/7 103/11 104/17 105/5 156/1 156/3
**Fort Lauderdale [4]** 58/21 105/5 156/1 156/3
**Forty [2]** 57/8 76/13
**Forty-five [1]** 76/13
**foundational [3]** 202/18 209/13 217/21
**four o'clock [1]** 196/6
**four-door [2]** 170/21 251/11
**Fourteen [1]** 97/22
**fourth [3]** 158/7 158/15 233/2
**Fran [5]** 16/9 16/9 16/14 19/1 213/6
**Francine [2]** 2/8 289/24
**Frank [1]** 119/20
**frankly [1]** 155/21
**freezer [6]** 176/15 176/16 176/16 176/21 176/22 177/6
**Friday [13]** 8/8 9/16 28/5 28/11 28/25 31/13 31/15 31/18 31/24 32/1 145/23 145/23 146/3
**friend [8]** 56/13 72/21 106/5 126/3 175/12 185/13 185/19 187/16

**friends [73]**
**front [39]** 5/21 6/6 11/15 11/19 12/8 12/15 50/23 111/19 111/21 140/11 140/13 167/4 173/12 173/17 192/22 192/25 196/21 196/23 205/6 226/24 235/24 236/16 237/12 237/24 238/21 238/23 242/23 252/2 254/1 254/7 254/7 254/9 254/12 262/12 263/16 273/16 273/21 274/3 280/18
**Fuentes [1]** 20/3
**fulfill [1]** 136/21
**functions [1]** 136/20
**funds [1]** 279/4
**Fynn [1]** 103/9

**G**

**G303 [3]** 176/11 268/14 270/10
**garage [31]** 174/20 174/21 176/10 176/12 176/13 176/13 176/14 176/21 176/22 177/6 186/24 268/4 268/9 268/11 268/13 268/16 268/23 269/10 269/15 269/18 269/19 269/20 270/8 270/9 270/10 276/3 276/17 276/18 276/22 277/3 285/21
**garages [1]** 244/20
**garb [1]** 5/18
**Garbharran [5]** 12/14 32/13 79/1 146/7 146/15
**general [2]** 21/24 47/21
**gentleman [3]** 134/11 273/20 279/17
**gentlemen [8]** 17/10 17/17 123/18 129/6 170/16 178/1 182/4 187/19
**Geography [1]** 79/17
**gets [4]** 36/15 138/25 139/23 205/8
**Giboyeaux [10]** 19/4 56/24 56/25 57/1 57/2 154/7 157/14 157/24 157/25 158/4
**Giraldo [4]** 54/5 154/7 157/14 158/6
**girlfriend [1]** 64/17
**gives [9]** 15/23 136/15 136/16 137/11 137/19 138/4 138/11 138/18 152/2
**Glancy [1]** 106/18
**Glass [1]** 84/20
**glasses [1]** 134/11
**glean [1]** 21/6
**Glen [4]** 206/4 206/12 211/22 254/23
**gloves [2]** 194/13 218/6
**God [4]** 13/16 116/20 158/25 178/7
**God-given [1]** 178/7
**goggles [1]** 194/13
**gold [1]** 228/9
**Golfing [1]** 64/5
**gonna [70]**
**Google [2]** 163/12 164/9
**Gordon [5]** 12/12 76/8 151/1 151/25 152/1
**gotten [4]** 22/8 135/19 278/18 278/20
**government [48]** 2/2 4/23 17/23 26/12 111/5 114/13 114/15 114/19 116/2 118/12 120/4 122/22 130/11 130/15 131/10 132/4 132/7 132/11 132/14 132/16 148/5 148/16 148/19 148/22 148/25 154/13 155/5 155/7 162/5 162/8 162/14 166/15 166/20

166/23 182/3 182/10 183/16 183/19 185/24 186/2 186/13 188/5 258/9 261/3 281/10 281/11 284/19 285/17
**government's [79]**
**Government's 1 [2]** 200/22 204/23
**Government's 2 [2]** 255/1 255/2
**Government's 28 [1]** 270/7
**Government's 3A [2]** 212/9 213/11
**Government's 3B [1]** 213/24
**Government's 3C [1]** 214/2
**Government's 3D [1]** 214/10
**Government's 4 [1]** 215/10
**Government's 5 [2]** 219/24 220/15
**Government's 6 [2]** 220/2 220/3
**Government's 7A [2]** 221/24 222/8
**Government's 7P [1]** 225/12
**Government's 8A [1]** 225/18
**Government's 8B [1]** 228/22
**grab [1]** 119/21
**Gracey [11]** 171/10 171/16 172/1 172/22 197/23 206/22 235/18 235/19 237/13 237/22 256/8
**graduate [1]** 101/12
**graduated [2]** 85/3 134/24
**graffiti [1]** 70/9
**gram [1]** 191/3
**grams [4]** 10/20 175/20 175/20 191/3
**grand [2]** 24/9 114/13
**grandfather [1]** 91/7
**grandson [1]** 106/8
**grant [13]** 142/1 143/1 143/9 143/16 144/1 144/13 144/22 145/3 145/17 146/21 147/4 147/12 156/4
**Grant's [1]** 16/23
**granted [2]** 178/19 250/25
**grass [1]** 159/23
**gray [2]** 170/21 233/3
**greater [1]** 166/12
**Green [1]** 41/12
**grind [1]** 186/9
**ground [9]** 172/19 206/14 210/25 211/25 213/15 241/8 241/10 244/11 255/19
**grounds [1]** 202/18
**group [1]** 80/9
**grown [1]** 79/19
**guarantee [1]** 165/19
**guidelines [1]** 161/24
**guilt [12]** 24/2 121/1 122/14 128/7 128/11 128/15 131/12 162/6 162/14 180/10 185/22 286/16
**guilty [31]** 10/19 111/8 111/8 111/24 111/24 111/25 111/25 113/3 115/2 115/3 118/14 121/4 122/2 122/25 123/6 123/10 126/13 126/17 126/18 127/12 129/15 130/16 132/16 159/12 159/12 162/4 178/13 187/23 188/3 248/1 285/23
**Guistiani [5]** 12/11 74/17 126/24 150/21 150/24
**gum [1]** 223/25
**gun [1]** 51/6
**gunpoint [1]** 93/10
**gunshots [1]** 51/7

**G**

**Gutierrez [5]** 27/25 29/19 41/23 147/6 147/13
**Guzman [14]** 27/5 64/8 84/11 118/6 118/12 118/18 134/15 134/16 134/22 143/5 143/10 155/4 155/6 155/7
**gym [1]** 46/5

**H**

**hairstylist [1]** 75/4
**half [12]** 175/7 175/8 188/21 189/7 198/6 234/8 256/1 256/2 256/14 256/15 256/16 256/19
**halfway [3]** 15/16 15/17 141/14
**hall [2]** 139/16 139/19
**hand [45]** 13/13 14/8 14/11 14/15 14/18 18/5 18/9 18/22 20/18 20/22 25/19 25/22 26/2 26/9 26/13 26/19 26/23 36/21 112/11 112/17 113/5 113/10 113/18 114/1 116/4 116/5 117/7 117/15 117/23 118/5 118/19 119/18 120/5 120/9 123/7 135/21 157/10 158/22 188/8 205/3 214/8 214/9 232/4 258/12 281/13
**handed [10]** 171/19 200/14 207/12 219/3 221/23 225/6 228/4 232/2 278/14 280/23
**handheld [3]** 16/18 16/21 22/4
**handhold [1]** 18/12
**handing [2]** 214/24 260/5
**handle [5]** 191/5 217/4 217/10 246/4 246/7
**handled [1]** 217/14
**handling [1]** 192/13
**hands [35]** 14/9 14/12 14/16 14/19 18/6 20/19 25/20 25/23 26/3 26/10 26/14 26/20 26/24 36/22 112/12 112/18 113/6 113/11 113/19 114/2 117/8 120/6 123/25 124/3 124/4 124/7 128/16 129/25 131/5 131/14 132/8 132/21 135/13 135/18 135/20
**handwriting [2]** 263/10 263/11
**hang [1]** 193/25
**hanging [1]** 175/19
**happy [1]** 286/3
**hardship [1]** 144/17
**harm [1]** 181/18
**Haverhill [1]** 206/5
**he'll [4]** 16/25 184/25 185/3 185/6
**head [2]** 80/10 111/12
**headquarters [1]** 216/20
**health [1]** 55/20
**hear [18]** 4/20 16/14 110/13 110/15 129/6 137/4 137/18 139/19 154/25 161/17 165/14 166/4 177/24 182/8 185/24 210/7 230/10 271/16
**heard [13]** 25/17 25/21 51/7 115/12 117/17 131/19 159/19 185/17 187/25 199/23 239/18 242/2 242/9
**hearing [10]** 15/19 16/16 26/7 31/4 178/18 192/20 205/9 260/22 281/24 285/1
**hearings [1]** 21/17
**hearsay [2]** 242/11 244/9

**heart [3]** 129/22 135/11 135/14
**hearts [2]** 135/11 135/15
**heavy [3]** 3/20 130/12 132/4
**hedge [2]** 214/5 245/22
**helicopter [9]** 172/14 205/25 241/8 241/16 241/25 242/9 242/10 244/4 255/9
**Hello [2]** 17/12 33/16
**help [8]** 13/16 51/22 158/25 162/19 165/19 165/25 166/16 233/12
**Hence [1]** 242/17
**here's [1]** 250/1
**hereby [1]** 289/18
**heroin [58]**
**Hey [2]** 3/23 117/20
**hi [5]** 31/12 33/7 139/13 258/21 270/18
**Hialeah [2]** 95/3 95/6
**high [4]** 62/2 94/10 162/17 172/9
**higher [1]** 115/23
**highest [1]** 114/21
**highly [1]** 193/3
**Hill [3]** 199/19 205/1 206/5
**hinted [1]** 136/20
**Hinton [5]** 13/1 36/19 96/8 146/16 146/22
**hit [11]** 50/22 80/10 101/9 119/3 119/4 160/16 173/23 173/23 229/21 253/7 253/14
**hobbies [49]** 39/5 41/20 43/6 44/17 46/3 47/7 49/23 51/8 52/25 54/1 55/13 56/20 58/15 60/6 61/10 62/22 64/4 65/9 66/21 67/20 68/20 70/15 71/23 73/11 74/14 76/5 77/15 78/22 80/18 81/25 82/23 84/8 86/6 87/16 90/1 91/18 93/11 94/23 96/5 97/14 99/2 99/25 101/21 103/3 104/12 106/13 107/17 108/23 110/4
**hold [18]** 18/11 18/12 18/24 18/24 18/25 22/17 113/8 113/17 119/23 120/9 128/9 132/6 134/12 178/10 178/11 180/25 218/9 264/16
**holding [1]** 252/4
**Hollywood [6]** 47/20 55/17 60/11 70/22 86/12 87/21
**home [14]** 15/4 15/11 26/25 30/11 33/10 51/5 51/21 66/2 88/7 91/14 122/5 166/8 264/6 274/24
**Homemaker [2]** 81/4 96/14
**homeowners [1]** 210/5
**homes [2]** 80/14 244/21
**Honda [28]** 170/21 170/23 170/24 171/1 171/5 171/11 171/12 171/16 171/20 171/22 172/2 195/8 195/20 195/23 197/10 198/14 198/18 198/24 215/25 235/6 235/7 235/10 235/14 237/16 237/19 237/20 244/25 247/9
**honest [2]** 129/19 252/2
**Honestly [1]** 33/1
**honesty [1]** 23/19
**honor [112]**
**Honor's [1]** 137/5
**Honorable [1]** 1/14
**hood [1]** 222/17

**hope [1]** 113/23
**hopefully [3]** 14/24 27/21 203/10
**horns [1]** 180/15
**Horseback [1]** 78/23
**hospital [1]** 51/2
**hospitalized [1]** 80/15
**hour [2]** 196/13 198/6
**hours [15]** 144/7 171/1 171/11 188/23 188/25 190/2 190/4 190/5 191/11 195/21 195/22 198/6 202/8 202/9 215/8
**house [11]** 29/25 50/23 60/2 61/6 62/18 62/19 121/21 121/22 206/13 242/4 243/15
**hum [7]** 6/16 67/23 134/18 180/22 273/1 273/8 274/1
**human [1]** 135/6
**hundred [2]** 10/20 192/9
**hundreds [5]** 188/25 188/25 189/10 190/12 191/11
**husband [14]** 30/10 30/13 37/18 38/20 86/21 88/4 89/12 98/2 98/4 102/6 102/24 103/20 105/3 108/6
**husband's [2]** 57/23 102/20
**hygiene [1]** 139/24

**I**

**I'd [8]** 31/14 120/1 124/10 147/9 152/17 157/10 234/10 282/4
**I'll [35]** 3/8 8/1 8/5 13/20 110/21 110/23 110/24 114/23 115/9 115/10 130/12 134/20 135/24 137/25 142/11 143/1 143/9 143/16 144/1 144/13 144/22 145/3 145/17 146/6 146/14 146/21 147/4 147/12 179/14 194/3 202/22 256/23 279/11 282/10 286/3
**I'm [165]**
**I've [30]** 6/14 18/9 21/11 65/5 65/7 85/11 86/1 89/21 100/10 116/5 118/7 119/19 120/9 141/4 142/19 154/5 154/21 180/12 186/15 188/23 189/10 189/10 200/14 207/12 219/3 221/23 225/6 228/4 232/2 284/25
**I-95 [1]** 156/2
**ID [1]** 252/10
**idea [1]** 15/23
**identification [23]** 177/14 179/5 200/19 207/12 207/15 211/19 214/24 215/3 219/1 219/3 221/24 222/2 225/6 225/9 228/4 227/7 232/3 232/6 260/6 260/9 269/25 270/5 282/12
**identified [9]** 197/6 197/23 235/16 263/6 273/20 274/14 275/20 275/24 276/2
**identify [6]** 197/2 216/12 233/12 236/13 263/2 271/10
**identifying [2]** 113/16 280/10
**identities [2]** 180/25 261/7
**identity [14]** 174/22 175/1 175/18 178/3 179/4 179/7 180/6 180/9 261/2 280/13 282/1 282/7 284/7 285/10
**ignore [2]** 161/3 161/6
**illegal [1]** 248/12
**image [1]** 174/7

## I

immediate [1] 252:23
immediately [16] 173:1 198/9 199/11
199/23 201/6 205/8 206/7 206/18
227/6 227/9 227/9 239/18 248/20
248/25 251/4 251/11
immune [1] 194/14
impartial [9] 18/2 20/24 23/2 26/16
26/23 125/9 125/24 126/20 127/21
impartiality [1] 26/1
impartially [1] 22/21
importance [1] 165/23
impound [4] 221/11 248/16 249/3
250/18
impounded [1] 243/11
impression [1] 166/12
improperly [1] 163/7
impropriety [2] 139/21 139/25
inappropriate's [1] 110/18
incapable [1] 26/8
incident [1] 163/6
include [1] 223/25
included [9] 7/23 7/25 8/3 8/7 8/13
8/17 124/2 131/18 286/19
includes [1] 164/5
including [10] 16/12 24/10 164/1
164/7 164/11 172/15 176/22 180/6
229/23 240/17
income [1] 266/16
inconsistent [1] 35/14
incorrect [1] 242/13
incumbent [1] 148/22
independently [1] 238/24
INDEX [3] 288/1 288/6 289/1
indicate [2] 262/6 268/9
indicated [14] 124/8 124/14 126/3
141/20 143/4 145/7 145/10 147/15
220/5 225/24 256/12 267/24 279/1
285/17
indicates [1] 263/23
indicating [2] 273/10 274/5
indicia [1] 250/9
indictment [12] 7/3 7/8 7/11 23/23
23/25 24/3 24/5 25/18 111/19 114/14
130/18 130/25 131/4 159/13 162/4
179/2 179/16 180/14 181/9 182/18
182/20 183/4 183/8 183/11 184/8
184/9 184/14 184/15 286/5
indirect [2] 159/24 160/3
indirectly [1] 159/22
individual [12] 232/25 233/1 233/2
233/4 233/13 249/15 251/22 261/3
262/6 276/5 276/11 280/11
individual's [1] 274/10
individuals [19] 171/8 176/5 189/12
189/15 198/3 210/14 227/11 230/6
231/3 231/9 231/21 232/8 232/19
244/3 251/17 253/4 254/3 255/3
272/2
inextricably [3] 179/13 180/5 180/12
inference [1] 139/24
influence [1] 163/8
influenced [3] 22/17 22/23 24/3
information [26] 21/23 22/1 22/7

22/8 37/5 93/22 162/24 163/4 164/4
164/6 164/10 165/17 191/10 241/15
244/3 244/5 263/18 263/19 263/25
264/6 264/8 266/8 266/10 267/22
277/20 278/13
informed [3] 123/22 124/24 124/25
ingests [1] 191/21
initial [5] 197/16 229/9 234/11
234/17 248/23
initially [9] 194/22 195/12 195/20
195/21 237/13 239/16 253/25 254/6
254/10
initials [5] 216/6 216/12 216/14
216/22 217/8
injected [1] 192/4
injured [1] 51/2
innocence [4] 115/14 130/10 131/10
162/10
innocent [10] 115/5 115/8 115/14
115/19 118/11 129/14 130/8 131/9
132/17 162/3
inquire [2] 120/7 123/15
inquiry [1] 282/11
inspected [1] 269/11
inspection [1] 274/25
instance [3] 134/6 135/3 160/15
instances [1] 179/17
instant [1] 163/22
Instead [1] 187/5
instruct [4] 134/1 139/9 161/9 167/1
instructed [1] 26/18
instruction [18] 136/16 179/15
179/19 179/24 181/4 181/6 181/6
181/7 181/16 183/21 193/6 194/2
194/3 282/10 282/10 282/14 286/19
286/24
instructions [18] 7/22 10/25 110/23
110/24 116/23 128/18 159/4 159/8
159/10 162/16 162/18 162/20 182/9
185/12 185/20 286/7 286/9 286/20
instructor [1] 54/18
insufficient [2] 177/7 177/13
insulting [1] 134/20
insurance [5] 48/25 76/24 269/1
269/3 269/6
integrity [2] 23/19 198/1
intelligent [1] 8/14
intent [21] 10/2 24/10 24/18 24/22
25/1 25/6 25/8 25/13 25/15 130/20
130/21 130/22 130/22 183/2 183/6
183/9 184/11 184/16 184/20 184/22
185/4
intentionally [7] 24/22 25/5 25/13
184/16 184/20 184/22 185/1
intercept [1] 189/21
intercepted [1] 189/24
interest [5] 161/19 186/4 186/17
187/8 253/1
intermediate [1] 10/18
intern [1] 68/6
Internet [7] 38/2 38/2 163/11 163/16
163/20 164/1 164/7
intersection [4] 205/4 205/13 205/15
206/5

intertwined [3] 179/14 180/5 180/13
interviewed [1] 174/23
introduce [8] 15/25 17/7 17/15
200/21 202/20 212/8 222/7 228/22
introduced [1] 16/7
investigated [1] 190/13
investigation [10] 170/23 189/4
194/20 194/22 194/24 195/9 235/1
235/12 252/14 253/12
investigations [6] 188/17 189/9
189/17 190/16 191/12 198/11
investigative [1] 173/21
iPhone [8] 228/9 228/9 228/10
249/21 249/22 249/25 250/1 250/1
iPhones [7] 175/15 224/2 224/5
227/23 227/24 252/15 252/20
irons [4] 5/6 5/10 5/14 169/7
ish [1] 29/14
Isles [11] 170/22 171/3 173/25
194/24 195/18 198/9 199/20 205/2
234/15 234/18 239/14
issue [4] 163/18 165/10 241/13
285/20
issues [3] 22/21 158/24 285/10
item [5] 161/9 197/2 218/9 263/2
270/1
items [20] 176/22 176/25 177/1
210/24 210/25 212/5 220/4 220/6
220/8 223/13 223/25 227/20 246/13
249/4 249/8 254/24 255/19 261/5
276/13 277/11

## J

jacket [4] 175/19 176/20 187/6
187/11
jail [4] 8/23 125/22 176/3 229/4
James [2] 20/1 226/4
janitor [1] 52/1
January [3] 1/7 3/1 169/1
JANUARY 7 [2] 3/1 169/1
Jersey [6] 69/22 90/2 91/4 91/6
94/16 100/14
jigsaw [2] 138/25 184/4
JMG [1] 258/23
Joanie [1] 6/7
job [8] 33/18 110/10 113/8 113/10
188/25 191/11 191/12 259/5
jobs [3] 94/9 110/19 110/20
jog [3] 117/10 272/13 272/14
John [4] 2/2 4/8 17/5 123/19
Johnson [5] 12/20 33/4 82/3 144/4
144/14
join [1] 256/5
Jose [1] 19/25
JOSEPH [126]
Joseph's [9] 4/13 8/10 114/5 114/9
115/5 169/15 179/15 203/21 257/18
joyriding [1] 85/17
judge [162]
Judge Dimitrouleas [18] 123/22
130/6 130/18 132/3 132/13 132/18
133/25 136/16 136/19 137/9 137/19
138/4 138/18 182/7 183/22 184/2
184/24 185/12

**J**

judge's [1]  16/5
judges [5]  21/13 21/16 111/4 137/16
183/25
judging [2]  120/25 142/18
July [28]  24/6 24/20 25/3 25/10
122/18 170/20 173/11 174/3 175/2
188/21 194/19 195/7 196/7 202/2
226/5 226/15 229/7 229/21 233/22
234/13 240/24 250/20 250/23 251/3
253/9 253/11 259/7 270/24
July 12th [7]  173/11 226/15 229/7
250/23 251/3 253/9 253/11
July 18th [7]  24/6 24/20 25/3 25/10
175/2 233/22 250/20
July 2018 [1]  270/24
July 6th [2]  174/3 229/21
July 7th [5]  170/20 194/19 195/7
226/5 234/13
June [3]  24/6 24/19 122/16
June 29th [2]  24/6 24/19
junior [1]  69/17
juries [5]  21/1 88/25 110/7 111/20
113/20
juror [81]
juror's [1]  117/11
jurors [44]  3/5 5/4 5/13 5/20 11/13
11/15 13/8 13/9 13/16 15/1 15/12
18/8 19/18 21/5 22/12 23/7 119/14
139/15 140/17 141/20 154/6 154/13
154/17 154/19 155/2 155/16 155/22
156/19 156/21 157/5 157/12 157/17
157/18 157/21 159/8 162/18 164/15
164/17 164/20 166/2 169/6 169/16
169/17 257/23
Jurors 44 [1]  155/16
jurors' [1]  117/10
jury [166]
jury's [1]  15/11
justice [7]  78/2 112/6 112/10 124/9
125/13 126/4 127/2
Juvenile [1]  78/2

**K**

Kantis [1]  107/21
karaoke [1]  86/7
Karen [8]  5/4 13/11 16/3 65/12
158/20 167/6 167/20 169/17
Karen's [1]  167/5
keep [6]  27/22 35/8 41/16 162/2
166/2 187/24
Kelly [1]  18/17
Kendall [1]  41/11
Kevin [1]  212/15
key [8]  21/11 175/14 176/15 276/17
276/18 276/19 276/25 277/3
keys [8]  176/9 176/10 176/15 276/8
276/10 276/16 276/16 278/17
kidnapped [1]  62/18
kids [16]  28/17 29/10 30/19 30/20
38/19 39/3 39/22 41/12 52/9 142/22
142/23 143/13 145/15 146/16 146/23
147/18
kill [1]  194/15

killed [1]  80/11
kilo [1]  9/4
kilogram [7]  10/20 24/15 24/18 24/23
25/2 183/2 183/7
kilograms [1]  176/17
Knight [1]  20/4
knowing [2]  130/24 185/1
knowingly [9]  24/8 24/22 25/5 25/12
184/11 184/12 184/16 184/19 184/22
knowledge [5]  22/18 241/22 244/7
285/20 285/23
knows [4]  230/8 230/11 230/12
230/21
Kristopher [2]  20/4 20/10

**L**

lab [1]  216/19
labeled [1]  176/11
laboratory [6]  19/25 20/1 20/11
20/12 20/13 218/19
ladies [8]  17/10 17/17 123/18 129/6
170/16 178/1 182/3 187/19
Lake [1]  283/9
Land [2]  69/6 69/12
Lane [4]  206/4 206/12 211/22 254/24
language [1]  33/17
large [1]  269/8
late [2]  6/22 80/11
latent [2]  20/2 176/24
LAUDERDALE [12]  1/3 1/7 2/7 2/10
58/21 68/24 99/7 103/11 104/17
105/5 156/1 156/3
Lauderhill [2]  37/9 91/23
Laughter [9]  19/10 27/24 83/17 86/8
95/9 98/8 120/14 129/11 140/16
law [69]
lawful [1]  189/21
laws [1]  26/17
lawsuit [1]  101/15
lawyer [8]  113/17 139/18 139/23
141/5 160/15 160/20 160/21 160/22
lawyer's [1]  160/14
lawyers [19]  18/4 22/11 23/4 27/22
29/5 31/25 32/23 110/11 110/16
110/22 111/22 139/11 139/17 139/21
160/8 160/9 160/11 164/12 182/6
lawyers' [1]  160/12
lead [2]  164/22 229/9
leading [2]  173/20 285/9
leads [1]  253/13
lean [1]  237/13
leaned [1]  197/17
leaning [1]  262/23
learn [6]  170/17 172/21 173/11
175/22 176/25 177/18
lease [8]  259/3 259/22 260/13 264/18
267/12 268/3 269/1 273/1
leasing [12]  174/6 174/9 174/15
175/5 195/15 229/23 233/6 233/8
233/14 236/5 264/11 269/11
leave [15]  29/25 30/10 33/12 50/24
115/15 128/24 147/6 147/16 147/20
155/14 166/6 166/7 187/13 198/8
235/15

leaving [8]  27/6 80/8 107/11 143/5
143/20 143/22 151/18 156/1
leg [5]  5/6 5/10 5/14 169/7 233/11
legal [2]  47/17 76/18
legalized [4]  123/25 124/2 124/6
124/6
legally [2]  162/12 182/12
lengthy [1]  284/21
lesser [8]  7/23 7/25 8/3 8/7 8/13 8/17
10/1 10/18
lessers [2]  10/10 10/11
Lessner [3]  13/2 99/5 144/23
Lester [1]  36/2
LG [1]  225/10
liability [1]  269/1
liberty's [3]  114/5 114/10 132/2
library [1]  163/20
license [18]  173/23 222/25 253/7
277/19 277/21 277/22 277/24 278/1
278/6 278/13 278/14 279/16 279/19
280/14 280/16 280/19 280/23 283/11
lieutenant [1]  45/20
life [12]  9/6 9/7 37/12 77/23 86/15
92/1 96/12 99/10 106/23 108/1 121/1
183/23
light [6]  119/3 161/22 165/4 172/11
185/11 205/11
lighting [1]  196/5
lights [2]  205/8 239/20
limit [2]  180/3 282/11
limited [6]  23/11 161/8 161/10
161/11 187/5 285/13
limp [1]  212/1
Linares [5]  13/2 97/17 155/10 155/13
156/6
Linares-Prat [1]  13/2
LINCOLN [8]  1/9 4/5 23/21 24/5
24/13 24/21 25/5 25/12
lined [2]  214/14 255/20
link [1]  173/7
list [7]  6/4 17/23 19/22 148/12 160/7
186/5 267/21
listen [4]  112/19 116/23 163/14
165/8
listened [3]  189/24 190/3 241/25
lists [3]  263/24 263/24 268/5
literally [1]  175/7
litigation [1]  131/22
litigator [1]  103/21
loaded [1]  171/22
loaned [1]  249/15
lobby [3]  140/5 140/9 167/7
location [13]  163/13 172/18 198/2
198/14 206/6 206/8 207/22 227/1
229/22 235/8 235/9 243/23 254/6
locations [1]  229/19
locked [1]  223/5
locks [1]  176/23
lost [1]  118/8
louder [1]  32/19
loudly [1]  16/13
Lourdes [4]  19/4 19/6 19/7 19/8
lousy [1]  113/8
love [2]  101/22 106/14

## L

**loved [1]** 112/10
**lucky [1]** 95/6
**Luma [25]** 173/24 174/1 174/4 174/5
174/16 229/13 229/21 229/24 232/7
233/17 236/6 253/6 253/8 253/15
259/7 259/13 259/23 260/16 267/17
269/2 272/11 272/20 276/14 283/3
283/5
**lunch [10]** 6/15 14/25 15/2 15/18
15/20 159/5 166/14 167/10 167/12
167/22
**Luncheon [1]** 168/7
**lunchtime [1]** 14/24

## M

**mailbox [7]** 276/16 276/19 276/25
278/18 278/19 278/22 278/23
**maintain [2]** 227/2 251/14
**maintained [4]** 259/20 259/23 260/15
276/5
**maintains [1]** 131/9
**major [2]** 61/7 272/12
**majority [2]** 186/23 192/10
**male [4]** 210/19 232/22 243/22 254/8
**males [1]** 196/2
**mall [1]** 65/8
**man [13]** 9/23 9/23 171/6 171/9
171/9 193/4 235/16 262/17 264/2
266/19 271/23 274/14 275/23
**management [1]** 83/8
**manager [11]** 43/18 46/15 47/18
72/11 74/25 92/3 94/1 94/6 94/7
97/24 258/25
**mandatory [5]** 9/5 9/13 9/13 10/18
10/21
**manner [1]** 161/18
**map [1]** 184/3
**Maps [1]** 163/12
**marathon [1]** 54/2
**Marc [61]**
**Marc's [4]** 176/2 187/20 228/12
252/23
**Margate [2]** 39/11 76/10
**marijuana [2]** 98/22 124/1
**marital [48]** 37/15 39/17 42/9 43/19
45/8 46/16 48/5 50/11 51/23 53/13
54/15 55/21 57/11 59/3 60/17 61/24
63/9 64/16 65/24 67/7 68/7 69/17 71/3
72/12 73/22 75/1 76/19 78/3 79/11
81/5 82/10 83/9 84/21 86/18 88/2
90/18 92/4 93/23 95/17 96/15 97/25
99/12 100/18 103/18 104/25 107/1
108/4 109/9
**marked [20]** 199/21 200/14 200/18
207/12 207/14 211/15 211/19 214/24
215/2 218/25 222/1 225/6 225/8
228/6 232/5 239/21 260/8 269/25
270/4 289/2
**marketing [2]** 61/23 71/6
**married [31]** 39/18 42/10 43/20 45/9
48/6 51/24 54/16 55/22 57/12 59/4
60/18 61/25 63/11 65/25 69/8 71/4
75/2 76/20 78/4 79/12 81/6 83/10

86/20 90/19 92/5 93/24 96/16 103/19
105/2 108/5 109/10
**marshals [1]** 251/12
**Martel [1]** 20/5
**Maryland [2]** 65/21 125/22
**mask [1]** 194/13
**Mason [1]** 47/20
**Massachusetts [1]** 45/4
**match [1]** 252/6
**matched [1]** 209/20
**matches [2]** 6/3 280/19
**maternal [1]** 33/17
**math [1]** 264/16
**matter [11]** 22/19 115/6 122/23
129/16 131/18 132/11 179/6 185/9
185/15 186/6 289/21
**matters [2]** 168/3 287/4
**Maxima [4]** 173/13 173/15 176/5
251/10
**maximum [7]** 8/5 8/11 8/23 8/25 9/11
10/5 10/22
**mean [33]** 20/20 23/9 23/14 26/6
26/25 28/19 29/8 29/9 35/12 36/23
36/24 48/25 111/12 112/20 121/10
139/16 169/10 177/1 181/2 183/14
184/25 186/16 191/1 191/21 202/19
223/2 241/4 250/3 250/4 274/16
279/19 279/22 286/8
**means [16]** 121/15 130/11 146/24
155/8 155/12 156/7 161/6 163/20
163/25 164/5 164/8 177/1 177/3
183/17 185/2 185/3
**mechanic [3]** 34/15 86/22 86/25
**mechanical [2]** 1/24 59/13
**media [2]** 25/22 163/17
**medical [2]** 83/12 95/16
**medication [2]** 191/16 218/15
**meet [1]** 235/14
**member [6]** 38/17 38/24 41/4 58/5
126/4 163/8
**members [11]** 35/20 80/12 135/10
139/5 159/3 159/6 203/6 240/8 241/5
257/2 284/23
**memory [5]** 117/11 161/18 166/10
166/11 166/12
**men's [1]** 120/12
**mere [3]** 10/2 20/24 24/1
**merely [4]** 185/7 185/16 185/21
247/25
**message [3]** 250/2 250/4 250/11
**messages [4]** 164/1 177/18 177/22
189/22
**Miami [4]** 32/18 55/20 56/22 102/18
**Miami-Dade [1]** 102/18
**mic [3]** 27/19 48/12 134/13
**Michael [4]** 2/5 2/6 4/12 17/13
**Michigan [1]** 74/4
**microphone [20]** 16/17 16/18 16/19
16/21 18/13 18/25 22/4 37/6 48/9
51/11 61/13 65/12 95/1 129/7 135/24
136/24 137/25 142/3 213/22 262/12
**microphone's [1]** 48/11
**mid [1]** 127/5
**mid-'90s [1]** 127/5

**middle [5]** 51/5 158/7 158/8 158/9
158/10
**military [1]** 96/24
**million [2]** 176/18 186/24
**min [2]** 9/22 9/23
**mine [2]** 262/3 265/6 265/6 265/9
**minimum [6]** 8/5 8/12 9/4 9/12 9/13
10/21
**minimums [1]** 10/18
**minute [5]** 140/14 203/7 256/1 256/1
257/3
**minutes [15]** 6/19 120/18 123/14
140/4 140/9 155/19 203/9 203/14
254/10 256/2 256/14 256/16 257/6
257/10 285/1
**Miramar [4]** 46/10 51/14 82/5 109/3
**miscellaneous [2]** 223/13 223/25
**misdemeanor [3]** 8/22 10/6 10/9
**miss [1]** 35/9
**mistake [1]** 185/2
**mistaken [2]** 165/5 251/3
**mistrial [13]** 178/25 179/11 179/22
179/23 180/16 181/14 181/15 194/5
194/7 282/20 285/11 285/15 285/16
**misunderstanding [1]** 85/21
**mixture [2]** 24/15 24/24
**mom [4]** 51/21 85/12 85/19 91/19
**moment [5]** 3/19 17/22 22/3 124/11
129/13 130/13 132/25 136/25 138/1
138/1 140/24 154/2 181/22 200/9
245/4 279/6
**moments [3]** 15/25 140/19 256/19
**MONDAY [5]** 3/1 13/24 21/21 31/22
169/1
**money [2]** 35/8 114/9
**monitors [1]** 203/2
**month [5]** 174/20 268/20 274/16
274/18 279/2
**monthly [3]** 264/14 267/24 268/15
**months [2]** 36/25 274/7
**moral [2]** 115/21 116/1 117/5
**morning [33]** 3/14 3/15 3/16 3/17
3/18 4/9 4/10 4/11 13/19 14/23 15/16
17/4 17/6 17/14 17/18 17/21 18/18
29/13 30/4 30/9 32/6 33/2 35/10 36/3
36/13 36/14 61/15 121/17 131/16
139/17 139/18 146/10 174/2
**morphine [1]** 192/10
**mortgage [1]** 67/6
**motion [20]** 6/18 178/15 178/19
179/22 179/23 180/2 181/14 181/15
192/18 194/16 217/23 220/21 278/10
278/10 282/19 284/1 285/7 285/11
285/14 285/16
**motorcycle [2]** 92/10 233/11
**mountain [2]** 65/10 107/18
**move [55]** 3/4 5/13 39/9 41/23 43/10
44/20 46/8 47/10 50/1 53/4 56/24
58/18 60/9 64/8 66/24 73/14 76/8
80/7 82/2 82/2 83/1 84/11 86/10
87/19 90/5 93/14 95/4 97/17 99/5
100/4 101/24 103/9 107/21 148/25
149/2 152/13 155/11 158/4 179/11
194/5 200/21 207/24 212/8 213/21

**M**

move... **[11]** 215/9 220/6 220/14 222/7 228/21 232/9 240/20 243/21 260/18 261/10 283/21
moved **[5]** 173/14 198/1 198/3 238/3 270/13
movements **[1]** 241/9
moves **[3]** 153/11 153/16 153/24
moving **[4]** 142/7 165/25 178/25 285/14
Moya **[7]** 33/20 101/24 147/23 156/7 156/11 157/17 158/18
Moya-Carmenate **[1]** 156/11
Mr **[20]** 33/3 201/2 208/4 212/13 215/14 234/3 240/22 245/9 245/13 248/4 272/9 279/15 288/4 288/9 288/10 288/11 288/12 288/13 288/15 288/16
Mr. **[176]**
Mr. Alubi **[1]** 12/22
Mr. Alvarez **[4]** 12/13 77/18 151/7 151/11
Mr. Balmy **[3]** 263/21 267/13 268/8
Mr. Benson **[1]** 237/4
Mr. Bryan **[5]** 11/21 60/9 154/6 157/13 158/3
Mr. Caulfield **[5]** 12/17 93/14 154/11 157/16 158/14
Mr. Cohen **[27]** 3/13 3/25 4/2 7/22 11/6 17/15 20/14 114/15 129/4 138/20 141/7 141/9 142/2 145/20 148/10 149/14 149/22 150/22 151/8 152/18 153/14 153/20 169/23 256/12 281/4 285/7 286/1
Mr. Desir **[3]** 275/24 282/25 285/11
Mr. Dix **[1]** 39/9
Mr. Dixon **[1]** 118/22
Mr. Ertug Ozan **[1]** 12/5
Mr. Fine **[1]** 134/3
Mr. Garbharran **[1]** 12/14
Mr. Glancy **[1]** 106/18
Mr. Guistiani **[5]** 12/11 74/17 126/24 150/21 150/24
Mr. Guzman **[6]** 84/11 134/15 134/16 134/22 143/5 155/4
Mr. Guzman Castillo **[6]** 27/5 64/8 118/6 118/12 118/18 143/10
Mr. Johnson **[4]** 33/4 82/3 144/4 144/14
Mr. Joseph **[50]** 4/20 5/6 5/17 8/1 8/11 9/16 11/4 18/3 22/11 23/4 25/18 25/25 26/12 111/6 113/3 114/16 115/7 115/13 115/18 118/11 118/14 120/4 122/24 130/2 130/7 130/14 131/8 132/12 139/11 154/17 154/20 169/6 174/19 181/18 185/18 234/18 235/23 241/19 241/23 251/22 254/18 276/13 278/17 279/1 282/12 284/6 286/1 286/4 286/17 286/22
Mr. Joseph's **[9]** 4/13 8/10 114/5 114/9 115/6 169/15 179/15 203/21 257/18
Mr. Marc **[4]** 226/21 226/22 229/18 251/1

Mr. Peiretti **[6]** 12/1 61/14 148/5 154/8 157/14 158/8
Mr. Pinzur **[6]** 55/16 135/22 135/23 135/25 153/7 153/10
Mr. Quinones **[3]** 67/24 149/17 149/19
Mr. Smith **[1]** 11/25
Mr. St. Rose **[4]** 27/12 58/18 141/24 142/12
Mr. Stein **[5]** 44/20 120/10 133/6 133/9 149/15
Mr. Stephen **[7]** 29/21 30/5 43/10 117/15 117/22 146/23 147/5
Mr. Zorovich **[5]** 62/25 148/9 154/8 157/15 158/9
Mrs. **[29]** 121/3 123/4 143/2 143/17 145/22 146/7 146/15 146/16 146/22 147/6 147/13 149/8 149/21 151/1 151/13 152/15 152/20 153/11 154/9 154/12 155/4 155/8 155/10 156/10 157/16 157/17 158/10 158/15 158/18
Mrs. Cotton **[3]** 149/8 154/9 158/10
Mrs. Crush **[1]** 149/21
Mrs. Ertug Oban **[1]** 143/17
Mrs. Flynn **[1]** 156/10
Mrs. Garbharran **[2]** 146/7 146/15
Mrs. Gordon **[1]** 151/1
Mrs. Gutierrez **[2]** 147/6 147/13
Mrs. Hinton **[2]** 146/16 146/22
Mrs. Linares-Prat **[1]** 155/10
Mrs. Moya-Carmenate **[2]** 157/17 158/18
Mrs. Rizzo **[1]** 153/11
Mrs. Rodriguez **[2]** 155/4 155/8
Mrs. Romano-Stoff **[5]** 152/15 152/20 154/12 157/16 158/15
Mrs. Shanley **[2]** 145/22 151/13
Mrs. Smith **[3]** 121/3 123/4 143/2
Ms **[54]** 13/4 58/18 188/15 194/10 194/18 197/8 200/13 204/22 207/11 210/12 211/14 213/10 213/23 214/23 218/3 219/2 219/12 220/10 221/1 221/22 222/15 225/5 225/23 228/3 229/2 230/13 231/2 231/18 232/1 232/17 253/20 258/19 260/4 261/23 263/8 269/24 271/20 277/17 278/12 280/9 282/24 283/24 284/3 288/3 288/8 288/9 288/10 288/11 288/12 288/13 288/15 288/16 288/17 288/18
Ms. **[168]**
Ms. Alubi **[8]** 12/22 18/21 19/16 95/1 155/9 155/13 157/17 158/17
Ms. Barnes **[9]** 11/16 22/3 37/5 37/7 117/23 118/4 124/12 148/7 148/8
Ms. Bemis **[5]** 53/4 136/22 154/7 157/14 158/7
Ms. Bronson **[5]** 12/23 12/25 33/13 104/15 145/18
Ms. Carlton **[1]** 16/3
Ms. Carmenate **[1]** 156/11
Ms. Cotton **[4]** 65/15 125/12 157/15 157/15
Ms. Crush **[4]** 12/3 18/9 68/23 150/9
Ms. Davila **[6]** 12/9 30/24 31/11 72/2

143/24 144/2
Ms. Dixon **[7]** 12/10 73/14 126/2 150/11 154/9 157/16 158/13
Ms. Ertug **[1]** 30/17
Ms. Ertug Ozan **[6]** 12/6 12/8 30/22 70/20 118/20 118/25
Ms. Ferris **[5]** 86/10 153/25 154/12 157/16 158/16
Ms. Fynn **[1]** 103/9
Ms. Garbharran **[2]** 32/13 79/1
Ms. Giboyeaux **[5]** 19/4 56/24 154/7 157/14 158/4
Ms. Giraldo **[4]** 54/5 154/7 157/14 158/6
Ms. Gordon **[4]** 12/12 76/8 151/25 152/1
Ms. Gutierrez **[3]** 27/25 29/19 41/23
Ms. Hinton **[2]** 36/19 96/8
Ms. Johnson **[1]** 12/20
Ms. Kantis **[1]** 107/21
Ms. Lessner **[2]** 99/5 144/23
Ms. Lester **[1]** 36/2
Ms. Linares-Prat **[3]** 97/17 155/13 156/6
Ms. Lourdes **[1]** 14/9 19/6 19/7 19/8
Ms. Moya **[1]** 147/23
Ms. Moya-Carmenate **[3]** 33/20 101/24 156/7
Ms. Peavey **[7]** 34/10 35/16 100/4 116/6 116/9 117/3 145/4
Ms. Peters **[5]** 66/24 149/13 154/9 157/15 158/12
Ms. Prabu **[1]** 109/1
Ms. Prats **[3]** 11/19 50/1 150/19
Ms. Rauscher **[5]** 87/19 119/8 152/6 153/17 153/21
Ms. Refkin **[3]** 47/10 149/11 149/12
Ms. Rinku **[1]** 120/7
Ms. Rizzo **[4]** 90/5 119/5 152/5 153/15
Ms. Rodriguez **[2]** 83/1 155/11
Ms. Romano-Stoff **[1]** 91/21
Ms. Shanley **[5]** 12/15 31/16 32/2 80/22 151/22
Ms. Shepherd **[2]** 46/8 151/5
Ms. Simmons **[3]** 230/4 258/22 272/10
Ms. Smith **[7]** 12/2 30/7 30/15 51/12 120/19 123/10 137/24
Ms. Tribuiani **[19]** 8/9 9/15 17/7 19/22 120/7 123/15 149/9 149/18 150/12 151/2 151/14 152/16 153/12 153/18 154/1 169/21 170/13 204/18 213/21
Ms. Tribuiani's **[1]** 142/7
mugged **[1]** 86/1
muggings **[1]** 94/20
multiple **[7]** 66/15 78/11 78/18 117/25 118/1 148/14 177/16
murder **[2]** 86/2 193/2
music **[1]** 60/7
musician **[2]** 27/9 59/1
mute **[1]** 210/9
MySpace **[1]** 164/3

## M

**mystery [1]** 182/22

## N

**name [34]** 40/5 123/18 134/11 134/20 145/8 157/6 157/22 174/14 174/17 175/17 188/11 188/11 223/18 235/17 248/10 248/11 248/11 258/15 258/16 261/3 262/1 262/2 262/4 263/23 268/8 271/13 281/1 281/16 281/17 281/18 281/21 282/12 283/22 285/21
**named [6]** 39/24 171/6 171/9 171/9 174/10 235/16
**names [5]** 6/3 20/14 20/17 119/14 134/17
**narcotics [15]** 123/23 123/25 124/1 179/1 180/24 187/6 189/1 189/6 189/8 206/13 206/15 211/24 218/16 218/17 247/15
**narcotics-related [1]** 123/23
**native [1]** 87/24
**nature [1]** 16/24
**Navy [1]** 94/9
**near [4]** 7/24 11/3 110/21 206/4
**nearby [1]** 34/25
**necessity [1]** 130/16
**Needlepoint [1]** 49/24
**needles [1]** 246/14
**negative [3]** 112/5 113/21 113/25
**neglected [1]** 142/24
**neighbor [1]** 55/6
**neighbor's [1]** 243/15
**neighborhood [4]** 41/15 41/15 206/24 239/16
**neighbors [2]** 65/1 102/17
**neither [2]** 165/6 166/18
**nephew [8]** 38/20 38/21 58/7 58/9 70/8 77/10 89/11 124/15
**network [1]** 94/8
**networking [1]** 164/2
**New Jersey [2]** 91/6 94/16
**New York [3]** 31/1 72/9 72/25
**Newcombe [5]** 202/15 204/25 205/12 239/17 239/20
**Newcombe's [1]** 202/19
**news [3]** 25/22 163/16 165/9
**newspapers [1]** 163/16
**nice [4]** 16/13 157/19 167/22 285/3
**nine [15]** 6/17 15/15 29/2 29/15 30/1 95/12 100/10 100/12 146/24 261/15 264/13 285/1 285/4 287/3 287/3
**nine o'clock [5]** 6/17 15/15 30/1 285/1 287/3
**Nissan [10]** 173/13 173/14 176/5 226/24 227/5 227/14 251/10 251/11 252/4 252/10
**nobody [8]** 30/11 177/1 197/18 198/5 223/2 238/1 241/7 254/17
**noise [1]** 192/22
**nominate [1]** 21/14
**none [4]** 64/21 99/18 125/21 161/14
**noon [1]** 15/17
**noontime [1]** 15/18

**normal [2]** 246/20 280/10
**normally [4]** 9/22 21/17 21/19 286/2
**Normandy [11]** 170/22 171/3 173/25 194/24 195/18 198/8 199/20 205/2 234/15 234/18 239/14
**north [1]** 243/25
**northbound [1]** 239/14
**note [2]** 133/5 282/17
**notebooks [1]** 167/20
**noted [2]** 7/21 8/8
**notes [9]** 117/19 147/16 165/25 166/1 166/6 166/10 166/11 167/19 167/21
**notetaking [1]** 166/3
**noticeable [1]** 233/10
**noticed [1]** 172/6
**notified [3]** 205/4 209/10 226/25
**novels [1]** 182/22
**November [1]** 274/17
**nowhere [5]** 240/7 240/9 240/12 240/15 241/19
**number [122]**
**Number 1 [3]** 6/7 148/6 148/8
**Number 10 [2]** 141/23 142/12
**Number 11 [1]** 154/6
**Number 12 [1]** 153/8 153/10
**Number 13 [1]** 154/7
**Number 14 [1]** 154/7
**Number 15 [1]** 143/2
**Number 16 [2]** 148/5 154/8
**Number 17 [2]** 148/9 154/8
**Number 18 [1]** 143/10
**Number 19 [2]** 149/7 154/8
**Number 2 [1]** 149/6
**Number 20 [2]** 149/13 154/9
**Number 21 [1]** 149/17
**Number 22 [1]** 149/21
**Number 23 [1]** 143/17
**Number 24 [1]** 144/2
**Number 25 [2]** 150/11 154/9
**Number 26 [3]** 149/24 150/20 150/23
**Number 27 [2]** 150/25 151/24
**Number 28 [1]** 151/7
**Number 29 [2]** 146/7 146/14
**Number 3 [2]** 147/6 147/13
**Number 30 [6]** 145/22 151/13 151/22 151/23 152/13 152/14
**Number 31 [1]** 154/11
**Number 32 [1]** 154/11
**Number 33 [1]** 153/11
**Number 34 [1]** 153/17
**Number 35 [2]** 153/24 154/12
**Number 38 [1]** 144/14
**Number 4 [2]** 146/23 147/5
**Number 40 [2]** 146/16 146/22
**Number 41 [1]** 147/15
**Number 42 [1]** 144/23
**Number 43 [1]** 145/4
**Number 44's [1]** 147/24
**Number 45 [1]** 156/9
**Number 46 [2]** 145/18 156/5
**Number 49 [1]** 156/5
**Number 5 [1]** 149/15
**Number 6 [1]** 151/5

**Number 7 [1]** 149/10
**Number 8 [1]** 150/19
**Number 9 [1]** 154/6
**number one [1]** 267/16
**numbers [7]** 211/18 213/2 218/25 220/23 222/1 222/11 261/7
**numerous [2]** 195/11 227/6
**nurse [10]** 28/1 28/4 37/14 42/6 78/4 79/10 104/22 104/24 104/25 144/16

## O

**o'clock [17]** 6/17 6/24 15/7 15/14 15/15 30/1 30/12 30/20 31/20 33/10 142/23 143/13 145/15 196/6 215/8 285/1 287/3
**oath [3]** 117/12 165/24 203/23
**Oban [2]** 30/17 143/17
**object [15]** 22/20 110/12 110/17 142/18 142/25 144/12 160/23 193/13 193/19 193/19 202/17 213/18 219/8 260/24 261/11
**objecting [1]** 193/16
**objection [43]** 110/13 110/14 141/24 143/14 143/15 143/25 144/20 145/2 145/13 160/23 160/24 161/2 180/16 193/18 193/21 193/22 194/16 202/22 209/13 209/21 209/22 217/21 217/22 219/19 220/16 221/5 222/9 225/19 228/23 230/7 230/20 230/24 231/14 231/14 248/2 254/20 255/16 260/20 275/5 278/7 278/7 282/17 283/19
**objections [4]** 110/16 137/5 160/11 182/12
**obligation [1]** 110/17
**observation [1]** 254/11
**observations [1]** 242/9
**observe [7]** 186/10 196/10 196/12 196/18 199/17 235/23 273/24
**observed [11]** 195/25 196/1 196/13 199/19 208/8 209/4 226/23 236/16 239/15 239/17 251/9
**obstructing [1]** 196/8
**obtain [7]** 22/20 176/24 177/5 207/4 209/2 269/2 269/5
**obtained [7]** 175/2 208/14 208/24 215/15 216/1 223/3 225/24
**obtaining [1]** 23/1
**occasion [1]** 273/22
**occupancy [1]** 268/22
**occupant [6]** 172/22 247/22 247/24 247/24 253/22 255/8
**occupants [13]** 171/5 171/10 172/8 172/15 172/16 172/21 197/12 199/3 206/16 241/11 243/25 256/5 267/20
**occupation [1]** 188/16
**occupied [6]** 171/25 176/1 176/7 177/15 197/9 254/18
**occupying [1]** 269/6
**October [1]** 274/17
**Oetinger [1]** 20/6
**off-the-table [1]** 35/22
**offenses [8]** 7/23 7/25 8/3 8/7 8/13 8/17 124/10 179/1
**offers [1]** 160/21

**O**

**office [26]** 3/8 20/2 20/4 20/5 20/6 20/7 20/10 20/13 47/17 95/16 97/24 170/20 172/13 175/5 188/18 188/20 192/12 195/15 201/7 205/20 233/6 234/7 240/1 263/17 265/4 269/11
**officer [13]** 16/22 20/7 74/4 94/16 102/18 112/19 112/20 133/13 134/4 135/11 135/12 135/13 189/2
**Officer Rey [1]** 20/7
**officers [25]** 38/15 72/21 72/22 112/13 112/14 112/14 132/22 134/3 134/23 135/10 172/8 172/10 175/2 175/9 175/10 175/13 176/4 176/9 205/16 206/6 238/16 241/9 256/13 270/24 285/24
**Offices [1]** 2/6
**Official [2]** 2/9 289/24
**oftentimes [1]** 115/11
**oh [11]** 12/5 20/21 58/7 65/13 73/3 119/7 124/18 129/10 136/2 239/12 262/23
**Okeechobee [3]** 229/13 272/13 272/14
**olders [1]** 102/21
**on-the-job [1]** 188/25 191/11
**one kilo [1]** 9/4
**one kilogram [3]** 24/15 183/2 183/7
**one-and-a-half [5]** 256/2 256/14 256/15 256/16 256/19
**ongoing [2]** 126/11 127/8
**open [11]** 176/13 176/16 218/4 222/18 223/15 224/14 224/19 243/16 243/17 250/2 255/7
**opening [9]** 138/24 160/9 166/15 166/18 166/18 170/11 179/12 182/5 288/2
**operates [1]** 16/5
**operating [1]** 7/2
**operation [1]** 198/1
**opiate [2]** 192/9 219/23
**opinion [4]** 159/21 165/17 219/10 239/10
**opinions [1]** 22/17
**opportunity [13]** 16/17 22/10 23/6 129/19 161/16 182/5 183/5 186/10 196/18 200/3 200/16 240/9 273/24
**opposite [2]** 210/20 211/2
**optimistic [1]** 21/19
**option [1]** 152/23
**Orange [1]** 40/21
**order [4]** 161/5 162/19 232/2 246/12
**ordinary [2]** 259/23 260/15
**organizations [2]** 189/1 189/18
**original [1]** 201/25
**originally [10]** 42/4 45/3 54/11 65/20 72/8 84/17 90/11 95/13 100/13 208/5
**Orlando [4]** 31/5 39/23 50/22 72/24
**ought [1]** 134/4
**outcome [3]** 161/19 186/4 186/17
**outlet [1]** 269/18
**outline [3]** 166/16 182/11 182/14
**overdose [2]** 192/11 192/24
**overhearing [1]** 167/14

**overnight [2]** 32/17 32/21
**overrule [7]** 110/14 160/23 193/21 202/22 209/22 240/21 275/7
**Overruled [7]** 217/23 220/20 231/17 232/13 254/21 255/17 261/12
**overruling [2]** 110/16 193/22
**owe [1]** 9/24
**owned [2]** 92/9 208/22
**owner [1]** 249/16
**owns [1]** 55/24
**Ozan [9]** 12/5 12/5 12/6 12/8 30/18 30/22 70/20 118/20 118/25

**P**

**p.m [8]** 30/19 168/7 169/1 203/17 203/17 257/14 257/14 287/10
**packaged [6]** 191/6 191/13 191/15 191/18 191/20 249/9
**packet [1]** 266/15
**padlocked [1]** 176/14
**page [15]** 261/25 262/2 264/10 265/19 266/10 266/13 266/15 266/23 266/24 268/3 268/25 273/7 277/19 288/2 288/7
**page 4 [1]** 265/19
**page 5 [1]** 266/15
**pages [1]** 265/18
**painting [1]** 51/9
**Palm [33]** 2/4 17/10 20/2 20/3 20/5 20/6 20/7 20/9 20/12 21/7 21/8 21/9 24/7 24/20 25/4 25/11 122/15 122/19 133/19 170/20 174/1 188/18 188/19 195/1 195/4 201/6 226/23 229/3 229/14 234/6 239/25 259/10 283/1
**panel [8]** 11/10 13/11 18/7 151/15 152/17 153/13 158/20 223/7
**Paniagua [1]** 20/8
**paper [4]** 130/25 131/2 183/13 274/4
**papers [2]** 260/15 273/25
**paperwork [8]** 16/5 40/25 259/18 259/20 273/16 273/21 274/2 274/9
**parents [1]** 62/18
**parked [18]** 50/23 171/4 174/3 196/3 198/14 207/8 207/18 212/2 214/4 235/9 237/19 242/18 242/22 244/18 244/18 244/25 254/10 255/25
**parking [7]** 171/4 171/13 174/4 195/25 198/7 198/19 235/13
**Parnofiello [4]** 2/2 4/8 17/5 123/19
**part [8]** 22/14 88/14 161/14 170/23 189/10 201/14 210/8 286/8
**part-time [1]** 88/14
**participate [2]** 125/2 127/18
**participated [1]** 189/17
**parties [2]** 165/16 267/16
**partners [1]** 178/2
**party [1]** 165/6
**pass [5]** 51/11 61/13 65/12 94/25 119/1
**passed [1]** 75/22
**passenger [43]** 173/12 173/15 173/17 196/2 196/21 196/23 197/17 197/20 197/22 198/21 211/4 211/7 211/8 211/10 211/22 213/14 214/14

222/18 223/7 223/15 223/16 224/16 225/10 226/20 226/24 227/8 227/13 235/24 236/16 237/17 237/13 237/25 242/5 243/19 251/9 252/7 254/1 254/7 254/12 255/7 255/14 255/21 256/8
**passenger's [1]** 210/19
**passengers [1]** 196/18
**patients [1]** 35/21
**patrol [1]** 200/1
**Pause [13]** 4/1 5/19 6/2 6/13 7/1 7/6 7/17 7/20 141/8 141/11 141/17 151/3 169/13
**pay [7]** 26/5 29/6 32/24 34/13 35/4 36/20 277/10
**payment [1]** 163/4
**PBSO [5]** 199/21 205/25 221/11 241/8 249/3
**peace [1]** 119/24
**Peavey [8]** 13/2 34/10 35/16 100/4 116/6 116/9 117/3 145/4
**Peiretti [6]** 12/1 61/14 148/5 154/8 157/14 158/8
**Pembroke [5]** 41/25 50/3 68/1 93/16 102/1
**pen [4]** 65/13 65/13 214/9 233/1
**penalties [1]** 9/19
**pencils [1]** 167/20
**pending [3]** 14/17 221/11 241/3
**pens [1]** 167/20
**people [31]** 3/4 11/23 19/17 19/19 19/20 21/3 21/8 65/7 115/21 119/17 119/18 121/15 123/21 124/11 128/3 128/4 128/19 128/21 159/23 162/23 164/11 177/12 185/8 217/7 237/9 237/10 241/5 241/15 243/4 244/8 244/8
**percent [2]** 131/21 131/23
**peremptory [3]** 23/9 23/12 148/4
**perfect [1]** 247/7
**perfectly [1]** 131/25
**performing [2]** 26/8 81/9
**perhaps [1]** 282/6
**period [5]** 124/20 193/10 202/6 272/16 272/22
**permission [5]** 174/25 282/12 283/22 284/6 284/8
**permission's [1]** 245/11
**permit [4]** 164/15 164/16 164/20 164/24
**permitted [1]** 160/22
**person [28]** 11/19 11/24 12/3 12/15 12/20 12/23 12/25 20/22 116/15 117/20 122/4 122/5 163/3 163/7 186/6 201/13 216/1 227/20 228/12 237/6 244/2 252/23 255/12 262/20 267/8 267/9 272/3 280/18
**personal [6]** 16/24 22/17 22/25 26/4 139/24 162/19
**personally [1]** 244/13
**personnel [9]** 16/1 18/4 174/6 174/9 229/24 233/6 233/8 233/15 236/6
**persons [2]** 22/21 24/9
**pertain [1]** 26/17

**P**

**pertinent [1]** 23/22
**pet [1]** 108/3
**Peters [5]** 66/24 149/13 154/9 157/15 158/12
**Pets [1]** 74/15
**pharmacist [1]** 38/1
**philosophical [3]** 115/21 116/1 117/5
**phone [26]** 28/7 177/19 177/21 186/13 189/22 189/22 223/24 224/11 224/14 224/16 224/19 224/25 225/10 225/12 225/14 225/25 238/18 249/5 249/5 249/7 249/15 249/20 250/7 250/10 250/17 264/7
**phones [24]** 173/6 173/7 173/8 173/19 175/7 175/8 177/17 177/19 223/13 224/1 224/8 224/21 227/21 227/22 227/24 228/10 228/12 228/14 250/17 250/19 252/15 252/15 252/18 252/20
**photo [2]** 211/21 246/11
**photograph [29]** 174/7 174/7 214/7 230/4 230/6 231/4 231/8 231/11 231/15 231/19 232/7 232/18 232/20 233/5 233/8 233/9 233/10 236/5 246/25 270/25 271/8 271/11 271/23 271/25 272/2 275/20 275/25 278/5 280/24
**Photographer [1]** 71/2
**photographs [8]** 211/17 212/4 212/14 212/18 212/20 221/25 222/4 250/18
**photography [3]** 71/24 82/24 93/12
**photos [1]** 249/5
**phrases [2]** 165/13 190/7
**physical [2]** 26/7 251/25
**physically [3]** 252/6 275/3 279/16
**physicians [1]** 79/21
**Physicians' [1]** 95/16
**pick [23]** 5/12 16/20 19/18 21/1 21/3 27/22 29/5 29/10 29/16 30/2 30/12 30/19 30/20 32/23 36/4 142/22 142/23 143/13 145/14 146/16 147/17 155/2 235/14
**picked [13]** 31/8 31/25 32/22 34/23 35/24 37/1 119/19 140/6 154/19 215/16 217/3 217/5 217/11
**picking [1]** 21/24
**Pickleball [1]** 46/4
**picture [15]** 211/22 214/4 215/23 222/17 223/20 224/19 230/14 230/18 244/19 246/20 246/21 247/4 247/5 280/17 280/19
**pictured [1]** 215/5
**pictures [3]** 230/8 230/11 245/4
**piece [3]** 130/25 131/2 160/4
**pilot [1]** 255/9
**pilots [4]** 205/25 241/9 241/25 244/11
**pine [1]** 246/14
**Pines [5]** 41/25 50/3 68/1 93/16 102/1
**Pinzur [5]** 55/16 135/22 135/23 135/25 153/7 153/10

**place [11]** 110/15 111/14 129/20 163/9 163/11 164/24 165/1 165/3 192/13 234/12 248/24
**plaintiff [2]** 1/7 131/25
**plane [1]** 31/12
**plans [1]** 31/5
**Plantation [9]** 34/17 34/22 34/23 34/25 47/12 74/20 83/3 100/6 107/23
**plastic [6]** 175/22 213/16 245/21 245/23 246/16 246/19
**plate [3]** 173/23 222/25 253/7
**play [1]** 204/23
**played [1]** 209/3
**playing [5]** 76/6 204/20 205/10 210/2 210/10
**plea [5]** 89/1 89/3 92/24 125/4 129/15
**plead [1]** 127/11
**pleading [2]** 126/13 180/5
**Plean [1]** 20/9
**pleasure [1]** 17/18
**pled [2]** 126/17 126/18
**plugging [1]** 184/4
**plumber [1]** 64/15
**Plumbing [1]** 60/16
**plural [1]** 182/3
**pocket [4]** 175/6 175/14 175/23 176/20
**podium [1]** 11/10
**point [47]** 5/15 21/22 124/23 131/1 131/6 131/9 135/20 147/20 148/16 152/23 152/24 162/16 167/19 171/24 179/21 181/14 181/17 181/18 186/7 187/5 193/6 196/5 197/12 199/1 199/14 209/6 213/18 220/14 227/1 234/14 235/21 236/1 238/15 239/4 239/6 239/9 239/22 240/2 240/4 241/7 242/23 243/9 254/5 255/5 282/15 286/18 286/24
**pointed [2]** 174/11 273/10
**pointing [1]** 35/13
**police [28]** 38/15 45/20 72/21 74/3 85/5 112/13 112/14 112/19 112/20 113/7 113/9 132/22 133/13 133/18 134/4 134/23 134/25 135/9 135/11 135/12 172/8 172/9 172/11 177/21 238/12 238/15 270/24 285/24
**policeman [1]** 55/6
**policemen [48]** 40/19 42/21 44/8 45/18 46/21 49/12 50/16 52/15 53/18 55/5 56/10 57/20 59/19 61/1 62/10 63/19 64/25 66/10 67/12 68/12 70/5 71/15 72/17 74/2 75/18 77/5 78/10 79/25 81/17 82/15 83/21 85/1 87/8 89/8 91/3 91/5 94/14 95/22 97/3 98/16 99/17 100/23 102/16 104/2 105/24 107/6 108/15 109/21
**policemens [1]** 118/2
**Policies [1]** 205/19
**Polito [1]** 20/10
**polling [4]** 156/24 170/5 204/11 258/3
**Pompano [3]** 41/10 41/12 63/2
**Pool [1]** 64/15
**portion [4]** 23/22 201/18 209/2

209/18
**portions [1]** 286/15
**position [11]** 7/25 11/5 167/13 180/20 184/5 186/3 197/16 199/15 214/14 232/20 256/18
**positively [2]** 252/10 271/10
**possess [10]** 24/10 24/17 24/22 25/5 25/13 130/20 184/11 184/16 184/20 184/22
**possessing [1]** 285/21
**possession [20]** 8/21 10/2 10/16 10/17 25/1 25/8 25/15 102/22 130/21 130/21 130/22 183/2 183/6 183/9 183/12 240/13 253/15 269/10 269/16 285/19
**possibilities [1]** 35/3
**possibility [2]** 7/23 11/2
**post [1]** 249/21
**posting [1]** 164/5
**postponed [1]** 9/20
**pouring [1]** 119/16
**powder [1]** 191/17
**Prabu [2]** 13/5 109/1
**practice [4]** 69/5 69/11 69/12 280/10
**practitioner [3]** 28/2 28/4 42/7
**Prat [5]** 13/2 97/17 155/10 155/13 156/6
**Prats [3]** 11/19 50/1 150/19
**pray [1]** 138/7
**precautions [1]** 194/12
**predicate [3]** 220/17 232/11 261/17
**predicates [1]** 260/24
**prefer [5]** 31/14 117/1 155/21 192/21 193/15
**prejudice [2]** 26/11 161/20
**prejudicial [4]** 179/8 193/3 261/9 282/3
**preliminary [2]** 159/4 159/8
**premarked [5]** 219/3 221/23 228/4 232/3 260/5
**premature [2]** 164/22 164/23
**premises [3]** 163/9 163/10 269/12
**prepaid [1]** 26/25
**preponderance [1]** 131/24
**prescheduled [2]** 30/25 31/7
**Preschool [1]** 73/21
**prescription [6]** 191/16 218/14 223/21 248/5 248/8 248/12
**presence [19]** 4/19 139/8 139/10 140/8 140/18 156/23 157/4 167/17 170/4 170/10 203/8 204/10 204/16 243/3 257/5 258/2 258/8 260/24 284/25
**present [23]** 4/11 4/13 70/12 162/10 166/20 166/22 166/25 169/15 169/15 185/6 185/16 185/21 195/10 203/21 203/21 221/17 225/14 226/16 247/25 257/18 257/18 271/15 277/7
**presented [4]** 22/22 26/17 159/18 165/12
**presently [1]** 169/2
**preserve [4]** 195/17 198/8 208/18 209/7
**preserved [8]** 201/4 201/5 201/17

**P**

**preserved... [5]** 201/22 208/9 208/20
 208/25 209/5
**president [5]** 21/13 46/5 55/19 61/22
 93/21
**presume [1]** 118/10
**presumed [8]** 115/5 115/8 115/13
 115/18 130/7 131/8 132/17 162/3
**presumption [2]** 115/14 130/10
**prevent [2]** 25/25 26/5
**price [2]** 177/25 190/22
**primary [1]** 88/8
**principles [1]** 159/7
**printed [1]** 131/3
**prints [2]** 176/24 177/2
**prison [3]** 9/6 9/7 94/16
**prisoner [1]** 5/18
**probative [5]** 179/8 261/9 282/3
 282/5 282/6
**problem [21]** 29/16 29/20 31/15
 31/25 35/6 36/20 142/16 143/8
 144/25 145/8 146/4 146/12 146/18
 146/19 146/25 147/2 147/10 147/25
 155/19 174/13 179/19
**problematic [1]** 286/17
**problems [5]** 16/24 26/4 118/2 129/8
 203/10
**procedures [3]** 192/12 192/15
 205/19
**proceed [2]** 170/13 204/18
**proceeding [1]** 131/1
**proceedings [8]** 1/13 1/24 181/20
 194/9 261/14 282/22 287/10 289/20
**process [5]** 23/5 23/8 201/13 201/14
 201/24
**processed [1]** 176/23
**processes [1]** 40/23
**processing [1]** 259/19
**produced [1]** 1/24
**product [1]** 201/14
**products [1]** 61/23
**professional [2]** 27/9 70/6
**professor [1]** 79/15
**program [2]** 41/2 163/12
**project [1]** 43/18
**promise [7]** 127/24 128/4 128/8
 128/17 128/25 138/15 165/24
**promised [1]** 164/19
**prompt [1]** 287/8
**promptly [1]** 163/6
**pronounce [1]** 157/22
**proof [10]** 114/21 130/11 131/2
 132/11 132/14 162/6 162/8 162/17
 183/16 185/8
**properly [1]** 219/9
**property [3]** 83/8 114/9 272/18
**proposed [1]** 7/22
**prosecution [3]** 180/21 185/17
 186/24
**prosecutor [2]** 179/3 285/13
**prosecutor's [1]** 193/5
**prosecutors [1]** 131/11
**prospect [1]** 279/22
**prospective [9]** 11/13 18/8 23/7

140/17 156/19 156/21 157/21 259/14
 265/25
**prove [17]** 114/20 114/25 115/2
 121/7 121/11 128/7 128/10 128/15
 130/12 131/11 132/16 162/9 162/14
 186/14 186/15 187/8 250/10
**proved [1]** 121/3
**proven [5]** 111/5 116/2 116/24 162/3
 183/20
**proves [4]** 114/7 159/22 160/1
 187/15
**provide [1]** 164/4
**provided [1]** 266/17
**proving [1]** 114/18
**prying [1]** 22/25
**psychologist [1]** 45/7
**psychology [1]** 68/6
**public [4]** 47/25 55/24 129/20 172/13
**publish [6]** 202/25 209/25 213/4
 222/13 245/11 261/21
**pull [5]** 199/10 218/5 230/16 239/17
 262/12
**pulled [8]** 171/2 171/16 172/4 199/11
 199/23 231/8 231/12 244/23
**punishments [2]** 8/6 8/12
**purchase [1]** 191/2
**purple [9]** 173/1 206/14 212/1 214/6
 214/17 215/4 218/10 244/18 247/7
**purported [1]** 217/5
**purposely [1]** 185/4
**purposes [7]** 133/11 177/8 177/14
 189/4 246/21 261/1 281/25
**purse [1]** 97/11
**pursuant [2]** 228/14 289/18
**pursue [1]** 205/21
**pursued [2]** 241/7 253/5
**puts [14]** 118/12 148/9 149/7 149/13
 149/17 149/21 150/11 150/20 150/25
 151/7 151/13 152/15 179/9 192/25
**puzzle [4]** 139/1 183/24 184/4 184/6
**puzzled [1]** 19/8

**Q**

**QA [1]** 42/12
**quadplex [1]** 244/21
**qualifications [1]** 13/16
**qualified [4]** 14/5 14/20 164/19
 193/11
**quality [1]** 109/12
**quarter [1]** 223/7
**question [32]** 29/4 33/16 39/25 40/7
 43/15 110/13 110/14 115/9 118/11
 123/24 128/12 128/23 129/24 138/21
 160/14 160/16 160/20 160/23 160/25
 161/2 161/3 165/2 180/13 192/25
 193/5 193/24 246/10 252/9 256/23
 279/10 279/12 285/13
**questioned [1]** 23/20
**questioning [5]** 22/11 22/24 23/3
 117/10 199/3
**questions [17]** 13/15 16/12 22/2 22/5
 22/10 113/14 113/18 125/12 127/1
 129/18 129/25 139/2 142/21 156/12
 160/11 160/12 285/9

**quickly [2]** 212/10 255/23
**Quinones [3]** 67/24 149/17 149/19
**quote [1]** 177/23

**R**

**racial [1]** 101/13
**Racquetball [1]** 39/6
**radio [4]** 163/16 199/1 205/4 244/5
**Radiography [1]** 50/10
**radioing [1]** 241/9
**raise [31]** 13/13 14/8 14/11 14/15
 14/18 18/4 20/18 20/22 25/19 25/22
 26/1 26/9 26/13 26/19 26/23 36/21
 112/11 112/16 113/4 113/10 113/18
 114/1 116/3 117/6 119/18 120/4
 123/7 158/21 188/8 258/12 281/13
**raised [3]** 135/17 135/20 135/21
**raising [2]** 18/22 124/4
**ran [5]** 65/13 117/20 172/11 229/18
 244/2
**random [1]** 28/22
**rate [1]** 172/9
**Rauscher [6]** 87/19 119/6 119/8
 152/6 153/17 153/21
**RE [2]** 280/8 288/17
**RE-REDIRECT [2]** 280/8 288/17
**reach [11]** 38/12 40/16 49/9 70/2
 75/15 88/23 88/25 92/21 105/21
 159/15 184/5
**reached [2]** 89/2 89/2
**reaching [1]** 161/12
**reactions [1]** 156/12
**read [12]** 17/23 23/22 25/21 106/14
 106/15 110/23 130/18 163/14 165/8
 182/21 182/22 223/20
**reader [5]** 173/22 173/23 173/23
 229/20 253/14
**reading [12]** 43/7 49/24 68/21 77/16
 80/19 97/15 101/22 103/4 104/13
 106/16 110/5 119/14
**ready [4]** 4/15 169/21 169/23 169/24
 170/11
**realize [1]** 118/21
**realized [2]** 118/24 251/19
**realizes [1]** 242/24
**Realty [1]** 258/23
**rear [16]** 197/16 197/20 197/22
 198/12 222/24 223/7 223/15 224/17
 225/11 226/20 227/8 235/20 235/21
 243/19 252/7 255/7
**rearrange [1]** 158/1
**reasonableness [1]** 161/21
**reasons [5]** 23/1 117/25 118/1
 172/13 278/7
**recall [2]** 227/22 233/24
**receipt [2]** 34/14 34/18
**receive [11]** 28/6 28/11 28/22 29/3
 221/13 224/20 226/5 233/16 233/19
 266/8 278/17
**received [19]** 28/25 160/20 160/24
 161/1 173/23 202/23 209/23 213/1
 217/25 220/21 222/10 225/20 228/24
 232/14 243/3 261/15 278/24 279/16
 289/2

**R**

**receiving [1]** 241/15
**recent [4]** 88/4 89/12 98/2 192/11
**recently [2]** 37/16 134/25
**recess [15]** 14/25 139/6 139/6 139/6 168/2 168/7 203/7 203/14 203/17 257/3 257/10 257/14 284/22 284/24 287/2
**recesses [1]** 21/18
**recognize [6]** 128/2 270/2 270/7 271/3 271/6 271/25
**recognized [1]** 18/18
**recollection [4]** 132/25 279/17 279/21 279/24
**record [49]** 4/7 5/17 5/25 6/11 7/15 7/18 132/15 133/6 133/11 134/11 135/17 140/22 141/15 141/25 142/6 151/9 152/21 153/1 153/5 154/3 154/22 169/14 181/25 188/12 197/5 197/7 200/12 203/4 203/20 211/13 213/7 214/22 218/24 221/21 225/4 228/2 231/24 245/8 257/17 258/15 260/3 263/5 263/7 269/23 279/8 281/16 281/25 285/10 289/20
**recorded [1]** 1/24
**records [1]** 174/15
**recovered [6]** 177/16 207/18 240/16 252/14 253/2 255/19
**recross [3]** 279/11 279/14 288/16
**RECROSS-EXAMINATION [1]** 279/14
**red [6]** 119/3 172/11 205/11 214/5 215/25 232/22
**Redirect [8]** 253/18 253/19 277/15 277/16 280/8 288/13 288/16 288/17
**reentered [1]** 171/24
**refer [4]** 110/25 134/17 185/17 239/4
**referee [1]** 110/10
**reference [1]** 25/24
**referred [3]** 179/3 185/25 243/13
**referring [1]** 263/12
**Refkin [3]** 47/10 149/11 149/12
**reflect [6]** 135/17 197/5 197/7 263/5 263/7 285/10
**reflected [1]** 267/25
**reflects [1]** 202/1
**refresh [1]** 132/24
**refrigerator [3]** 187/2 187/3 187/4
**regional [1]** 94/7
**registered [4]** 14/10 14/11 19/19 21/4
**rehab [1]** 101/11
**relations [1]** 55/25
**relationship [5]** 94/6 133/2 133/23 134/22 135/1
**relationships [1]** 134/9
**relatives [57]** 38/14 40/18 42/20 42/23 44/7 45/17 46/20 46/23 49/11 49/14 50/15 52/14 53/17 55/4 56/9 56/12 57/19 59/18 60/25 62/9 63/18 64/24 66/9 67/11 68/11 70/4 71/14 72/16 72/19 74/1 75/17 77/4 78/9 79/24 81/16 82/14 83/20 84/25 87/7 89/7 91/2 91/5 94/13 95/21 97/2

98/15 99/16 100/22 102/15 104/1 105/23 106/1 106/3 107/5 108/14 109/20 132/22
**relayed [3]** 244/5 244/9 251/11
**relevancy [2]** 261/1 285/18
**relevant [2]** 282/11 285/24
**reliable [1]** 34/12
**religious [6]** 115/21 115/25 116/11 117/4 142/17 144/25
**rely [1]** 166/10
**remain [4]** 157/13 157/18 162/11 216/21
**remained [1]** 173/17
**remains [1]** 131/10
**remarks [1]** 160/10
**remember [17]** 19/1 117/13 117/24 118/1 134/17 140/7 142/24 166/1 167/16 176/3 182/15 182/17 186/7 203/7 257/3 263/17 284/24
**remembered [1]** 119/9
**remind [1]** 177/14
**removed [2]** 201/11 223/22
**render [5]** 26/8 26/16 26/22 158/24 164/17
**rendition [1]** 182/16
**renew [2]** 194/16 283/19
**rent [17]** 174/20 180/6 259/4 262/15 264/14 264/20 267/24 268/9 268/11 268/16 270/22 274/16 274/20 274/22 274/24 277/11 279/2
**rental [14]** 259/14 259/17 260/11 260/12 261/4 262/7 262/14 266/6 266/23 266/25 267/2 267/3 280/11 283/2
**rented [7]** 174/16 174/21 178/3 180/9 267/8 267/10 269/8
**renters [2]** 269/3 269/5
**renting [1]** 275/13
**repaired [1]** 34/14
**reporter [8]** 2/8 2/9 16/9 129/9 133/10 203/5 213/8 289/24
**reporter's [1]** 165/16
**represent [3]** 17/19 123/21 270/16
**Representing [1]** 17/2
**Republic [3]** 42/5 85/22 95/14
**request [1]** 163/2
**required [5]** 162/17 162/24 219/20 267/21 269/1
**research [5]** 83/12 163/18 163/20 163/23 165/10
**resided [1]** 187/10
**residence [9]** 186/25 186/25 206/12 207/7 207/17 208/16 208/18 208/21 269/6
**resident [3]** 208/22 268/5 269/2
**residents [2]** 259/3 269/2
**residue [1]** 248/6
**resolved [1]** 203/10
**resources [1]** 35/15
**respectfully [3]** 179/11 179/20 180/21
**respond [4]** 206/6 206/8 226/25 270/20
**responded [1]** 251/13

**response [8]** 131/7 132/9 154/18 180/2 180/4 192/25 193/4 271/16
**responsibilities [1]** 259/2
**rest [7]** 15/3 15/4 37/2 121/1 140/15 157/8 245/17
**restaurant [2]** 46/15 92/3
**restored [1]** 14/14
**restroom [1]** 3/19
**result [4]** 24/13 179/11 190/6 190/16
**resulted [1]** 193/12
**retail [2]** 88/14 94/7
**retaliation [1]** 101/14
**retire [1]** 106/5
**retired [12]** 45/6 45/11 74/3 76/15 76/22 79/10 79/14 91/7 92/7 104/22 104/23 106/5
**retrieved [1]** 217/2
**return [3]** 115/1 163/4 199/14
**returned [3]** 24/4 171/14 199/17
**Rey [1]** 20/7
**Richia [1]** 149/5
**ride [1]** 35/1
**riding [1]** 78/23
**right-hand [3]** 205/3 214/8 214/9
**rights [3]** 14/14 114/9 132/2
**ring [2]** 20/17 176/15
**Rinku [7]** 2/2 4/8 8/25 9/24 17/3 120/7 123/18
**ripped [1]** 248/11
**rise [14]** 3/10 11/12 140/10 156/18 157/20 167/24 168/5 170/1 203/11 204/8 257/7 257/12 257/25 285/5
**Riverland [1]** 58/20
**Rizzo [5]** 90/5 119/5 152/5 153/11 153/15
**RMR [2]** 2/8 289/24
**RMR-CRR [1]** 289/24
**road [14]** 184/3 226/22 272/13 272/14
**robbed [2]** 93/10 117/21
**robberies [1]** 89/21
**robbery [1]** 73/10
**rock [2]** 59/7 193/10
**Rodriguez [5]** 20/10 83/1 155/4 155/8 155/11
**role [2]** 110/9 110/9
**Romano [6]** 91/21 152/15 152/20 154/12 157/16 158/15
**room [14]** 2/10 111/13 111/16 115/15 120/13 166/3 166/7 166/9 167/2 167/7 167/9 167/18 203/9 257/5
**roommate [1]** 267/21
**rooms [2]** 164/2 164/7
**rose [5]** 27/12 58/18 141/24 142/12 228/9
**row [34]** 6/6 11/16 11/19 11/21 11/22 11/23 11/24 12/1 12/3 12/4 12/8 12/15 12/16 12/19 12/20 12/21 12/23 12/25 13/1 13/4 118/5 140/11 140/13 158/7 158/8 158/9 158/11 158/12 158/13 158/14 158/15 158/16 158/17 158/19
**Royal [16]** 173/2 206/15 211/5 212/1 212/3 214/6 214/11 214/17 215/4 215/17 215/20 216/2 240/13 247/10

## R

**Royal... [2]** 247/13 248/5
**rubber [1]** 176/9
**rude [1]** 139/13
**rule [1]** 230/7
**rules [10]** 114/5 114/10 139/14
 160/19 160/22 162/2 164/13 165/19
 165/21 165/23
**ruling [1]** 261/19
**ruling's [1]** 261/12
**rulings [1]** 137/5
**rung [1]** 286/13
**runner [2]** 54/2 56/21
**runs [1]** 205/11

## S

**S-I-M-M-O-N-S [1]** 258/17
**safe [3]** 166/8 254/18 269/14
**safety [2]** 172/13 205/20
**sake [1]** 111/20
**Salopek [2]** 2/8 289/24
**Salopek's [1]** 16/9
**sandwich [2]** 213/16 246/24
**sanitation [1]** 105/5
**sat [5]** 113/20 114/3 114/4 171/10
 198/4
**saturated [1]** 206/7
**saved [1]** 249/20
**saves [1]** 208/22
**saw [42]** 123/8 139/19 156/12 159/19
 159/23 160/15 160/17 172/7 175/4
 175/5 175/8 176/14 176/14 195/23
 199/21 199/22 212/21 235/5 237/12
 237/13 237/14 239/3 239/11 239/12
 239/12 240/1 242/4 242/14 242/16
 242/16 242/20 243/5 244/13 252/1
 252/7 252/8 253/25 274/13 274/17
 275/4 275/9 279/1
**scales [1]** 131/20
**scenario [3]** 250/5 250/11 250/13
**scene [18]** 50/24 107/11 165/6
 173/15 185/7 185/16 185/21 218/11
 219/15 221/12 227/9 238/16 242/11
 242/22 248/25 251/17 255/24 256/13
**schedule [1]** 15/21
**scheduling [2]** 14/22 15/24
**scheduling-wise [1]** 15/24
**scheme [1]** 36/23
**school [10]** 29/23 33/10 40/5 43/23
 51/5 52/11 62/2 94/10 101/12 118/23
**schools [1]** 37/20
**science [2]** 42/13 100/17
**scientist [1]** 20/9
**scratch [1]** 111/12
**screen [3]** 205/3 243/20 273/10
**Scuba [1]** 94/24
**seal [1]** 222/21
**sealed [3]** 221/12 241/3 248/25
**seamstress [1]** 64/19
**search [30]** 129/22 163/12 164/9
 173/3 173/6 173/20 175/3 175/4
 175/11 175/16 208/14 208/23 221/11
 221/13 221/15 222/3 222/21 223/3
 224/20 225/24 226/10 228/14 228/17

229/9 229/22 233/16 233/19 233/21
 241/3 249/10
**searched [6]** 172/25 173/9 221/17
 223/4 227/18 227/19
**searching [2]** 222/5 251/1
**seat [41]** 11/16 11/17 11/20 12/19
 12/24 140/2 156/20 158/4 158/6
 158/7 158/8 158/9 158/10 158/12
 158/13 158/14 158/15 158/16 158/17
 158/18 173/12 173/15 173/18 198/18
 224/17 225/11 226/20 226/24 227/8
 227/13 235/25 237/13 251/10 252/22
 253/25 254/1 254/7 254/8 254/9
 254/12 254/19
**seats [3]** 157/13 157/18 254/5
**second [37]** 7/2 7/11 11/21 11/22
 11/23 11/24 12/16 12/19 12/20 23/23
 25/17 89/1 114/14 120/9 130/18
 131/3 133/4 135/24 153/3 155/10
 155/13 155/15 155/16 156/8 156/15
 158/13 162/8 165/2 182/18 183/4
 183/8 184/8 184/14 184/14 264/10
 273/7 277/12
**secretary [3]** 16/6 47/17 59/14
**section [2]** 264/7 289/18
**secured [2]** 236/9 249/10
**security [6]** 16/22 16/23 174/18
 261/7 263/24 283/13
**seeks [1]** 183/17
**sees [1]** 205/6
**seized [1]** 225/14
**select [5]** 14/23 15/1 22/12 23/5
 119/13
**selected [6]** 15/1 15/24 26/15 119/15
 129/1 157/5
**selection [1]** 16/13
**seminars [1]** 188/24
**Seminole [1]** 283/9
**semis [1]** 227/8
**Senate [1]** 21/14
**send [6]** 31/13 250/6 265/23 265/24
 266/5 267/7
**sending [1]** 250/7
**senior [2]** 61/22 76/17
**sense [7]** 128/24 128/25 178/7
 186/19 186/20 187/13 234/23
**sentencing [1]** 6/14
**September [4]** 264/13 264/13 265/3
 274/17
**September 18 [1]** 265/3
**September 19 [1]** 264/13
**September 20th [1]** 264/13
**sergeant [7]** 199/21 202/15 202/19
 204/25 205/12 239/17 239/20
**Sergeant Newcombe [5]** 202/15
 204/25 205/12 239/17 239/20
**Sergeant Newcombe's [1]** 202/19
**Serial [1]** 221/11
**series [3]** 22/2 177/22 285/9
**serious [2]** 132/6 165/20
**serve [57]** 13/16 22/13 42/18 44/5
 45/15 46/18 49/1 50/13 52/12 53/15
 52/2 56/7 56/21 57/17 59/16 60/23
 62/7 63/16 64/22 66/7 67/9 68/9

69/19 72/14 73/1 73/24 75/7 77/2
 78/7 79/22 81/14 82/12 83/18 84/23
 87/5 88/15 90/25 91/9 92/13 94/11
 95/19 96/25 98/13 99/14 100/20
 102/13 103/24 105/13 107/3 108/12
 109/18 113/24 115/22 116/1 116/12
 157/6 157/12
**served [5]** 38/4 40/8 71/12 88/25
 110/7
**server [6]** 201/6 201/11 201/11
 208/15 208/17 208/20
**service [2]** 14/2 90/15
**serving [2]** 20/25 120/3
**settled [2]** 92/25 93/1
**seven [15]** 5/22 5/22 52/10 89/21
 94/4 161/22 173/19 176/17 188/21
 189/7 227/21 227/22 229/7 234/8
 252/14
**seven kilograms [1]** 176/17
**seven-and-a-half [3]** 188/21 189/7
 234/8
**Seventeen [2]** 93/19 102/4
**Shanley [8]** 12/15 31/16 32/2 80/22
 145/22 151/13 151/22 152/14
**shared [1]** 176/1
**she'll [1]** 156/15
**Shepherd [2]** 46/8 151/5
**Sheriff [2]** 20/4 133/19
**Sheriff Kristopher [1]** 20/4
**sheriff's [18]** 17/11 18/3 20/2 20/4
 20/5 20/6 20/7 20/9 20/13 170/20
 172/13 188/18 188/19 192/12 201/7
 205/20 234/6 239/25
**shifted [1]** 15/20
**shifts [1]** 32/22
**shirt [3]** 232/22 233/1 233/3
**shooter [1]** 54/3
**shoplifting [2]** 89/12 104/7
**short [3]** 171/14 172/16 210/19
**shown [3]** 203/8 233/9 236/5
**sic [30]** 13/2 30/17 30/19 33/25 42/12
 52/10 59/23 71/11 102/4 102/7
 102/11 102/21 102/25 106/5 118/2
 118/22 130/18 134/3 143/17 152/13
 156/5 156/10 176/3 184/13 185/1
 187/20 201/19 204/25 214/8 251/19
**sick [3]** 26/25 28/16 28/17
**side [32]** 3/4 3/5 5/9 5/13 7/24 23/8
 23/9 23/13 23/14 23/18 114/8 160/21
 167/5 169/9 198/12 205/3 210/20
 211/2 211/4 211/10 211/23 213/14
 214/3 214/8 214/9 222/18 222/20
 223/7 223/15 242/5 255/7 255/21
**sidebar [13]** 178/16 181/20 192/19
 194/9 260/20 260/21 261/14 280/3
 281/5 281/20 281/23 282/22 285/12
**sides [2]** 4/15 102/20
**sight [1]** 26/7
**sign [2]** 264/25 273/24
**signature [4]** 265/4 265/5 265/7
 266/12
**signed [7]** 261/4 264/23 265/2
 267/13 273/1 273/6 274/2
**significance [6]** 110/15 182/20

# S

**significance... [4]** 245/20 246/12 246/15 246/16
**signify [1]** 265/10
**silent [1]** 162/11
**silly [1]** 111/13
**Simmons [10]** 20/11 174/10 230/2 230/4 258/11 258/13 258/17 258/22 272/10 288/14
**simple [2]** 178/1 252/9
**sing [1]** 53/1
**single [15]** 46/17 50/12 53/14 67/8 68/8 72/13 73/23 82/11 84/22 95/18 99/13 100/19 107/2 191/12 279/22
**sirens [1]** 239/21
**sister [6]** 31/1 44/13 66/13 83/24 125/14 160/16
**sister's [1]** 31/6
**site [2]** 164/7 244/17
**situation [5]** 23/16 136/5 179/9 261/10 282/7
**six a.m [1]** 31/21
**six o'clock [2]** 31/20 215/8
**Six-year [1]** 71/10
**sixth [2]** 158/9 158/17
**Sixty [1]** 104/20
**Sixty-five [1]** 104/20
**skip [2]** 265/19 268/2
**slang [1]** 190/7
**slate [1]** 162/7
**sleep [3]** 121/18 121/22 122/1
**sleepy [4]** 27/18 27/20 27/21 29/8
**slept [4]** 121/17 121/21 122/4 122/5
**slightly [1]** 232/2
**Slow [1]** 152/7
**small [4]** 21/1 173/16 215/5 227/15
**smaller [1]** 176/2
**smash [1]** 101/7
**smelled [1]** 159/20
**Smith [11]** 11/25 12/2 30/7 30/15 51/12 120/19 121/3 123/4 123/10 137/24 143/2
**smoked [1]** 192/4
**snap [1]** 175/8
**snapped [1]** 175/7
**snorted [1]** 192/4
**soccer [2]** 91/19 99/3
**social [6]** 164/2 164/8 174/17 261/7 263/24 283/13
**software [2]** 93/22 94/7
**sole [1]** 145/11
**solely [2]** 159/17 165/11
**solemnly [2]** 13/14 158/23
**solution [1]** 248/9
**solved [2]** 112/24 113/1
**someone's [2]** 134/4 159/21
**Sometime [1]** 171/13
**son [10]** 36/14 40/20 52/9 80/7 94/15 98/19 102/21 102/25 105/11 105/12
**son-in-law [1]** 94/15
**soon [2]** 170/3 199/21
**sought [2]** 114/13 180/3
**source [2]** 163/21 165/15
**south [51]** 37/10 39/12 39/14 42/1

43/13 44/23 46/11 47/13 50/4 51/15 53/7 54/8 57/6 58/22 60/12 61/18 63/3 64/11 65/17 67/2 68/2 68/25 70/23 72/5 73/17 74/21 76/11 77/21 79/6 80/13 80/25 82/6 83/4 84/14 86/13 87/22 90/8 91/24 93/17 95/11 96/10 97/20 99/8 100/7 102/2 103/12 104/18 106/21 107/24 109/4 244/1
**southbound [2]** 243/23 255/13
**SOUTHERN [11]** 1/2 13/21 21/10 21/12 24/7 24/21 25/4 25/11 95/7 229/14 259/10
**space [7]** 198/19 244/19 244/24 245/1 268/9 268/11 268/16
**span [1]** 27/11
**spear [1]** 78/23
**special [5]** 22/18 133/20 165/13 188/17 192/12
**specialist [1]** 76/18
**specialized [1]** 188/25
**specific [9]** 28/15 129/25 181/8 189/4 231/9 233/9 233/17 279/21 279/24
**speculate [2]** 137/6 137/17
**speculation [5]** 254/20 255/16 256/20 256/21 275/6
**speed [1]** 172/9
**speeding [4]** 50/22 112/8 136/3 136/6
**spell [1]** 188/11
**spelling [3]** 258/15 281/16 281/19
**spent [1]** 277/12
**spit [3]** 197/17 197/20 237/14
**spoke [4]** 174/6 174/9 182/17 201/19
**spontaneous [1]** 193/4
**spontaneously [1]** 175/11
**sports [1]** 76/6
**spot [3]** 171/4 198/3 198/7
**spotted [1]** 251/13
**spouse [26]** 39/19 42/11 43/21 45/10 48/15 51/25 54/17 55/23 57/13 59/5 60/19 62/1 63/12 66/1 69/9 71/5 75/3 76/21 79/13 81/7 83/11 90/20 92/6 93/25 96/17 109/11
**spread [1]** 21/15
**Springs [6]** 67/1 73/16 77/20 80/24 90/7 106/20
**squeal [1]** 199/24
**squealing [1]** 239/19
**St. [4]** 27/12 58/18 141/24 142/12
**stabbing [1]** 101/20
**staff [1]** 35/20
**stake [4]** 114/5 114/10 132/2 132/2
**stamps [1]** 209/14
**stand [18]** 13/13 15/9 16/19 18/13 18/14 22/4 37/7 110/12 116/8 116/9 120/11 131/15 133/1 134/10 135/23 158/21 285/12 285/12
**standard [3]** 114/21 219/20 286/8
**standing [3]** 16/20 167/6 175/5
**standpoint [2]** 234/24 249/15
**stands [1]** 129/14
**Stanley [1]** 152/13
**starts [2]** 29/23 162/7

**state [26]** 15/9 25/24 38/6 38/7 40/10 40/11 45/20 49/3 49/4 69/21 69/22 74/4 75/9 75/10 78/1 88/17 89/5 92/15 92/16 94/16 105/15 105/16 127/10 188/11 258/15 281/16
**stated [2]** 175/12 278/8
**statement [7]** 138/24 166/15 166/18 182/5 266/16 266/17 288/2
**statements [4]** 160/8 160/9 166/18 170/12
**STATES [24]** 1/1 1/6 1/15 2/9 4/4 4/9 13/20 14/7 14/8 17/2 17/3 21/2 23/21 94/9 116/22 123/20 123/21 128/3 128/4 133/20 185/23 188/6 258/10 289/19
**States vs [2]** 4/4 23/21
**station [1]** 34/20
**stationary [1]** 173/13
**status [48]** 37/15 39/17 42/9 43/19 45/8 46/16 48/5 50/11 51/23 53/13 54/15 55/21 57/11 59/3 60/17 61/24 63/9 64/16 65/24 67/7 68/7 69/7 71/3 72/12 73/22 75/1 76/19 78/3 79/11 81/5 82/10 83/9 84/21 86/18 88/2 90/18 92/4 93/23 95/17 96/15 97/25 99/12 100/18 103/18 104/25 107/1 108/4 109/9
**stay [7]** 50/25 51/21 66/2 88/7 90/2 167/9 243/2
**stay-at-home [3]** 51/21 66/2 88/7
**stays [1]** 115/14
**steal [1]** 174/25
**stealing [1]** 65/7
**Stein [5]** 44/20 120/10 133/6 133/9 149/15
**stenography [1]** 1/24
**step [3]** 256/25 281/6 284/13
**Stephanie [7]** 20/11 174/10 230/2 258/10 258/13 258/17 288/14
**Stephen [7]** 29/21 30/5 43/10 117/15 117/22 146/23 147/5
**Steve [1]** 47/20
**Steven [1]** 20/12
**Stoff [6]** 91/21 152/15 152/20 154/12 157/16 158/15
**stolen [12]** 45/24 62/18 97/11 175/18 178/3 179/4 179/5 180/6 180/8 180/9 180/24 261/7
**stop [15]** 34/22 172/3 172/10 199/2 199/8 205/12 205/12 206/1 206/3 206/4 210/3 227/5 236/20 251/16 254/23
**stopped [1]** 272/25
**storage [1]** 268/4
**store [1]** 92/10
**stores [1]** 201/10
**straight [2]** 33/2 196/1
**strategy [5]** 8/1 8/2 11/6 286/22 286/23
**street [7]** 175/21 176/17 190/17 190/19 191/7 191/14 243/24
**street-level [2]** 191/7 191/14
**stricken [1]** 161/5
**Striped [1]** 263/4

312

**S**

**strolled [2]** 256/11 256/17
**stronger [1]** 192/9
**student [3]** 50/8 98/12 102/11
**students [2]** 62/6 81/13
**studying [2]** 50/9 100/1
**stuff [2]** 34/14 101/8
**subdivision [6]** 194/25 199/20 205/2
205/2 235/15 239/15
**subject [7]** 22/19 179/6 182/12
217/23 219/9 220/21 233/24
**submitted [3]** 218/19 249/10 267/5
**substance [9]** 24/11 24/12 24/15
24/23 24/24 25/6 25/14 183/10
219/13
**substances [1]** 219/15
**sufficiently [1]** 132/14
**suggest [1]** 192/16
**suggests [1]** 160/14
**suit [1]** 5/18
**Suite [2]** 2/4 2/7
**summarize [1]** 166/25
**summer [1]** 196/7
**Sunday [5]** 27/7 28/25 31/23 31/24
143/6
**sunny [1]** 196/7
**Sunrise [6]** 43/12 54/7 57/5 72/4 79/5
84/13
**super [1]** 130/18
**superseding [13]** 7/3 7/10 7/11
23/23 25/18 111/18 114/14 131/3
182/18 183/4 183/8 184/9 184/15
**supplying [1]** 163/4
**support [1]** 76/18
**supported [1]** 183/16
**surgeon [1]** 35/20
**surgeries [1]** 144/17
**surgery [1]** 35/17
**surgical [2]** 35/18 144/16
**surveillance [26]** 170/21 195/8
195/14 202/7 202/13 202/14 207/2
207/4 207/6 207/16 207/22 227/2
234/11 234/17 235/7 235/13 238/4
241/17 241/18 241/20 242/4 243/15
244/10 251/14 254/25 255/6
**suspect [1]** 219/25
**suspected [10]** 194/11 219/21
219/23 220/2 220/3 220/8 220/11
221/7 247/2 248/6
**sustain [11]** 110/13 160/24 161/2
194/17 219/11 230/22 231/1 248/3
256/22 278/9 283/20
**sustaining [1]** 110/16
**SUV [2]** 215/25 247/9
**swab [1]** 177/9
**swabs [2]** 177/7 177/11
**swallow [1]** 191/24
**swear [4]** 13/11 13/14 158/20 158/23
**switched [1]** 254/5
**sworn [4]** 159/6 188/9 258/13 281/14
**syringe [1]** 192/5
**system [15]** 40/21 41/3 55/20 94/16
112/6 112/10 124/9 125/13 126/4
127/2 173/10 201/5 201/9 201/9

201/10
**systems [1]** 94/8

**T**

**T-shirt [1]** 233/1
**table [1]** 35/22
**tag [6]** 173/22 173/23 222/25 229/18
229/20 253/14
**take [50]** 6/19 11/17 12/18 12/24
15/16 15/17 15/25 16/10 30/13 30/16
31/13 35/9 36/24 36/25 110/25 113/3
120/18 131/16 136/24 139/6 140/2
140/24 146/5 152/23 158/6 161/15
165/25 166/1 166/8 166/9 167/19
167/21 184/1 193/25 194/12 199/3
203/6 211/16 214/25 234/11 257/3
259/3 259/14 260/6 264/17 270/2
279/19 280/13 285/1 285/22
**taken [21]** 51/2 168/7 173/18 203/17
208/15 214/17 219/15 224/5 224/8
224/11 224/16 224/25 226/19 228/12
229/3 246/25 248/16 249/8 250/18
256/15 257/14
**takes [1]** 153/9
**talk [10]** 11/4 14/22 117/17 139/19
162/21 164/15 164/16 164/20 177/3
219/21
**talked [6]** 120/2 192/23 192/23 236/6
241/18 254/24
**talking [6]** 139/16 140/12 142/5
148/1 163/23 180/24
**tape [3]** 222/20 223/1 223/2
**task [2]** 20/7 189/2
**taught [1]** 40/4
**tax [2]** 96/18 103/16
**teach [2]** 39/16 79/16
**teacher [11]** 19/12 19/13 19/14 19/15
40/3 57/10 62/2 73/21 86/17 100/16
118/22
**teaches [1]** 39/20
**technical [1]** 35/20
**Technically [1]** 275/12
**technician [1]** 201/16
**technicians [3]** 201/15 217/7 217/10
**technology [1]** 93/22
**teenagers [1]** 41/12
**telecom [1]** 61/23
**telecommunication [1]** 189/23
**telecommunications [1]** 189/21
**telephone [4]** 164/1 225/25 249/11
249/12
**television [1]** 163/16
**tell [51]** 8/11 41/9 63/23 72/19 74/7
77/9 85/10 85/25 93/8 97/9 101/19
104/6 106/3 107/10 110/20 111/3
111/10 114/23 120/1 129/22 136/19
140/6 162/22 163/6 180/13 181/9
181/10 182/6 185/3 185/6 185/20
201/3 207/13 211/17 215/1 219/5
225/7 228/5 235/5 238/2 242/7
243/19 249/14 259/1 260/7 264/11
270/2 271/13 286/1 286/2 286/3
**telling [8]** 123/11 186/9 219/13 230/3
233/14 244/11 255/10 255/10

**tells [2]** 164/21 185/19
**ten-minute [2]** 203/7 257/3
**ten-year [1]** 9/23
**ten-year-old [1]** 33/8
**tenant [2]** 259/15 265/25
**tender [1]** 272/5
**tennis [2]** 54/18 54/19
**Tens [1]** 190/4
**terms [6]** 131/2 185/11 255/2 273/15
274/15 280/10
**Terry [5]** 16/23 37/6 119/20 140/12
157/10
**test [4]** 192/16 192/17 219/18 219/25
**tested [2]** 219/16 219/23
**testified [4]** 161/17 234/10 234/15
254/2
**testify [10]** 17/24 19/23 113/13
133/18 162/10 162/12 162/13 167/15
186/6 275/2
**testifying [4]** 161/18 186/18 186/19
195/3
**testimony [17]** 15/11 133/22 134/5
135/3 159/19 161/13 161/13 161/15
161/21 161/22 163/13 164/25 165/3
165/11 166/13 219/20 282/5
**testing [2]** 218/20 221/9
**Texas [2]** 127/15 127/16
**text [5]** 164/1 177/18 177/22 189/22
250/2
**texts [1]** 186/12
**thank [142]**
**thanks [4]** 132/20 157/7 157/19
251/7
**theft [6]** 74/9 179/7 261/2 282/2
282/7 285/10
**therapist [1]** 43/22
**thereafter [1]** 173/9 226/10
**thereof [1]** 222/3
**they'd [1]** 8/20
**thin [1]** 21/15
**think [100]**
**thinking [2]** 113/4 129/22
**thinks [2]** 160/21 180/19
**Thirteen [2]** 64/13 74/23
**Thirty [6]** 39/14 46/13 47/15 68/4
73/19 152/20
**Thirty-five [1]** 68/4
**Thirty-two [4]** 46/13 47/15 73/19
152/20
**thoroughfare [1]** 272/12
**thought [3]** 40/6 147/19 178/22
**thousands [3]** 189/10 190/4 190/4
**three o'clock [3]** 30/12 33/10 145/15
**threshold [1]** 191/4
**Throw [1]** 65/13
**thrown [1]** 211/5
**Thursday [6]** 32/6 32/9 32/10 146/8
146/9 146/11
**thus [1]** 89/16
**ticket [5]** 52/20 85/15 112/8 112/8
135/19 135/25 136/6
**tickets [2]** 27/1 31/12
**tie [3]** 5/18 197/4 263/4
**tied [2]** 217/24 220/22

**T**

**till [3]** 15/17 28/7 29/15
**time [102]**
**times [15]** 28/22 61/7 66/15 110/11
117/25 118/2 125/17 129/20 190/11
192/9 215/7 259/14 273/19 274/13
274/15
**tip [1]** 131/20
**tired [4]** 27/17 33/2 141/21 144/10
**tires [3]** 176/14 199/24 239/19
**title [2]** 258/24 289/19
**titled [1]** 268/3
**tonight [1]** 31/2
**tools [4]** 173/21 173/22 178/6 178/8
**top [6]** 9/25 210/18 222/25 243/20
262/2 269/19
**topical [1]** 248/9
**total [11]** 34/18 150/13 150/14
237/10 264/14 264/18 264/19 264/20
267/24 274/13 274/20
**totally [1]** 179/6
**touched [2]** 130/6 177/1
**touching [1]** 13/15
**tough [2]** 113/14 113/18
**tour [1]** 279/20
**tow [44]** 171/15 171/15 171/18
171/19 171/20 171/21 171/23 171/23
171/24 172/2 172/4 172/4 172/5
172/6 198/10 198/12 198/13 198/15
198/15 198/17 198/20 198/22 198/25
199/2 199/5 199/6 199/7 199/8
199/10 199/11 199/12 199/23 235/6
235/14 237/15 237/17 237/19 237/20
237/22 238/19 238/21 238/23 251/15
254/17
**towards [3]** 11/10 210/21 213/22
**towed [2]** 221/11 248/25
**town [5]** 27/1 27/3 27/6 143/20
143/22
**traffic [8]** 3/20 52/20 112/8 135/19
135/25 172/3 227/5 251/16
**trafficking [3]** 85/22 189/1 189/18
**tragedies [1]** 118/14
**training [2]** 188/25 191/11
**transcript [3]** 1/13 1/24 289/20
**transferred [1]** 40/5
**transmit [1]** 250/2
**transported [1]** 191/23
**travel [1]** 87/17
**travelling [4]** 58/16 73/12 96/6 103/4
**treated [2]** 112/6 112/9 112/10
**trees [1]** 241/13
**trial [58]**
**trial's [1]** 166/14
**trials [3]** 21/23 36/25 111/19
**Tribuiani [75]**
**Tribuiani's [1]** 142/7
**trick [1]** 115/9
**trip [1]** 11/23
**trouble [2]** 31/4 41/16
**truck [49]** 171/15 171/15 171/15
171/19 171/19 171/20 171/21 171/23
171/23 171/24 172/2 172/4 172/4
172/5 172/6 196/2 198/10 198/13

198/13 198/15 198/15 198/17 198/20
198/22 198/25 199/3 199/5 199/6
199/7 199/8 199/10 199/11 199/12
199/23 226/22 226/23 227/2 227/6
235/6 235/14 237/15 237/17 237/19
237/20 237/23 238/19 238/22 238/23
254/17
**trucking [1]** 59/14
**true [6]** 142/10 142/24 158/24 160/14
235/24 289/19
**truly [1]** 158/24
**trust [1]** 165/22
**truth [1]** 186/9
**truthfully [2]** 13/15 277/6
**turning [5]** 263/9 264/10 266/15
266/23 277/18
**TV [2]** 182/21 182/21
**Twenty [10]** 9/12 43/15 50/6 60/14
69/2 81/2 83/6 109/6 150/1 150/10
**Twenty years [1]** 9/12
**Twenty-five [1]** 69/2
**Twenty-four [2]** 50/6 81/2
**Twenty-one [2]** 83/6 109/6
**Twenty-two [4]** 43/15 60/14 150/1
150/10
**twice [1]** 88/3 98/1
**twins [2]** 71/8 71/10
**Twitter [1]** 164/3
**two o'clock [3]** 30/20 142/23 143/13
**two-week [1]** 14/1
**typical [1]** 190/23
**typically [1]** 8/4

**U**

**U-turn [3]** 198/9 198/10 205/5
**U.S [1]** 2/3
**U.S. [3]** 96/24 251/12 275/17
**U.S. attorney [1]** 275/17
**U.S. marshals [1]** 251/12
**U.S. military [1]** 96/24
**uhm [33]** 30/8 35/21 38/16 40/23
40/24 49/21 50/19 50/21 51/9 52/8
59/13 60/7 74/8 74/9 88/7 88/24
100/24 101/6 101/10 118/22 237/3
245/23 249/7 254/6 259/3 264/1
264/16 266/18 267/8 272/21 272/25
273/19 278/18
**ultimately [6]** 127/11 137/11 183/5
227/7 241/2 248/16
**um [7]** 6/16 67/23 134/18 180/22
273/1 273/8 274/1
**um-hum [7]** 6/16 67/23 134/18
180/22 273/1 273/8 274/1
**umbrellas [1]** 159/24
**umpire [1]** 110/10
**unbelievable [1]** 112/21
**unbiased [1]** 118/9
**uncle [1]** 91/8
**uncles [2]** 72/22 80/14
**undercover [2]** 189/11 189/14
**underlying [1]** 201/25
**underneath [11]** 122/4 211/6 211/6
214/5 214/11 215/16 215/16 215/20
215/21 215/22 247/12

**understand [31]** 19/5 22/24 33/18
33/22 34/2 110/8 111/11 112/1
114/18 114/22 115/4 115/7 115/18
116/21 121/5 121/8 121/12 130/7
130/8 132/10 135/5 137/1 137/7
137/15 164/13 165/22 166/16 180/17
182/20 203/22 215/17
**understanding [1]** 138/3
**Understood [3]** 149/4 193/23 194/1
**undivided [1]** 26/22
**unduly [1]** 286/16
**unfortunately [6]** 58/8 80/5 175/13
176/24 177/6 177/13
**Union [1]** 89/21
**Union/Wachovia [1]** 89/21
**unit [4]** 172/18 190/23 191/1 268/4
**UNITED [24]** 1/1 1/6 1/15 2/9 4/4 4/9
13/20 14/7 14/8 17/2 17/2 21/2 23/21
94/9 116/22 123/20 123/21 128/3
128/4 133/20 185/23 188/6 258/10
289/19
**units [1]** 256/5
**university [2]** 52/9 79/14
**unjustly [1]** 136/11
**unknown [1]** 24/9
**unless [8]** 129/22 131/10 142/16
155/9 156/8 160/18 183/16 231/14
**unlike [1]** 182/21
**unlimited [1]** 23/13
**unobstructed [1]** 198/4
**unrelated [4]** 170/23 179/6 179/10
195/9
**unring [1]** 286/14
**unrung [3]** 179/21 180/23 194/5
**untimely [1]** 193/18
**up-close [1]** 223/20
**uploaded [2]** 201/6 201/7
**upset [2]** 112/9 112/25
**us [48]** 16/22 17/25 20/22 21/25 22/6
59/2 102/12 123/11 129/21 129/22
132/5 141/12 148/9 148/16 148/19
149/7 149/13 149/17 149/21 150/11
150/20 150/25 151/7 151/13 151/18
152/2 152/15 153/9 153/11 153/16
153/24 155/18 169/3 194/24 205/19
219/5 219/13 222/16 229/20 230/3
233/14 243/24 244/11 253/15 255/10
255/10 259/1 273/16
**user [5]** 190/21 191/2 191/21 191/24
192/2
**usual [1]** 21/4
**utilize [1]** 192/2
**utilized [1]** 173/21
**utterance [1]** 193/4

**V**

**vacancies [1]** 21/14
**vacation [1]** 31/6
**vacuum [1]** 285/18
**valuable [1]** 132/1
**value [7]** 9/25 175/21 176/18 176/25
177/2 190/17 190/19
**vandalized [2]** 41/13 97/10
**Vanmali [1]** 20/11

**V**

**vantage [2]** 254/5 255/5
**variables [1]** 190/22
**vehicle [82]**
**vehicles [2]** 205/12 244/22
**verdict [29]** 26/16 26/23 38/12 40/16
49/9 70/2 75/15 88/25 89/2 89/3
92/21 105/21 115/2 115/3 115/11
115/13 116/18 121/4 137/12 137/18
158/24 159/15 161/12 164/18 167/2
182/24 184/5 188/2 188/3
**verdicts [3]** 88/23 111/24 111/24
**verification [3]** 265/20 266/23 267/5
**verifications [1]** 274/11
**verify [5]** 265/21 266/3 266/25 267/1
280/13
**Vero [1]** 21/11
**via [2]** 205/4 244/5
**vice [3]** 55/19 61/22 93/21
**victim [55]** 38/25 41/7 43/2 44/12
45/23 47/2 49/18 50/20 52/21 53/22
55/9 56/16 58/2 58/11 60/1 61/5
62/14 63/25 65/4 66/17 67/16 68/16
70/10 71/19 73/7 74/10 76/1 77/11
78/14 80/4 81/21 82/19 84/2 85/23
87/12 89/17 89/18 89/22 91/13 93/4
94/19 96/1 97/7 98/23 99/21 101/3
101/9 101/13 102/23 104/8 106/9
107/13 108/19 109/25 119/4
**victimized [2]** 113/1 113/2
**victims [1]** 112/23
**video [62]**
**video/audio [2]** 201/17 202/9
**videos [1]** 201/7
**view [16]** 163/9 163/13 165/5 165/17
171/5 195/15 196/8 198/4 200/3
200/16 213/14 235/9 235/10 239/8
244/10 255/5
**viewed [2]** 202/3 207/19
**vigorously [1]** 182/15
**Village [1]** 58/20
**violates [2]** 282/3 282/4
**violation [1]** 261/10
**violations [1]** 123/23
**violence [2]** 86/5 89/25
**Virginia [1]** 52/9
**virtually [1]** 139/8
**visit [2]** 163/9 164/24
**visited [2]** 187/17 283/5
**visiting [3]** 175/12 185/19 187/22
**visualizing [2]** 202/6 209/10
**Vitacost [1]** 38/3
**vitamins [1]** 38/2
**voice [1]** 16/21
**voir [16]** 4/22 22/14 22/15 22/20
183/25 200/23 201/1 208/1 208/3
212/10 212/12 215/13 288/9 288/10
288/11 288/12
**voir dire [5]** 4/22 22/14 22/15 22/20
183/25
**volume [2]** 1/17 249/20
**voluntarily [2]** 185/2 185/4
**volunteer [1]** 82/1
**vote [2]** 116/15 116/18

**voter [2]** 14/10 14/11
**voters [2]** 19/19 21/4
**VP [1]** 83/8

**W**

**W-I-L-B-E-R-T [1]** 281/21
**Wachovia [1]** 89/21
**wait [3]** 137/25 140/5 193/20
**waiting [4]** 7/21 11/9 21/13 167/15
**waive [5]** 156/23 170/4 180/16
204/11 258/5
**Walgreens [1]** 93/9
**walk [2]** 129/7 139/12
**walked [3]** 139/17 242/19 242/21
**walking [4]** 51/5 51/6 80/19 108/24
129/10 159/23
**wall [6]** 12/5 12/8 12/16 12/21 13/4
13/7
**Walter [3]** 20/10 39/24 40/7
**warrant [26]** 173/3 173/10 175/3
175/4 208/14 208/23 221/12 221/13
221/15 222/21 223/3 225/24 226/6
226/8 233/16 233/19 233/21 236/8
241/3 249/10 250/21 250/23 250/25
250/25 251/4 251/5
**warrants [4]** 173/6 224/20 228/15
228/17
**watch [2]** 163/14 197/10
**watched [10]** 170/24 171/1 171/2
171/11 171/11 171/12 195/23 198/5
239/19 240/8
**watching [5]** 170/21 195/16 195/19
195/21 204/24
**we'd [4]** 143/24 146/24 150/8 151/11
**weapon [1]** 89/16
**weapons [1]** 85/21
**wear [1]** 194/13
**wearing [5]** 187/7 197/3 233/1 233/3
263/3
**websites [2]** 164/2 164/8
**Wednesday [3]** 27/4 27/6 143/5
**week [22]** 13/24 13/24 13/25 14/1
15/5 15/5 21/17 21/20 21/20 21/21
27/1 27/2 28/5 28/11 28/20 32/22
36/24 37/2 37/2 80/15 157/8 157/9
**weekend [2]** 28/22 28/23
**weigh [1]** 136/14
**weight [7]** 130/25 133/22 160/4
162/12 166/12 202/21 209/21
**welcome [3]** 13/20 133/8 167/9
**Wendy [1]** 20/5
**west [2]** 2/4 21/11 34/21 174/1
210/22 215/23 259/10 283/1
**westbound [1]** 205/1
**Weston [6]** 36/18 61/17 64/10 65/16
96/9 146/17
**wet [2]** 159/23 159/24
**whatsoever [2]** 160/17 164/5
**Whenever [1]** 161/2
**where's [1]** 19/7
**whereabouts [51]** 36/5 36/16 37/8
39/10 41/24 43/11 44/21 46/9 47/11
50/2 51/13 53/5 54/5 55/16 57/3
58/19 60/10 61/16 62/25 64/9 65/15

66/25 67/24 68/23 70/21 72/2 73/15
74/19 76/9 77/18 79/3 80/23 82/4
83/2 84/12 86/11 87/20 90/6 91/21
93/15 95/2 96/8 97/18 99/6 100/5
101/25 103/10 104/15 106/19 107/22
109/2
**wherever [1]** 169/5
**white [4]** 224/2 228/9 228/9 233/1
**who's [5]** 4/22 140/3 193/1 230/11
249/19
**widowed [1]** 37/16
**wife [2]** 98/5 98/7
**Wilbert [30]** 19/25 174/15 174/22
174/24 175/18 261/2 262/16 262/17
263/23 264/1 264/2 264/25 266/18
266/19 267/17 268/5 268/8 270/14
270/16 270/18 270/20 271/14 271/21
271/22 273/21 281/1 281/11 281/14
281/18 288/18
**willfully [3]** 24/8 184/11 185/3
**William [1]** 1/14
**Williams [1]** 20/12
**Williamson [2]** 231/20 233/2
**willingly [1]** 184/13
**window [2]** 101/7 223/1
**wins [1]** 114/8
**wiretap [4]** 189/1 189/17 189/20
189/21
**wise [1]** 15/24
**wish [2]** 83/16 165/25
**wishes [2]** 132/16 166/22
**withdraw [1]** 256/23
**withdrawn [1]** 246/10
**witness [62]**
**witness's [6]** 161/18 161/18 161/19
161/21 161/22 186/17
**witnessed [38]** 39/2 41/17 44/15
46/1 47/5 49/22 51/3 52/23 58/13
60/4 61/8 62/20 64/2 65/6 66/19
70/13 73/9 74/12 76/3 77/13 80/16
84/4 84/6 86/3 89/23 91/16 94/21
97/12 98/25 101/6 101/16 103/1
104/10 106/11 107/15 113/12 202/4
202/15
**witnesses [17]** 17/23 17/25 19/23
21/7 113/13 131/11 132/15 133/18
134/2 161/25 164/12 166/1 166/5
166/20 166/23 167/14 288/6
**witnesses's [1]** 160/12
**woman [1]** 174/9
**wondering [1]** 246/15
**Wood [1]** 88/5
**word [1]** 182/19
**words [15]** 33/25 131/3 132/12
165/13 184/7 184/8 184/10 184/15
184/19 184/21 184/25 185/11 185/19
186/16 190/7
**work [96]**
**worked [8]** 37/19 63/13 89/20 105/4
144/10 178/4 189/6 272/22
**workers [1]** 57/23
**workforce [1]** 72/11
**working [12]** 16/1 32/21 32/24 40/10
48/11 88/11 88/13 204/17 259/7

**W**

**working... [3]**  272/15 272/19 272/25
**works [9]**  23/5 38/2 40/20 41/3 88/14
 103/16 105/10 142/8 144/4
**world [1]**  182/23
**worn [1]**  187/11
**worry [2]**  33/17 33/24
**worse [1]**  282/15
**worth [1]**  131/2
**WPD [1]**  1/4
**wrapped [2]**  146/3 176/9
**wrecking [1]**  227/7
**wrecks [1]**  227/7
**write [1]**  111/14
**Writing [1]**  67/21
**written [1]**  262/1
**wrong [3]**  119/7 120/25 242/25
**wrongfully [1]**  122/8
**wrongs [1]**  178/20

**Y**

**yard [5]**  226/22 226/23 227/3 227/6
 251/15
**Yellow [1]**  34/18
**York [3]**  31/1 72/9 72/25
**you'd [6]**  31/9 32/1 35/25 136/6
 136/8 138/13
**youngest [1]**  102/25
**youth [1]**  80/9

**Z**

**Zorovich [5]**  62/25 148/9 154/8
 157/15 158/9